IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 3:23-cv-455-S |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT
WILLIAM FRANCIS'S MOTION TO STAY, OR ALTERNATIVELY, EXPEDITED
MOTION FOR ENTRY OF PROTECTIVE ORDER AND BRIEF IN SUPPORT**

Respectfully submitted,

By: _/s/ Charlene C. Koonce_____
    Cortney C. Thomas
      Texas Bar No. 24075153
      cort@brownfoxlaw.com
    Charlene C. Koonce
      Texas Bar No. 11672850
      charlene@brownfoxlaw.com
    Andrew C. Debter
      Texas Bar No. 24133954
      andrew@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

    *Attorneys for Defendant William Francis*

| Exhibit No. | Description | App No. |
|:---:|:---|:---:|
| A | Declaration of Charlene C. Koonce | APP001-008 |
| A-1 | Plaintiff Phoenix Capital Group Holdings, LLC's State Court Case Original Petition | APP009-030 |
| A-2 | Order Dated November 9, 2022 | APP031-032 |
| A-3 | Email from Phoenix counsel dated December 6, 2022 | APP033-035 |
| A-4 | Fifth Court of Appeals Memorandum Opinion filed August 29, 2023 | APP036-058 |
| A-5 | Email from Phoenix counsel dated June 2, 2023 | APP059-060 |
| A-6 | Plaintiff Phoenix Capital Group Holdings, LLC's Original Petition in North Dakota Federal Case | APP061-075 |
| A-7 | Docket for Civil Action No. 2023CH000113, in the 12th Judicial Circuit Court, Illinois | APP076-078 |
| A-8 | Godaddy.com, LLC's response to the subpoena issued in the Illinois Discovery Proceeding | APP079-083 |
| A-9 | Subpoena issued by Ferrari to Findit on November 8, 2023 | APP084-086 |
| A-10 | First Requests for Production served by Ferrari on November 8, 2023 | APP087-106 |
| A-11 | First Requests for Admission served by Ferrari on November 8, 2023 | APP107-131 |
| A-12 | First Set of Interrogatories served by Ferrari on November 8, 2023 | APP132-141 |
| A-13 | Second Requests for Admission served by Ferrari on November 11, 2023 | APP142-156 |
| A-14 | Second Requests for Production served by Ferrari on November 20, 2023 | APP157-174 |
| A-15 | Chart Comparing Allegations | APP175-177 |

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

*/s/ Charlene C. Koonce*
Charlene C. Koonce

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ADAM FERRARI,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **NO. 3:23-cv-455-S** |
| | § | |
| **WILLIAM FRANCIS,** | § | |
| | § | |
| **Defendant.** | § | |

**DECLARATION OF CHARLENE C. KOONCE IN SUPPORT OF
FRANCIS'S MOTION TO STAY AND FOR ENTRY OF PROTECTIVE ORDER**

1.     My name is Charlene C. Koonce.  I have personal knowledge of the matters set forth in this Declaration, I am of sound mind, and I am otherwise competent to testify to these matters.

2.     I have been licensed to practice law in Texas since 1991 and am admitted to practice before all state and federal courts in Texas as well as the Fifth and Eleventh Circuit Courts of Appeal. I am a partner with Brown Fox PLLC, and one of the attorneys who represent William Francis in this lawsuit.

**A.     Phoenix's Texas State Court Case**

3.     In addition to this lawsuit, I also represent Francis and Incline Energy Partners, LP in a related lawsuit pending in state court, *Phoenix Capital Group Holdings, LLC v. Francis*, Cause No. DC 22-06350 in the 116th Judicial District Court for Dallas County, and Appeal No. 05-22-01260-CV, in the Fifth District Court of Appeals (the "State Case").  A true and correct copy of Phoenix Capital Group Holdings, LLC's ("Phoenix") Original Petition, which was filed in the State Court Case on June 15, 2022, is attached as **Exhibit A-1**.

- 1 -

4.      In the State Court Case, Incline initially sought agreement from Phoenix to proceed with discovery before the stay imposed by Incline's TCPA motion was triggered. Phoenix, however, opposed discovery.

5.      In reliance on Phoenix's initial representation that it did not oppose amending the Scheduling Order, which it rescinded once it realized the amendment was requested to permit early discovery, Francis and Incline had served third-party subpoenas.  Phoenix moved to quash those subpoenas.

6.      In the State Court Case, pursuant to the TCPA, which requires that a motion dependent on the statute be filed within 60 days of the date on which the Defendant was served, Incline moved to dismiss Phoenix's claims. Although Phoenix's Petition includes other purportedly defamatory but time-barred statements, during arguments on Incline's motion to dismiss (and as reflected in appellate briefing and the transcript from the hearing), Phoenix conceded its claims rested on only on two statements: an email to the Krystal Family (the "Taylor email") and a communication to First International Bank and Trust (the "FIBT communication").

7.      Following extensive briefing and two lengthy hearings, the trial court granted Incline's motion to dismiss in part and dismissed Phoenix's (a) tortious interference with existing contract claim, and (b) business disparagement and defamation claims, to the extent those claims relied on any statement *other than* the Taylor email[1] (i.e., communications with First International Bank & Trust,[2] ("FIBIT") and other time-barred communications alleged in the Petition). The trial court denied the motion with respect to Phoenix's claims for tortious interference with prospective contract, disparagement, and defamation relying on the Taylor email, and conspiracy and unfair

---

[1] The email attached to Ferrari's Amended Petition as Exhibit G. Dkt. 7-7. It was also attached to the Original Petition as an Exhibit and was defined in the State Case as the "Taylor email."

[2] *See* Amended Complaint ¶ 25.

competition. A true and correct copy of the Order dated November 9, 2022, is attached as **Exhibit A-2**.

8.      Immediately after the trial court ruled on the motion to dismiss, Phoenix served subpoenas on several third parties, including GoDaddy, Google, Joe Moylan, and Greeley Publishing.  Before responses were due, however, discovery was again stayed when Incline appealed the partial denial of its motion to dismiss. At Incline's request, Phoenix confirmed it had withdrawn its subpoenas. A true and correct copy of the email from Phoenix's counsel dated December 6, 2022, regarding withdrawal of those subpoenas, is attached as **Exhibit A-3**.

9.      Following extensive briefing and oral arguments, the appellate court entered a judgment reversing denial of Incline's motion to dismiss, finding the trial court erred in failing to dismiss all claims, except for defamation per se, which was remanded for the trials court's consideration of an applicable affirmative defense. A true and correct copy of the Memorandum Opinion filed August 29, 2023, in Cause No. 05-22-01260-CV, *William Francis and Incline Energy Partners, L.P. v. Phoenix Capital Group Holdings, LLC,* in the Court of Appeals for the Fifth District of Texas at Dallas, is attached as **Exhibit A-4**.

**B.      Ferrari Filed this Case in Anticipation of Phoenix Losing its Appeal**

10.      This case was filed on the same day Phoenix filed its appellee's brief in the State Court Case.

11.      In this case, on May 31, 2023, Ferrari issued four subpoenas to various third parties: First International Bank & Trust, ANB Bank, Dalmore Group, and GoDaddy (the "Subpoenas").

12.      Before Francis moved for a protective order regarding those subpoenas, but after he had conferred about that motion, on June 2, 2023, this Court conducted a Scheduling Conference.  During the Conference the Court discussed the relatedness between this case and the

APP004

State Court Case and stated the Court's intention to delay ruling on the motion to dismiss at least until the Court of Appeals ruled on the then-pending appeal.  The Court also stated that discovery was stayed while the motion to dismiss was pending, and that accordingly, Ferrari should withdraw his pending subpoenas so that Incline did not need to move for its protective order.

13.     Immediately after the Scheduling Conference, Ferrari's counsel confirmed it had or would withdraw the Subpoenas. A true and correct copy of the email from Ferrari's counsel dated June 2, 2023, is attached as **Exhibit A-5**.

**C.     Phoenix Filed Suit in North Dakota to Circumvent the Discovery Stay in Both Texas Cases and Race to Res Judicata**

14.     On October 20, 2023, a mere nine days after Phoenix's petition for rehearing filed in the appellate court in the State Court Case, Phoenix filed suit in North Dakota.  I also represent Incline Energy Partners, LP in the North Dakota Case, filed in the United States District Court for the District of North Dakota, *Phoenix Capital Group Holdings, LLC v. Incline Energy Partners, L.P.*, C.A. No. 1:23-cv-00209 (the "North Dakota Lawsuit").

15.     The North Dakota Lawsuit is premised on the exact same FIBT communication as well as Incline's alleged communications with mineral owners regarding Ferrari's felony status and his role with Phoenix pleaded in this case [Dkt. 7, ¶ 25] and the State Court Case.  A true and correct copy of Phoenix's Original Complaint filed in the North Dakota Case, is attached as **Exhibit A-6**.

16.     Phoenix's counsel in the North Dakota case is now lead counsel in this matter as well.

17.     One day after Incline conferred with Phoenix regarding its motion to dismiss the North Dakota case based on *Colorado River* abstention and discussed res judicata that will arise when the State Court Case judgment becomes final, Phoenix's counsel in the State Court Case

conferred regarding a request for a ***two-month*** extension in which to file its petition for review to the Texas Supreme Court. On November 20, 2023, Phoenix filed the motion for extension to file its petition for review to the Texas Supreme Court, seeking 46 additional days.

**D.    Phoenix and Ferrari Sought (and Received) Documents in Violation of the Discovery Stay**

18.    Unbeknownst to Incline and Franics, and in direct violation of the discovery stay in this case as well as the State Case, on June 20, 2023, five days after the Court issued the Scheduling Order in this case which included the stay of discovery, Phoenix—through the same lawyers that are now Ferrari's lead counsel here—filed a fourth—discovery only—lawsuit in an Illinois State Court, from which it commenced to issue documents subpoenas (the "Illinois Discovery Proceeding").  Phoenix voluntarily dismissed the Illinois Discovery Proceeding on November 14, 2023—six days after the discovery stay lifted in this case. A true and correct copy of the docket in Civil Action No. 2023CH000113, in the 12th Judicial Circuit Court, Illinois is attached as **Exhibit A-7**. (Francis's requests to the Illinois court clerk for additional documents and a more complete version of the docket is pending).

19.    The Illinois Discovery Proceeding was filed against ANB Bank, Dalmore Group, LLC, Domains by Proxy, LLC, GoDaddy.com, LLC, Google, LLC, and Reddit Inc. as "respondents in discovery" rather than defendants.  A true and correct copy of Godaddy.com, LLC's response to the subpoena issued in the Illinois Discovery Proceeding is attached as **Exhibit A-8.**

20.    Francis's counsel learned about the Illinois Discovery Proceeding on November 20, 2023, when it requested copies of documents produced in response to subpoenas from Ferrari's counsel.  Francis received no notice of the proceeding when it was filed and had no opportunity to object to the discovery requested in that proceeding.

21.     The day the discovery stay in this case was lifted, on November 8, 2023, Ferrari issued a new third-party subpoena to FindIt, Inc.  The subpoena to Findit seeks documents and communications related to two websites (a) lawsuitsoilandgas.com and (b) adamferrarioilandgaslawsuits.com, as well as any documents related to payments that relate to those websites. A true and correct copy of the Findit Subpoena issued by Ferrari on November 8, 2023, to FindIt, Inc. is attached as **Exhibit A-9**.

22.     On November 8, 2023, Ferrari also served discovery requests including requests for production, requests for admissions, and interrogatories. Each of these discovery requests seek documents or information for a time period from "January 1, 2016 to Present."  A true and correct copy of the First Requests for Production served by Ferrari on November 8, 2023, are attached as **Exhibit A-10**. A true and correct copy of the First Requests for Admission served by Ferrari on November 8, 2023, are attached as **Exhibit A-11**. A true and correct copy of the Interrogatories served by Ferrari on November 8, 2023, are attached as **Exhibit A-12**.

23.     On November 11, 2023, Ferrari served a second set of Requests for Admission. A true and correct copy of the Second Requests for Admission served by Ferrari on November 11, 2023, are attached as **Exhibit A-13**. On November 20, 2023, Ferrari served a second set of Requests for Production. A true and correct copy of the Second Requests for Production served by Ferrari on November 20, 2023, are attached as **Exhibit A-14**. Each of these discovery requests also seek documents or information for a time period from "January 1, 2016 to Present."

24.     A chart comparing the allegations in this case, the State Court Case, and a case Phoenix just filed in North Dakota as described below is attached as **Exhibit A-15**.

25.     I declare under penalty of perjury that the foregoing is true and correct.

November 21, 2023


                                          */s/ Charlene C. Koonce*                     
                                          CHARLENE C. KOONCE

APP008

# EXHIBIT A-1

FORM NO. 353-3 - CITATION
THE STATE OF TEXAS

ESERVE

CITATION

DC-22-06350

To:     WILLIAM FRANCIS
        15800 SPECTRUM DRIVE, APT. #1432
        ADDISON, TEXAS

PHOENIX CAPITAL GROUP
HOLDINGS, LLC
vs.
WILLIAM FRANCIS, et al

ISSUED THIS
17th day of June, 2022

GREETINGS:
    You have been sued.  You may employ an attorney.  If you or your attorney do not file a written answer with  the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty days after you were served this citation and  petition, a  default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk.  Find out more at TexasLawHelp.org.   Your answer should be addressed to the clerk of the 116th District Court at 600 Commerce Street, Ste. 101, Dallas, Texas 75202.

Said Plaintiff being PHOENIX CAPITAL GROUP HOLDINGS, LLC

Filed in said Court  15th day of June, 2022 against

WILLIAM FRANCIS AND INCLINE ENERGY PARTNERS L.P.

For Suit, said suit being numbered DC-22-06350, the nature of which demand is as follows:
Suit on DEFAMATION etc. as shown on said petition, a copy of which accompanies this citation.
If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office this 17th day of June, 2022.

ATTEST: FELICIA PITRE, Clerk of the District Courts of Dallas, County, Texas

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By: ANGELA CONEJO, Deputy

By          , Deputy     Sktti5'+'
    ANGELA CONEJ          s.kt*

Attorney for Plaintiff
JAMES CREWSE
CREWSE LAW FIRM, PLLC
5546 GOODWIN AVE,
DALLAS, TEXAS  75206
214-394-2856
Jcrewse.Acrewselawfirm.com

OALLAS COUNTY
;SERVICE FEES
NOT PAID

## OFFICER'S RETURN

Case No. : DC-22-06350

Court No. 116th District Court

Style: PHOENIX CAPITAL GROUP HOLDINGS, LLC

vs.

WILLIAM FRANCIS, et al

Came to hand on the      day of      , 20      . at      o'clock      .M. Executed at

within the County of      at      o'clock      .M. on the      day of

20      , by delivering to the within named

each in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of delivery. The distance actually traveled by

me in serving such process was      miles and my tees are as follows:   To certify which witness my hand.

For serving Citation

For mileage      of      County,

For Notary      By      Deputy

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said      before me this      day of      , 20

to certify which witness my hand and seal of office.

Notary Public

County

FILED
6/15/2022 12:35 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Connie Jones DEPUTY

ESERVE 2                              DC-22-06350

CAUSE NO.

| | |
|---|---|
| PHOENIX CAPITAL GROUP HOLDINGS, LLC, | IN THE DISTRICT COURT |
| Plaintiff, | 116th |
| v. | JUDICIAL DISTRICT |
| WILLIAM FRANCIS and INCLINE ENERGY PARTNERS, L.P., | |
| Defendants. | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff, Phoenix Capital Group Holdings, LLC ("Plaintiff' or "Phoenix"), by counsel, submits the following Original Petition against Defendants, William Francis ("Mr. Francis") and Incline Energy Partners, L.P. ("Incline") (collectively, "Defendants").

### I.
### NATURE OF ACTION

1.       Before this Court comes Phoenix Capital Group Holdings, LLC, a Colorado-based company specializing in the mineral rights industry. For years, Phoenix has suffered a persistent campaign of defamation and tortious interference at the hands of William Francis, the managing partner of Incline, a competitor to Phoenix in the mineral rights industry. Mr. Francis, upset at the direct competition presented by Phoenix's business, set out to harm Phoenix at all costs and with no regard for the truth. Mr. Francis has published false and defamatory statements to land owners, oil companies, and financial institutions, posing significant damage to Phoenix's business and operations. Phoenix cannot let Mr. Francis and Incline's actions continue without redress and, accordingly, must seek this Court's intervention to bring a stop to Defendants' tortious conduct and to penalize them to the fullest extent permissible under law.

## II.
## RULE 47(c) STATEMENT & DISCOVERY LEVEL

2.  Plaintiff seeks monetary relief over $1,000,000.

3.  Plaintiff requests this case be conducted under a Level 2 Discovery Control Plan in accordance with Texas Rules of Civil Procedure 190.3.

## III.
## PARTIES

2.  Plaintiff is a Delaware limited liability company with its headquarters located in Littleton, Colorado.

3.  Defendant William Francis is an individual who resides in Dallas County and may be served with process at his residence located at 15800 Spectrum Drive, Apt 1432, Addison, Texas.

4.  Defendant Incline Energy Partners, L.P. is a Texas limited partnership with its principal place of business in Dallas County, and may be served through its registered agent, Andrew K. Louis, at such agent's designated address on record with the Texas Secretary of State, 5019 N. Central Expwy, Dallas, Texas 75205, or wherever he may be found.

## IV.
## JURISDICTION AND VENUE

5.  This Court has jurisdiction over this action because damages sought are within the jurisdictional limits of this Court.  Venue is proper in this Court pursuant to Texas Civil Practice and Remedies Code § 15.022(1)-(3) as both Defendants reside in and have their principal place of business in Dallas County, and all or a substantial part of the events or omissions giving rise to the claims occurred in Dallas County.

V.
BACKGROUND

Phoenix's Growth

6.      Phoenix was founded in 2019 and is currently led by Lindsey Wilson, Phoenix's Manager and Chief Operating Officer.

7.      Phoenix brought together industry experts with decades of experience in their fields to build an industry leader in mineral rights.  One of those experts with whom Phoenix consulted regularly was Adam Ferrari ("Mr. Ferrari"), an individual with years of experience and expertise in the mineral rights industry.

8.      At the time Phoenix was founded, the industry was dominated by Incline and very few firms were able to compete.

9.      By deploying its proprietary technology and decades of industry experience, Phoenix was able to successfully compete with Incline.

10.     Further, Phoenix was able to outbid Incline directly on acquisitions and often came out on top when competing for the same investment opportunity.

11.     Phoenix's success was met with hostility from Incline, specifically from Mr. Francis, Incline's Managing Partner.

Francis's Campaign Against Phoenix

12.     Incline operates in the oil and gas industry, where it operates and acquires mineral rights, and is a direct competitor to Plaintiff in the mineral rights space.  Mr. Francis is currently a managing partner of Incline.

13.     In response to Phoenix's success, Mr. Francis and Incline set out on an intentional, willful, and malicious campaign against Phoenix with the intention of damaging Phoenix's reputation and ability to compete in the marketplace.

PLAINTIFF'S ORIGINAL PETITION                                                          Page 3

14.     Incline is liable to Phoenix through the theory of respondeat superior and/or ratification of Mr. Francis's tortious conduct.

15.     Mr. Francis focused on Phoenix's work with Mr. Ferrari, an individual with whom Mr. Francis had a long and contentious history.

16.     Mr. Francis and Mr. Ferrari are no strangers to each other, having competed in the mineral rights industry for years.

17.     As a response to Mr. Ferrari's competition, Mr. Francis has always engaged in sharp business practices against Ferrari and his businesses, causing numerous lawsuits to be filed against Mr. Ferrari and those companies over the years.

18.     Mr. Francis often tortiously interfered with Mr. Ferrari's business efforts – sending defamatory packets to Mr. Ferrari's business associates to try and derail Mr. Ferrari's transactions.

19.     For example, on November 27, 2018, Bryan Hymer, an employee of Incline, sent to a landowner a link to an anonymous website disparaging Mr. Ferrari and his company, Ferrari Energy.

20.     With respect to Phoenix, Mr. Francis latched onto the relationship between Phoenix's executives and Mr. Ferrari, an individual with whom Phoenix's executives had previously partnered.

21.     Mr. Francis began emailing and sending anonymous packets to mineral rights sellers and industry executives, claiming that Mr. Ferrari was Phoenix's Chief Executive Officer and a convicted felon.

22.     Importantly, however, Mr. Ferrari is not an owner of Phoenix and has never been an owner of Phoenix.

23.    Further, Mr. Ferrari has never held ally management position with Phoenix and has never had authority to bind Phoenix.

24.    Instead, Mr. Ferrari provided consulting services to Phoenix, providing his decades of experience in the industry.

25.    As Phoenix became more successful in acquiring mineral rights and other investments, Mr. Francis became incensed and set out on a campaign to intentionally interfere with and damage Phoenix's business and reputation.

26.    Upon information and belief, Mr. Francis set up a number of websites wherein he published information about various lawsuits filed against Mr. Ferrari and companies with which he was affiliated, including alleging that Mr. Ferrari was a convicted felon, which was and is false.

27.    Further, and upon information and belief, Mr. Francis conspired with others, including at least one reporter at a Colorado newspaper, specifically Joe Moylan of the Greeley Tribune, to publish false statements to third parties and to damage Phoenix's business.

28.    Upon information and belief, Mr. Francis set up anonymous email accounts and sent, or had sent, packets of information to various industry players, including one email on January 7, 2021 to executives from Hess, ExxonMobil, and other leading oil and gas operators, alleging, among other things, that Phoenix was violating SEC laws and was owned, financed, and managed by a convicted felon.  A true and correct copy of the January 7, 2021 e-mail is attached as Exhibit A.

29.    Hess and ExxonMobil, of course, are large multinational energy corporations.  As a result of its work in the mineral rights industry, Phoenix regularly conducts business with Hess, ExxonMobil, and others copied on the email.  In fact, Phoenix became aware of the anonymous

PLAINTIFF'S ORIGINAL PETITION                                                                  Page 5

email to ExxonMobil when it was forwarded to one of Phoenix's employees by an ExxonMobil employee with whom Phoenix regularly interfaces.

30.     Importantly, the anonymous January 7, 2021 e-mail forwarded the same link, "lawsuitsoilandgas.com" as the November 27, 2018 e-mail from Bryan Hymer, an Incline employee.

31.     Further, on June 17, 2021, Mr. Francis emailed Ms. Crystal Taylor, an individual with whom Phoenix was in the process of closing a real estate transaction. A true and correct copy of the e-mail thread is attached as Exhibit B.

32.     In the June 17, 2021, email, Mr. Francis stated: "I would love nothing more than to defend my company's track record versus the misdeeds that Phoenix/Ferrari has performed over the years. Namely, the fact that their CEO was arrested and convicted for forging a mineral owners signature in order to defraud her of hundreds of thousands of dollars." (Ex. B, at 1.)

33.     Mr. Ferrari is not and never was Phoenix's CEO, a fact of which Mr. Francis has always been aware.

34.     Further, at the time of Mr. Francis's statement, Mr. Ferrari had not been, and has never been, convicted of any crimes. Mr. Francis was also aware that Mr. Ferrari had never been convicted of any crimes.

35.     In February and March of 2022, Mr. Francis contacted Dalmore Capital, Phoenix's broker-dealer, to disparage Phoenix, to disparage Mr. Ferrari, and try to derail Phoenix's latest capital raise.

36.     In early May of 2022, Phoenix was moving to close on a $50,000,000 loan with its primary bank, First International Bank and Trust ("FIBT"), which closing was derailed, upon information and belief, by Francis's conduct.

37.    On May 11, 2022, Phoenix received a call from FIBT, informing Phoenix that FIBT was backing out of the transaction.

38.    Phoenix later learned that someone had sent FIBT an anonymous packet regarding Mr. Ferrari, which caused FIBT to back out of the transaction.

39.    Upon information and belief, Mr. Francis intentionally interfered with the transaction by defaming Phoenix.

40.    Mr. Francis and Incline have acted with malicious intent and with the sole goal of damaging Phoenix in its reputation, trade, and business.

## VI.
## CONDITIONS PRECEDENT

41.    All paragraphs in this pleading are reasserted and incorporated by reference

42.    Any and all conditions precedent, including as it relates to Plaintiff's filing of this lawsuit, recovery against Defendant, and right to all relief requested herein have occurred, been fulfilled, fully performed, and/or been waived or excused.

## VII.
## CAUSES OF ACTION

COUNT 1:    DEFAMATION, LIBEL, & SLANDER / DEFAMATION, LIBEL & SLANDER PER SE

43.    Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

44.    Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights.  Defendants defamed Plaintiff by intentionally and knowingly publishing falsehoods to third parties.  Defendants knew at the time of the publications that the statements were false and damaging to Plaintiffs business and reputation.

45.    Indeed, Defendants published the defamatory statements with malice and with the intent to harm Plaintiffs business and reputation.  Plaintiff's business and reputation has been harmed by Defendants' defamatory statements.

APP018

COUNT 2:     BUSINESS DISPARAGEMENT

46.     Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

47.     Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights. Defendants published disparaging words about Plaintiff's economic interests, specifically including but not necessarily limited to, the character of Plaintiff's business. The words were false, and Defendants published the words with malice, and without privilege, and the publication caused Plaintiff to suffer damages, specifically including special damages.

COUNT 3:     TORTIOUS INTERFERENCE WITH CONTRACT

48.     Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

49.     Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights. Plaintiff engaged in business with a variety of other companies in the mineral rights industry, as well as with landowners and financial institutions, with whom Plaintiff had one or more valid contracts. Defendants had actual knowledge of the Plaintiff's contracts and Plaintiff's interests therein, or had knowledge of facts and circumstances that would lead a reasonable person to believe there was a contract in which Plaintiff had an interest.

50.     Defendants willfully and intentionally interfered with Plaintiff's contracts and business relations when they published defamatory statements with the intent to harm Plaintiff's business. Defendants' interference proximately caused injury to Plaintiff, and Plaintiff has incurred actual damage or loss.

COUNT 4:     TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT/RELATIONS

51.     Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

52.     Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights. There was a reasonable probability that Plaintiff would have

APP019

entered into one or more business relationships and/or contracts with one or more third persons, but Defendants intentionally interfered with the relationships by engaging in conduct that was independently tortious or unlawful.  Defendants' interference proximately caused injury to Plaintiff, and Plaintiff suffered actual damage or loss.

COUNT 5:    UNFAIR COMPETITION

53.    Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

54.    The foregoing conduct of Defendants constitutes an unfair method of competition. As a consequence of the foregoing, Plaintiff has suffered injury and damages.

COUNT 6:    CIVIL CONSPIRACY

55.    Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

56.    Defendants conspired with others, including a reporter from a Colorado newspaper, to publish false statements regarding Plaintiff.

57.    Defendants conspired with others with the intent to damage Plaintiff's business.

58.    Plaintiff's business was damaged as a result of Defendants' conspiracy.

VIII.
EXEMPLARY DAMAGES

59.    Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

60.    Defendants' conduct complained of herein was intentional, with malice, with conscious indifference to Plaintiff's rights, and with a specific intent to cause serious harm and substantial injury to Plaintiff, and Defendants were consciously indifferent to the harm.  Based on the foregoing, Plaintiff is entitled to and seeks to recover exemplary damages against Defendants in an amount to be determined by the trier of fact.

IX.
PRAYER

WHEREFORE, Phoenix Capital Group Holdings, LLC, by counsel, respectfully requests

that the Court enter judgment in favor of Plaintiff and against Defendants, jointly and severally,

which awards Plaintiff the following:

a.      actual, consequential, compensatory and/or special damages in the amount of
$50,000,000.00;

b.      exemplary damages in the amount of $50,000,000.00 and/or the maximum amount
permitted by law;

c.      all costs of court;

d.      pre-judgment interest at the highest rate permitted by law;

e.      post-judgment interest on all amounts awarded at the highest rate permitted by law;
and

f.      all other and further relief, general and special, and legal and equitable, that Plaintiff
may be entitled to receive, at law or in equity.

DATED: June 15, 2022                Respectfully submitted,

   /s/ James Crewse
JAMES CREWSE
State Bar No. 24045722
icrewse@crewselawfinn.com
CREWSE LAW FIRM, PLLC
5546 Goodwin Ave.
Dallas, TX 75206
Phone: (214) 394-2856
Fax: (253) 252-8776

- and -

VERNON E. INGE, JR. (pro hac vice application
forthcoming)
vinge@wtplaw.com
PATRICK D. HOUSTON (pro hac vice application
forthcoming)
phouston@wtplaw.com
WHITEFORD, TAYLOR & PRESTON LLP
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219

PLAINTIFF'S ORIGINAL PETITION                                    Page 10

APP021

Phone: (804) 977-3301
Fax: (804) 977-3291

***ATTORNEYS FOR PHOENIX CAPITAL
GROUP HOLDINGS, LLC***

# EXHIBIT A

APP023

EXHIBIT A

From: Mchenry, Stacey Ohwen <stacey.mchenry@exxonmobil.com>
Sent: Thursday, January 7, 2021 11:50 AM
To: Curtis Allen <CA@phxcapitalgroup.com>
Subject: FW: Adam Ferrari - CEO of Phoenix Capital Group Holdings, LLC

I opened this thinking it was from you, and was wondering if you have any idea who is sending this out to oil companies?

Thank You,
Stacey McHenry | Sr. Title Analyst- Central
EXXONMOBIL-Land Administration UOG     LW-03-5326
Mail:  22777 Springwoods Village Pkwy- LOC 116 I Spring, TX 77389
Direct:  346.335.0400 I Personal Cell 713.498.2532 I Oildex Log In [secure.oildexdx.com]

From: Concerned Mineral Owner [mailto:concernedbakkenmineralowner@gmaiLcomj
Sent: Thursday, January 7, 2021 11:28 AM
To: ask@hess.com; integritv@hess.com
Subject: Adam Ferrari - CEO of Phoenix Capital Group Holdings, LLC

External Email - Think Before You Click

To Whom It May Concern:

I was extremely disappointed to see, via some backup (Ex1) that Phoenix Capital Group Holdings, LLC ("Phoenix") provided through an auction at Enerp..yNet fenergynet.coml, that Hess Corporation was essentially conducting pro bono due diligence for a mineral acquisition Phoenix was pursuing but had not closed on yet. It appears that Phoenix was utilizing Hess' labor and internal proprietary title databases to check ownership on a mineral owner on or before December 2, 2020, and would hold off on closing their acquisition until Hess blessed and signed off on title via an email on Friday December 4, 2020 at 7:05 AM. After obtaining Hess' due diligence on their mineral acquisition, Phoenix would then electronically file their Mineral and Royalty Deed

APP024

EXHIBIT A

shortly thereafter the same day at 2:56 PM (Ex2). Within 3 business days, on December 9, 2020 this interest would be setup to be auctioned on EnergyNet platform, with final bids due at 2:55 today.

Phoenix did this in a manner in which it appears to exploit the spread of prices that they knew existed between the price they got Ms. Western under agreement for and what buyers on EnergyNet would pay, while seemingly not taking on any pricing or title risk and certainly not informing Ms. Western of their intentions to start the process of having this interest put up for auction prior to even closing on her transaction. One could speculate with the facts at hand, and reviewing their PSA templates, that Phoenix went through this timeline in a manner in which the auction would close and they would have funds from that sales prior to even having tendered Ms. Western the closing price promised in their PSA. I've provided a copy of one of their proposed agreements (Ex3) which provides that Phoenix must take ownership of the asset prior to closing and that they don't have to close until 45 business days after they receive the executed PSA & Mineral Deed. As the mineral deed between Ms. Western and Phoenix was executed and notarized on December 1, 2020, if they negotiated their typical PSA, that would mean that Phoenix wouldn't need to even pay Ms. Western until January 31, 2021.

Hess providing ownership confirmation to its mineral owners in this type of transparent fashion should be applauded within our industry. However, that doesn't appear to be what happened and I think anyone reviewing this email would agree that providing this kind of proprietary data should not extend to mineral brokers who are trying to profit off risk free flipping of mineral owners property. Further more and most disturbing, is the mineral broker being granted preferential treatment is owned, financed and managed by a convicted criminal named Adam Ferrari (Ex4 & Ex5). Mr. Ferrari was arrested in 2019 after he had cut off the signature and notary block of a mineral deed and cut and pasted it onto a backdated mineral deed into his company in order to defraud said mineral owner out of >$250k.

Phoenix obviously doesn't promote the fact that their CEO is in fact Mr. Ferrari for obvious purposes, most importantly being the fact that they're clearly violating SEC laws, which disallows any company to utilize EnergyNet's online marketplace if their owners or management have been convicted of crimes that "(ii) are based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct, issued within ten years;", thus assisting them in their scheme to profit off unsuspecting mineral owners. As such, I'll address several points I feel prove beyond a reasonable doubt that Mr. Ferrari is behind Phoenix:

-Mr. Ferrari has a Phoenix email (Ex6) and is actively being listed in association with the company alongside the rest of their employees contact information on 3rd party websites not associated with Phoenix.
-I've never heard of a company that lists and actively promotes who their COO, CTO & CFO are, but omits who the CEO of the company is.
-First hand accounts from Phoenix's counterparties have specifically stated that their point of contact in working with Phoenix was Mr. Ferrari.
-Phoenix was incorporated in Delaware on 4/16/2019 (Ex7) two months after Ferrari was arrested and almost immediately after he was kicked out of his company by his board of directors shortly thereafter.
-Mr. Ferrari lists his address with the Colorado Secretary of State (Ex8) as being in Playa Vista, CA, which is adjacent to Phoenix offices in a city in which I don't think anyone can name another active mineral and royalty acquisition company.
-Phoenix's "founding member" (Ex9) alongside Mr. Ferrari, as well as Tom Kruk (Ex10), Sean Goodnight (Ex11) and Adam Josephson (Ex12) all worked for Mr. Ferrari prior to being let go alongside Mr. Ferrari in the purge that occurred after his arrest, and are all now gainfully employed at Phoenix under Mr. Ferrari's direction.

I mention all of this, as I don't believe it's widely known in the Bakken/Williston Basin community as to Mr. Ferrari's association with Phoenix or their wider employee base's lack luster track record in conducting themselves in an ethical manner. Also, I feel compelled to bring this particular incident to light so that Phoenix is not being assisted in promulgating the same business tactics that Mr. Ferrari utilized in order to exploit the

EXHIBIT A

mineral ownership community in Weld County Colorado starting in 2017 up until his arrest in 2019 while running Ferrari Energy/Wolfhawk Energy Holdings LLC.

In particular, Phoenix's predecessor entity's standard business practice in Weld County was to get someone under agreement in a manner in which the owner signed a PSA & Mineral Deed at the same time prior to closing. They would then file the mineral deed but hold off on paying or closing on that mineral owner until they had been able to sell the interest or the mineral owner started to complain. This ultimately led to Phoenix's predecessor entity getting sued 9 times within the span of just 9 months to a point that someone would set up a website to document all of these misdeeds flawsuitsoilandgas.com]. Phoenix's predecessor would ultimately not win a single one of these lawsuits. In fact, over the span of just two years between September 2017 and 2019, Phoenix's predecessor would have to file 59 reconveyances (Ex13) to the counterparties they never paid, but had already filed a mineral deed of record in Weld County, with their misconduct and behavior being well documented in the local press (Ex14).

Clearly I don't believe anyone at Hess or the organization in general has done anything wrong here, but were merely attempting to expedite your operations. So, at the very least, I would encourage you and the rest of the operator community in the Bakken to stop providing Phoenix/Ferrari with proprietary information without having first obtained a filed copy of a mineral deed. Further, and I believe more importantly, I would also highly recommend that additional oversight be placed into whether or not Phoenix has actually tendered full payment to their mineral owners they're transacting with prior to formalizing any transfers they might be requesting and certainly before releasing any funds.

Thank you for your time,


Concerned Mineral Owner

3

EXHIBIT B

# Mr

From: Adam Ferrari <AF@phxcapitalgroup.com>
Date: Thursday, June 24, 2021 at 9:18 AM
To: Curtis Allen <CA@phxcapitalgroup.com>, Lindsey Wilson <LW@phxcapitalgroup.com>
Subject: Fw: Krystal family oil holdings

From: William Francis <william@inclinelp.com>
Sent: Thursday, June 17, 2021 2:59 PM
To: Crystal Taylor <cat44771@yahoo.com>; Adam Ferrari <AF@phxcapitalgroup.com>
Subject: Re: Krystal family oil holdings

You citing Phoenix/Ferrari as the other offer/group that is telling you that we low balled you is all the information I need to know. We made your aunt aware of those permits when she had called us and not the other way around.

I would love nothing more than to defend my company's track record versus the misdeeds that Phoenix/Ferrari has peformed over the years. Namely, the fact that their CEO was arrested and convicted for forging a mineral owners signature in order to defraud her of hundreds of thousands of dollars.

https://www.denverpost.com/2019/02/19/denver-ceo-ferrari-oil-gas-weld-fraud-charges/ fdenverpost.com]
https://www.greeleytribune.com/2019/08/08/adam-ferrari-pleads-guilty-to-felony-theft-in-denver-district-court-receives-deferred-sentence/ fgreeleytribune.coml

Here's another link that details Sean Goodnight track record, who you're working with:
https://www.greeleytribune.com/2019/02/24/weld-district-court-records-provide-insights-into-adam-ferraris-business-practices/ fgreeleytribune.coml

1

EXHIBIT  B

Regards,


William Francis
Managing Partner
Incline Energy Partners, LP
(214) 274-3800
https://inclinelp.com/ finclinelp.comi


On Thu, Jun 17, 2021 at 3:59 PM Crystal Taylor <cat44771@yahoo.com> wrote:

Hi again William,

I have spent every spare minute these past days researching, calling, and investigating these mineral oil interests and the oil market in general.

Your claim that Incline has acquired 3 times more business in the Williston Basin area than any other company in the past 3 years doesn't automatically equate to your company never giving low ball offers as you proposed in this last email. That could mean any number of things....you could be marketing more aggressively than your competitors, you could be buying up undervalued mineral deeds from lots of owners who have no idea what they're doing in the selling marketplace like the case with my aunt, etc. That's great that your business is growing so rapidly but your argument here about never giving low ball offers doesn't hold weight. I don't think negatively of you as a person, I'm just doing what is fair and right in this case based on personal as well as professional opinions and appraisals.

In reference to the professional opinions we've received since my brother and I stepped in, they are all from reputable and highly experienced mineral oil brokers who know the market well. The first opinion/appraisal was from Brian Wolf Oil and Gas Properties, who has been in business since 1992 and has brokered over $1 billion in mineral oil transactions. The other professional opinions/appraisals have been from US Mineral Exchange, who have been in business for a decade, Vintage Oil and Gas, and Community Minerals, which has over 50 years in this business.

They have all agreed that this was a low ball offer and I'll explain why. As I'm sure you are aware, 10-12 new drilling permits have been issued on and around the land in this particular contract with Incline (4.8 net mineral acres in 147N-96W sections 23 & 26). That greatly increases the value of these oil interests and these permits were issued before May 19th.

We do very much appreciate your offer to make things right by honoring any other official offers during that time period. Sheila has been searching through her emails for other offers on this exact piece of land and she's getting confused again by all the numbers and details of dozens of mineral oil properties we own in several different states. She thinks she began putting our various properties up for sale in March or April of this year so there would be nothing before that time. But I do have an official offer in my inbox that she emailed to me back in May for the same exact property. They have the 4.8 net mineral acres divided up into sections 23 and 26, with an offer of $27,615.56 for 23 and $55,231.14 for 26. So the total offer for the same 4.8 net mineral acres was $82,846.70. They also wanted to buy other holdings we have in Dunn County, which is included in their offer but it's all separated out into distinct holdings and offers as you will see in the documents. She was in contact with them before May 19th but did not receive the official documentation until May 24th and then they sent finalized documents on May 31st and June 1st. My research and conversations with professionals in this field show that the price of oil fluctuated very little between May 19th and June 1st and absolutely does not account for the difference in offers....Incline at $45,000 and Phoenix at $82,846.70 for the same exact mineral oil holdings.

I will forward you Phoenix's official offer in a separate email.

Thank you for your consideration,
Crystal

2

EXHIBIT B

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

James Crewse on behalf of James Crewse
Bar No. 24045722
jcrewse@crewselawfirm.com
Envelope ID: 65465651
Status as of 6/17/2022 7:19 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| James Crewse | | jcrewse@crewselawfirm.com | 6/15/2022 12:35:44 PM | SENT |

Associated Case Party: Phoenix Capital Group Holdings, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| James Crewse | | jcrewse@crewselawfirm.com | 6/15/2022 12:35:44 PM | SENT |
| Vernon E.Inge | | vinge@wtplaw.com | 6/15/2022 12:35:44 PM | SENT |
| Patrick D.Houston | | phouston@wtplaw.com | 6/15/2022 12:35:44 PM | SENT |

# EXHIBIT A-2

APP031

CAUSE NO. DC-22-06350

| | | |
|---|---|---|
| PHOENIX CAPITAL GROUP HOLDINGS, LLC, | § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| WILLIAM FRANCIS and INCLINE ENERGY PARTNERS, L.P., | § § § | |
| *Defendants.* | § § | 116TH JUDICIAL DISTRICT |

Partially Granting and Partially
## ORDER DENYING DEFENDANTS' TCPA MOTION TO DISMISS

On this day came on to be heard and considered Defendants' TCPA Motion to Dismiss

("**Motion**"). After considering the Motion, Plaintiff's Response, and any and all replies and

in part, and GRANTED in part
arguments of counsel, the court finds the Motion should be DENIED.  It is, therefore,

**ORDERED, ADJUDGED and DECREED** that Defendants' TCPA Motion to Dismiss

is denied ~~in all respects.~~ except as to the tortious interference with a existing contract claim and, to the extent
that such claims rest upon statements other than the Taylor email, Plaintiff's defamation and business
disparagement claims are dismissed to that extent only.  IT IS FURTHER ORDERED that movant is awarded
Signed this _____9th_____ day of ~~October, 2022.~~  $10,000 for reasonable and necessary costs and fees in
                                     November        defending against the dismissed legal action.



PRESIDING JUDGE

# EXHIBIT A-3

APP033

**From:** James Crewse <jcrewse@crewselawfirm.com>
**Sent:** Tuesday, December 6, 2022 1:18 PM
**To:** Charlene Koonce <charlene@brownfoxlaw.com>
**Cc:** Houston, Patrick D. <PHouston@wtplaw.com>; Cort Thomas <cort@brownfoxlaw.com>; Inge, Vernon E. <VInge@wtplaw.com>; Tim Wells <tim@brownfoxlaw.com>
**Subject:** RE: Notification of Service for Case: DC-22-06350, PHOENIX CAPITAL GROUP HOLDINGS LLC vs. WILLIAM FRANCIS et al for filing Notice, Envelope Number: 70715535

Charlene,

I will file something with the court which provides notice that Plaintiff is withdrawing the 12/5/22 Notices of Intent to Subpoena.  I will also send letters to GoDaddy, Google, Greeley Publishing, and Joe Moylan notifying them that the 12/5/22 Notice of Intent to Subpoena is withdrawn, but will be resent after Defendants' interlocutory appeal of the trial court's order denying Defendants' motion to dismiss is final.

James

JAMES CREWSE, ESQ.
**CREWSE LAW FIRM, PLLC**
5546 Goodwin Ave.
Dallas, Texas 75206
Phone:  (214) 394-2856
jcrewse@crewselawfirm.com
www.crewselawfirm.com



APP034

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by U.S. Treasury Regulations, we inform you that, unless otherwise expressly stated, any tax advice contained in this communication, including any attachment(s), was and is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties pursuant to U.S. law, including the Internal Revenue Code, or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein, and such taxpayer should seek advice on the taxpayer's particular circumstances from an independent tax advisor.

CONFIDENTIALITY NOTICE: This email and any files accompanying its transmission is confidential and may contain information that is legally privileged, confidential attorney-client communication, or both, and should be read or retained only by the intended recipient. If you have received this email transmission in error or are not the intended recipient, please immediately notify the sender by reply e-mail, and then destroy all copies of the transmission.

If any of the information you receive in the email or its attachments appears corrupt or missing, please notify the sender immediately.

# EXHIBIT A-4

**Affirmed in part and Reversed in part and Opinion Filed August 29, 2023**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

No. 05-22-01260-CV

**WILLIAM FRANCIS AND INCLINE ENERGY PARTNERS, L.P.,**
**Appellants**

**V.**

**PHOENIX CAPITAL GROUP HOLDINGS, LLC, Appellee**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-22-06350**

## MEMORANDUM OPINION

Before Justices Nowell, Goldstein, and Breedlove
Opinion by Justice Breedlove

Appellants William Francis (Francis) and Incline Energy Partners, L.P.
(Incline) appeal the trial court's November 9, 2022 order partially granting and
partially denying their motion to dismiss appellee Phoenix Capital Group Holdings,
LLC (Phoenix)'s claims under the Texas Citizens Participation Act (TCPA). *See*
TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a). We reverse the portions of the trial
court's judgment denying dismissal of Phoenix's claims for: (1) disparagement;
(2) defamation; (3) tortious interference with prospective contract; (4) conspiracy;

and (5) unfair competition. We affirm the portion of the trial court's judgment denying dismissal of Phoenix's claim for defamation per se, and we remand the case for further proceedings on that cause of action, as well as on the issue of attorney's fees.

## I.    BACKGROUND[1]

Incline and Phoenix are direct competitors in the oil and gas industry. Francis serves as Incline's managing partner. Incline also competes with companies previously operated by Adam Ferrari with whom Incline had previously been involved in business disputes and litigation. In 2019, Ferrari pleaded guilty to a felony theft charge related to forgery of deeds in a mineral transaction, and Incline obtained information regarding Ferrari's criminal proceedings in litigation between one of Ferrari's businesses and an affiliate of Incline. In exchange for his guilty plea Ferrari received a deferred sentence pursuant to which the felony charge would be dismissed following the expiration of three years upon compliance with the terms of his probation. Ferrari's criminal records were then sealed, and the felony charge was dismissed in 2022. Ferrari's arrest and plea deal became the subject of articles published in *The Greeley Tribune*, a local newspaper, as well as the *Denver Post*.

---

[1] Many of the facts of this case are disputed; therefore, we limit our discussion to those facts necessary to our analysis and, where specific facts necessary to our analysis are disputed, we identify both parties' assertions.

At some point after receiving the documents related to Ferrari's criminal background, Incline began investigating Ferrari's possible involvement with Phoenix. While Incline asserts that Ferrari controls Phoenix as its CEO and that Phoenix has attempted to conceal Ferrari's role within the company, Phoenix contends that Ferrari is only one of many non-executive consultants it employs. Specifically, Phoenix asserts that Ferrari's role is limited to being a "Petroleum Engineering Consultant." Phoenix offered evidence that it has no CEO and instead is managed by Manager and COO Lindsey Wilson, along with CFO Curtis Roger Allen.

The present dispute centers primarily on an email sent by Francis to Crystal Taylor on June 17, 2021 (the "Taylor email").[2] Both Phoenix and Incline sought a potential transaction with the family of Sheila Krystal, a landowner with mineral interests in Colorado. Taylor is Krystal's niece. In April 2021, Incline contracted with the Krystal family to purchase certain oil and gas interests. The deed conveying those interests to Incline was recorded on June 2, 2021. At some point, Phoenix made a competing offer and characterized Incline's offer as a "low ball" offer, prompting some of Krystal's family members, led by Taylor, to seek to renegotiate the deal with Incline. In response, Francis sent the following to Taylor:

---

[2] Phoenix also alleged that Francis sent an anonymous package to First International Bank & Trust (FIBT) containing allegedly defamatory content. The trial court dismissed the portions of the lawsuit relying on the FIBT package, and Phoenix does not cross-appeal. Therefore, our discussion is limited only to the Taylor email.

> You citing Phoenix/Ferrari as the other offer/group that is telling you
> that we low balled you is all the information I need to know.  We made
> your aunt aware of those permits when she had called us and not the
> other way around.
>
> I would love nothing more than to defend my company's track record
> versus the misdeeds that Phoenix/Ferrari has performed over the years.
> Namely, the fact that their CEO was arrested and convicted for forging
> a mineral owners signature in order to defraud her of hundreds of
> thousands of dollars.

Francis also included the links to several articles regarding Ferrari's criminal history.

Phoenix filed suit on June 15, 2022, alleging: (1) defamation and defamation per se, libel and libel per se, slander and slander per se; (2) business disparagement; (3) tortious interference with contract; (4) tortious interference with prospective contract and relationship; (5) unfair competition; and (6) civil conspiracy.  Francis and Incline filed a general denial and affirmative defenses on July 8, 2022.  Francis and Incline filed a motion to dismiss under the TCPA on August 16, 2022.  Phoenix filed objections to evidence submitted along with Francis's and Incline's motion to dismiss on September 29, 2022, along with their response to the motion to dismiss. Francis and Incline filed their own motion to strike evidence on October 3, 2022. The trial court held a hearing on the motions to strike as well as the motion to dismiss on October 6, 2022, and entered an order on November 8, 2022 partially granting and partially denying objections from both sides.  On November 9, 2022, the trial court entered an order partially granting and partially denying appellants' TCPA

motion to dismiss.  More specifically, the order reads that Francis's and Incline's motion to dismiss

> is denied except as to the tortious interference with a [sic] existing contract claim and, to the extent that such claims rest upon statements other than the Taylor email, Plaintiff's defamation and business disparagement claims are dismissed to that extent only.  It is further ordered that movant is awarded $10,000 for reasonable and necessary costs and fees in defending against the dismissed legal action.[3]

Francis and Incline appealed the trial court's ruling on November 23, 2022. In five issues, they complain that the trial court erred: (1) in denying the motion to dismiss regarding the disparagement and defamation claims relying on the Taylor email; (2) in denying the motion to dismiss regarding the tortious interference with prospective contract claim; (3) in denying the motion to dismiss regarding the conspiracy and unfair competition claims; (4) regarding evidentiary objections, which likely resulted in the improper denial of their motion; and (5) by abusing its discretion regarding the fee award.

## II.    APPLICABLE LAW

The TCPA is Texas's anti-SLAPP law, providing a means to dismiss so-called "Strategic Lawsuits Against Public Participation."  *Krasnicki v. Tactical Entm't, LLC*, 583 S.W.3d 279, 282 (Tex. App.—Dallas 2019, pet. denied).  The TCPA "protects citizens who petition or speak on matters of public concern from retaliatory

---

[3] The order is unclear whether by "movant" the court means both Francis and Incline, and if so, whether the award is for $10,000 to each party or $10,000 split between the two moving parties.

lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding).  That protection comes in the form of a motion to dismiss suits, or claims within suits, that appear to stifle the defendant's exercise of those rights. *Barnes v. Kinser*, 600 S.W.3d 506, 509 (Tex. App.—Dallas 2020, pet. denied); *see White Nile Software, Inc. v. Carrington, Coleman, Sloman & Blumenthal, LLP*, No. 05-19-00780-CV, 2020 WL 5104966, at *4 (Tex. App.—Dallas Aug. 31, 2020, pet. denied) (mem. op.).  We construe the TCPA liberally to fully effectuate its purpose and intent.   TEX. CIV. PRAC. & REM. CODE ANN. § 27.011(b).  We review a trial court's ruling on a TCPA motion to dismiss de novo. *Mireskandari v. Casey*, 636 S.W.3d 727, 734 (Tex. App.—Dallas 2021, pet. denied). In our review, we consider the pleadings, evidence a court could consider under civil procedure rule 166a, and any supporting and opposing affidavits stating the facts on which the liability or defense is based. *Id.* at 735.

Under the TCPA, a party may file a motion to dismiss a legal action based on or in response to a party's exercise of the right of free speech. TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a).  "Exercise of the right of free speech" means a communication made in connection with a matter of public concern. *Id.* § 27.001(3). A "matter of public concern" is defined as a statement or activity regarding:

> (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity;
>
> (B) a matter of political, social, or other interest to the community; or

–6–

(C)  a subject of concern to the public.

*Id.* § 27.001(7).

The TCPA process generally involves three steps.  *Mireskandari*, 636 S.W.3d at 734.  First, the TCPA movant has the burden to demonstrate the nonmovant's legal action is based on or in response to the moving party's exercise of the right of association, right of free speech, or the right to petition.  *Id.*  Second, if the movant meets its step-one burden, the burden of proof shifts to the nonmovant to establish by clear and specific evidence a prima facie case for each essential element of the claim.  *Id.*  Third, if the nonmovant meets its step-two burden, the burden of proof shifts back to the movant to establish an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law.  *Id.* at 735.  If the nonmovant either cannot meet its step two burden or the movant establishes an affirmative defense, the motion to dismiss will be granted.  *Id.*

## III.   DISCUSSION

## A.   TCPA Step One

Because we review the denial of a motion to dismiss under the TCPA de novo, we first consider whether the appellants have satisfied their step-one burden.  *See Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019); *Thomas v. Wm. Charles Bundren & Assocs. Law Grp. PLLC*, No. 05-20-00632-CV, 2021 WL 3159795, at *3 (Tex. App.—Dallas July 26, 2021, no pet.) (mem. op.).  In conducting

–7–

our review, we consider the pleadings, evidence a court could consider under Texas Rule of Civil Procedure 166a, and supporting and opposing affidavits stating the facts on which the liability or defense is based.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a).  More specifically, we must determine whether the Taylor email, the communication upon which Phoenix's lawsuit rests, constitutes a matter of public concern.  *Id.* § 27.001(7).  For a movant to trigger the TCPA's dismissal framework, there must first be a "communication" as defined by section 27.001(1). *Id.* § 27.001(1).

> The relevant portion of the Taylor email states:

> [T]he fact that their CEO was arrested and convicted for forging a mineral owners [sic] signature in order to defraud her of hundreds of thousands of dollars.

Neither party challenges whether the Taylor email is a "communication." Therefore, we must analyze whether the statement was made while exercising the right of free speech.  *See Thomas*, 2021 WL 3159795, at *5.  The "exercise of the right of free speech" means "a communication made in connection with a matter of public concern." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3).

A "matter of public concern" means "a statement or activity regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter

–8–

of political, social, or other interest to the community; or (C) a subject of concern to the public." *See id.* § 27.001(7)(A)–(C).[4]

We are constrained by this court's interpretation of "matter of public concern," which includes within its ambit "criminal acts." *See Garcia v. Semler*, 663 S.W.3d 270, 281 (Tex. App.—Dallas 2022, no pet.) (communication alleging theft of estate sale signs is a matter of public concern because "[i]t is well-settled that even after the 2019 amendments, 'criminal acts are matters of public concern'"); *Austin v. Amundson*, No. 05-22-00066-CV, 2022 WL 16945911, at *3 (Tex. App.—Dallas Nov. 15, 2022, no pet.) (mem. op.) (allegation of road rage is a matter of public concern); *Page v. Bakewell*, No. 05-21-00905-CV, 2022 WL 4007879, at *4 (Tex. App.—Dallas Sept. 2, 2022, no pet.) (mem. op.) (communication alleging the hiring of a hit man to "take care" of ex-wife is a matter of public concern); *Beard v. McGregor Bancshares, Inc.,* No. 05-21-00478-CV, 2022 WL 1076176, at *6 (Tex. App.—Dallas Apr. 11, 2022, pet. denied) (mem. op.) (statements about the killing of Joanna Gaines' goats implicated a matter of public concern because they concerned criminal activity); *Miller v. Schupp*, No. 02-21-00107-CV, 2022 WL 60606, at *2 (Tex. App.—Fort Worth Jan. 6, 2022, no pet.) (mem. op.) (Instagram

---

[4] In 2019, the legislature amended the definition of "matter of public concern." The prior definition included: "(A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." Act of May 18, 2011, 82nd Leg., R.S., Ch. 341, 2011 Tex. Gen. Laws 961, 962 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)).

–9–

message alleging drug addition, sexual assault, and physical assault is a matter of public concern); *CBS Stations Grp. of Tex., LLC v. Burns*, No. 05-21-00042-CV, 2021 WL 4398031, at *3 (Tex. App.—Dallas Sept. 27, 2021, no pet.) (mem. op.) (news broadcast involving robbery, high-speed chase, and arrest of suspect is a matter of public concern).

Incline's accusation that Phoenix's CEO "was arrested and convicted for forging a mineral owners [sic] signature in order to defraud her of hundreds of thousands of dollars" is a communication regarding an allegation of criminal activity. *See* TEX. PENAL CODE ANN. § 32.21 (forgery). Phoenix argues, however, that this particular communication is not a subject of concern to the public because the allegation was made in a private communication, between private parties, regarding a private transaction, which affects only the fortunes of the parties to the communication.   Phoenix asks this court to reject a bright line rule that all communications regarding criminal activity are a matter of public concern, without regard to the content, form, and context of the speech.  *See Saks & Co., LLC v. Li*, 653 S.W.3d 306, 316 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (finding "dubious" the proposition that any statement about the commission of a crime is matter of public concern).  Phoenix asserts that the content, form, and context of the speech removes it from the scope of a matter of public concern because the Taylor email was not addressed to the community and was not a news report, a statement made to law enforcement, or a public social media post.

We need not reach the broader question of whether every communication regarding criminal activity is a subject of concern to the public because the Taylor email fits squarely within the scope of "public concern" that has been adopted by this court.  Phoenix's focus on the fact that the allegation was shared in a private email is misplaced because whether Incline had posted its allegations of criminal activity on a public social media post, rather than in a private email, does not change the subject matter of the allegation or the TCPA analysis.  The TCPA does not require a communication to be public in order for it to constitute a matter of public concern.  *See Lippincott v. Whisenhunt*¸ 462 S.W.3d 507, 508 (Tex. 2015) (per curiam) (holding that despite the private context of a private email regarding the employment of a nurse anesthetist, the communication nevertheless amounted to a matter of public concern because it regarded the provision of medical services by a health care professional).[5]

Because the Taylor email regards a matter of public concern, we conclude that Francis and Incline have satisfied their step-one burden.  *See Page*, 2022 WL

---

[5] During oral argument and in subsequent briefing, the parties considered the applicability of *Morris v. Daniel*, 615 S.W.3d 571, 573, 578 (Tex. App.—Houston [1st Dist.] 2020, no pet.), to the present case.  We find *Morris* distinguishable.  In that case, the general subject of the communication, the health and safety of children, was a matter of public concern, but the specific issue identified in the communication, the health and safety of one child, was not because it affected only the concerns of that specific child.  *Id.*  By contrast, the criminal history and continued involvement of Ferrari with a large-scale oil and gas company is potentially relevant to anyone involved in the buying and selling of mineral rights in the areas the parties do business.  The present case is therefore more analogous to *Lippincott*.  *See Lippincott*¸ 462 S.W.3d at 508, discussed above.

4007879, at *4; *Beard*, 2022 WL 1076176, at *6. We now turn to consider whether Phoenix satisfied its burden under step two.

## B.    TCPA Step Two

Because Francis and Incline satisfied their initial burden, we now move to step two of the burden-shifting analysis: whether Phoenix established by clear and specific evidence a prima facie case for each essential element of its claims for defamation,[6] defamation per se, business disparagement,[7] tortious interference,[8] and civil conspiracy.[9] [10] TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).

---

[6] The elements of a defamation action include (1) publication of a false statement of fact to a third party; (2) that was defamatory concerning the plaintiff; (3) with the requisite degree of fault; and (4) caused damages. *In re Lipsky*, 460 S.W.3d at 594. The plaintiff must plead and prove damages, unless the defamatory statements are defamatory per se. *Id.* at 593. Defamation per se refers to statements that are so obviously harmful that general damages may be presumed. *See id.* at 592. The elements of a defamation per se claim are similar to that of a claim for defamation and differ only in that damages are presumed. *See Van Der Linden v. Khan*, 535 S.W.3d 179, 198 (Tex. App.—Fort Worth 2017, pet. denied).

[7] To prevail on a business disparagement claim, the plaintiff must establish that (1) the defendant published disparaging words about the plaintiff's economic interests; (2) with malice; (3) without privilege; (4) that resulted in special damages. *Marketshare Telecom, L.L.C. v. Ericsson*, 198 S.W.3d 908, 924–25 (Tex. App.—Dallas 2006, no pet.).

[8] The elements of a tortious interference with prospective business relations claim are: (1) there was a reasonable probability that plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). Phoenix plead tortious interference with existing contract but limits itself to tortious interference with prospective contract and business relations on appeal.

[9] The elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *RTLC AG Prod. Inc. v. Treatment Equip. Co.*, 195 S.W.3d 824, 833 (Tex. App.—Dallas 2006, no pet.).

[10] Phoenix also pleaded "unfair competition" but provided no elements or legal analysis to support its claim beyond the mere assertion that Francis's defamatory and tortious conduct constituted unfair competition. Accordingly, Phoenix has not presented anything for our review on this claim. TEX. R. APP. P. 38.1.

"[A prima facie case, in its traditional legal meaning] refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *In re Lipsky*, 460 S.W.3d at 590.  A prima facie standard generally requires only the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding) (per curiam)). "Prima facie evidence is evidence that, until its effect is overcome by other evidence, will suffice as proof of a fact in issue.  In other words, a prima facie case is one that will entitle a party to recover if no evidence to the contrary is offered by the opposite party." *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 726 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citation omitted), *disapproved on other grounds by In re Lipsky*, 460 S.W.3d at 587–88).

"[A] plaintiff must provide enough detail to show the factual basis for its claim." *In re Lipsky*, 460 S.W.3d at 591; *see D Magazine Partners, L.P. v. Rosenthal*, 475 S.W.3d 470, 480 (Tex. App.—Dallas 2015), *aff'd in part, rev'd in part on other grounds*, 529 S.W.3d 429 (Tex. 2017).  "Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case." *Serafine v. Blunt*, 466 S.W.3d 352, 358 (Tex. App.—Austin 2015, no pet.) (op. on reh'g).  In other words, "bare, baseless opinions" are not "a sufficient substitute for the clear and specific evidence required to establish a prima facie case" under the Act.  *In re*

*Lipsky*, 460 S.W.3d at 592.  "Opinions must be based on demonstrable facts and a reasoned basis."  *Id.* at 593.

### 1. Defamation, business disparagement, tortious interference with prospective contract, and civil conspiracy

With the sole exception of defamation per se, all of Phoenix's causes of action require a showing of damages; therefore, we turn first to evaluating whether Phoenix established a prima facie case of damages.

Phoenix alleges that the evidence shows that the Taylor email "(1) interfered with and disrupted Phoenix's business and economic interest with Taylor and her family; (2) harmed Phoenix's reputation; (3) caused Taylor not to do business with or sell mineral rights to Phoenix; and (4) caused Taylor to do business with and sell mineral rights to Incline despite Incline's substantially inferior 'low ball' offer."  The evidence Phoenix relies on to support this assertion is the Taylor email itself as well as the fact that Krystal did not ultimately sell mineral rights to Phoenix.  However, Phoenix fails to address the timeline of events showing that Incline and Krystal had already entered into a contract for the subject mineral rights prior to Phoenix's involvement.

According to the mineral and royalty deed offered by Phoenix as an exhibit to its response to the TCPA motion to dismiss, the deed transferring Krystal's mineral rights to Incline was effective as of April 1, 2021, was signed and notarized by Sheila Krystal on May 19, 2021, and was recorded in the Dunn County records on June 2,

APP050

2021.  Phoenix's CFO, Curtis Allen, attests that the interests conveyed in that deed are the same interests that are the subject of Phoenix's offer referenced in Taylor's email.  This evidence shows that, at the very latest, the transaction at issue between Krystal and Incline was completed by June 2, 2021.  The Taylor email upon which Phoenix's claims are based was not sent until June 17, 2021.  By the time Francis sent the Taylor email the mineral rights had already been transferred to Incline.  Accordingly, the email came too late for any prospective interference with Phoenix's interests in the subject mineral rights.

Further, a close reading of the email from Taylor that prompted Francis's response does not support Phoenix's allegations that, if not for the Taylor email, the Krystal family would have sold its interests to Phoenix because its offer was twice that of Incline's.   Instead, Taylor describes ongoing negotiations between Francis/Incline and Taylor regarding the price discrepancy in an attempt to seek a resolution.  Taylor notes that "[w]e do very much appreciate your offer to make things right by honoring any other official offers during that time period" and provides Francis with the details of Phoenix's offer, ostensibly so that Incline could address the discrepancy as discussed.  There is no suggestion in Taylor's email that she or the family were planning to breach their existing contract with Incline or to enter into a new agreement with Phoenix—every indication in the email instead suggests an ongoing attempt to resolve discrepancies with Incline despite Phoenix's higher offer.

APP051

Phoenix's Manager and COO Lindsey Wilson alleges in her affidavit that "Phoenix was close to closing the transaction with Ms. Krystal and Ms. Taylor, but after the email from Francis, Ms. Taylor had doubts about Phoenix and Incline ultimately purchased the mineral rights."  However, not only is this statement contradicted by the clear timeline of events, her allegation that Phoenix was "close to closing the transaction" is unsupported by any evidence in the record.  Phoenix offers no other evidence to support its assertion that the Taylor email caused damages.

Phoenix failed to establish a prima facie case for the essential element of damages; therefore, we sustain Francis's and Incline's first, second, and third issues as they apply to the defamation, business disparagement, tortious interference with prospective contract, and civil conspiracy claims.  *See In re Lipsky*, 460 S.W.3d at 592.

### 2. *Defamation per se*

In addition to its other causes of action, Phoenix pled defamation per se. Unlike Phoenix's other causes of action, defamation per se does not require a showing of damages.  *See Van Der Linden*, 535 S.W.3d at 198.  Therefore, Phoenix can still carry its step two burden by making a prima facie showing of the elements of a defamation per se claim.  *See id.*

Defamation per se refers to statements that are so obviously harmful that general damages may be presumed.  *See In re Lipsky*, 460 S.W.3d at 592.  General

–16–

damages include non-economic losses, such as loss of reputation and mental anguish. *Id.* Defamation per se is itself broken down into separate categories of falsehoods. *Id.* at 596. Accusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se. *Id.* Remarks that adversely reflect on a person's fitness to conduct his or her business or trade are also deemed defamatory per se. *Id.* And whether a statement qualifies as defamation per se is generally a question of law. *Id.* If false and disparaging statements injure a corporation's reputation, it can sue for defamation per se just like flesh-and-blood individuals. *Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 151 (Tex. 2014). Francis and Incline do not argue that defamation per se is inapplicable to the facts of this case; therefore, we turn to consider whether Phoenix satisfied its step two burden on each element of defamation per se.

The elements of a defamation per se claim are similar to that of a claim for defamation: (1) the publication of a false statement of fact to a third party; (2) that was defamatory concerning the plaintiff; (3) with the requisite degree of fault. *In re Lipsky*, 460 S.W.3d at 593. Defamation per se differs only in that damages are presumed. *Van Der Linden*, 535 S.W.3d at 198.

    *a. Publication of a false statement*

Francis and Incline first contend that Phoenix cannot meet its burden on the first element of defamation per se because the allegedly defamatory statement in the

APP053

Taylor email was true "in its gist."  Truth in the "gist" exists where the actual statement is no more "damaging to the person affected by it than a literally true statement would have been."  *River Oaks L-M. Inc. v. Vinton-Duarte*, 469 S.W.3d 213, 239–40 (Tex. App.—Houston [14th Dist.] 2015, no pet.).  To support this argument, they assert that the statement at issue is "Phoenix's CEO, Adam Ferrari, is a felon," and argue that because Ferrari pled guilty to a felony, the statement is true in its gist even though Ferrari ultimately completed probation and was cleared of the felony charges as a result.

However, Francis's and Incline's assertion ignores the plain text of the statement in an attempt to distinguish what Francis allegedly "meant" from what he actually said.  Unlike appellants' rewriting of the statement, the actual email said "the fact that their CEO was arrested and convicted for forging a mineral owners signature in order to defraud her of hundreds of thousands of dollars."  A factual restatement of the allegedly disparaging statement at issue, then, can be condensed to "Phoenix's CEO is a felon," and Phoenix has met its burden of providing competent evidence demonstrating that Phoenix does not have a CEO and that none of its executives have been convicted of a felony.

### b.  *Defamatory concerning the plaintiff*

Francis and Incline argue that Phoenix cannot meet its burden on this element because Phoenix failed to address how or why the email's assertion of Ferrari's relationship with Phoenix was defamatory; however, this again requires us to read

–18–

additional words into the Taylor email that are not there.  Francis and Incline do not argue that the statement "Phoenix's CEO is a felon" is not defamatory; indeed, Texas law provides that this is exactly the type of statement that satisfies the showing required under a defamation per se standard.  *See In re Lipsky*, 460 S.W.3d at 596 (holding remarks that adversely reflect on a person's fitness to conduct his or her business or trade are defamatory per se).  Therefore, Phoenix has established a prima facie showing of the second element of defamation per se.

### c.  Requisite degree of fault

A private individual need only prove negligence to prevail on a defamation per se claim.  *Id.* at 593.  To prove negligence, a private individual must show "that the publisher . . . knew or should have known that the defamatory statement was false."  *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex. 1976). Although appellants allege that they believe that a felon (Ferrari) actually is acting as Phoenix's CEO despite their attempts to conceal the extent of his involvement, the court must review the evidence in the light most favorable to Phoenix, the claimant/nonmovant.  *Dyer v. Medoc Health Servs., LLC*, 573 S.W.3d 418, 424 (Tex. App.—Dallas 2019, pet. denied).  The evidence provided by Phoenix satisfies a prima facie showing that Incline and Francis, as regular business competitors experienced in dealing with Phoenix and its executives, should have known that the statement was false, despite its allegations of having conducted research that created the suspicion of Ferrari's deeper involvement with Phoenix.  *See D Magazine*

–19–

*Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 437–40 (Tex. 2017) (holding that a prima facie showing of negligence was made in spite of evidence that raised suspicion of the allegedly defamatory statement's truth).

Because Phoenix has satisfied its step two burden regarding its defamation per se claim, we turn to step three of the TCPA analysis. *See Mireskandari*, 636 S.W.3d at 735.

## C.    TCPA Step Three

If the nonmovant meets its step-two burden, the burden of proof shifts back to the movant to establish an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law. *Id.* One such affirmative defense to defamation per se is privilege, an affirmative defense which Francis and Incline pled. *See In re Lipsky*, 460 S.W.3d at 592; *Butler v. Cent. Bank & Tr. Co.*, 458 S.W.2d 510, 514 (Tex. App.—Dallas 1970, writ dism'd).

Qualified privilege in the context of defamation includes all communications made in good faith on any subject matter in which the author has an interest. *Id.* Circumstances that may give rise to the privilege include:

> (1) a belief that publication protects the publisher's interest; (2) a belief that publication protects the interest of certain recipients or third persons; (3) a belief that a person sharing a common interest in the published information is entitled to know that information…and (5) a belief that an important public interest requires publication.

*Steinhaus v. Beachside Envtl. LLC*, 590 S.W.3d 672, 677 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). As discussed in detail above, at the time of the Taylor

email, Incline produced evidence demonstrating that it had an existing contract with the Krystal family as well as an ongoing business relationship which Phoenix was attempting to disrupt. Accordingly, we conclude that Francis and Incline have provided evidence raising the affirmative defense of privilege, and we remand the case to the trial court for further consideration of this issue. *See id.*

Because we sustain issues one through three, we need not address appellants' fourth issue. TEX. R. APP. P. 47.1. Further, our disposition of issues one through three require us to remand the case to the trial court for reconsideration of the award of attorney's fees challenged in issue five; therefore, we do not address it here. *Id.*

## IV.   CONCLUSION

We reverse the portions of the trial court's judgment denying dismissal of Phoenix's claims for: (1) disparagement; (2) defamation; (3) tortious interference with prospective contract; (4) conspiracy; and (5) unfair competition. We affirm the portion of the trial court's judgment denying dismissal of Phoenix's claim for defamation per se, and we remand the case for further proceedings on that cause of action as well as on the issue of attorney's fees.

221260f.p05

/Maricela Breedlove/
_____
MARICELA BREEDLOVE
JUSTICE

APP057



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

WILLIAM FRANCIS AND
INCLINE ENERGY PARTNERS,
L.P.,                     Appellants

No. 05-22-01260-CV          V.

PHOENIX CAPITAL GROUP
HOLDINGS, LLC, Appellee

On Appeal from the 116th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-22-06350.

Opinion delivered by Justice
Breedlove. Justices Nowell and
Goldstein participating.

In accordance with this Court's opinion of this date, the trial court's November 9, 2022 "Order Partially Granting and Partially Denying Defendants' TCPA Motion to Dismiss" is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's order denying appellee Phoenix Capital Group Holdings, LLC's motion to dismiss appellants William Francis and Incline Energy Partners, L.P.s' claims for disparagement, defamation, tortious interference with prospective contract, conspiracy, and unfair competition.

In all other respects, the trial court's order is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 29th day of August, 2023.

APP058

# EXHIBIT A-5

**From:** Austin Champion <austin.champion@championllp.com>
**Sent:** Friday, June 2, 2023 4:16 PM
**To:** Charlene Koonce <charlene@brownfoxlaw.com>
**Subject:** Ferrari v. Francis

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

Charlene -

To confirm our conversation this afternoon, and in view of the court's comments today during the hearing, we will withdraw the subpoenas that we circulated to you and your team yesterday.

Thanks,

**Austin Champion**
CHAMPION LLP
2200 Ross Avenue
Suite 4500W
Dallas, Texas 75201
214.225.8885 | Direct
214.225.8881 | Fax
www.championllp.com

APP060

# EXHIBIT A-6

APP061

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| PHOENIX CAPITAL GROUP HOLDINGS, LLC ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 23-cv- |
| ) | |
| INCLINE ENERGY PARTNERS, L.P. ) | |
| ) | COMPLAINT AND JURY DEMAND |
| Defendant. ) | |

## COMPLAINT

Plaintiff, Phoenix Capital Group Holdings, LLC by and through its undersigned attorneys, complains against Defendant, Incline Energy Partners, L.P ("Incline"), and alleges and states as follows:

### I.      THE PARTIES

1.      Plaintiff, Phoenix Capital Group Holdings, LLC ("Phoenix") is a Delaware limited liability company with its headquarters located in Littleton, Colorado whose members are all domiciled in Illinois.

2.      Defendant Incline Energy Partners, L.P. ("Incline") is a Texas limited partnership with its principal place of business in Dallas County, Texas whose partners are domiciled in Texas.

### II.      JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1331.

4.      This Court has specific personal jurisdiction over the Defendant because all of the acts and omissions complained of occurred in this District.

5.      Venue is also proper in this District pursuant to 28 U.S.C. §1391 because the Defendant systematically and continuously conducts business in this District, and because a

APP062

substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### IV.    ALLEGATIONS COMMON TO ALL COUNTS

6.    North Dakota's importance to our nation's energy security cannot be understated. The state has grown into the nation's third-largest crude oil producer, according to the U.S. Energy Information Administration, with the state estimating that energy supports 75,000 jobs and generates more than $3.2 billion annually.

7.    It is critical to achieving our nation's goal of energy independence, not to mention North Dakota's economic growth, that oil and gas reserves in the state be efficiently developed by those with the best expertise rather than those motivated solely by greed. North Dakotans also deserve fair treatment in developing their mineral rights to maximize their returns.

8.    In the last four years Phoenix has become the leading mineral and lease acquisition company in the Williston Basin region of North Dakota.

9.    Phoenix has transacted in over 1,000 unique deals in the Williston Basin since 2019.

10.    In September 2023, Phoenix launched its operating company that drills wells in the Williston Basin and employs many North Dakotans.

11.    Phoenix brought together industry experts with decades of experience in their fields to build an industry leader in mineral rights.

12.    At the time Phoenix was founded, the industry was dominated by Incline and very few firms were able to compete.

13.    Incline operates in the oil and gas industry, where it operates and acquires mineral rights, and is a direct competitor to Plaintiff for mineral rights in North Dakota.

APP063

14.     Phoenix competes with Incline by deploying its proprietary technology and decades of industry experience.

15.     Phoenix's rapid success in North Dakota was met with hostility from Incline, specifically from William Francis, Incline's Managing Partner.

16.     Phoenix is successful because it offers the best price to mineral rights owners.

17.     Incline's success is because it can fund deals faster than Phoenix and because it tortiously interferes with Phoenix's potential acquisition.

18.     Incline's principal, William Francis ("Francis") has lashed out at Phoenix in every way possible hoping to  corner the mineral rights market in North Dakota, including making defamatory statements to customers, lenders, investors, regulators both directly and via pseudonyms online.

19.     Incline and Phoenix routinely compete to purchase the same interests being sold throughout North Dakota. For example, in one area of Williams and Divide Counties, North Dakota, Incline was Phoenix's only competition for leases.

20.      Incline disparaged Phoenix to multiple lessors in North Dakota between 2021 and 2023 who Incline knew were considering offers from both Incline and Phoenix to obtain the leases.

21.      Several mineral owners, including but not limited to the Bakke Family in Williams County, chose Incline because of Incline's disparagement campaign, despite the fact that Phoenix was offering more money. In doing so, they were intentionally misled through underhanded bullying tactics, denying them and other North Dakotans a fair opportunity to maximize the returns they deserved for their rights.

22.     As part of its campaign to take advantage of North Dakota mineral rights holders, Incline's agents told potential lessors, including but not limited to the Bakke Family, that Phoenix

APP064

was operated by criminals, among other false statements, in order to scare North Dakota mineral owners into paying more to Incline rather than selling or leasing to Phoenix.

23.     After Incline obtained thousands of acres of leases in Williams and Divide Counties, Incline approached Phoenix's Chief of Land attempting to sell those leases to Phoenix for a profit.

24.     One of the leases Incline tried to sell to Phoenix was with the Bakke Family in Williams County. Remarkably, Incline first told the Bakke Family not to do business with Phoenix because it was operated by criminals then turned around and offered to sell the Bakke Family's lease to Phoenix so Incline could profit from the deal without doing the drilling!

25.     Phoenix's business model, like the majority of oil and gas companies in the industry, requires debt financing.

26.     Phoenix had a debt financing relationship with First International Bank and Trust ("FIBT") in Watford City, North Dakota at all times relevant this complaint.

27.     Phoenix began its relationship with FIBT in October of 2020 with its first bank loan, a credit facility of $1,000,000, to finance acquisitions in North Dakota.

28.     FIBT and Phoenix mutually agreed to expand that facility frequently for the next year, growing to as large as $9,000,000 at its peak.

29.     Phoenix and FIBT knew each other well and enjoyed their mutually beneficial relationship.

30.     FIBT was intimately familiar with Phoenix's business, its principals, and its owners.

31.     On April 27, 2022, Phoenix committed to borrow $50,000,000 from FIBT and paid a $50,000 non-refundable commitment fee in consideration of FIBT's mutual promises.

APP065

32.     FIBT had sole discretion to complete the transaction but was obligated to exercise that discretion in good faith.

33.     Phoenix and FIBT worked quickly throughout the spring of 2022 to complete the due diligence process and Phoenix provided all the information required of it.

34.     Phoenix's senior leaders, consultants, and owners engaged in multiple Zoom meetings with FIBT.

35.     As of May 4, 2022, the deal was full steam ahead and set to close within 10 days.

36.     FIBT President, Justin Voll emailed Phoenix on May 4, 2022, "We will do our best to hit the date [end of May 2022], but there is still a lot of work and negotiation to do on the final loan documents. I hope to have the first draft for your review this week."

37.     During the due diligence process, whether via the shared banking relationship or through other connections in the small world of the North Dakota oil and gas industry, Incline became aware that their competitor Phoenix was about to secure significant financing from FIBT.

38.     Phoenix is the fastest growing mineral and lease acquisition company in the Williston Basin where Incline has enjoyed a competitive stranglehold over for years thanks to its advantage in financing.

39.     Incline's only competitive advantage over Phoenix in North Dakota is its ability to close deals quickly with immediately available funds.

40.     Incline persuades sellers and lessors to accept less money than offered by Phoenix by promising funding the deal faster than Phoenix can.

41.     Phoenix would dominate the North Dakota marketplace if it could match Incline's speed of closing. North Dakotans would naturally benefit from a more fair, competitive market

5

because sellers and lessors would receive more money than they would if one company had a stranglehold on the business.

42.     In the spring of 2022 FIBT offered the solution for Phoenix to surpass Incline's closing speed with a $50,000,000 credit facility.

43.     Incline needed to eliminate Phoenix's financing to maintain its competitive advantage of closing speed.

44.     On May 5, 2022, Francis emailed Joel Brown ("Brown") "I was wondering if you're free later today or tomorrow to hop on a call to discuss a potential loan with my group, as well as another issue that I'd like to pick your brain about."

45.     The other issue Francis wanted to discuss with Brown was FIBT's agreement with Phoenix to provide a $50,000,000 credit facility.

46.     After the call, at 5:07 PM on May 5, 2022, Brown emailed Francis, "I appreciate you bringing my attention to the concerns surrounding Phoenix Capital, and I will wait with anticipation for the additional information you mentioned. Once received, I would like to circulate it among some key personnel within our bank."

47.     Francis had no justification for bringing "his concerns" about Phoenix to Brown other than to kneecap a competitor's financing.

48.     At 10:17 p.m. on May 5, 2022, Francis emailed Brown, "I've attached what I put together on Adam's association with Phoenix. While some claims in here might be brushed off as hearsay and conjecture, the entirety of the body of evidence points to a convicted criminal who pleaded guilty to defrauding mineral owners in Colorado as the controlling force that's actually running Phoenix. After digesting all of the instruments which have been filed with the SEC and elsewhere, for someone to consume those and still believe Adam is not actually running Phoenix

6

APP067

would be akin to believing his paralyzed father has been one of the most active mineral buyers in the Williston since Adam was arrested."

49.     The attachments to the 10:17 p.m. email made numerous false accusations about Phoenix's current Vice President of Engineering, Adam Ferrari, accused him of committing various crimes while omitting the fact that the charges were dropped and the matter vacated, and lying to investors about his role in the business.

50.     The only purpose for the May 5, 2022, communication was to harm Phoenix and improve Incline's position in the North Dakota marketplace thus unfairly exploiting North Dakotans holding mineral rights.

51.     On Monday, May 9, 2022, Justin Voll asked Phoenix's deal team a series of questions about our public debt program that was previously discussed at length. Voll's newfound interest in that program was a direct result of Francis's May 5 communication.

52.     On May 10, 2022, counsel for Phoenix tried to correct the misperceptions induced by Incline's smear campaign as follows:

> The only legal relationship that Mr. Ferrari has with the Company is an at-will consulting agreement which specifies that he provide engineering support and other advice specific to oil and mineral drilling and leaseholds.
> To our knowledge, Mr. Ferrari has no legal authority to bind the Company contractually, set policy for the Company or direct the actions of ANY employee of the Company.
> I understand that you have expressed some concern that not including Mr. Ferrari in the Offering Statement could constitute a material omission based upon Mr. Ferrari's "influence" with the Company. I disagree.
> Form 1-A speaks to disclosure specifically of directors, executive officers and "significant <u>employees</u>". Directors and executive officers are self-explanatory. "Significant employees" includes "persons such as production managers, sales managers and research scientists, who are not executive officers, but who make significant contributions to the business of the issuer." Again, Mr. Ferrari is neither an employee, nor does he have ANY authority to direct any employees or operations of the Company.
> Beyond the specific language of Form 1-A, without the ability or power to bind the Company or direct the Company's actions or policies, "influence" is, at best, a

APP068

subjective assessment. Indeed, the SEC has never adopted such a subjective standard. In various other contexts, the SEC has routinely adopted the language around the power to bind a company or direct the policies/actions/business of the Company, rather than a more subjective standard. Mr. Ferrari possesses no such power, and it strains credulity to determine when "influence" could equate to such power....

We analyzed all of this in the preparation of the disclosure. We further examined this with the managing broker-dealer for the offering, including their in-house counsel and compliance personnel, and reached the same conclusion. I have spent more than 26 years practicing securities law and, in fact, was very involved in lobbying Congress and SEC on "Regulation A+." I have dealt with companies at all stages of development, as well as advising on establishing advisory boards and working with their consultants. I have never had to try to assess the level of respect or esteem that an individual may enjoy with a company's management from the standpoint of materiality when that person has no ACTUAL management authority.

53.    On or about May 11, 2022, FIBT terminated the agreement in bad faith exercise of its discretion.

54.    FIBT terminated the agreement to provide $50,000,000 in financing to Phoenix in bad faith based on the statements made by Francis on behalf of Incline.

55.    As a result of the breach Phoenix was unable to obtain the $50,000,000 loan from FIBT that would have been invested in North Dakota and yielded tens of millions in profits for Phoenix and enabled more competitive pricing for North Dakotans selling and leasing land rights.

56.    To date Phoenix has not been able to secure a more advantageous first lien loan despite reasonable efforts to mitigate its damages.

57.    In June of 2022, Phoenix began discussions with DelMorgan & Co., a highly reputable brokerage service that connects capital with opportunity. Phoenix formally hired DelMorgan on August 10, 2022, with a $150,000 non-refundable commitment fee to replace the financing lost because of Incline's interference.

58.    Many other lenders were interested in lending to Phoenix, but none came close to the favorable terms FIBT offered and there were no viable alternatives for this sort of financing.

APP069

59.     FIBT could offer more favorable terms based on its familiarity with how the funds were being deployed (FIBT's president leased his land to Phoenix) and their deep relationship with Phoenix prior to Incline's interference.

60.     Phoenix has been forced to borrow extremely expensive money from lenders in order to continue to compete and replace the funds it lost as a result of Incline's interference actions. Since May 2022, Phoenix has taken $17,500,000 in hard money loans, costing $188,695 in origination fees and another $3,925,203 in interest.

61.     As a result of not obtaining the loan, Plaintiff has been burdened with hundreds of hours of unnecessary distractions, expensive fees, high interest rate loans and inadequate funds to compete in the oil and gas space.

62.     Phoenix has been forced to forego dozens of mineral and lease opportunities that could have been obtained with FIBT financing during an extraordinarily profitable period in the oil and gas industry.

APP070

## V.  CLAIMS

### COUNT ONE
### TORTIOUS INTERFERENCE WITH CONTRACT

63.     Plaintiff, Phoenix incorporates Paragraphs 1 through 62 as if set forth fully herein.

64.     Valid contracts existed between Phoenix and FIBT.

65.     Defendant, Incline knew of the contracts between Phoenix and FIBT, and communicated information or otherwise instigated FIBT to breach its contract with Phoenix.

66.     In their actions, Defendant Incline, acted intentionally to instigate the breach by FIBT or acted with knowledge that the breach would result.

67.     As a result, FIBT terminated ongoing business it had with Phoenix upon information and belief in favor of entering business with Incline.

68.     By their conduct, the Defendants intentionally interfered with contracts Phoenix retained, and there was no justification for Incline's actions.

69.     The interference was done with the direct purpose of injuring Phoenix and benefiting Incline at Phoenix's expense.

70.     Phoenix suffered damages, including but not limited to lost profits, lost future profits, and lost goodwill, as a result of the Defendants' actions in an amount to be determined at trial.

### COUNT TWO
### TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

71.     Plaintiff, Phoenix incorporates Paragraphs 1 through 62 as if set forth fully herein.

72.     Phoenix had a reasonable expectation of economic advantage or benefit, or otherwise had an ongoing business relationship or expectancy in maintaining its lender relationship with FIBT and entering into leases with mineral owners in North Dakota.

APP071

73.     Defendant Incline had knowledge of Phoenix's expectations of economic advantage, valid business relationships or expectancy.

74.     Defendant Incline wrongfully, without justification, and illegally interfered with Phoenix's reasonable expectation of economic advantage or benefit by willfully and maliciously causing FIBT to terminate their ongoing business with Phoenix and inducing mineral owners to pay more to Incline rather than do business with Phoenix by scaring the mineral owners with false disparaging statements about Phoenix.

75.     Incline's communication of false statements of fact, publishing other facts in a false light, unfairly competing, to consumers and businesses in North Dakota for the purpose of harming Phoenix was otherwise tortious.

76.     In the absence of Defendant's wrongful acts, it is reasonably probable that Plaintiff would have realized its economic advantage or benefit by entering into a $50,000,000 agreement with FIBT and entered into more leases with mineral owners in North Dakota and Defendants' actions were the proximate cause of the harm sustained by Phoenix.

77.     Phoenix has sustained actual damages as a result of Defendants' actions, including, but not limited to, lost profits, lost goodwill, and a termination of the company as a functional business equipment as of the date of the taking.

**COUNT THREE**
**UNFAIR COMPETITION**

78.     Plaintiff, Phoenix incorporates Paragraphs 1 through 62 as if set forth fully herein.

79.     The actions of Incline in unfairly diverting a loan from a competitor and making false statements of fact to sellers and lessors about Phoenix constitutes unfair competition in violation of Phoenix's rights under the common law of the state of North Dakota.

APP072

80.    The foregoing actions of defendants were committed willfully, knowingly, maliciously and in conscious disregard of Phoenix's rights.

81.    The foregoing actions of Incline caused immediate and irreparable injury to Phoenix's business and caused innocent consumers to pay a premium to Incline and still have their land drilled by Phoenix.

82.    Phoenix is entitled to relief for defendants' unfair competition, including an accounting for and a constructive trust over, followed by the return of all property and profits wrongfully obtained by defendants from said unfair competition, damages, and interest and costs as allowed by law.

**COUNT FOUR**
**UNJUST ENRICHMENT**

83.    Plaintiff, Phoenix incorporates Paragraphs 1 through 62 as if set forth fully herein.

84.    Incline was enriched as a result of Phoenix losing its loan from FIBT because Incline was able to directly reduce funds available to its most direct competitor.

85.     Incline is aware of its one competitive advantage, its funding and ability to close quickly. Incline knew that damaging its competition's capital position would allow it to continue to lowball offers to mineral sellers and lessors in North Dakota without fear of adequate competition.

86.    Incline's enrichment came at the expense of Phoenix.

87.     Incline cannot compete with Phoenix head-to-head. Phoenix has a reputation for paying top dollar, for following through with its word, and for treating folks with respect.

88.    Access to capital is the only advantage Incline has and by preserving that advantage it was unjustly enriched by in excess of $5,000,000.

89.    Phoenix was harmed as a direct result of the Incline's enrichment.

APP073

## VI. PRAYER FOR RELIEF

90.  WHEREFORE, Plaintiff, Phoenix Capital Group Holdings, LLC, respectfully requests the following relief:

A. Enter a judgment in favor of Phoenix and against the Incline on all counts in an amount to be determined at trial in excess of $10,000,000.00 and to pay damages to Phoenix, including, but not limited to, compensatory damages, exemplary damages in excess of $10,000,000, attorneys' fees, interest, and reasonable costs and disbursements;

B. Enjoin Incline from further acts of unfair competition;

C.  Grant all other relief the Court deems just and proper in the premises.

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

Dated this 20th day of October, 2023.

LOFTUS & EISENBERG, LTD.

*Alexander Loftus*

By:    Alexander Loftus, Esq.
       Ross Good, Esq.
       LOFTUS & EISENBERG, LTD.
       161 N. Clark St. Suite 1600
       Chicago, Illinois 60601
       T: 312.332.4200
       alex@loftusandeisenberg.com
       ross@loftusandeisenberg.com

13

APP074

ILND 44 (Rev. 07/10/17)

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

## I. (a) PLAINTIFFS

PHOENIX CAPITAL GROUP HOLDINGS, LLC

## DEFENDANTS

INCLINE ENERGY PARTNERS, L.P..

**(b)** County of Residence of First Listed Plaintiff   Illinois
*(Except in U.S. plaintiff cases)*

County of Residence of First Listed Defendant   Texas
*(In U.S. plaintiff cases only)*
Note: In land condemnation cases, use the location of the tract of land involved.

**(c)** Attorneys *(firm name, address, and telephone number)*

Alexander Loftus, Loftus & Eisenberg, Ltd. 161 N. Clark, Suite 1600
Chicago, Illinois 60601

Attorneys *(if known)*

## II. BASIS OF JURISDICTION *(Check one box, only.)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government not a party)*
- ☑ 4  Diversity *(Indicate citizenship of parties in Item III.)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated *and* Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Check one box, only.)*

| CONTRACT | TORTS | | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | **Habeas Corpus:** | ☐ 720 Labor/Management Relations | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | ☐ 530 General | ☐ 740 Railway Labor Act | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 367 Health Care/ Pharmaceutical | ☐ 535 Death Penalty | ☐ 751 Family and Medical Leave Act | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Personal Injury Product Liability | ☐ 540 Mandamus & Other | ☐ 790 Other Labor Litigation | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury | ☐ 550 Civil Rights | ☐ 791 Employee Retirement | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Product Liability | ☐ 555 Prison Condition | Income Security Act | ☐ 460 Deportation |
| ☐ 153 Recovery of Veteran's Benefits | ☐ 350 Motor Vehicle | | ☐ 560 Civil Detainee – Conditions of Confinement | | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **PERSONAL PROPERTY** | | **PROPERTY RIGHTS** | ☐ 480 Consumer Credit |
| ☑ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 370 Other Fraud | | ☐ 820 Copyrights | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 371 Truth in Lending | | ☐ 830 Patent | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 380 Other Personal Property Damage | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 890 Other Statutory Actions |
| | | ☐ 385 Property Damage Product Liability | | ☐ 840 Trademark | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **BANKRUPTCY** | **FORFEITURE/PENALTY** | **SOCIAL SECURITY** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 861 HIA (1395ff) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **IMMIGRATION** | | ☐ 864 SSID Title XVI | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 462 Naturalization Application | | ☐ 865 RSI (405(g)) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition ) | | **FEDERAL TAXES** | |
| | ☐ 448 Education | ☐ 465 Other Immigrant Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | | | ☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Check one box, only.)*

- ☑ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation
- ☐ 8  Multidistrict Litigation Direct File

## VI. CAUSE OF ACTION
*(Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)*

Tortuous Interference

## VII. Previous Bankruptcy Matters
*(For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)*

## VIII. REQUESTED IN COMPLAINT:

☐ Check if this is a **class action** under Rule 23, F.R.CV.P.

DEMAND $ 20,000,000

Check Yes only if demanded in complaint.
JURY DEMAND:  ☑ Yes  ☐ No

## IX. RELATED CASE(S) IF ANY
*(See instructions)*

Judge _____    Case Number _____

## X. Is this a previously dismissed or remanded case?  ☐ Yes  ☑ No  If yes, Case #

| | | |
|---|---|---|
| Date | Signature of attorney of record | Name of Judge |
| 10/20/2023 | /s/ Alexander N. Loftus | |

APP075

# EXHIBIT A-7

11/20/23, 1:43 PM                                  Case Docketed Events



**12th Judicial Circuit Court, Illinois**
**Honorable Andrea Lynn Chasteen**
**Clerk of the Circuit Court**



*iPublic*™

**12th Judicial Circuit Court, Will Cou**
**IL**
**Case Docketed Events**

| Parties | Offenses | Financials | Schedule | Events |

---

**Case:** 2023CH000113      **Status:** Closed      **Opened:** 06/20/2023      **Closed:**

**Title:** PHOENIX CAPITAL GROUP HOLDINGS vs. NO DEFENDANT

**Type:** CHANCERY                    **File Type:** Injunction

---

| Event Date | Docket Entry |
|---|---|
| 11/14/2023 | **File is Closed / Dismissed** |
| 11/14/2023 | **AB - Dismissed without Prejudice**<br>Plaintiff by Attorney, Ross Good. Defendant not present. Cause comes on for status. On Plaintiff's oral motion, cause is dismissed without prejudice. |
| 10/25/2023 | **E-Copy Copy Work** |
| 10/24/2023 | **E-Copy Copy Work** |
| 10/10/2023 | **ORDER** |
| 10/10/2023 | **AB - Cause set for Status**<br>Plaintiff present by Attorney, Ross Good. Defendant not appearing. Case comes on for case management. Google LLC and Reddit, INC., are dismissed as Respondents in discovery. Cause continued for status. Order to be submitted electronically. |
| 09/29/2023 | **E-Copy Copy Work** |
| 09/06/2023 | **ORDER** |
| 09/06/2023 | **ORDER** |
| 09/06/2023 | **DV - Status**<br>Plaintiff by Attorney, Ross Good. Defendant not present. Cause comes on for Plaintiff's motion for commission for the purpose of taking out of state deposition and obtaining documents and Plaintiff's motion for entry of court order in order to pursue immediate third party discovery. Motions are granted. Future court dates to stand. Orders to be submitted electronically. |
| 08/31/2023 | **MOTION FOR COMMISSION** |
| 08/31/2023 | **NOTICE OF MOTION** |
| 08/30/2023 | **NOTICE OF MOTION** |
| 08/25/2023 | **EXHIBIT(S)** |

© 2011-2023, The Clerk of the 12th Judicial Circuit Court, Will County, Illinois, All Rights Reserved.
By using this service, the user agrees and understands that he or she is bound by the on-line access to

APP077

Case Docketed Events

 **12th Judicial Circuit Court, Illinois**
**Honorable Andrea Lynn Chasteen**
**Clerk of the Circuit Court**



**12th Judicial Circuit Court, Will Cou**
**IL**

**Case Docketed Events**

| Parties | Offenses | Financials | Schedule | Events |
|---|---|---|---|---|

| **Case:** 2023CH000113 | **Status:** Closed | **Opened:** 06/20/2023 | **Closed:** |
|---|---|---|---|
| **Title:** PHOENIX CAPITAL GROUP HOLDINGS vs. NO DEFENDANT | | | |
| **Type:** CHANCERY | | **File Type:** Injunction | |

| 06/20/2023 | **PETITION** |
|---|---|
| 06/20/2023 | **INJUNCTION** |

## Informational Message

### Site Availability:

- This site is unavailable Monday through Saturday from 11:50 pm CST until 3:00 am CST the next morning, and Sunday from 11:50 pm CST until Monday morning at 4:00 am CST.

© 2011-2023, The Clerk of the 12th Judicial Circuit Court, Will County, Illinois, All Rights Reserved.
By using this service, the user agrees and understands that he or she is bound by the on-line access to

APP078

# EXHIBIT A-8

APP079



2155 E. GoDaddy Way, Tempe, AZ 85284

August 7, 2023

Ross Good, Esq.
Loftus & Eisenberg, Ltd.
161 N. Clark Suite 1600
Chicago, IL 60601

Re:     *adamferrarioilandgaslawsuits.com*
        GDG Ref No. 23-68177

Dear Mr. Good:

Please consider this GoDaddy.com, LLC's official response to the Subpoena issued by the Will
County, Illinois Circuit Court of the Twelfth Judicial District.  In response to that Subpoena, we
are herewith producing approximately fifteen (15) pages of documents which have been Bates
labeled as GD 000001- GD 000015.  These documents contain confidential, proprietary, trade
secret, and/or private information that warrants special protection from public disclosure and
from use for any purpose other than prosecuting or defending the action in which the subpoena is
served.  It is imperative that any documents designated "CONFIDENTIAL" receive confidential
treatment.  Confidential treatment includes: (1) limiting access to these documents to the parties
in this litigation, their agents, and the court and its personnel; (2) taking the procedural steps
necessary to file under seal any portion of any submission to the court that refers to or
incorporates these documents; and (3) destroying all CONFIDENTIAL documents included in
this production, including copies thereof, within 60 days after the final disposition of the action
in which the subpoena is served.  More information can be found in GoDaddy's Subpoena
Policy/Attorney Tips, available on our Legal page.  You should assume that if categories of
documents called for in the subpoena are not included in the produced documents,
GoDaddy.com has no responsive documents for such categories.

We have also enclosed an executed Certificate of Authenticity.

If this case involves a domain name dispute, please provide courtdisputes@godaddy.com with a
file copy of the complaint so that they may place the domain name on registrar lock pending the
outcome of the case.

August 7, 2023
Page 2 of 2

Please remit your check in the amount of $37.50 to cover the cost of production.

Copying, printing and reproduction

    .5 Hour x $75.00 per Hour                $37.50

TOTAL                                  $37.50

If we can assist further, please do not hesitate to contact me via email at
compliancemgr@godaddy.com.

                      Very truly yours,

                      GODADDY.COM, LLC

                      Reanna McCarty
                      Legal-Admin II

Enclosure

APP081

## CERTIFICATE OF AUTHENTICITY
## OF
## BUSINESS RECORDS

I, Reanna McCarty, declare that I am employed by GoDaddy.com, LLC, and that my office title or position is Legal-Admin II.  I further declare that I am a custodian of records of said business and that each of the records attached hereto is the original or a duplicate (exact photocopy) of an original record in the custody of GoDaddy.com, LLC.

I further state that:

1.  Such records were made, at or near the times of the occurrence of the matters set forth by (or from information transmitting by) a person with knowledge of those matters;

2.  such records are kept in the course of a regularly conducted business activity;

3.  the business activity made such records as a regular practice; and

4.  if such records are not the originals, such records are duplicates of the originals.

I declare under penalty of perjury the forgoing is true and correct.

Dated this 7th day of August 2023.

Reanna McCarty
Legal-Admin II
GoDaddy.com, LLC.
2155 E. GoDaddy Way
Tempe, AZ 85284

APP082

GoDaddy Subpoena Compliance
07-12-23
Reference: 23-68177

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
WILL COUNTY, ILLINOIS LAW DIVISION**

Phoenix Capital Group Holdings, LLC,

        Plaintiff,

        v.            No. 2023CH000113

ANB Bank, Dalmore Group, LLC, Domains
By Proxy, LLC, GoDaddy.com, LLC,
Google LLC, Reddit, Inc.,

        Respondents in Discovery.

To:    Godaddy.com, LLC
       2155 E. GoDaddy Way,
       Tempe, AZ 85284

YOU ARE COMMANDED to mail the following documents in your possession or control to

Loftus & Eisenberg, Ltd.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
on or before July 19, 2023. at 12:00 P.M.

(THIS IS FOR RECORDS ONLY. THERE WILL BE NO ORAL INTERROGATORIES.):

    1.    Any and all documents referring or relating to hosting of adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

    2.    Any and all documents referring or relating to the payment received by GoDaddy for web registration of adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

    3.    Any and all documents indicating who is the owner of adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

    4.    Any and all documents indicating what person or entity registered the domain adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

    5.    Any and all documents indicating the internet service provider and IP address of the user who created adamferrarioilandgaslawsuits.com.

    YOUR FAILURE TO RESPOND TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT FOR CONTEMPT OF THIS COURT.

Issued by: Loftus & Eisenberg, Ltd.
161 N. Clark, Suite 1600, Chicago, Illinois 60601
Date: June 23, 2023

# EXHIBIT A-9

APP084

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | | |
|---|---|---|
| ADAM FERRARI | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 3:23-CV-455 |
| WILLIAM FRANCIS | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          FINDIT, INC.  c/o Incorp Services, Inc.
          3773 HOWARD HUGHES PKWY STE 500S Las Vegas, NV, 89169

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Rider

| Place: Ross M. Good, Esq., Loftus & Eisenberg, Ltd. 161 N. Clark, Suite 1600, Chicago, IL 60601 | Date and Time: 11/29/2023 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 11/08/2023

*CLERK OF COURT*

OR

_____          /s/Ross M. Good
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* __Plaintiff__
ADAM FERRARI _____ , who issues or requests this subpoena, are:

Ross Good, Loftus & Eisenberg, Ltd., ross@loftusandeisenberg.com, (786) 539-3952

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

APP085

**ADAM FERRARI v. WILLIAM FRANCIS**
**USDC – NORTHERN DISTRICT OF TEXAS – Civil Action No. 3:23-CV-455**

### Rider to Subpoena

**DEFINITIONS:**

1.      The term "**Communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise). By way of illustration only, communication includes, but is not limited to, telephone conversations, letters, e-mails, SMS texts, notes, telegrams, teletypes, telecopies, memoranda, face-to-face conversations, Facebook, Whatsapp, Signal, Instagram, or Twitter communications, and any other forms of textual or written communication, including any web-based, website-based, or other forms of electronic communication or record of a communication.

2.      The term "**Document**" includes each and every form of communication, including all written, printed, typed, recorded, or graphic matter of any kind, type, nature, or description, in whatever form (e.g., final and draft versions) that is or has been in Your actual or constructive possession, custody or control, including all printed and electronic copies of email, electronic text, chat, or direct messages sent on any platform (such as SMS, iMessage, WhatsApp, Signal, Confide, Telegram, Facebook, Instagram, Twitter, Slack, Microsoft Teams, Google Chat, Zoom, etc.), notes, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, teletypes, telexes, facsimiles, invoices, order forms, checks, drafts, statements, credit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, pamphlets or any written or recorded materials of any other kind, however stored (whether in tangible or electronic form), recorded, produced or reproduced, including backups.

3.      "You" refers to subpoena respondent.

4.      "Relevant Time Period" means January 1, 2017 to Present"

**TOPICS:**

1.   Any and all documents and communications related to (a) lawsuitsoilandgas.com and (b) adamferrarioilandgaslawsuits.com, during Relevant Time Period.

2.   Any and all documents referring or relating to payment(s) received by you relating to (a) lawsuitsoilandgas.com and (b) adamferrarioilandgaslawsuits.com, including but not limited to full credit card numbers, during Relevant Time Period.

**INSTRUCTIONS:**

Responsive data should be emailed if possible to ross@loftusandeisenberg.com.

Questions should be directed to Ross Good at ross@loftusandeisenberg.com or (786) 539-3952.

1

# EXHIBIT A-10

APP087

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-CV-455 |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

## ADAM FERRARI'S FIRST REQUESTS FOR PRODUCTION TO WILLIAM FRANCIS

Plaintiff Adam Ferrari. ("Ferrari") hereby serves the following Requests for Production to Defendant William Francis ("Francis"). Ferrari requests Francis produce documents responsive to these Requests in accordance with the Federal Rules of Civil Procedure.

### INSTRUCTIONS

1. The time frame covered by these discovery requests shall be January 1, 2016 to the present (the "Relevant Time Period"), unless otherwise indicated by a particular topic or request.

2. All responses shall comply with the requirements of the Federal Rules of Civil Procedure and the Local Rules for this Court.

3. The following Requests shall be deemed continuing in nature. In the event You become aware of or acquire additional information relating or referring to any of the following Requests, such additional information is to be promptly produced.

4. You are to produce all responsive Documents in Your possession, custody, or control, wherever located, including those in the possession, custody, or control of Your representatives and affiliates. Documents are deemed to be in Your possession, custody, or control if they are in Your physical custody, or if they are in the physical custody of any other person or entity and You: (i) own such Document in whole or in part; (ii) have a right, by contract, statute,

1

or otherwise, to use, inspect, examine, or copy such Document on any terms; (iii) have an understanding, express or implied, that You may use, inspect, examine, or copy such Document on any terms; or (iv) as a practical matter, You have been able to use, inspect, examine, or copy such Document when You sought to do so. Documents in Your control also includes those in the possession or custody of any of Your financial or other advisors or any of their respective affiliates. If any requested Document was, but no longer is, in Your control, state the disposition of each such Document.

5.      If any Document requested herein was formerly in Your possession, custody or control and has been lost or destroyed or otherwise disposed of, You are requested to submit in lieu of any such Document a written statement (a) describing in detail the nature of the Document and its contents, (b) identifying the person(s) who prepared or authored the Document and, if applicable, the person(s) to whom the Document was sent, (c) specifying the date on which the Document was prepared or transmitted, and (d) specifying the date on which the Document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the person(s) requesting and performing the destruction.

6.      If any part of the following Requests cannot be responded to in full, respond to the extent possible, specifying the reason(s) for Your inability to respond to the remainder and stating whatever information or knowledge You have concerning the portion to which You do not respond.

7.      If You object to any of these Requests, state in writing with specificity the grounds of Your objections. Any ground not stated shall be deemed waived. If You object to a particular portion of any Request, You shall respond to the remaining portions of such Request as to which there is no objection and state with specificity the grounds of the objection.

APP089

8.      Where any copy of any Document whose production is sought herein, whether a draft or final version, is not identical to any copy thereof, by reason of alterations, notes, comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto, all such non-identical copies are to be produced separately.

9.      Copies of all Documents available electronically should be delivered in uncompressed native format with all metadata intact, e.g., the "Last Modified Date" property of a Word document should not be altered during the production process such that the production date becomes the last modified date.

10.      In the Definitions, Instructions, and Requests:

    a.      The words "and" and "or" are to be construed both conjunctively and disjunctively;

    b.      The singular form of a noun or pronoun includes the plural form and vice versa;

    c.      The word "all" shall also include "each of," and vice versa; and

    d.      The word "any" shall be construed to mean "any and all" where the effect of such construction is to broaden the scope of the Request.

11.      If there are no Documents responsive to a Request, state so in writing.

12.      A Request for any Document shall be deemed to include any and all transmittal letters, exhibits, enclosures, or attachments to such Document, in addition to its full and unexpurgated form.

13.      Documents should be segregated according to the number of the Request to which You are responding or produced in the manner they are kept in the ordinary course of business. Documents attached to each other should not be separated, e.g., files attached to emails should remain linked to the email.

14.      If any privilege is claimed as to any Communication requested herein:

3

a.    State the nature of the privilege claim (attorney/client communication, attorney work product, etc.);

b.    State the name of the party claiming privilege and the name of the attorney, if any, with respect to whom the privilege is claimed;

c.    State the basis for claiming the privilege as to the specific Communication;

d.    Identify all persons present at any Communication to which privilege is claimed and all persons to whom the subject matter of the Communication was discussed or disclosed; and

e.    State the date of each such Communication.

15.    If any privilege is claimed as to any Document requested herein:

a.    State the nature of the privilege claimed (attorney/client communication, attorney work product, etc.);

b.    State the basis for claiming the privilege as to the specific Documents; and

c.    State the date of such Document; identify the type of document (i.e., letter, memo, email, email attachment, etc.); set forth the subject matter thereof; identify each person who prepared it; identify each person (if any) who signed it; identify each person to whom it was directed, circulated, or shown; and identify each person now in possession of the Document.

16.    If a Request concerns Communications with and/or actions by an entity, then the Request should be interpreted to include Communications with or actions by agents acting on an entity's behalf.

## **DEFINITIONS**

The following terms are defined and used in these Requests as follows:

17.    The term "**Communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise). By way of illustration only, communication includes, but is not limited to, telephone conversations, letters, e-mails, SMS texts, notes, telegrams, teletypes, telecopies, memoranda, face-to-face conversations, Facebook, Whatsapp, Signal, Instagram, or Twitter communications, and any other forms of textual or written communication, including any

4

web-based, website-based, or other forms of electronic communication or record of a communication.

18.    The term "**Document**" includes each and every form of communication, including all written, printed, typed, recorded, or graphic matter of any kind, type, nature, or description, in whatever form (e.g., final and draft versions) that is or has been in Your actual or constructive possession, custody or control, including all printed and electronic copies of email, electronic text, chat, or direct messages sent on any platform (such as SMS, iMessage, WhatsApp, Signal, Confide, Telegram, Facebook, Instagram, Twitter, Slack, Microsoft Teams, Google Chat, Zoom, etc.), notes, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, teletypes, telexes, facsimiles, invoices, order forms, checks, drafts, statements, credit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, pamphlets or any written or recorded materials of any other kind, however stored (whether in tangible or electronic form), recorded, produced or reproduced, including backups.

1.    The term "**including**" means including without limitation.

2.    The terms "**You**" or "**Your**" refers to William Francis, Defendant in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf; including, but not limited to Incline Energy.

5

3.      The term "**Adam Ferrari**" means Adam Ferrari, Plaintiff in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf.

4.      The term "**Daniel Ferrari**" means Daniel Ferrari, an individual and relative of Adam Ferrari.

5.      The term "**Charlene Ferrari**" means Charlene Ferrari, an individual and relative of Adam Ferrari.

6.      The term "**Phoenix Capital Group**" means Phoenix Capital Group Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

7.      The term "**Ferrari Energy**" means Ferrari Energy Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

8.      The term "**Wolfhawk Energy**" means Wolfhawk Energy Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

9.      The term "**Incline Energy**" means Incline Energy Partners, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

6

19.     The term "**Greeley Tribune**" means Greeley Publishing Company, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to (1) **Joe Moylan,** (2) **Jerry Martin, and (3) Trevor Reid**.

20.     The term "**SEC**" means The U.S. Securities and Exchange Commission its subsidiaries, divisions, and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

21.     The term "**Jennifer Davis**" means Jennifer Davis, a resident of Oregon in 2016.

22.     The term "**Crystal Taylor**" means Crystal Taylor, whose email address is [cat44771@yahoo.com](mailto:cat44771@yahoo.com).

23.     The term "**John Hodgin**" means John Hodgin, a petroleum engineer.

24.     The term "**Denver DA**" means District Attorney for Denver County Colorado District Attorney's Office including but not limited to Danielle Sexton.

25.     The term "**Denver Police Department**" means the Denver Police Department, its subsidiaries, divisions, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

26.     The term "**FINRA**" means Financial Industry Regulatory Authority, Inc., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and any  other person who ever served in any such capacity.

APP094

27.     The term "**EnergyNet**" means EnergyNet.com, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and any person who ever served in any such capacity.

28.     The term "**Dalmore**" means Dalmore Group, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and including any person who ever served in any such capacity.

29.     The term "**Long Reimer Winegar LLP**" means Long Reimer Winegar LLP, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including Kris Koski, and including any person who ever served in any such capacity.

30.     The term "**Barclay Leib**" means Barclay Leib, CFE, CAIA of Morristown NJ.

31.     The term "**FindIt**" means FINDIT, INC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Tom Powers, (2) Raymond Firth, (3) Dean Powers, and (4) Peter Tosto, and including any person who ever served in any such capacity.

32.     The term "**Lorene Butler Mineral Owners**" means owners of mineral rights in Williams County North Dakota.

33.     The term "**Smith Mineral Owners**" means Mark S Smith or Marilyn L Nardini-Smith, owners of mineral rights in Williams County North Dakota.

APP095

34.     The term "**Firenza Mineral Owners**" means Patricia Firenza, owner of mineral rights in Williams County North Dakota.

35.     The term "**Wilson Mineral Owners**" means Darrell Wilson, owner of mineral rights in Williams County, North Dakota.

36.     The term "**Thornton Colorado**" means the government for the city of Thronton Colorado, and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to Scott Twombly and Steven Louis-Prescott.

37.     The term "**Hansrude Sather Farms**" means Hansrude Sather Farms, LLLP. And Meagher Energy Advisors, their subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Bradley K. Sather and (2) Nick Asher, and including any person who ever served in any such capacity.

38.     The term "**Eagle River Energy Advisors**" means Eagle River Energy Advisors, LLC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Steve Florentine, (2) Blake Nance, (3) Austin McKee, and including any person who ever served in any such capacity.

39.     The term "**Rudman Family Trust**" means Rudman Family Trust, owners of mineral rights in North Dakota, including Hiram Luicius.

40.     The term "**The Petram Group**" means The Petram Group, LLC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and

APP096

attorneys, including (1) Scott Fey, (2) Larry Fey, (3) Dan Rose, (4) Kent Tedford, and (5) Mark Anderson, and including any person who ever served in any such capacity.

41.     The term "**Dines Family**" means Dines Family Trust, owners of mineral rights in Weld County Colorado, including Winston Dines and Holliday Dines.

42.     The term "**Arthur Bishop**" means Arthur Bishop of Cape Town South Africa.

43.     The term "**Ryan Werking**" means Ryan Werking of Denver, Colorado.

44.     The term "**Duchossois Group**" means THE DUCHOSSOIS GROUP, INC. and THE DUCHOSSOIS FAMILY FOUNDATION., their subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

45.     The term "**ANB Bank**" means ANB Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

46.     The term "**JPMorgan Chase Bank**" means JPMorgan Chase & Co (NYESE:JPM), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

47.     The term "**TPG Specialty Lending**" means TPG Specialty Lending, Inc., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

48.     The term "**Texas Capital Bank**" means Texas Capital Bank, N.A.., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

49.     The term "**Prosperity Bank**" means Prosperity Bank, f/k/a LegacyTexas Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

50.     The term "**CrossFirst Bank**" means CrossFirst Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

51.     The term "**MUFG Union Bank**" means MUFG Union Bank, N.A., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

52.     The term "**Capital One Financial**" means Capital One Financial Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

53.     The term "**G. Warren Smith II**" means G. Warren Smith II of Colorado.

54.     The term "**4 GRLZ Investments**" means 4 GRLZ Investments, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and

APP098

each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

55.     The term "**Hess Corporation**" means Hess Corporation (NYSE:HESS), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

56.     The term "**Continental Resources**" means Continental Resources, Inc. (https://www.clr.com/), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

57.     The term "**GTCR**" means GTCR, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

58.     The term "**ExxonMobil**" means ExxonMobil Corporation (ExxonMobil (NYSE:XOM), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

59.     The term "**Royalty Asset Holdings**" means Royalty Asset Holdings, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and

APP099

each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

60.     The term "**Chevron**" means Chevron Corporation (NYSE:CVX), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to (1) PDC Energy (NASDAQ:PDCE), (2) Great Western Petroleum, LLC, and (3) Noble Energy, Inc.

61.     The term "**Bayswater**" means Bayswater Exploration & Production, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

62.     The term "**Raisa II Holdings**" means Raisa II Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

63.     The term "**Rearden Minerals**" means Rearden Minerals, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

64.     The term "**Sitio Royalties**" means Sitio Royalties Corp (NYSE:STR), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and

13

each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

65.     The term "**Whiting Oil and Gas Corporation**" means Whiting Oil and Gas Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

66.     The term "**Chord Energy**" means Chord Energy Corporation (NASDAQ:CHRD), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to Oasis Petroleum North America LLC.

67.     The term "**Kraken Oil & Gas**" means Kraken Oil & Gas, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

68.     The term "**ConocoPhillips**" means ConocoPhillips Company (NYSE:COP), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

69.     The term "**Devon Energy Production**" means Devon Energy Production Company, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives,

14

consultants, accountants, and attorneys, including any person who ever served in any such capacity.

70.     The term "**Enerplus**" means Enerplus Resources (USA) Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

71.     The term "**EOG RESOURCES**" means EOG RESOURCES, INC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

72.     The term "**SOGC**" means SOGC, Inc., f/k/a Sinclair Oil Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

73.     The term "**relating to**" means in whole or in part constituting, containing, concerning, embodying, reflecting, describing, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to.

74.     The term "**Complaint**" refers to Plaintiffs' First Amended Complaint including Exhibits A-H, and Jury Demand, filed April 13, 2023. (Doc. 7).

75.     Any undefined terms are to be defined in the manner in which they are used in the Complaint.

15

## REQUESTS

1.      Any and all communications between You on the one hand, and any individual or

entity, including but not limited to

      a.      Greeley Tribune,
      b.      SEC,
      c.      Jennifer Davis,
      d.      Crystal Taylor,
      e.      John Hodgin,
      f.      Denver DA,
      g.      Denver Police Department,
      h.      FINRA,
      i.      EnergyNet,
      j.      Dalmore,
      k.      Long Reimer Winegar LLP,
      l.      Barclay Leib,
      m.      FindIt,
      n.      Lorene Butler Mineral Owners,
      o.      Smith Mineral Owners,
      p.      Firenza Mineral Owners,
      q.      Wilson Mineral Owners,
      r.      Thornton Colorado,
      s.      Hansrude Sather Farms,
      t.      Eagle River Energy Advisors,
      u.      Rudman Family Trust,
      v.      The Petram Group,
      w.      Dines Family,
      x.      Arthur Bishop,
      y.      Ryan Werking,
      z.      Duchossois Group,
      aa.      ANB Bank,
      bb.      JPMorgan Chase Bank,
      cc.      TPG Specialty Lending,
      dd.      Texas Capital Bank,
      ee.      Prosperity Bank,
      ff.      CrossFirst Bank,
      gg.      MUFG Union Bank,
      hh.      Capital One Financial,
      ii.      G. Warren Smith II,
      jj.      4 GRLZ Investments,
      kk.      Hess Corporation,
      ll.      Continental Resources,
      mm.      GTCR,
      nn.      ExxonMobil,

16

oo.    Royalty Asset Holdings,
pp.    Chevron,
qq.    Bayswater,
rr.    Raisa II Holdings,
ss.    Rearden Minerals,
tt.    Sitio Royalties,
uu.    Whiting Oil and Gas Corporation,
vv.    Chord Energy,
ww.    Kraken Oil & Gas,
xx.    ConocoPhillips,
yy.    Devon Energy Production,
zz.    Enerplus,
aaa.    EOG RESOURCES, and
bbb.    SOGC,

during the Relevant Time Period, discussing, disparaging, defaming, opining as to the character, reputation, or conduct of, or in any other form regarding or relating to (1) Adam Ferrari, (2) Phoenix Capital Group, (3) Ferrari Energy, (4) Wolfhawk Energy, (5) Daniel Ferrari, and/or (6) Charlene Ferrari.

2.    Any and all communications related to lawsuitsoilandgas.com, including but not limited to the registration, ownership, and contents thereof during the Relevant Time Period.

3.    Any and all documents related to lawsuitsoilandgas.com, including but not limited to the registration, ownership, and contents thereof during the Relevant Time Period.

4.    Any and all communications related to adamferrarioilandgaslawsuits.com, including but not limited to the registration, ownership, and contents thereof during the Relevant Time Period.

5.    Any and all documents related to adamferrarioilandgaslawsuits.com, including but not limited to the registration, ownership, and contents thereof during the Relevant Time Period.

6.    Any and all communications sent to and/or received by the email address "criminal@gmail.com" during the Relevant Time Period.

7.      Any and all communications sent to and/or received by the email address "concernedbakkenmineralowner@gmail.com" during the Relevant Time Period.

8.      Any and all communications related to out-bidding Adam Ferrari in any mineral acquisition deal during the Relevant Time Period.

9.      Any and all documents evidencing that Adam Ferrari was the CEO of Phoenix Capital Group and/or directly organized Phoenix Capital Group during the Relevant Time Period.

10.     Any and all documents evidencing Your opinion of Adam Ferrari during the Relevant Time Period.

11.     Any and all drafts of documents made by You which were subsequently sent to those identified in Request 1.

12.     Any and all communications evidencing Your opinion of Adam Ferrari during the Relevant Time Period.

13.     Any and all documents evidencing Adam Ferrari has been convicted of a felony.


Dated:  November 8, 2023                  Respectfully submitted,

                                          _/s/Ross M. Good_____
                                          One of Plaintiff's Attorneys

Ross Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark Suite 1600
Chicago, Illinois 60601
p: (786) 539-3952
ross@loftusandesienberg.com

APP105

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record via electronic mail and pursuant to the Federal Rules of Civil Procedure on November 8, 2023.

<u>*/s/ Ross M. Good*</u>
Ross M. Good

19

# EXHIBIT A-11

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-CV-455 |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

## ADAM FERRARI'S FIRST REQUESTS FOR ADMISSION OF FACTS DIRECTED TO DEFENDANT

Pursuant Federal Rules of Civil Procedure 36, Defendant, ADAM FERRARI ("Plaintiff"), requests that Defendant, William Francis, ("Defendant"), separately admit or deny the statements of fact herein within 30 days of service.

## DEFINITIONS & INSTRUCTIONS

1.      The time frame covered by these discovery requests shall be January 1, 2016 to the present (the "Relevant Time Period"), unless otherwise indicated by a particular topic or request.

2.      The term "**Communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise). By way of illustration only, communication includes, but is not limited to, telephone conversations, letters, e-mails, SMS texts, notes, telegrams, teletypes, telecopies, memoranda, face-to-face conversations, Facebook, Whatsapp, Signal, Instagram, or Twitter communications, and any other forms of textual or written communication, including any web-based, website-based, or other forms of electronic communication or record of a communication.

3.      The term "**Document**" includes each and every form of communication, including all written, printed, typed, recorded, or graphic matter of any kind, type, nature, or description, in

1

whatever form (e.g., final and draft versions) that is or has been in Your actual or constructive possession, custody or control, including all printed and electronic copies of email, electronic text, chat, or direct messages sent on any platform (such as SMS, iMessage, WhatsApp, Signal, Confide, Telegram, Facebook, Instagram, Twitter, Slack, Microsoft Teams, Google Chat, Zoom, etc.), notes, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, teletypes, telexes, facsimiles, invoices, order forms, checks, drafts, statements, credit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, pamphlets or any written or recorded materials of any other kind, however stored (whether in tangible or electronic form), recorded, produced or reproduced, including backups.

4.     If you decline to respond to a Request to Admit in whole or in part because of a claim of privilege, please: (a) identify the nature of the document or information (*e.g.* email, letter, memorandum, *etc.*); (b) state its date; (c) identify its author; (d) identify each person to whom the document or information was sent or shown or with whom the content was otherwise shared; (e) state the alleged privilege that applies; and (f) state the facts upon which the privilege is based.

5.     "**You**" or "**Your**" refers to William Francis, Defendant in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf; including, but not limited to Incline Energy.

2

6.      The term "**Adam Ferrari**" means Adam Ferrari, Plaintiff in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf.

7.      The term "**Daniel Ferrari**" means Daniel Ferrari, an individual and relative of Adam Ferrari.

8.      The term "**Charlene Ferrari**" means Charlene Ferrari, an individual and relative of Adam Ferrari.

9.      The term "**Phoenix Capital Group**" means Phoenix Capital Group Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

10.     The term "**Ferrari Energy**" means Ferrari Energy Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

11.     The term "**Incline Energy**" means Incline Energy Partners, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

12.     The term "**Greeley Tribune**" means Greeley Publishing Company, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and

attorneys, including any person who ever served in any such capacity including but not limited to (1) **Joe Moylan,** (2) **Jerry Martin, and** (3) **Trevor Reid**.

13.    The term "**SEC**" means The U.S. Securities and Exchange Commission its subsidiaries, divisions, and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

14.    The term "**Jennifer Davis**" means Jennifer Davis, a resident of Oregon in 2016.

15.    The term "**Crystal Taylor**" means Crystal Taylor, whose email address is cat44771@yahoo.com.

16.    The term "**John Hodgin**" means John Hodgin, a petroleum engineer.

17.    The term "**Denver DA**" means District Attorney for Denver County Colorado District Attorney's Office including but not limited to Danielle Sexton.

18.    The term "**Denver Police Department**" means the Denver Police Department, its subsidiaries, divisions, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

19.    The term "**FINRA**" means Financial Industry Regulatory Authority, Inc., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and any  other person who ever served in any such capacity.

20.    The term "**EnergyNet**" means EnergyNet.com, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees,

managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and any person who ever served in any such capacity.

21.      The term "**Dalmore**" means Dalmore Group, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and including any person who ever served in any such capacity.

22.      The term "**Long Reimer Winegar LLP**" means Long Reimer Winegar LLP, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including Kris Koski, and including any person who ever served in any such capacity.

23.      The term "**Barclay Leib**" means Barclay Leib, CFE, CAIA of Morristown NJ.

24.      The term "**FindIt**" means FINDIT, INC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Tom Powers, (2) Raymond Firth, (3) Dean Powers, and (4) Peter Tosto, and including any person who ever served in any such capacity.

25.      The term "**Lorene Butler Mineral Owners**" means owners of mineral rights in Williams County North Dakota.

26.      The term "**Smith Mineral Owners**" means Mark S Smith or Marilyn L Nardini-Smith, owners of mineral rights in Williams County North Dakota.

27.      The term "**Firenza Mineral Owners**" means Patricia Firenza, owner of mineral rights in Williams County North Dakota.

28. The term "**Wilson Mineral Owners**" means Darrell Wilson, owner of mineral rights in Williams County, North Dakota.

29. The term "**Thornton Colorado**" means the government for the city of Thronton Colorado, and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to Scott Twombly and Steven Louis-Prescott.

30. The term "**Hansrude Sather Farms**" means Hansrude Sather Farms, LLLP. And Meagher Energy Advisors, their subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Bradley K. Sather and (2) Nick Asher, and including any person who ever served in any such capacity.

31. The term "**Eagle River Energy Advisors**" means Eagle River Energy Advisors, LLC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Steve Florentine, (2) Blake Nance, (3) Austin McKee, and including any person who ever served in any such capacity.

32. The term "**Rudman Family Trust**" means Rudman Family Trust, owners of mineral rights in North Dakota, including Hiram Luicius.

33. The term "**The Petram Group**" means The Petram Group, LLC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Scott Fey, (2) Larry Fey, (3) Dan Rose, (4) Kent Tedford, and (5) Mark Anderson, and including any person who ever served in any such capacity.

34.     The term "**Dines Family**" means Dines Family  Trust, owners of mineral rights in Weld County Colorado, including Winston Dines and Holliday Dines.

35.     The term "**Arthur Bishop**" means Arthur Bishop of Cape Town South Africa.

36.     The term "**Ryan Werking**" means Ryan Werking of Denver, Colorado.

37.     The term "**Duchossois Group**" means THE DUCHOSSOIS GROUP, INC. and THE DUCHOSSOIS FAMILY FOUNDATION., their subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

38.     The term "**ANB Bank**" means ANB Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

39.     The term "**JPMorgan Chase Bank**" means JPMorgan Chase & Co (NYESE:JPM), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

40.     The term "**TPG Specialty Lending**" means TPG Specialty Lending, Inc., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

41.     The term "**Texas Capital Bank**" means Texas Capital Bank, N.A.., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its

APP114

employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

42.     The term "**Prosperity Bank**" means Prosperity Bank, f/k/a LegacyTexas Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

43.     The term "**CrossFirst Bank**" means CrossFirst Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

44.     The term "**MUFG Union Bank**" means MUFG Union Bank, N.A., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

45.     The term "**Capital One Financial**" means Capital One Financial Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

46.     The term "**G. Warren Smith II**" means G. Warren Smith II of Colorado.

47.     The term "**4 GRLZ Investments**" means 4 GRLZ Investments, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

APP115

48.     The term "**Hess Corporation**" means Hess Corporation (NYSE:HESS), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

49.     The term "**Continental Resources**" means Continental Resources, Inc. (https://www.clr.com/), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

50.     The term "**GTCR**" means GTCR, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

51.     The term "**ExxonMobil**" means ExxonMobil Corporation (ExxonMobil (NYSE:XOM), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

52.     The term "**Royalty Asset Holdings**" means Royalty Asset Holdings, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

9

53.     The term "**Chevron**" means Chevron Corporation (NYSE:CVX), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to (1) PDC Energy (NASDAQ:PDCE), (2) Great Western Petroleum, LLC, and (3) Noble Energy, Inc.

54.     The term "**Bayswater**" means Bayswater Exploration & Production, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

55.     The term "**Raisa II Holdings**" means Raisa II Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

56.     The term "**Rearden Minerals**" means Rearden Minerals, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

57.     The term "**Sitio Royalties**" means Sitio Royalties Corp (NYSE:STR), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

58.     The term "**Whiting Oil and Gas Corporation**" means Whiting Oil and Gas Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

59.     The term "**Chord Energy**" means Chord Energy Corporation (NASDAQ:CHRD), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to Oasis Petroleum North America LLC.

60.     The term "**Kraken Oil & Gas**" means Kraken Oil & Gas, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

61.     The term "**ConocoPhillips**" means ConocoPhillips Company (NYSE:COP), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

62.     The term "**Devon Energy Production**" means Devon Energy Production Company, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

11

63.     The term "**Enerplus**" means Enerplus Resources (USA) Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

64.     The term "**EOG RESOURCES**" means EOG RESOURCES, INC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

65.     The term "**SOGC**" means SOGC, Inc., f/k/a Sinclair Oil Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

66.     The term "**including**" means including without limitation.

67.     The term "**relating to**" means in whole or in part constituting, containing, concerning, embodying, reflecting, describing, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to.

68.     The term "**Complaint**" refers to Plaintiffs' First Amended Complaint and Jury Demand, filed April 13, 2023. (Doc. 7).

69.     All words not specifically defined herein shall be given their ordinary meaning.

## <u>STATEMENTS OF FACT TO BE ADMITTED OR DENIED</u>

You are requested to admit that the following are true:

1.     Defendant communicated with Greeley Tribune regarding Adam Ferrari during Relevant Time Period.

12

**ANSWER:**

2.      Defendant communicated with SEC regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

3.      Defendant communicated with Jennifer Davis regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

4.      Defendant communicated with Crystal Taylor regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

5.      Defendant communicated with John Hodgin regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

6.      Defendant communicated with Danielle Sexton regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

7.      Defendant communicated with the Denver DA regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

8.      Defendant communicated with Denver Police Department regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

13

9.      Defendant communicated with FINRA regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

10.      Defendant communicated with EnergyNet regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

11.      Defendant communicated with Dalmore regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

12.      Defendant communicated with Long Reimer Winegar LLP regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

13.      Defendant communicated with Long Reimer Winegar LLP in 2023 that Adam Ferrari was under investigation by SEC.

**ANSWER:**

14.      Defendant communicated with Barclay Leib regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

15.      Defendant communicated with FindIt regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

16.      Defendant communicated with Lorene Butler Mineral Owners regarding Adam Ferrari during Relevant Time Period.

14

**ANSWER:**

17.      Defendant communicated with Smith Mineral Owners regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

18.      Defendant communicated with Firenza Mineral Owners regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

19.      Defendant communicated with Wilson Mineral Owners regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

20.      Defendant communicated with Thornton Colorado regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

21.      Defendant communicated with Hansrude Sather Farms regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

22.      Defendant communicated with Eagle River Energy Advisors regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

23.      Defendant communicated with Rudman Family Trust regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

15

24.     Defendant communicated with The Petram Group regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

25.     Defendant communicated with Dines Family regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

26.     Defendant communicated with Arthur Bishop regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

27.     Defendant communicated with Ryan Werking regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

28.     Defendant communicated with Duchossois Group regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

29.     Defendant communicated with ANB Bank regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

30.     Defendant communicated with JPMorgan Chase Bank regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

31.     Defendant communicated with TPG Specialty Lending regarding Adam Ferrari during Relevant Time Period.

16

**ANSWER:**

32.    Defendant communicated with Texas Capital Bank regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

33.    Defendant communicated with Prosperity Bank regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

34.    Defendant communicated with CrossFirst Bank regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

35.    Defendant communicated with MUFG Union Bank regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

36.    Defendant communicated with Capital One Financial regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

37.    Defendant communicated with G. Warren Smith II regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

38.    Defendant communicated with 4 GRLZ Investments regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

17

39.     Defendant communicated with 4 GRLZ Investments by sending a physical communication identifying the signor as "A Concerned Colorado, North Dakota and Wyoming Interest Owner" during Relevant Time Period

**ANSWER:**

40.     Defendant communicated with Hess Corporation regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

41.     Defendant communicated with Continental Resources regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

42.     Defendant communicated with GTCR regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

43.     Defendant communicated with GTCR regarding Ferrari Energy during Relevant Time Period.

**ANSWER:**

44.     Defendant communicated regarding Daniel Ferrari during Relevant Time Period.

**ANSWER:**

45.     Defendant communicated regarding Charlene Ferrari during Relevant Time Period.

**ANSWER:**

46.     Defendant communicated with ExxonMobil regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

47.     Defendant communicated with Royalty Asset Holdings regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

48.     Defendant communicated with Chevron regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

49.     Defendant communicated with Bayswater regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

50.     Defendant communicated with Raisa II Holdings regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

51.     Defendant communicated with Rearden Minerals regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

52.     Defendant communicated with Sitio Royalties regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

53.     Defendant communicated with Whiting Oil and Gas Corporation regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

54.     Defendant communicated with Chord Energy regarding Adam Ferrari during Relevant Time Period.

19

**ANSWER:**

55.      Defendant communicated with Kraken Oil & Gas regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

56.      Defendant communicated with ConocoPhillips regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

57.      Defendant communicated with Devon Energy Production regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

58.      Defendant communicated with Enerplus Resources regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

59.      Defendant communicated with EOG RESOURCES regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

60.      Defendant communicated with SOGC regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

61.      Defendant sent at least one email using the account concernedbakkenmineralowner@gmail.com during Relevant Time Period.

**ANSWER:**

20

62.     Defendant knows at least one individual that sent at least one email using the account concernedbakkenmineralowner@gmail.com during Relevant Time Period.

**ANSWER:**

63.     Defendant sent at least one email using the account Concernedweldmineralowner@gmail.com during Relevant Time Period.

**ANSWER:**

64.     Defendant knows at least one individual that sent at least one email using the account Concernedweldmineralowner@gmail.com during Relevant Time Period.

**ANSWER:**

65.     Defendant sent at least one email using the account concernedwyomingmineralowner@gmail.com during Relevant Time Period.

**ANSWER:**

66.     Defendant knows at least one individual that sent at least one email using the account concernedwyomingmineralowner@gmail.com during Relevant Time Period.

**ANSWER:**

67.     Defendant sent physical correspondence signed by concernedwyomingmineralowner@gmail.com during Relevant Time Period

**ANSWER:**

68.     Defendant sent at least one email to Aferrari@ferrarienergy.com during Relevant Time Period.

**ANSWER:**

69.     Defendant sent at least one email to AF@phxcapitalgroup.com during Relevant Time Period.

21

**ANSWER:**

70.     Defendant instrcuted one or more individuals to send emails regarding Adam Ferrari to mineral rights owners during Relevant Time Period.

**ANSWER:**

71.     Defendant contracted for the creation of Lawsuitsoilandgas.com during Relevant Time Period.

**ANSWER:**

72.     Defendant paid over $10 for the creation and operation of Lawsuitsoilandgas.com during Relevant Time Period.

**ANSWER:**

73.     Defendant paid over $100 for the creation and operation of Lawsuitsoilandgas.com during Relevant Time Period.

**ANSWER:**

74.     Defendant paid over $1,000 for the creation and operation of Lawsuitsoilandgas.com during Relevant Time Period.

**ANSWER:**

75.     Defendant paid over $10,000 for the creation and operation of Lawsuitsoilandgas.com during Relevant Time Period.

**ANSWER:**

76.     Defendant contracted for the creation of adamferrarioilandgaslawsuits.com during Relevant Time Period.

**ANSWER:**

77.     Defendant   paid   over   $10   for   the   creation   and   operation   of adamferrarioilandgaslawsuits.com during Relevant Time Period.

**ANSWER:**

78.     Defendant   paid   over   $100   for   the   creation   and   operation   of adamferrarioilandgaslawsuits.com during Relevant Time Period.

**ANSWER:**

79.     Defendant   paid   over   $1,000   for   the   creation   and   operation   of adamferrarioilandgaslawsuits.com during Relevant Time Period.

**ANSWER:**

80.     Defendant   paid   over   $10,000   for   the   creation   and   operation   of adamferrarioilandgaslawsuits.com during Relevant Time Period.

**ANSWER:**

Dated:  November 8, 2023                  Respectfully submitted,
                                           /s/Ross M. Good
                                          One of Plaintiff's Attorneys

Ross Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark Suite 1600
Chicago, Illinois 60601
p: (786) 539-3952
ross@loftusandesienberg.com

23

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record via electronic mail and pursuant to the Federal Rules of Civil Procedure on November 8, 2023.

                            */s/ Ross M. Good*
                            Ross M. Good

APP131

# EXHIBIT A-12

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-CV-455 |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

**ADAM FERRARI'S FIRST SET OF INTERROGATORIES
DIRECTED TO DEFENDANT**

Pursuant Federal Rules of Civil Procedure 33, Plaintiff, ADAM FERRARI ("Plaintiff"), requests that Defendant, William Francis, ("Defendant"), answer fully and separately, under oath, the following Interrogatories within 30 days after service of this document upon you, or sooner if the Court so orders.

**DEFINITIONS & INSTRUCTIONS**

1.      The time frame covered by these discovery requests shall be January 1, 2016 to the present (the "Relevant Time Period"), unless otherwise indicated by a particular topic or request.

2.      The term "**Communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise). By way of illustration only, communication includes, but is not limited to, telephone conversations, letters, e-mails, SMS texts, notes, telegrams, teletypes, telecopies, memoranda, face-to-face conversations, Facebook, Whatsapp, Signal, Instagram, or Twitter communications, and any other forms of textual or written communication, including any web-based, website-based, or other forms of electronic communication or record of a communication.

1

3.    The term "**Document**" includes each and every form of communication, including all written, printed, typed, recorded, or graphic matter of any kind, type, nature, or description, in whatever form (e.g., final and draft versions) that is or has been in Your actual or constructive possession, custody or control, including all printed and electronic copies of email, electronic text, chat, or direct messages sent on any platform (such as SMS, iMessage, WhatsApp, Signal, Confide, Telegram, Facebook, Instagram, Twitter, Slack, Microsoft Teams, Google Chat, Zoom, etc.), notes, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, teletypes, telexes, facsimiles, invoices, order forms, checks, drafts, statements, credit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, pamphlets or any written or recorded materials of any other kind, however stored (whether in tangible or electronic form), recorded, produced or reproduced, including backups.

4.    The term "**Adam Ferrari**" means Adam Ferrari, Plaintiff in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf.

5.    "**You**" or "**Your**" refers to William Francis, Defendant in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf; including, but not limited to Incline Energy.

2

6.      The term "**Phoenix Capital Group**" means Phoenix Capital Group Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

7.      The term "**Greeley Tribune**" means Greeley Publishing Company, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to (1) **Joe Moylan** and (2) **Jerry Martin**.

8.      If you decline to respond to a Request to Admit in whole or in part because of a claim of privilege, please: (a) identify the nature of the document or information (*e.g.* email, letter, memorandum, *etc.*); (b) state its date; (c) identify its author; (d) identify each person to whom the document or information was sent or shown or with whom the content was otherwise shared; (e) state the alleged privilege that applies; and (f) state the facts upon which the privilege is based.

16.      "Person" or "persons" shall mean each and every individual, corporation, partnership, joint venture, association, division or any other entity, whether real or incorporated, encompassed within the usual and customary meaning of person or persons or otherwise encompassed within this definition.

17.      "Concerning" means relating, referring to, describing, evidencing, or constituting.

18.      "Relate to," "related to," "relating to" or "regarding" shall mean directly or indirectly, mentioning or describing, pertaining to, being connected with, or reflecting upon a stated subject matter.

19.      "Relied upon" shall mean being or having been dependent upon, or referred to, or

being or having been arguably appropriate for such reliance.

    20.    "Identification" or "identify" shall mean:

    (a)    As to an individual, stating his or her:

        (i)    full and customarily used name;

        (ii)    present residence and business address and home and work telephone numbers.

    (b)    As to any person other than an individual, stating:

        (i)    its legal name and any other names used;

        (ii)    the form or manner of an organization (e.g., partnership, corporation, etc.);

        (iii)    its address and telephone number.

    (c)    As to a document, stating:

        (i)    the date of its creation, execution, and receipt;

        (ii)    its author or signatory;

        (iii)    its address and every other recipient or person having knowledge of its contents or whereabouts;

        (iv)    its type or nature (e.g., letter, memorandum, etc.) including its subject matter;

        (v)    the name and address of the custodian of the document.

    (d)    As to an event, transaction, or occurrence, stating:

        (i)    its date;

        (ii)    the place where it took place and the manner of its occurrence (e.g., face to face meeting, telephone calls, etc.);

4

   (iii)  identification of all its participants and eyewitnesses to its

      occurrences;

   (iv)  its purpose and subject matter.

21. In construing these Interrogatories:

  (a)  Singular nouns and pronouns shall be deemed to include their plurals, and plural nouns and pronouns shall be deemed to include their singulars.

  (b)  All nouns and pronouns used herein shall be deemed to be gender neutral and to include all persons regardless of sex:

  (c)  "and" as well as "or" shall be construed disjunctively or conjunctively as necessary in order to bring within the scope of the Interrogatory, all responses which might otherwise be construed to be outside its scope; and

  (d)  any undefined word or term is to be understood according to its commonly accepted meaning. Please consult with Plaintiff's counsel in the event that you or your counsel has difficulty understanding the meaning of any term as it is used in these Interrogatories.

22. If you cannot respond to any Interrogatory in full after exercising due diligence to secure any information needed to provide an answer, please state the reason(s) for the inability to respond and the efforts undertaken to secure the information sought.

23. If you object to responding to any portion of these Interrogatories, please (a) state the legal basis and the factual basis for each such objection and (b) identify with reasonable particularity the subject matter of the information as to which you believe the objection applies.

24. If you contend that responding to any Interrogatory would impose an undue burden upon you, then you shall specify in detail how responding would impose such a burden and respond

to the Interrogatory to the broadest extent possible without engaging in the activities claimed to be unduly burdensome.

25.    If you contend that any Interrogatory is overly broad, specify with precision the way in which you contend the Interrogatory is overly broad, specify what narrower interpretation of the Interrogatory would be acceptable, and then respond to the Interrogatory on the basis of such a narrower interpretation of the Interrogatory.

26.    If any response is withheld on grounds of privilege, work product, or otherwise, for each such response, set forth a privilege log and state the reason for withholding the response and the factual basis for such reason, with sufficient particularity to allow Plaintiff to assess the validity of the reason and, if necessary, for the Court to rule on it.

27.    Notwithstanding the assertion of an objection on the grounds of privilege, any purportedly privileged response containing non-privileged matter must be provided, with the purportedly privileged portion expressly redacted.

28.    These Interrogatories are to be considered as continuing in duration. You are instructed to provide—by way of supplemental responses—such additional information as you may hereafter obtain that will augment or otherwise modify your responses to these Interrogatories.

29.    All words not specifically defined herein shall be given their ordinary meaning.

## **<u>INTERROGATORIES</u>**

1.    Identify each person that provided information or documents used to answer any of Plaintiff's interrogatories, document requests, or requests for admission, and identify which information or documents the person provided.

**RESPONSE:**

6

2.      Identify (1) all persons that had a role in the creation of (a) Lawsuitsoilandgas.com and (b) adamferrarioilandgaslawsuits.com during Relevant Time Period, and (2) what role each person had.

**RESPONSE:**

3.       Identify all persons known to Defendant that have made a donation to a public institution in Weld County Colorado, and identify the public institution and the amount of each donation.

**RESPONSE:**

4.      Identify all persons empoyed at Phoenix Capital Group that you have communicated with during Relevant Time Period, when each communication occurred,  and provide a description of each communication.

**RESPONSE:**

5.      Identify all persons at Greeley Tribune that you have communicated with during Relevant Time Period, when each communication occurred, and provide a description of each communication.

**RESPONSE:**

6.      Identify any statements, written or oral, from any persons that claim to have knowledge with respect to the facts alleged in the Complaint.

**RESPONSE:**

7.      Identify all persons you intend to call as a fact witness in this case.

**RESPONSE:**

8.      Identify all persons you intend to call as an expert witness in this case.

**RESPONSE:**

7

Dated:  November 8, 2023

Respectfully submitted,
 _/s/Ross M. Good_____
One of Plaintiff's Attorneys

Ross Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark Suite 1600
Chicago, Illinois 60601
p: (786) 539-3952
ross@loftusandesienberg.com

APP140

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record via electronic mail and pursuant to the Federal Rules of Civil Procedure on November 8, 2023.

*/s/ Ross M. Good*
Ross M. Good

APP141

# EXHIBIT A-13

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-CV-455 |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

## ADAM FERRARI'S SECOND REQUESTS FOR ADMISSION OF FACTS DIRECTED TO DEFENDANT

Pursuant Federal Rules of Civil Procedure 36, Defendant, ADAM FERRARI ("Plaintiff"), requests that Defendant, William Francis, ("Defendant"), separately admit or deny the statements of fact herein within 30 days of service.

## DEFINITIONS & INSTRUCTIONS

1.     The time frame covered by these discovery requests shall be January 1, 2016 to the present (the "Relevant Time Period"), unless otherwise indicated by a particular topic or request.

2.     The term "**Communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise). By way of illustration only, communication includes, but is not limited to, telephone conversations, letters, e-mails, SMS texts, notes, telegrams, teletypes, telecopies, memoranda, face-to-face conversations, Facebook, Whatsapp, Signal, Instagram, or Twitter communications, and any other forms of textual or written communication, including any web-based, website-based, or other forms of electronic communication or record of a communication.

3.     The term "**Document**" includes each and every form of communication, including all written, printed, typed, recorded, or graphic matter of any kind, type, nature, or description, in

1

whatever form (e.g., final and draft versions) that is or has been in Your actual or constructive possession, custody or control, including all printed and electronic copies of email, electronic text, chat, or direct messages sent on any platform (such as SMS, iMessage, WhatsApp, Signal, Confide, Telegram, Facebook, Instagram, Twitter, Slack, Microsoft Teams, Google Chat, Zoom, etc.), notes, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, teletypes, telexes, facsimiles, invoices, order forms, checks, drafts, statements, credit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, pamphlets or any written or recorded materials of any other kind, however stored (whether in tangible or electronic form), recorded, produced or reproduced, including backups.

4.      If you decline to respond to a Request to Admit in whole or in part because of a claim of privilege, please: (a) identify the nature of the document or information (*e.g.* email, letter, memorandum, *etc.*); (b) state its date; (c) identify its author; (d) identify each person to whom the document or information was sent or shown or with whom the content was otherwise shared; (e) state the alleged privilege that applies; and (f) state the facts upon which the privilege is based.

5.      "**You**" or "**Your**" refers to William Francis, Defendant in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf; including, but not limited to Incline Energy.

6.      The term "**Adam Ferrari**" means Adam Ferrari, Plaintiff in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf.

7.      The term "**Daniel Ferrari**" means Daniel Ferrari, an individual and relative of Adam Ferrari.

8.      The term "**Charlene Ferrari**" means Charlene Ferrari, an individual and relative of Adam Ferrari.

9.      The term "**Phoenix Capital Group**" means Phoenix Capital Group Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

10.      The term "**Ferrari Energy**" means Ferrari Energy Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

11.      The term "**Incline Energy**" means Incline Energy Partners, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

12.      The term "**Greeley Tribune**" means Greeley Publishing Company, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and

attorneys, including any person who ever served in any such capacity including but not limited to (1) **Joe Moylan,** (2) **Jerry Martin, and** (3) **Trevor Reid**.

13.     The term "**SEC**" means The U.S. Securities and Exchange Commission its subsidiaries, divisions, and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

14.     The term "**Jennifer Davis**" means Jennifer Davis, a resident of Oregon in 2016.

15.     The term "**Crystal Taylor**" means Crystal Taylor, whose email address is cat44771@yahoo.com.

16.     The term "**John Hodgin**" means John Hodgin, a petroleum engineer.

17.     The term "**Denver DA**" means District Attorney for Denver County Colorado District Attorney's Office including but not limited to Danielle Sexton.

18.     The term "**Denver Police Department**" means the Denver Police Department, its subsidiaries, divisions, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

19.     The term "**FINRA**" means Financial Industry Regulatory Authority, Inc., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and any  other person who ever served in any such capacity.

20.     The term "**EnergyNet**" means EnergyNet.com, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees,

managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and any person who ever served in any such capacity.

21.     The term "**Dalmore**" means Dalmore Group, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and including any person who ever served in any such capacity.

22.     The term "**Long Reimer Winegar LLP**" means Long Reimer Winegar LLP, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including Kris Koski, and including any person who ever served in any such capacity.

23.     The term "**Barclay Leib**" means Barclay Leib, CFE, CAIA of Morristown NJ.

24.     The term "**FindIt**" means FINDIT, INC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Tom Powers, (2) Raymond Firth, (3) Dean Powers, and (4) Peter Tosto, and including any person who ever served in any such capacity.

25.     The term "**Lorene Butler Mineral Owners**" means owners of mineral rights in Williams County North Dakota.

26.     The term "**Smith Mineral Owners**" means Mark S Smith or Marilyn L Nardini-Smith, owners of mineral rights in Williams County North Dakota.

27.     The term "**Firenza Mineral Owners**" means Patricia Firenza, owner of mineral rights in Williams County North Dakota.

5

28.     The term "**Wilson Mineral Owners**" means Darrell Wilson, owner of mineral rights in Williams County, North Dakota.

29.     The term "**Thornton Colorado**" means the government for the city of Thronton Colorado, and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to Scott Twombly and Steven Louis-Prescott.

30.     The term "**Hansrude Sather Farms**" means Hansrude Sather Farms, LLLP. And Meagher Energy Advisors, their subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Bradley K. Sather and (2) Nick Asher, and including any person who ever served in any such capacity.

31.     The term "**Eagle River Energy Advisors**" means Eagle River Energy Advisors, LLC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Steve Florentine, (2) Blake Nance, (3) Austin McKee, and including any person who ever served in any such capacity.

32.     The term "**Rudman Family Trust**" means Rudman Family Trust, owners of mineral rights in North Dakota, including Hiram Luicius.

33.     The term "**The Petram Group**" means The Petram Group, LLC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Scott Fey, (2) Larry Fey, (3) Dan Rose, (4) Kent Tedford, and (5) Mark Anderson, and including any person who ever served in any such capacity.

6

34.     The term "**Dines Family**" means Dines Family Trust, owners of mineral rights in Weld County Colorado, including Winston Dines and Holliday Dines.

35.     The term "**Arthur Bishop**" means Arthur Bishop of Cape Town South Africa.

36.     The term "**Ryan Werking**" means Ryan Werking of Denver, Colorado.

37.     The term "**Duchossois Group**" means THE DUCHOSSOIS GROUP, INC. and THE DUCHOSSOIS FAMILY FOUNDATION., their subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

38.     The term "**ANB Bank**" means ANB Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

39.     The term "**JPMorgan Chase Bank**" means JPMorgan Chase & Co (NYESE:JPM), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

40.     The term "**TPG Specialty Lending**" means TPG Specialty Lending, Inc., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

41.     The term "**Texas Capital Bank**" means Texas Capital Bank, N.A.., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its

7

employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

42.     The term "**Prosperity Bank**" means Prosperity Bank, f/k/a LegacyTexas Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

43.     The term "**CrossFirst Bank**" means CrossFirst Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

44.     The term "**MUFG Union Bank**" means MUFG Union Bank, N.A., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

45.     The term "**Capital One Financial**" means Capital One Financial Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

46.     The term "**G. Warren Smith II**" means G. Warren Smith II of Colorado.

47.     The term "**4 GRLZ Investments**" means 4 GRLZ Investments, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

48.     The term "**Hess Corporation**" means Hess Corporation (NYSE:HESS), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

49.     The term "**Continental Resources**" means Continental Resources, Inc. (https://www.clr.com/), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

50.     The term "**GTCR**" means GTCR, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

51.     The term "**ExxonMobil**" means ExxonMobil Corporation (ExxonMobil (NYSE:XOM), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

52.     The term "**Royalty Asset Holdings**" means Royalty Asset Holdings, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

9

53.     The term "**Chevron**" means Chevron Corporation (NYSE:CVX), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to (1) PDC Energy (NASDAQ:PDCE), (2) Great Western Petroleum, LLC, and (3) Noble Energy, Inc.

54.     The term "**Bayswater**" means Bayswater Exploration & Production, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

55.     The term "**Raisa II Holdings**" means Raisa II Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

56.     The term "**Rearden Minerals**" means Rearden Minerals, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

57.     The term "**Sitio Royalties**" means Sitio Royalties Corp (NYSE:STR), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

58.     The term "**Whiting Oil and Gas Corporation**" means Whiting Oil and Gas Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

59.     The term "**Chord Energy**" means Chord Energy Corporation (NASDAQ:CHRD), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to Oasis Petroleum North America LLC.

60.     The term "**Kraken Oil & Gas**" means Kraken Oil & Gas, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

61.     The term "**ConocoPhillips**" means ConocoPhillips Company (NYSE:COP), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

62.     The term "**Devon Energy Production**" means Devon Energy Production Company, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

63.     The term "**Enerplus**" means Enerplus Resources (USA) Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

64.     The term "**EOG RESOURCES**" means EOG RESOURCES, INC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

65.     The term "**SOGC**" means SOGC, Inc., f/k/a Sinclair Oil Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

66.     The term "**Mary Western**" means Mary Western of North Dakota.

67.     The term "**Bravera Bank**" means Bravera Bank, f/k/a American Bank Center based in North Dakota, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

68.     The term "**including**" means including without limitation.

69.     The term "**relating to**" means in whole or in part constituting, containing, concerning, embodying, reflecting, describing, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to.

12

70.     The term "**Complaint**" refers to Plaintiffs' First Amended Complaint and Jury Demand, filed April 13, 2023. (Doc. 7).

71.     All words not specifically defined herein shall be given their ordinary meaning.

### STATEMENTS OF FACT TO BE ADMITTED OR DENIED

You are requested to admit that the following are true:

81.     Defendant communicated with Mary Western regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**

82.     Defendant communicated with Bravera Bank regarding Adam Ferrari during Relevant Time Period.

**ANSWER:**


Dated:  November 15, 2023                         Respectfully submitted,
                                                  _/s/Ross M. Good_____
                                                  One of Plaintiff's Attorneys

Ross Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark Suite 1600
Chicago, Illinois 60601
p: (786) 539-3952
ross@loftusandesienberg.com

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record via electronic mail and pursuant to the Federal Rules of Civil Procedure on November 15, 2023.

*/s/ Ross M. Good*
Ross M. Good

14

# EXHIBIT A-14

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-CV-455 |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

## ADAM FERRARI'S SECOND REQUESTS FOR PRODUCTION TO WILLIAM FRANCIS

Plaintiff Adam Ferrari. ("Ferrari") hereby serves the following Requests for Production to Defendant William Francis ("Francis"). Ferrari requests Francis produce documents responsive to these Requests in accordance with the Federal Rules of Civil Procedure.

## INSTRUCTIONS

1.     The time frame covered by these discovery requests shall be January 1, 2016 to the present (the "Relevant Time Period"), unless otherwise indicated by a particular topic or request.

2.     All responses shall comply with the requirements of the Federal Rules of Civil Procedure and the Local Rules for this Court.

3.     The following Requests shall be deemed continuing in nature. In the event You become aware of or acquire additional information relating or referring to any of the following Requests, such additional information is to be promptly produced.

4.     You are to produce all responsive Documents in Your possession, custody, or control, wherever located, including those in the possession, custody, or control of Your representatives and affiliates. Documents are deemed to be in Your possession, custody, or control if they are in Your physical custody, or if they are in the physical custody of any other person or

1

entity and You: (i) own such Document in whole or in part; (ii) have a right, by contract, statute, or otherwise, to use, inspect, examine, or copy such Document on any terms; (iii) have an understanding, express or implied, that You may use, inspect, examine, or copy such Document on any terms; or (iv) as a practical matter, You have been able to use, inspect, examine, or copy such Document when You sought to do so. Documents in Your control also includes those in the possession or custody of any of Your financial or other advisors or any of their respective affiliates. If any requested Document was, but no longer is, in Your control, state the disposition of each such Document.

5.      If any Document requested herein was formerly in Your possession, custody or control and has been lost or destroyed or otherwise disposed of, You are requested to submit in lieu of any such Document a written statement (a) describing in detail the nature of the Document and its contents, (b) identifying the person(s) who prepared or authored the Document and, if applicable, the person(s) to whom the Document was sent, (c) specifying the date on which the Document was prepared or transmitted, and (d) specifying the date on which the Document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the person(s) requesting and performing the destruction.

6.      If any part of the following Requests cannot be responded to in full, respond to the extent possible, specifying the reason(s) for Your inability to respond to the remainder and stating whatever information or knowledge You have concerning the portion to which You do not respond.

7.      If You object to any of these Requests, state in writing with specificity the grounds of Your objections. Any ground not stated shall be deemed waived. If You object to a particular portion of any Request, You shall respond to the remaining portions of such Request as to which there is no objection and state with specificity the grounds of the objection.

8.      Where any copy of any Document whose production is sought herein, whether a draft or final version, is not identical to any copy thereof, by reason of alterations, notes, comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto, all such non-identical copies are to be produced separately.

9.      Copies of all Documents available electronically should be delivered in uncompressed native format with all metadata intact, e.g., the "Last Modified Date" property of a Word document should not be altered during the production process such that the production date becomes the last modified date.

10.     In the Definitions, Instructions, and Requests:

    a.      The words "and" and "or" are to be construed both conjunctively and disjunctively;

    b.      The singular form of a noun or pronoun includes the plural form and vice versa;

    c.      The word "all" shall also include "each of," and vice versa; and

    d.      The word "any" shall be construed to mean "any and all" where the effect of such construction is to broaden the scope of the Request.

11.     If there are no Documents responsive to a Request, state so in writing.

12.     A Request for any Document shall be deemed to include any and all transmittal letters, exhibits, enclosures, or attachments to such Document, in addition to its full and unexpurgated form.

13.     Documents should be segregated according to the number of the Request to which You are responding or produced in the manner they are kept in the ordinary course of business. Documents attached to each other should not be separated, e.g., files attached to emails should remain linked to the email.

14.     If any privilege is claimed as to any Communication requested herein:

APP160

a.   State the nature of the privilege claim (attorney/client communication, attorney work product, etc.);

b.   State the name of the party claiming privilege and the name of the attorney, if any, with respect to whom the privilege is claimed;

c.   State the basis for claiming the privilege as to the specific Communication;

d.   Identify all persons present at any Communication to which privilege is claimed and all persons to whom the subject matter of the Communication was discussed or disclosed; and

e.   State the date of each such Communication.

15.   If any privilege is claimed as to any Document requested herein:

a.   State the nature of the privilege claimed (attorney/client communication, attorney work product, etc.);

b.   State the basis for claiming the privilege as to the specific Documents; and

c.   State the date of such Document; identify the type of document (i.e., letter, memo, email, email attachment, etc.); set forth the subject matter thereof; identify each person who prepared it; identify each person (if any) who signed it; identify each person to whom it was directed, circulated, or shown; and identify each person now in possession of the Document.

16.   If a Request concerns Communications with and/or actions by an entity, then the Request should be interpreted to include Communications with or actions by agents acting on an entity's behalf.

## **DEFINITIONS**

The following terms are defined and used in these Requests as follows:

17.   The term "**Communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise). By way of illustration only, communication includes, but is not limited to, telephone conversations, letters, e-mails, SMS texts, notes, telegrams, teletypes, telecopies, memoranda, face-to-face conversations, Facebook, Whatsapp, Signal, Instagram, or Twitter communications, and any other forms of textual or written communication, including any

4

web-based, website-based, or other forms of electronic communication or record of a communication.

18.      The term "**Document**" includes each and every form of communication, including all written, printed, typed, recorded, or graphic matter of any kind, type, nature, or description, in whatever form (e.g., final and draft versions) that is or has been in Your actual or constructive possession, custody or control, including all printed and electronic copies of email, electronic text, chat, or direct messages sent on any platform (such as SMS, iMessage, WhatsApp, Signal, Confide, Telegram, Facebook, Instagram, Twitter, Slack, Microsoft Teams, Google Chat, Zoom, etc.), notes, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, teletypes, telexes, facsimiles, invoices, order forms, checks, drafts, statements, credit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, pamphlets or any written or recorded materials of any other kind, however stored (whether in tangible or electronic form), recorded, produced or reproduced, including backups.

1.      The term "**including**" means including without limitation.

2.      The terms "**You**" or "**Your**" refers to William Francis, Defendant in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf; including, but not limited to Incline Energy.

APP162

3.      The term "**Adam Ferrari**" means Adam Ferrari, Plaintiff in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf.

4.      The term "**Daniel Ferrari**" means Daniel Ferrari, an individual and relative of Adam Ferrari.

5.      The term "**Charlene Ferrari**" means Charlene Ferrari, an individual and relative of Adam Ferrari.

6.      The term "**Phoenix Capital Group**" means Phoenix Capital Group Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

7.      The term "**Ferrari Energy**" means Ferrari Energy Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

8.      The term "**Wolfhawk Energy**" means Wolfhawk Energy Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

9.      The term "**Incline Energy**" means Incline Energy Partners, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

19.    The term "**Greeley Tribune**" means Greeley Publishing Company, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to (1) **Joe Moylan,** (2) **Jerry Martin, and (3) Trevor Reid**.

20.    The term "**SEC**" means The U.S. Securities and Exchange Commission its subsidiaries, divisions, and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

21.    The term "**Jennifer Davis**" means Jennifer Davis, a resident of Oregon in 2016.

22.    The term "**Crystal Taylor**" means Crystal Taylor, whose email address is cat44771@yahoo.com.

23.    The term "**John Hodgin**" means John Hodgin, a petroleum engineer.

24.    The term "**Denver DA**" means District Attorney for Denver County Colorado District Attorney's Office including but not limited to Danielle Sexton.

25.    The term "**Denver Police Department**" means the Denver Police Department, its subsidiaries, divisions, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

26.    The term "**FINRA**" means Financial Industry Regulatory Authority, Inc., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and any  other person who ever served in any such capacity.

7

27.     The term "**EnergyNet**" means EnergyNet.com, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and any person who ever served in any such capacity.

28.     The term "**Dalmore**" means Dalmore Group, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and including any person who ever served in any such capacity.

29.     The term "**Long Reimer Winegar LLP**" means Long Reimer Winegar LLP, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including Kris Koski, and including any person who ever served in any such capacity.

30.     The term "**Barclay Leib**" means Barclay Leib, CFE, CAIA of Morristown NJ.

31.     The term "**FindIt**" means FINDIT, INC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Tom Powers, (2) Raymond Firth, (3) Dean Powers, and (4) Peter Tosto, and including any person who ever served in any such capacity.

32.     The term "**Lorene Butler Mineral Owners**" means owners of mineral rights in Williams County North Dakota.

33.     The term "**Smith Mineral Owners**" means Mark S Smith or Marilyn L Nardini-Smith, owners of mineral rights in Williams County North Dakota.

34.     The term "**Firenza Mineral Owners**" means Patricia Firenza, owner of mineral rights in Williams County North Dakota.

35.     The term "**Wilson Mineral Owners**" means Darrell Wilson, owner of mineral rights in Williams County, North Dakota.

36.     The term "**Thornton Colorado**" means the government for the city of Thronton Colorado, and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to Scott Twombly and Steven Louis-Prescott.

37.     The term "**Hansrude Sather Farms**" means Hansrude Sather Farms, LLLP. And Meagher Energy Advisors, their subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Bradley K. Sather and (2) Nick Asher, and including any person who ever served in any such capacity.

38.     The term "**Eagle River Energy Advisors**" means Eagle River Energy Advisors, LLC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Steve Florentine, (2) Blake Nance, (3) Austin McKee, and including any person who ever served in any such capacity.

39.     The term "**Rudman Family Trust**" means Rudman Family Trust, owners of mineral rights in North Dakota, including Hiram Luicius.

40.     The term "**The Petram Group**" means The Petram Group, LLC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and

9

attorneys, including (1) Scott Fey, (2) Larry Fey, (3) Dan Rose, (4) Kent Tedford, and (5) Mark Anderson, and including any person who ever served in any such capacity.

41.     The term "**Dines Family**" means Dines Family  Trust, owners of mineral rights in Weld County Colorado, including Winston Dines and Holliday Dines.

42.     The term "**Arthur Bishop**" means Arthur Bishop of Cape Town South Africa.

43.     The term "**Ryan Werking**" means Ryan Werking of Denver, Colorado.

44.     The term "**Duchossois Group**" means THE DUCHOSSOIS GROUP, INC. and THE DUCHOSSOIS FAMILY FOUNDATION., their subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

45.     The term "**ANB Bank**" means ANB Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

46.     The term "**JPMorgan Chase Bank**" means JPMorgan Chase & Co (NYESE:JPM), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

47.     The term "**TPG Specialty Lending**" means TPG Specialty Lending, Inc., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

48.     The term "**Texas Capital Bank**" means Texas Capital Bank, N.A.., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

49.     The term "**Prosperity Bank**" means Prosperity Bank, f/k/a LegacyTexas Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

50.     The term "**CrossFirst Bank**" means CrossFirst Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

51.     The term "**MUFG Union Bank**" means MUFG Union Bank, N.A., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

52.     The term "**Capital One Financial**" means Capital One Financial Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

53.     The term "**G. Warren Smith II**" means G. Warren Smith II of Colorado.

54.     The term "**4 GRLZ Investments**" means 4 GRLZ Investments, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and

11

each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

55. The term "**Hess Corporation**" means Hess Corporation (NYSE:HESS), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

56. The term "**Continental Resources**" means Continental Resources, Inc. (https://www.clr.com/), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

57. The term "**GTCR**" means GTCR, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

58. The term "**ExxonMobil**" means ExxonMobil Corporation (ExxonMobil (NYSE:XOM), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

59. The term "**Royalty Asset Holdings**" means Royalty Asset Holdings, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and

each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

60.     The term "**Chevron**" means Chevron Corporation (NYSE:CVX), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to (1) PDC Energy (NASDAQ:PDCE), (2) Great Western Petroleum, LLC, and (3) Noble Energy, Inc.

61.     The term "**Bayswater**" means Bayswater Exploration & Production, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

62.     The term "**Raisa II Holdings**" means Raisa II Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

63.     The term "**Rearden Minerals**" means Rearden Minerals, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

64.     The term "**Sitio Royalties**" means Sitio Royalties Corp (NYSE:STR), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and

APP170

each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

65.     The term "**Whiting Oil and Gas Corporation**" means Whiting Oil and Gas Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

66.     The term "**Chord Energy**" means Chord Energy Corporation (NASDAQ:CHRD), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to Oasis Petroleum North America LLC.

67.     The term "**Kraken Oil & Gas**" means Kraken Oil & Gas, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

68.     The term "**ConocoPhillips**" means ConocoPhillips Company (NYSE:COP), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

69.     The term "**Devon Energy Production**" means Devon Energy Production Company, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives,

14

consultants, accountants, and attorneys, including any person who ever served in any such capacity.

70.     The term "**Enerplus**" means Enerplus Resources (USA) Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

71.     The term "**EOG RESOURCES**" means EOG RESOURCES, INC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

72.     The term "**SOGC**" means SOGC, Inc., f/k/a Sinclair Oil Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

73.     The term "**relating to**" means in whole or in part constituting, containing, concerning, embodying, reflecting, describing, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to.

74.     The term "**Complaint**" refers to Plaintiffs' First Amended Complaint including Exhibits A-H, and Jury Demand, filed April 13, 2023. (Doc. 7).

75.     Any undefined terms are to be defined in the manner in which they are used in the Complaint.

## **REQUESTS**

14.     Produce all insurance policies, including umbrella and excess policies, which were in effect during any portion of the Relevant Time Period.

15.     Produce all correspondence between Francis and any insurance company, broker, or agent, concerning or relating to a reservation of rights or a denial of coverage for the claims in this litigation.

16.     Produce all correspondence between Francis and any insurance company, broker, or agent, concerning or relating to a tender of this suit, reservation of rights, or a denial of coverage for the claims in this litigation.

Dated:  November 20, 2023                    Respectfully submitted,

                                         _/s/Ross M. Good_____
                                         One of Plaintiff's Attorneys

Ross Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark Suite 1600
Chicago, Illinois 60601
p: (786) 539-3952
ross@loftusandesienberg.com

16

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record via electronic mail and pursuant to the Federal Rules of Civil Procedure on November 20, 2023.

*/s/ Ross M. Good*
Ross M. Good

17

# EXHIBIT A-15

| | | Dallas County<br>DC-22-06350 | TX 5thCOA<br>05-22-01260-CV | TXND<br>3:23-CV-455<br>Ferrari v. Francis | USDC North Dakota<br>1:23-cv-00209-DLH |
|---|---|---|---|---|---|
| 06/15/2022 | Original Petition - Filed | | | | |
| 08/16/2022 | Incline TCPA Motion to Dismiss - Filed | | | | |
| 09/29/2022 | Phoenix Response to MTD - Filed | | | | |
| 09/29/2022 | Phoenix Obj to Incline TCPA MTD Evidence – Filed | | | | |
| 09/29/2022 | Phoenix Response to Incline TCPA MTD | | | | |
| 09/29/2022 | Incline MFL to File Amended Declarations | | | | |
| 10/03/2022 | Phoenix Response to Incline MFL and Objections | | | | |
| 10/03/2022 | Incline Objs and MTS Evid submitted by Phoenix ISO Response to Incline TCPA MTD | | | | |
| 10/03/2022 | Incline Reply ISO MFL to Amend Declarations | | | | |
| 10/03/2022 | Incline Response to Phoenix Objs to Evid submitted ISO Incline TCPA MTD | | | | |
| 10/06/2022 | ORDER Granting Motion to File Amended Declarations | | | | |
| 10/27/2022 | Ferrari's Plea in Intervention and Motion to Seal Court Records – Filed | | | | |
| 11/08/2022 | ORDER on Incline Objs to Pltf's Evid in Response to Incline TCPA MTD | | | | |
| 11/08/2022 | ORDER on Phoenix Objs to Amended Declarations | | | | |
| 11/08/2022 | ORDER on Phoenix Objs to Purported Evid of Incline | | | | |
| 11/09/2022 | TCPA motion partially granted/denied<br><br>Denied except as to Plaintiff's tortious Interference with existing contract claim and Plaintiff's defamation and business disparagement claims | | | | |
| 11/23/2022 | Incline Notice of Appeal - Filed | | | | |

| | | | |
|---|---|---|---|
| 02/08/2023 | | Appellants' Brief - Filed | |
| 02/28/2023 | | Appellee's Brief - Filed | Plaintiff's Original Complaint - Filed |
| 03/17/2023 | | Appellants' Reply Brief - Filed | |
| 03/23/2023 | | | Francis MTD - Filed |
| 04/13/2023 | | | Ferrari 1st Amd Complaint – Filed Ferrari Response to Francis MTD |
| | | | Francis MTD P's Amd Complaint - Filed |
| | | | Ferrari Response IOT Francis' MTD P's Amd Complaint |
| 05/18/2023 | | | P's Motion to Seal |
| 05/24/2023 | | Appellants' Letter Brief Re TCPA Issues – Filed | |
| 05/30/2023 | | | Francis Response IOT P's Motion to Seal |
| 06/05/2023 | | Appellee's Post-Argument Letter Brief Re TCPA Issues - Filed | |
| 06/08/2023 | | | Francis Reply ISO MTD P's Amd Complaint |
| 08/04/2023 | | | Memorandum Opinion and Order Denying Ferrari Motion to Seal |
| 08/29/2023 | | Memorandum Opinion – Affirming/Reversing order on Defs TCPA MTD - Remand | |
| 09/29/2023 | | Appellee's Motion for Rehearing – Filed | |
| 10/11/2023 | | Order Denying Phoenix Motion for Rehearing | |
| 10/20/2023 | | | | Phoenix Complaint Filed in Federal Court ND |
| 10/31/2023 | | | | Motion for EOT to Respond to Complaint – Filed |