# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| PHOENIX CAPITAL GROUP HOLDINGS, LLC )<br>)<br>  Plaintiff, )<br>)<br>v. )<br>)<br>INCLINE ENERGY PARTNERS, L.P. )<br>)<br>  Defendant. ) | No. 23-cv-<br><br>COMPLAINT AND JURY DEMAND |

## COMPLAINT

Plaintiff, Phoenix Capital Group Holdings, LLC by and through its undersigned attorneys, complains against Defendant, Incline Energy Partners, L.P ("Incline"), and alleges and states as follows:

### I.    THE PARTIES

1.    Plaintiff, Phoenix Capital Group Holdings, LLC ("Phoenix") is a Delaware limited liability company with its headquarters located in Littleton, Colorado whose members are all domiciled in Illinois.

2.    Defendant Incline Energy Partners, L.P. ("Incline") is a Texas limited partnership with its principal place of business in Dallas County, Texas whose partners are domiciled in Texas.

### II.   JURISDICTION AND VENUE

3.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1331.

4.    This Court has specific personal jurisdiction over the Defendant because all of the acts and omissions complained of occurred in this District.

5.    Venue is also proper in this District pursuant to 28 U.S.C. §1391 because the Defendant systematically and continuously conducts business in this District, and because a

1

substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## IV. ALLEGATIONS COMMON TO ALL COUNTS

6. North Dakota's importance to our nation's energy security cannot be understated. The state has grown into the nation's third-largest crude oil producer, according to the U.S. Energy Information Administration, with the state estimating that energy supports 75,000 jobs and generates more than $3.2 billion annually.

7. It is critical to achieving our nation's goal of energy independence, not to mention North Dakota's economic growth, that oil and gas reserves in the state be efficiently developed by those with the best expertise rather than those motivated solely by greed. North Dakotans also deserve fair treatment in developing their mineral rights to maximize their returns.

8. In the last four years Phoenix has become the leading mineral and lease acquisition company in the Williston Basin region of North Dakota.

9. Phoenix has transacted in over 1,000 unique deals in the Williston Basin since 2019.

10. In September 2023, Phoenix launched its operating company that drills wells in the Williston Basin and employs many North Dakotans.

11. Phoenix brought together industry experts with decades of experience in their fields to build an industry leader in mineral rights.

12. At the time Phoenix was founded, the industry was dominated by Incline and very few firms were able to compete.

13. Incline operates in the oil and gas industry, where it operates and acquires mineral rights, and is a direct competitor to Plaintiff for mineral rights in North Dakota.

14. Phoenix competes with Incline by deploying its proprietary technology and decades of industry experience.

15. Phoenix's rapid success in North Dakota was met with hostility from Incline, specifically from William Francis, Incline's Managing Partner.

16. Phoenix is successful because it offers the best price to mineral rights owners.

17. Incline's success is because it can fund deals faster than Phoenix and because it tortiously interferes with Phoenix's potential acquisition.

18. Incline's principal, William Francis ("Francis") has lashed out at Phoenix in every way possible hoping to corner the mineral rights market in North Dakota, including making defamatory statements to customers, lenders, investors, regulators both directly and via pseudonyms online.

19. Incline and Phoenix routinely compete to purchase the same interests being sold throughout North Dakota. For example, in one area of Williams and Divide Counties, North Dakota, Incline was Phoenix's only competition for leases.

20. Incline disparaged Phoenix to multiple lessors in North Dakota between 2021 and 2023 who Incline knew were considering offers from both Incline and Phoenix to obtain the leases.

21. Several mineral owners, including but not limited to the Bakke Family in Williams County, chose Incline because of Incline's disparagement campaign, despite the fact that Phoenix was offering more money. In doing so, they were intentionally misled through underhanded bullying tactics, denying them and other North Dakotans a fair opportunity to maximize the returns they deserved for their rights.

22. As part of its campaign to take advantage of North Dakota mineral rights holders, Incline's agents told potential lessors, including but not limited to the Bakke Family, that Phoenix

was operated by criminals, among other false statements, in order to scare North Dakota mineral owners into paying more to Incline rather than selling or leasing to Phoenix.

23. After Incline obtained thousands of acres of leases in Williams and Divide Counties, Incline approached Phoenix's Chief of Land attempting to sell those leases to Phoenix for a profit.

24. One of the leases Incline tried to sell to Phoenix was with the Bakke Family in Williams County. Remarkably, Incline first told the Bakke Family not to do business with Phoenix because it was operated by criminals then turned around and offered to sell the Bakke Family's lease to Phoenix so Incline could profit from the deal without doing the drilling!

25. Phoenix's business model, like the majority of oil and gas companies in the industry, requires debt financing.

26. Phoenix had a debt financing relationship with First International Bank and Trust ("FIBT") in Watford City, North Dakota at all times relevant this complaint.

27. Phoenix began its relationship with FIBT in October of 2020 with its first bank loan, a credit facility of $1,000,000, to finance acquisitions in North Dakota.

28. FIBT and Phoenix mutually agreed to expand that facility frequently for the next year, growing to as large as $9,000,000 at its peak.

29. Phoenix and FIBT knew each other well and enjoyed their mutually beneficial relationship.

30. FIBT was intimately familiar with Phoenix's business, its principals, and its owners.

31. On April 27, 2022, Phoenix committed to borrow $50,000,000 from FIBT and paid a $50,000 non-refundable commitment fee in consideration of FIBT's mutual promises.

4

32. FIBT had sole discretion to complete the transaction but was obligated to exercise that discretion in good faith.

33. Phoenix and FIBT worked quickly throughout the spring of 2022 to complete the due diligence process and Phoenix provided all the information required of it.

34. Phoenix's senior leaders, consultants, and owners engaged in multiple Zoom meetings with FIBT.

35. As of May 4, 2022, the deal was full steam ahead and set to close within 10 days.

36. FIBT President, Justin Voll emailed Phoenix on May 4, 2022, "We will do our best to hit the date [end of May 2022], but there is still a lot of work and negotiation to do on the final loan documents. I hope to have the first draft for your review this week."

37. During the due diligence process, whether via the shared banking relationship or through other connections in the small world of the North Dakota oil and gas industry, Incline became aware that their competitor Phoenix was about to secure significant financing from FIBT.

38. Phoenix is the fastest growing mineral and lease acquisition company in the Williston Basin where Incline has enjoyed a competitive stranglehold over for years thanks to its advantage in financing.

39. Incline's only competitive advantage over Phoenix in North Dakota is its ability to close deals quickly with immediately available funds.

40. Incline persuades sellers and lessors to accept less money than offered by Phoenix by promising funding the deal faster than Phoenix can.

41. Phoenix would dominate the North Dakota marketplace if it could match Incline's speed of closing. North Dakotans would naturally benefit from a more fair, competitive market

5

because sellers and lessors would receive more money than they would if one company had a stranglehold on the business.

42. In the spring of 2022 FIBT offered the solution for Phoenix to surpass Incline's closing speed with a $50,000,000 credit facility.

43. Incline needed to eliminate Phoenix's financing to maintain its competitive advantage of closing speed.

44. On May 5, 2022, Francis emailed Joel Brown ("Brown") "I was wondering if you're free later today or tomorrow to hop on a call to discuss a potential loan with my group, as well as another issue that I'd like to pick your brain about."

45. The other issue Francis wanted to discuss with Brown was FIBT's agreement with Phoenix to provide a $50,000,000 credit facility.

46. After the call, at 5:07 PM on May 5, 2022, Brown emailed Francis, "I appreciate you bringing my attention to the concerns surrounding Phoenix Capital, and I will wait with anticipation for the additional information you mentioned. Once received, I would like to circulate it among some key personnel within our bank."

47. Francis had no justification for bringing "his concerns" about Phoenix to Brown other than to kneecap a competitor's financing.

48. At 10:17 p.m. on May 5, 2022, Francis emailed Brown, "I've attached what I put together on Adam's association with Phoenix. While some claims in here might be brushed off as hearsay and conjecture, the entirety of the body of evidence points to a convicted criminal who pleaded guilty to defrauding mineral owners in Colorado as the controlling force that's actually running Phoenix. After digesting all of the instruments which have been filed with the SEC and elsewhere, for someone to consume those and still believe Adam is not actually running Phoenix

6

would be akin to believing his paralyzed father has been one of the most active mineral buyers in the Williston since Adam was arrested."

49. The attachments to the 10:17 p.m. email made numerous false accusations about Phoenix's current Vice President of Engineering, Adam Ferrari, accused him of committing various crimes while omitting the fact that the charges were dropped and the matter vacated, and lying to investors about his role in the business.

50. The only purpose for the May 5, 2022, communication was to harm Phoenix and improve Incline's position in the North Dakota marketplace thus unfairly exploiting North Dakotans holding mineral rights.

51. On Monday, May 9, 2022, Justin Voll asked Phoenix's deal team a series of questions about our public debt program that was previously discussed at length. Voll's newfound interest in that program was a direct result of Francis's May 5 communication.

52. On May 10, 2022, counsel for Phoenix tried to correct the misperceptions induced by Incline's smear campaign as follows:

> The only legal relationship that Mr. Ferrari has with the Company is an at-will consulting agreement which specifies that he provide engineering support and other advice specific to oil and mineral drilling and leaseholds.
> To our knowledge, Mr. Ferrari has no legal authority to bind the Company contractually, set policy for the Company or direct the actions of ANY employee of the Company.
> I understand that you have expressed some concern that not including Mr. Ferrari in the Offering Statement could constitute a material omission based upon Mr. Ferrari's "influence" with the Company. I disagree.
> Form 1-A speaks to disclosure specifically of directors, executive officers and "significant employees". Directors and executive officers are self-explanatory. "Significant employees" includes "persons such as production managers, sales managers and research scientists, who are not executive officers, but who make significant contributions to the business of the issuer." Again, Mr. Ferrari is neither an employee, nor does he have ANY authority to direct any employees or operations of the Company.
> Beyond the specific language of Form 1-A, without the ability or power to bind the Company or direct the Company's actions or policies, "influence" is, at best, a

7

subjective assessment. Indeed, the SEC has never adopted such a subjective standard. In various other contexts, the SEC has routinely adopted the language around the power to bind a company or direct the policies/actions/business of the Company, rather than a more subjective standard. Mr. Ferrari possesses no such power, and it strains credulity to determine when "influence" could equate to such power....

We analyzed all of this in the preparation of the disclosure. We further examined this with the managing broker-dealer for the offering, including their in-house counsel and compliance personnel, and reached the same conclusion. I have spent more than 26 years practicing securities law and, in fact, was very involved in lobbying Congress and SEC on "Regulation A+." I have dealt with companies at all stages of development, as well as advising on establishing advisory boards and working with their consultants. I have never had to try to assess the level of respect or esteem that an individual may enjoy with a company's management from the standpoint of materiality when that person has no ACTUAL management authority.

53. On or about May 11, 2022, FIBT terminated the agreement in bad faith exercise of its discretion.

54. FIBT terminated the agreement to provide $50,000,000 in financing to Phoenix in bad faith based on the statements made by Francis on behalf of Incline.

55. As a result of the breach Phoenix was unable to obtain the $50,000,000 loan from FIBT that would have been invested in North Dakota and yielded tens of millions in profits for Phoenix and enabled more competitive pricing for North Dakotans selling and leasing land rights.

56. To date Phoenix has not been able to secure a more advantageous first lien loan despite reasonable efforts to mitigate its damages.

57. In June of 2022, Phoenix began discussions with DelMorgan & Co., a highly reputable brokerage service that connects capital with opportunity. Phoenix formally hired DelMorgan on August 10, 2022, with a $150,000 non-refundable commitment fee to replace the financing lost because of Incline's interference.

58. Many other lenders were interested in lending to Phoenix, but none came close to the favorable terms FIBT offered and there were no viable alternatives for this sort of financing.

59. FIBT could offer more favorable terms based on its familiarity with how the funds were being deployed (FIBT's president leased his land to Phoenix) and their deep relationship with Phoenix prior to Incline's interference.

60. Phoenix has been forced to borrow extremely expensive money from lenders in order to continue to compete and replace the funds it lost as a result of Incline's interference actions. Since May 2022, Phoenix has taken $17,500,000 in hard money loans, costing $188,695 in origination fees and another $3,925,203 in interest.

61. As a result of not obtaining the loan, Plaintiff has been burdened with hundreds of hours of unnecessary distractions, expensive fees, high interest rate loans and inadequate funds to compete in the oil and gas space.

62. Phoenix has been forced to forego dozens of mineral and lease opportunities that could have been obtained with FIBT financing during an extraordinarily profitable period in the oil and gas industry.

## V. CLAIMS

### COUNT ONE
### TORTIOUS INTERFERENCE WITH CONTRACT

63. Plaintiff, Phoenix incorporates Paragraphs 1 through 62 as if set forth fully herein.

64. Valid contracts existed between Phoenix and FIBT.

65. Defendant, Incline knew of the contracts between Phoenix and FIBT, and communicated information or otherwise instigated FIBT to breach its contract with Phoenix.

66. In their actions, Defendant Incline, acted intentionally to instigate the breach by FIBT or acted with knowledge that the breach would result.

67. As a result, FIBT terminated ongoing business it had with Phoenix upon information and belief in favor of entering business with Incline.

68. By their conduct, the Defendants intentionally interfered with contracts Phoenix retained, and there was no justification for Incline's actions.

69. The interference was done with the direct purpose of injuring Phoenix and benefiting Incline at Phoenix's expense.

70. Phoenix suffered damages, including but not limited to lost profits, lost future profits, and lost goodwill, as a result of the Defendants' actions in an amount to be determined at trial.

### COUNT TWO
### TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

71. Plaintiff, Phoenix incorporates Paragraphs 1 through 62 as if set forth fully herein.

72. Phoenix had a reasonable expectation of economic advantage or benefit, or otherwise had an ongoing business relationship or expectancy in maintaining its lender relationship with FIBT and entering into leases with mineral owners in North Dakota.

73. Defendant Incline had knowledge of Phoenix's expectations of economic advantage, valid business relationships or expectancy.

74. Defendant Incline wrongfully, without justification, and illegally interfered with Phoenix's reasonable expectation of economic advantage or benefit by willfully and maliciously causing FIBT to terminate their ongoing business with Phoenix and inducing mineral owners to pay more to Incline rather than do business with Phoenix by scaring the mineral owners with false disparaging statements about Phoenix.

75. Incline's communication of false statements of fact, publishing other facts in a false light, unfairly competing, to consumers and businesses in North Dakota for the purpose of harming Phoenix was otherwise tortious.

76. In the absence of Defendant's wrongful acts, it is reasonably probable that Plaintiff would have realized its economic advantage or benefit by entering into a $50,000,000 agreement with FIBT and entered into more leases with mineral owners in North Dakota and Defendants' actions were the proximate cause of the harm sustained by Phoenix.

77. Phoenix has sustained actual damages as a result of Defendants' actions, including, but not limited to, lost profits, lost goodwill, and a termination of the company as a functional business equipment as of the date of the taking.

## COUNT THREE
## UNFAIR COMPETITION

78. Plaintiff, Phoenix incorporates Paragraphs 1 through 62 as if set forth fully herein.

79. The actions of Incline in unfairly diverting a loan from a competitor and making false statements of fact to sellers and lessors about Phoenix constitutes unfair competition in violation of Phoenix's rights under the common law of the state of North Dakota.

80. The foregoing actions of defendants were committed willfully, knowingly, maliciously and in conscious disregard of Phoenix's rights.

81. The foregoing actions of Incline caused immediate and irreparable injury to Phoenix's business and caused innocent consumers to pay a premium to Incline and still have their land drilled by Phoenix.

82. Phoenix is entitled to relief for defendants' unfair competition, including an accounting for and a constructive trust over, followed by the return of all property and profits wrongfully obtained by defendants from said unfair competition, damages, and interest and costs as allowed by law.

## COUNT FOUR
## UNJUST ENRICHMENT

83. Plaintiff, Phoenix incorporates Paragraphs 1 through 62 as if set forth fully herein.

84. Incline was enriched as a result of Phoenix losing its loan from FIBT because Incline was able to directly reduce funds available to its most direct competitor.

85. Incline is aware of its one competitive advantage, its funding and ability to close quickly. Incline knew that damaging its competition's capital position would allow it to continue to lowball offers to mineral sellers and lessors in North Dakota without fear of adequate competition.

86. Incline's enrichment came at the expense of Phoenix.

87. Incline cannot compete with Phoenix head-to-head. Phoenix has a reputation for paying top dollar, for following through with its word, and for treating folks with respect.

88. Access to capital is the only advantage Incline has and by preserving that advantage it was unjustly enriched by in excess of $5,000,000.

89. Phoenix was harmed as a direct result of the Incline's enrichment.

## VI. PRAYER FOR RELIEF

90. WHEREFORE, Plaintiff, Phoenix Capital Group Holdings, LLC, respectfully requests the following relief:

A. Enter a judgment in favor of Phoenix and against the Incline on all counts in an amount to be determined at trial in excess of $10,000,000.00 and to pay damages to Phoenix, including, but not limited to, compensatory damages, exemplary damages in excess of $10,000,000, attorneys' fees, interest, and reasonable costs and disbursements;

B. Enjoin Incline from further acts of unfair competition;

C. Grant all other relief the Court deems just and proper in the premises.

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

Dated this 20th day of October, 2023.

LOFTUS & EISENBERG, LTD.

*/s/ Alexander Loftus*

By:   Alexander Loftus, Esq.
      Ross Good, Esq.
      LOFTUS & EISENBERG, LTD.
      161 N. Clark St. Suite 1600
      Chicago, Illinois 60601
      T: 312.332.4200
      alex@loftusandeisenberg.com
      ross@loftusandeisenberg.com