IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 3:23-cv-455-S |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

**SUPPLEMENTAL APPENDIX TO
DEFENDANT WILLIAM FRANCIS'S REPLY IN SUPPORT
OF MOTION TO STAY, OR ALTERNATIVELY, EXPEDITED
<u>MOTION FOR ENTRY OF PROTECTIVE ORDER AND BRIEF IN SUPPORT</u>**

Respectfully submitted,

By: _/s/ Charlene C. Koonce_____
    Cortney C. Thomas
     Texas Bar No. 24075153
     cort@brownfoxlaw.com
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Andrew C. Debter
     Texas Bar No. 24133954
     andrew@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

    *Attorneys for Defendant William Francis*

| Exhibit No. | Description | App No. |
|:---:|:---|:---:|
| B | Subpoena issued to Domains by proxy LLC (Wills County, Illinois lawsuit) | APP178-180 |
| C | Subpoena issued to GoDaddy.com LLC (Wills County, Illinois lawsuit) | APP181-183 |
| D | Excerpts from Reporter's Record from Appeal, Volume 3 (Fifth Court of Appeals case) | APP184-190 |
| E | Defendants' Brief in Support of Motion to Dismiss Based on Abstention, or Alternatively, Motion to Transfer Venue and Brief in Support (without exhibits) | APP191-224 |
| F | Complaint Comparison Chart | APP225-231 |

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

*/s/ Charlene C. Koonce*
Charlene C. Koonce

# EXHIBIT B

Andrea Lynn Chasteen
Will County Circuit Clerk
Twelfth Judicial Circuit Court
Electronically Filed
2023CH000113
Filed Date: 6/27/2023 2:13 PM
Envelope: 23312272
Clerk: GMA

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## WILL COUNTY, ILLINOIS LAW DIVISION

Phoenix Capital Group Holdings, LLC,

        Plaintiff,

        v.               No. 2023CH000113

ANB Bank, Dalmore Group, LLC, Domains
By Proxy, LLC, GoDaddy.com, LLC,
Google LLC, Reddit, Inc.,

        Respondents in Discovery.

To:    Domains By Proxy, LLC
       2150 E. Warner Rd.,
       Tempe, AZ 85284 USA

YOU ARE COMMANDED to mail the following documents in your possession or control to

Loftus & Eisenberg, Ltd.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
on or before July 19, 2023. at 12:00 P.M.

(THIS IS FOR RECORDS ONLY. THERE WILL BE NO ORAL INTERROGATORIES.):

      1.    Any and all documents referring or relating to web registration of adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

      2.    Any and all documents referring or relating to the payment received for web registration of adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

      3.    Any and all documents indicating who is the owner of adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

      4.    Any and all documents indicating what person or entity registered the domain adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

YOUR FAILURE TO RESPOND TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT FOR CONTEMPT OF THIS COURT.

Issued by:
Loftus & Eisenberg, Ltd.
161 N. Clark, Suite 1600, Chicago, Illinois 60601
Date: June 23, 2023

I served this subpoena by mailing a copy, as required by Ill. Sup. Ct. Rules 11, 12 and 204(a)(2), to ANB Bank by certified mail, return receipt requested (Receipt # _____) on June 27, 2023. I paid the witness $ (please advise of reproduction expense) for witness and mileage fees.

/s/Alexander N. Loftus___
(Signature of Server)

REQUEST RECEIVED ON-AW@RDAPLAW.NET-11/20/2023 02:34:31 PM DOCUMENT SUPPLIED ON 11/30/2023 09:31:22 AM # 17197230732

APP180

# EXHIBIT C

Andrea Lynn Chasteen
Will County Circuit Clerk
Twelfth Judicial Circuit Court
Electronically Filed
2023CH000113
Filed Date: 6/27/2023 2:15 PM
Envelope: 23312394
Clerk: GMA

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
WILL COUNTY, ILLINOIS LAW DIVISION**

Phoenix Capital Group Holdings, LLC,

        Plaintiff,

        v.           No. 2023CH000113

ANB Bank, Dalmore Group, LLC, Domains
By Proxy, LLC, GoDaddy.com, LLC,
Google LLC, Reddit, Inc.,

        Respondents in Discovery.

To:    Godaddy.com, LLC
       2155 E. GoDaddy Way,
       Tempe, AZ 85284

YOU ARE COMMANDED to mail the following documents in your possession or control to

Loftus & Eisenberg, Ltd.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
on or before July 19, 2023. at 12:00 P.M.

(THIS IS FOR RECORDS ONLY. THERE WILL BE NO ORAL INTERROGATORIES.):

    1.    Any and all documents referring or relating to hosting of adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

    2.    Any and all documents referring or relating to the payment received by GoDaddy for web registration of adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

    3.    Any and all documents indicating who is the owner of adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

    4.    Any and all documents indicating what person or entity registered the domain adamferrarioilandgaslawsuits.com from January 1, 2017 to Present.

    5.    Any and all documents indicating the internet service provider and IP address of the user who created adamferrarioilandgaslawsuits.com.

YOUR FAILURE TO RESPOND TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT FOR CONTEMPT OF THIS COURT.

Issued by: Loftus & Eisenberg, Ltd.
161 N. Clark, Suite 1600, Chicago, Illinois 60601
Date: June 23, 2023

I served this subpoena by mailing a copy, as required by Ill. Sup. Ct. Rules 11, 12 and 204(a)(2), to ANB Bank by certified mail, return receipt requested (Receipt # _____) on June 27, 2023. I paid the witness $ (please advise of reproduction expense) for witness and mileage fees.

/s/Alexander N. Loftus____
(Signature of Server)

# EXHIBIT D

1

```
 1                    REPORTER'S RECORD
                   VOLUME 3 OF 3 VOLUMES
 2          TRIAL COURT CAUSE NO. DC-22-06350        FILED IN
                                                 5th COURT OF APPEALS
 3          COURT OF APPEALS CAUSE NO. 05-22-01260-CV DALLAS, TEXAS
                                                 12/19/22 12:00:00 AM
 4    PHOENIX CAPITAL GROUP        )  IN THE DISTRICT COURT
      HOLDINGS, LLC                )             Ruben Morin
 5                                 )               Clerk
      vs.                          )  116th JUDICIAL DISTRICT
 6                                 )
      WILLIAM FRANCIS AND INCLINE  )
 7    ENERGY PARTNERS, L.P.        )  DALLAS COUNTY, TEXAS

 8

 9

10       _____

11       CONTINUATION OF DEFENDANTS' TCPA MOTION TO DISMISS
         _____

12

13

14

15

16       On the 28th day of October, 2022, the following

17    proceedings came on to be held in the above-titled and

18    numbered cause before the Honorable Tonya Parker, Judge

19    Presiding, held in Dallas County, Texas.

20       Proceedings reported by computerized stenotype

21    machine.

22

23

24

25
```

*CONTINUATION OF DEFENDANTS' TCPA MOTION TO DISMISS*
*OCTOBER 28, 2022*

```
 1                            APPEARANCES

 2    James Crewse
      SBOT NO. 24045722
 3    Crewse Law Firm, PLLC
      5546 Goodwin Avenue
 4    Dallas, Texas 75206
      Telephone:  214-394-2856
 5    Attorney for Plaintiff

 6    Patrick D. Houston, Pro Hac Vice
      Whiteford, Taylor & Preston LLP
 7    Two James Center
      1021 East Cary Street, Suite 1700
 8    Richmond, Virginia 23219
      Telephone:  804-977-3300
 9    Attorney for Plaintiff

10    Charlene C. Koonce
      SBOT NO. 11672850
11    Brown Fox PLLC
      8111 Preston Road, Suite 300
12    Dallas, Texas 75225
      Telephone:  214-327-5000
13    Attorney for Defendants

14

15

16

17

18

19

20

21

22

23

24

25
```

APP186

*CONTINUATION OF DEFENDANTS' TCPA MOTION TO DISMISS*
*OCTOBER 28, 2022*

```
 1                         VOLUME 3

 2      CONTINUATION OF DEFENDANTS' TCPA MOTION TO DISMISS

 3   OCTOBER 28, 2022
                                           PAGE VOL.
 4   Reporter's Certificate .........................61   3

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*CONTINUATION OF DEFENDANTS' TCPA MOTION TO DISMISS*
*OCTOBER 28, 2022*

1            **P R O C E E D I N G S**

2            *THE COURT:*  I'm ready to go back on the

3    record in the Phoenix Capital Group matter,

4    *Phoenix Capital Group Holdings, LLC, v. William Francis*

5    *and Incline Energy Partners, LLP.*  Again, this is the

6    TCPA motion filed by the defendants.

7            And, Counsel, I will turn it over to you

8    in terms of further arguments in support and opposition

9    to the motion.  Mr. Crewse, I see that you are standing

10   along with Ms. Koonce.  And while you're standing,

11   you-all might as well go ahead and put your appearances

12   on the record, and then I'll receive any preliminary

13   comments you have before we jump back in.  Appearances,

14   please.

15           *MS. KOONCE:*  Charlene Koonce on behalf of

16   the defendants.

17           *MR. CREWSE:*  James Crewse and

18   Patrick Houston on behalf of the plaintiff, Phoenix

19   Capital Group.

20           *MS. KOONCE:*  Judge, I just wanted to ask,

21   I know last time, as you are aware, I was very fast, we

22   thought we had 30 minutes.  We went, I think, about an

23   hour.  I had 20 of that.  I think he had 40.  I'd like

24   to reserve at least equal time for a rebuttal today,

25   depending on how you want to proceed, but I did want to

*CONTINUATION OF DEFENDANTS' TCPA MOTION TO DISMISS*
*OCTOBER 28, 2022*

1    evidence, overrule defendants' objections to Phoenix's

2    evidence, deny defendants' motion to dismiss.  And the

3    Court can do that both because -- under Step 1, because

4    it's not a matter of public concern.  And also under

5    Step 2, we've overcome every single -- we have shown a

6    basis under each of the elements for each claim.

7                    *THE COURT:*  Thank you, Counsel.

8                    *MR. CREWSE:*  Thank you, your Honor.

9                    *MS. KOONCE:*  I prefer to stand, if that's

10   okay.  And can y'all assist in getting this back to the

11   screen because I don't know how to take yours off.

12                   Judge, while we're working on that, can I

13   approach?  I have two cases to give you.  And I'll give

14   them to you-all.  And then most of the slides are the

15   same, but I have modified them a little bit.

16                   *THE COURT:*  Okay.  You may approach.  I

17   think the deputy is going to help you out.

18                   *MS. KOONCE:*  So, Judge, there's a lot

19   there.  And first of all, to allegations that we didn't

20   deny something, we have a general denial on file and

21   we -- our -- our motion, our reply repeatedly states

22   that we're not admitting to have made any anonymous

23   statements.  We're still entitled to challenge those

24   anonymous statements based on the TCPA, in any event.

25                   With respect to -- I'm just going to hit

*CONTINUATION OF DEFENDANTS' TCPA MOTION TO DISMISS*
*OCTOBER 28, 2022*

```
 1   STATE OF TEXAS

 2   COUNTY OF DALLAS

 3

 4       I, Lanetta Williams, Official Court Reporter in and

 5   for the 116th District Court of Dallas, State of Texas,

 6   do hereby certify that the above and foregoing contains

 7   a true and correct transcription of all portions of

 8   evidence and other proceedings requested in writing by

 9   counsel for the parties to be included in this volume of

10   the Reporter's Record in the above-styled and numbered

11   cause, all of which occurred in open court or in

12   chambers and were reported by me.

13       I further certify that this Reporter's Record of the

14   proceedings truly and correctly reflects the exhibits,

15   if any, offered by the respective parties.

16       I further certify that the total cost for the

17   preparation of this Reporter's Record is $661.50 and was

18   paid by Brown Fox PLLC.

19
                              /s/ Lanetta Williams
20
                              Lanetta Williams, CSR, RPR, CRR
21                            Texas CSR 6216
                              Official Court Reporter
22                            116 District Court
                              Dallas County, Texas
23                            600 Commerce Street, 6th Floor
                              Suite 620C
24                            Dallas, Texas 75202
                              Telephone:  214-653-7159
25                            Expiration:  10/31/2023
```

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| **PHOENIX CAPITAL GROUP** | § | |
| **HOLDINGS, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 1:23-cv-00209** |
| | § | |
| **INCLINE ENERGY PARTNERS, L.P.** | § | |
| | § | |
| **Defendant.** | § | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS BASED ON ABSTENTION, OR ALTERNATIVELY, MOTION TO TRANSFER VENUE

## TABLE OF CONTENTS

I.      SUMMARY ............................................................................................. 1

II.     STATEMENT OF FACTS ...................................................................... 1

        A.      Phoenix's First Lawsuit Alleged Incline Defamed It by Informing FIBT
                that Phoenix's Founder and Controlling Executive, Ferrari, is a Felon.................. 1

        B.      Phoenix's Second Lawsuit Alleges Francis Defamed Ferrari by Informing
                FIBT that Ferrari is a Felon ..................................................................... 4

        C.      The Texas Appellate Court Dismissed All But One of Phoenix's Claims
                and Remanded The Remaining Claim for Dismissal.............................. 6

        D.      Phoenix Seeks a Third Bite at the Apple, Alleging Again, that Incline
                Improperly Disclosed Adam Ferrari's Criminal Record to FIBT.......................... 6

        E.      Witness Location and Importance ...................................................... 8

III.    ARGUMENTS & AUTHORITIES ........................................................ 8

        A.      The Court Should Abstain From Exercising Its Jurisdiction and Dismiss
                In Favor of the Texas State Case ...................................................... 8

                1.      Legal Standard Applicable to Abstention ................................ 8

                2.      The Texas State Case is a Parallel Proceeding ........................... 9

                3.      Exceptional Circumstances Justify Abstention......................... 13

        B.      In the Alternative, the Case Should be Transferred to the Northern District
                of Texas.......................................................................................... 15

                1.      Legal Standard for a Motion to Transfer Venue ....................... 15

                        i.      Two Related Cases in Texas and Phoenix's Improper Effort to
                                Circumvent Its Loss in Texas Mandate Transfer............................. 16

                        ii.     Additional "Interests of Justice" Factors Weigh in Favor of
                                Transfer .................................................................................. 19

                                a.      Judicial Economy, Phoenix's Choice Of Forum,
                                        Comparative Costs, Enforcement And Obstacles To
                                        Fairness Weigh In Favor Of Transfer .................................. 19

                                b.      Conflicts of Law Issues and Having a Texas Court
                                        Determine Issues Controlled by Texas Law Also Weigh
                                        in Favor of Transfer. ............................................................ 20

iii.   The Interests of the Parties and the Witnesses Also Support
Transfer ............................................................................................. 23

a.      The Interests of the Parties Point to Texas........................... 23

b.      Phoenix Already Conceded Texas Is Convenient for
Witnesses ............................................................................ 24

IV.     CONCLUSION................................................................................................. 25

APP194

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amstadt v. U.S. Brass Corp.*
    919 S.W.2d 644 (Tex.1996) ................................................................................. 10

*Bank of Okla., N.A. v. Tharaldson Motels II, Inc.*
    671 F. Supp. 2d 1058 (D.N.D. 2009) ............................................................... 9, 14

*Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Services, Inc.*
    500 S.W.3d 26 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ..................... 11

*Bhd. of Maint. of Way Employes Div./IBT v. Union Pac. R.R. Co.*
    485 F. Supp. 3d 1048 (D. Neb. 2020) ............................................................... 23

*Birnstill v. Home Sav. of Am.*
    907 F.2d 795 (8th Cir. 1990) .......................................................................... 22

*Black & Decker Corp. v. Amirra, Inc.*
    909 F. Supp. 633 (W.D. Ark. 1995) ................................................................ 16

*Citizens Ins. Co. of Am. v. Daccach*
    217 S.W.3d 430 (Tex. 2007) ............................................................................ 11

*Colorado River Water Conservation Dist. v. United States*
    424 U.S. 800, 96 S. Ct. 1236, 47 L.Ed.2d 483 (1976) ........................................ 9

*Compania Financiara Libano, S.A. v. Simmons*
    53 S.W.3d 365 (Tex. 2001) ........................................................................ 10, 15

*Continental Grain Co. v. The FBL—585*
    364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960) ........................................ 16

*Cosmetic Warriors Ltd. v. Abrahamson*
    723 F. Supp. 2d 1102 (D. Minn. 2010) ............................................................ 19

*Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*
    591 S.W.3d 127 (Tex. 2019) .......................................................................... 3

*Dakota W. Bank of N. Dakota v. N. Am. Nutrition Companies, Inc.*
    284 F. Supp. 2d 1232 (D.N.D. 2003) .............................................................. 24

*Daley v. Am. States Preferred Ins. Co.*
    1998 ND 225, 587 N.W.2d 159 ...................................................................... 21

*DataTreasury Corp. v. First Data Corp.*
    243 F. Supp. 2d 591 (N.D. Tex. 2003) ............................................................ 15

iv

*De Melo v. Lederle Labs.*
    801 F.2d 1058 (8th Cir.1986) ............................................................................................ 17

*EEOC v. Jefferson Dental Clinics, PA*
    478 F.3d 690 (5th Cir. 2007) ...................................................................................... 18, 20

*Engelman Irrigation Dist. v. Shields Bros., Inc.*
    514 S.W.3d 746 (Tex. 2017).............................................................................................. 10

*Follette v. Wal-Mart Stores, Inc.*
    41 F.3d 1234 (8th Cir. 1994) ...................................................................................... 10, 20

*Fru-Con Const. Corp. v. Controlled Air, Inc.*
    574 F.3d 527 (8th Cir. 2009) ........................................................................................ 9, 14

*Hardwick v. Factor*
    2011 WL 1831706 (S.D. Tex. May 9, 2011)................................................................... 16

*In re Apple, Inc.*
    602 F.3d 909 (8th Cir. 2010) ...................................................................................... 17, 23

*Kelly v. Lexxus Intern., Inc.*
    No. 4:05CV3201, 2006 WL 436047 (D. Neb. Feb. 21, 2006)........................................ 16, 19

*Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*
    342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952)........................................................... 9

*Levitt v. Maryland Deposit Insurance Fund Corp.*
    643 F.Supp. 1485 (E.D.N.Y.1986) ............................................................................... 16

*Martinez v. Hardy*
    864 S.W.2d 767 (Tex. App.—Houston [14th Dist.] 1993, no writ) ......................... 21

*May Dept. Stores Co. v. Wilansky*
    900 F.Supp. 1154 (E.D.Mo.1995)................................................................................. 19

*Melichar v. Blue Cross and Blue Shield of Kansas, Inc.*
    309 F. Supp. 3d 719 (D. Neb. 2018)............................................................................. 23

*Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*
    460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).................................................... 14

*Nath v. Tex. Children's Hosp.*
    446 S.W.3d 355 (Tex. 2014)....................................................................................... 21

*R.D. Offutt Co. v. Lexington Ins. Co.*
    342 F. Supp. 2d 838 (D.N.D. 2004).......................................................................... 15, 19

APP196

*Reid–Walen v. Hansen*
  933 F.2d 1390 (8th Cir.1991) ................................................................................ 24

*Reiffin v. Microsoft Corp.*
  104 F. Supp. 2d 48 (D.D.C. 2000) ........................................................................ 16

*Spectra Comm's Grp., LLC v. City of Cameron, Mo.*
  806 F.3d 1113 (8th Cir. 2015) .......................................................................... 9, 14

*Steward v. Up N. Plastics, Inc.*
  177 F. Supp. 2d 953 (D. Minn. 2001) .................................................................. 16

*Sundance Leasing Co. v. Bingham*
  503 F. Supp. 139 (N.D. Tex. 1980) ...................................................................... 17

*Terra Int'l, Inc. v. Mississippi Chem. Corp.*
  119 F.3d 688 (8th Cir.1997) ................................................................................ 15

*The Whistler Grp., Inc. v. PNI Corp.*
  2003 WL 22939214 (N.D. Tex. Dec. 5, 2003) ...................................................... 17

*Van Dyke v. Boswell, O'Toole, Davis & Pickering*
  697 S.W.2d 381 (Tex. 1985)................................................................................. 10

*Wal–Mart Stores, Inc. v. Sturges*
  52 S.W.3d 711 (Tex. 2001).................................................................................. 21

**Statutes**

17 Moore's Federal Practice § 111.13[1][o].......................................................... 15

Restatement (Second) of Conflict of Laws, § 145(2)(a)-(d) (1971) ............................ 22

TEX. CIV. PRAC. & REM. CODE § 27.003 ................................................................. 3

TEX. CIV. PRAC. & REM. CODE § 73.055(c) .......................................................... 21

APP197

Pursuant to Rule 12(b)(1) and *Colorado River* abstention, Defendant Incline Energy Partners, L.P. ("Incline") moves to the Court to abstain from exercising its jurisdiction and dismiss or stay this case.  In the alternative, pursuant to 28 U.S.C. § 1404(a), Incline requests transfer of this case to the United States District Court for the Northern District of Texas, Dallas Division.  In support, Incline respectfully shows the Court as follows.

## I.      SUMMARY

Phoenix and the person who controls it, Adam Ferrari, have now filed three lawsuits against Incline or its principal. All three lawsuits turn on whether Ferrari is factually a felon, and whether in violation of SEC regulations, he controls Phoenix.  In this lawsuit, Phoenix seeks to avoid the soon to be preclusive effect of a partial interlocutory judgment that has already been affirmed by a Texas state appellate court and through which virtually identical claims asserted here were dismissed. Because this case is parallel to the Texas State Case and other exceptional circumstances exist, this Court should abstain from exercising its jurisdiction and dismiss this case.

In the alternative, if it declines to abstain, the Court should transfer the case to the Northern District of Texas, where a third, related case is pending and where both parties have offices.

## II.      STATEMENT OF FACTS

**A.      Phoenix's First Lawsuit Alleged Incline Defamed It by Informing FIBT that Phoenix's Founder and Controlling Executive, Ferrari, is a Felon**

1.      Phoenix is a Delaware corporation headquartered in Colorado.[1]  Phoenix recently opened an office in Dallas, Texas.[2]  Incline is a Texas entity, headquartered in Dallas, Texas.[3]

2.      On June 15, 2022, Phoenix filed suit against Incline and its principal, William

---

[1] Dkt. 1, ¶ 1.

[2] The Court may judicially notice Phoenix's public information. *See* https://phxcapitalgroup.com/blog/2023/07/20/phoenix-capital-group-expands-presence-with-opening-of-new-office-in-dallas-texas/

[3] Dkt. 1, ¶ 2.

APP198

Francis, in a Texas state district court.[4] *See Phoenix Capital Group Holdings, LLC v. William Francis and Incline Energy Partners, LP*, Cause No. DC 06360, pending in the 116th District Court for Dallas County, Texas (the "Texas State Case").

      3.     In the Texas State Case, Phoenix judicially admitted that Ferrari, at least as of the date it filed its Original Petition, was its "expert consultant."[5] Phoenix now identifies Ferrari as its Vice President of Engineering.[6]

      4.     The Texas State Case rests on the same, and additional similar facts underlying this lawsuit, including allegations that:

> "Mr. Francis began emailing and sending anonymous packets to mineral rights sellers and industry executives, claiming that Mr. Ferrari was Phoenix's Chief Executive Officer and a convicted felon."

> "In early May of 2022, Phoenix was moving to close on a $50,000,000 loan with its primary bank, First International Bank and Trust ("FIBT"). . . . On May 11, 2022, Phoenix received a call from FIBT, informing Phoenix that FIBT was backing out of the transaction. Phoenix later learned that someone had sent FIBT an anonymous packet regarding Mr. Ferrari, which caused FIBT to back out of the transaction. Upon information and belief, Mr. Francis intentionally interfered with the transaction by defaming Phoenix."[7]

      5.     Additionally, based on an email from Incline to a Colorado mineral owner in which Ferrari's felony status and control over Phoenix were discussed, (the "Taylor email,") Phoenix alleged Incline interfered with its purchase of minerals from Colorado residents, the Krystal

---

[4] A true and correct copy of Phoenix's Original Petition (the "Original Petition") filed in the Texas State Case is attached to the Declaration of Charlene Koonce, ("Koonce Dec.") as Exhibit A-1. The Court can also view the docket in the Texas State Case here: https://courtsportal.dallascounty.org/DALLASPROD/Home/WorkspaceMode?p=0.   .

[5] Original Petition, ¶ 7.

[6] *See* https://phxcapitalgroup.com/our-team/.

[7] Original Petition ¶¶ 21; 26; 35-38.

Family.[8] With respect to that transaction, however, Phoenix admitted Incline had already closed the sale and Phoenix later attempted to convince the mineral owner to breach.[9]

6.       In the Texas State Case, Phoenix asserted claims for (a) defamation, slander, libel, and slander/libel per se; (b) business disparagement; (c) tortious interference with contract; (d) tortious interference with prospective contract; (d) unfair competition; and (e) civil conspiracy.[10]

7.       Texas has codified First Amendment protection by creating a statutory framework that authorizes motions to dismiss challenging "legal actions" that are "based on" or "in response to" a party's exercise of its "right of free speech, right to petition, or right of association . . ." TEX. CIV. PRAC. & REM. CODE § 27.003 (the Texas Citizen's Participation Act, "the TCPA"); *see also Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 131 (Tex. 2019).  Relying on the TCPA, Incline and Francis moved to dismiss Phoenix's claims.[11]

8.       Notably, to eliminate expensive discovery on claims that are improper, while a TCPA motion is pending, unless the trial court expressly authorizes discovery in furtherance or response to the motion, discovery is stayed.  *See* TEX. CIV. PRAC. & REM. CODE § 27.003(c).  The trial court did not authorize any discovery while Incline's motion was pending, and thus discovery was stayed in August 2022, when Incline filed its TCPA motion.[12]

9.       In support of their TCPA motion, Incline and Francis demonstrated the truth of Ferrari's status as a felon, based on his guilty plea to one out of fourteen felony counts and arising

---

[8] Original Petition ¶¶ 31-32, and Exhibit B.  Notably, as discussed below, the Texas appellate court concluded that Phoenix, not Incline, was engaged in interference with respect to the Krystal Family transaction.

[9] *See* Texas State Court Appellate Opinion (further defined below), attached to the Koonce Dec. as Exhibit A-5, at pp. 14-15.

[10] Original Petition, pp. 7-10.

[11] *See* Koonce Dec. A-4.

[12] *See* Koonce Dec. ¶ 8.

out of his forgery of a mineral owner's signature on a deed.[13]  It also demonstrated numerous defects with many of Phoenix's other claims, including statute of limitations, the absence of an existing contract with respect to the tortious interference with existing contract claim, and justification or privilege.

10.     The trial court granted Incline's motion to dismiss in part and dismissed Phoenix's (a) tortious interference with existing contract claim, and (b) business disparagement and defamation claims, to the extent those claims relied on any statement *other than* the Taylor email (i.e., the FIBT email, and other time-barred communications alleged in the Petition). The trial court denied the motion with respect to Phoenix's claims for tortious interference with prospective contract, disparagement and defamation relying on the Taylor email, and conspiracy and unfair competition.[14]

11.     In November 2022, Incline appealed the partial denial of its motion to dismiss to the Texas Fifth District Court of Appeals, *Incline et al. v. Phoenix Group Holdings, LLC,* Appeal No. 05-22-01260-CV.  As discussed below, the Texas appellate court reversed the partial denial of Incline's motion to dismiss except for one claim, which it remanded with instructions for the trial court to consider dismissing based on an affirmative defense that the court found was supported by the evidence.

**B.     Phoenix's Second Lawsuit Alleges Francis Defamed Ferrari by Informing FIBT that Ferrari is a Felon**

12.     On the same day Incline filed its Reply brief in support of its appeal, on February 28, 2023, Adam Ferrari filed suit against William Francis in the United States District Court for

---

[13] *See* the true and correct copy of the Declaration of Mary Ann Sobel, submitted by Incline in support of its Motion to Dismiss, attached to the Koonce Dec. as Exhibit A-3; *see also* Order Denying Motion to Seal, Dkt. 31, from the Texas Federal Case (defined below), attached to the Koonce Dec. as Exhibit A-6.

[14] *See* Koonce Dec. ¶ 11, Exhibit A-4.

APP201

the Northern District of Texas, Dallas Division. *See* Ferrari v. Francis, Case No. 23-CV-455, in

the in the United States District Court for the Northern District of Texas ("Texas Federal Case").[15]

13.     The Texas Federal Case regurgitates many of the same facts included in the Texas

State Case, including the allegation that Francis's communications with First International Bank

and Trust, ("FIBT") regarding the same loan transaction at issue in this lawsuit, harmed Ferrari,

individually:

> "In approximately 2021 or 2022, upon information and belief, Mr. Francis sent one
> of his slanderous packets to First International Bank and Trust ("FIBT") in order to
> further disparage Mr. Ferrari and damage relations between Mr. Ferrari and
> potential investors. Based on information and belief, as well as Mr. Francis' pattern
> and practice of publishing false statements against Mr. Ferrari, Mr. Francis
> published false statements to FIBT, including that Mr. Ferrari was a felon, was
> acting as the CEO of Phoenix, and was defrauding mineral owners and investors."[16]

14.     In addition to other allegations that are time-barred, the Texas Federal Case also

includes allegations that Francis slandered Ferrari by calling out his fraud to other mineral owners;

that Francis made false statements, also about Ferrari's felony status and his control over Phoenix,

to Dalmore Capital, a brokerage firm engaged by Phoenix (a contention also pleaded in the Texas

State Case) and FINRA.[17]

15.     In the Texas Federal Case, Ferrari alleged that venue was proper in the Northern

District of Texas because this is the Judicial District in which Mr. Francis resides and because, as

explained more fully below, a substantial part of the events or omissions giving rise to the action

occurred within this judicial district."[18]

16.     On June 15, 2024, the Texas Federal Court stayed discovery until seven days after

---

[15] A true and correct copy of the Amended Complaint filed in the Texas Federal Case ("Amended Complaint") is
attached to the Koonce Dec. as Exhibit A-7.

[16] Amended Complaint, ¶ 25.

[17] Amended Complaint, ¶¶ 26-35.

[18] Amended Complaint, ¶ 5.

the Court ruled on Francis's Motion to Dismiss Ferrari's Amended Complaint.[19]  The Court denied that motion to dismiss on October 31, 2023, and thus discovery commenced on November 8, 2023.[20]

## C.   The Texas Appellate Court Dismissed All But One of Phoenix's Claims and Remanded The Remaining Claim for Dismissal.

17.     On August 29, 2023, the Texas appellate court entered a judgment reversing denial of Incline's motion to dismiss all claims, except for defamation per se, which was remanded for the trials court's consideration of an applicable affirmative defense, and attorney's fees.[21]

18.     Phoenix filed a petition for rehearing, which was denied on October 11, 2023. Because the remand requires the Texas trial court to reconsider the final claim pursuant to the TCPA, discovery in the Texas State Case will remain stayed.

19.     The day after counsel conferred about this motion, Phoenix's Texas counsel conferred about a request for a *two-month* extension in which to file its petition for review to the Texas Supreme Court, in an effort to slow down the preclusive effect that will result from a final judgment upon remand.[22]   Review of such a petition is discretionary, and review, as well as reversal, is rare.[23]

## D.   Phoenix Seeks a Third Bite at the Apple, Alleging Again, that Incline Improperly Disclosed Adam Ferrari's Criminal Record to FIBT.

20.     Undeterred by, or perhaps because of the impending final judgment in the Texas State Case, Phoenix filed this lawsuit, nine days after its petition for rehearing was denied in the

---

[19] Texas Federal Case, Dkt. 29.

[20] In the Texas Federal Case, Ferrari seeks discovery on many issues that relate to Phoenix's alleged damages, and which are far outside of the one-year limitations period for his defamation claim.  Koonce Dec. ¶ 18.  Incline will address these issues with the Texas Federal Case judge.

[21] *See* Koonce Dec., Exhibit A-5.

[22] *See* Koonce Dec. ¶ 13.

[23] *See* Koonce Dec. ¶ 13.

Texas State Case.

21.     Here, Phoenix alleges again that Incline tortiously interfered with the loan transaction between Phoenix and FIBT, as well as transactions between Phoenix and undisclosed North Dakota mineral owners, by allegedly defamatory statements made by Incline, to the effect that Ferrari is a felon and controls Phoenix.  Dkt. 1, ¶ 18 ("Incline's principal . . . has lashed out at Phoenix . . ., including making defamatory statements to customers, lenders, investors, regulators both directly and via pseudonyms online."); *Id.* ¶  22 ("As part of its campaign to take advantage of North Dakota mineral rights holders, Incline's agents told potential lessors, including but not limited to the Bakke Family, that Phoenix was operated by criminals, among other false statements . . .").

22.     Phoenix also seeks redress, again, for FIBT's cancellation of its potential loan. Although Phoenix concedes for the first time that closing the loan was contingent on FIBT's *sole discretion* so long as the discretion was exercised in good faith, as in both Texas cases, Phoenix alleges that it sought to borrow $50,000,000 from FIBT.  *Id.* at ¶31-32.  Again, as in both Texas cases, Phoenix contends that Francis's communication with FIBT interfered with the transaction:

> 48.  At 10:17 p.m. on May 5, 2022, Francis emailed Brown, "I've attached what I put together on Adam's association with Phoenix. While some claims in here might be brushed off as hearsay and conjecture, the entirety of the body of evidence points to a convicted criminal who pleaded guilty to defrauding mineral owners in Colorado as the controlling force that's actually running Phoenix. After digesting all of the instruments which have been filed with the SEC and elsewhere, for someone to consume those and still believe Adam is not actually running Phoenix would be akin to believing his paralyzed father has been one of the most active mineral buyers in the Williston since Adam was arrested."
>
> "49. The attachments to the 10:17 p.m. email made numerous false accusations about Phoenix's current Vice President of Engineering, Adam Ferrari, accused him of committing various crimes while omitting the fact that the charges were dropped and the matter vacated, and lying to investors about his role in the business."

*Id.*, ¶ 48-49.

APP204

23.     Phoenix asserts here, as in both Texas cases (but following further communications between Phoenix and FIBT), that FIBT "terminated the agreement to provide $50,000,000 in financing to Phoenix in bad faith based on the statements made by Francis on behalf of Incline. *Id.*, ¶ 54.[24]  As in the Texas State Case, Phoenix quantifies its damages, at least in part, on the loss of the FIBT loan. *Id.,* ¶¶ 55-60; 63-70.

**E.     Witness Location and Importance**

24.     Incline has no employees or agents in North Dakota.  It currently employs no contractors within the state.[25]  Incline, instead, is based in Texas, and Mr. Francis resides and works in Dallas.  Any statements made by Francis on which Phoenix's claims depend, were made from Texas.   All other Incline employees reside in Texas.[26]

## III.     ARGUMENTS & AUTHORITIES

**A.     The Court Should Abstain From Exercising Its Jurisdiction and Dismiss In Favor of the Texas State Case**

Although  circumstances  justifying  *Colorado  River*  abstention  are  rare,  this  case  fits squarely within the doctrine.  Because this lawsuit evidences blatant forum shopping, a desperate effort to avoid res judicata, coupled with a colossal waste of judicial resources, this Court should dismiss this case in deference to the Texas State Case, or stay it.

### 1.     Legal Standard Applicable to Abstention

Although  federal  courts  generally  have  an  "unflagging"  obligation  to  exercise  their jurisdiction, "exceptional circumstances" afford discretion to stay or dismiss a case in favor of a parallel state proceeding. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800,

---

[24] *See also* Original Petition ¶¶ 36-39; First Amended Complaint ¶ 25.

[25] *See* Declaration of William Francis, attached at **Exhibit B.**

[26] *Id.*

APP205

817, 96 S. Ct. 1236, 47 L.Ed.2d 483 (1976); *Fru-Con Const. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 534 (8th Cir. 2009) (plurality opinion). *Colorado River* abstention rests on "'conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River Water Conservation Dist.*, 424 U.S. at 817 (quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952)). Application of the doctrine requires two conditions: "1) parallel state and federal actions, and 2) exceptional circumstances." *Bank of Okla., N.A. v. Tharaldson Motels II, Inc.*, 671 F. Supp. 2d 1058, 1062 (D.N.D. 2009); *Fru–Con Constr. Corp.,* 574 F.3d at 534. Both conditions exist here.

### 2.    The Texas State Case is a Parallel Proceeding

Whether two cases are parallel turns on whether a "substantial similarity" exists between the cases such that "there is a substantial likelihood that the state proceeding will fully dispose of the claims presented in the federal court." *Spectra Comm's Grp., LLC v. City of Cameron, Mo.*, 806 F.3d 1113, 1121 (8th Cir. 2015) (quoting *Fru–Con,* 574 F.3d at 535)). The analysis does not require that the matters are identical; instead, courts advance the policies underlying the doctrine by favoring the most complete action. *Spectra Comm's Grp., LLC*, 806 F.3d at 1122; *Fru-Con Const. Corp.*, 574 F.3d at 535. Thus, the presence of additional parties or issues does not destroy parallelism. *Bank of Okla., N.A.*, 671 F. Supp. 2d at 1062.

In the Texas State Case Phoenix asserts claims against Incline and its principal Francis. It alleged the same tortious interference and unfair competition claims, based on the same purported defamatory statements asserted here. Moreover, the Texas case is more comprehensive than this one, since in Texas, Phoenix also asserted the defamation and business disparagement claims on which its tortious interference claims depend, as well as a "conspiracy" claim.[27] Here, based on

---

[27] In the Texas State Case, Phoenix also judicially admitted during a hearing that its claims rested solely on two communications: the FIBT communication and the Taylor email. Koonce Dec. ¶ 10.

9

the same nucleus of facts—deprivation of the FIBT loan and purportedly defamatory statements to mineral owners who chose to contract with Incline rather than Phoenix—Phoenix also alleges an implausible "unjust enrichment" claim.[28]

Most importantly, final resolution of the Texas State Case will bar Phoenix's claims here, as well as Ferrari's claims in the Texas Federal Case.  Texas law, as the substantive law that controls the interlocutory judgment already issued in the Texas State Case, will govern the preclusive effect of a final judgment on the claims asserted here.  *Follette v. Wal-Mart Stores, Inc.*, 41 F.3d 1234, 1237 (8th Cir. 1994) ("When a federal court is sitting in diversity, the preclusive effect of a prior judgment is determined by the preclusion rules of the forum which provided the substantive law underlying that prior judgment.").  In Texas, "[r]es judicata bars the relitigation of claims that have been finally adjudicated or that could have been litigated in the prior action." *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 750 (Tex. 2017) (internal quotation omitted); *Compania Financiara Libano, S.A. v. Simmons,* 53 S.W.3d 365, 367 (Tex. 2001).  The doctrine focuses on what could have been litigated, rather than just the actual claims asserted. *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex. 1985).

Under Texas law, Incline will be entitled to a res judicata bar when it demonstrates (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action grounded on the same claims as those raised or that could have been raised in the first action." *Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 652 (Tex.1996).  Each element is easily satisfied by the Texas State Case.

---

[28] Dkt. 1.  83-89.  As set forth in Incline's Rule 12(b)(6) motion to dismiss which is filed concurrently with this motion, Phoenix's unjust enrichment and unfair competition claims are legally implausible, and its tortious interference claim premised solely on the FIBT transaction, Count I, also lacks plausibility given the absence of a breach.

First, resolution based on the TCPA will qualify as a final judgment on the merits.[29] *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Services, Inc.*, 500 S.W.3d 26, 40 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("A dismissal with prejudice under the TCPA constitutes a final determination on the merits for res judicata purposes.").  Likewise, no question exists that in both lawsuits, Phoenix Capital Group Holdings, LLC is the Plaintiff and Incline Energy Partners, LP is the Defendant.  And finally, this case is grounded on the same facts and claims raised in Texas, all of which could have been raised in the Texas State Case.

In evaluating the final factor governing res judicata, Texas courts follow the transactional approach, which requires examining the factual basis, rather than the legal theories, presented in the cases. *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007).  Here, Phoenix alleges Incline, its competitor, has sought to disparage Phoenix in communications with mineral owners, FIBT, and others, by informing those third persons that Adam Ferrari controls Phoenix and is factually, a felon.[30]   In the Texas State Case, Phoenix alleged the same factual basis for its claims:

> 7.   Phoenix brought together industry experts with decades of experience in their fields to build an industry leader in mineral rights. One of those experts with whom Phoenix consulted regularly was Adam Ferrari ("Mr. Ferrari"), an individual with years of experience and expertise in the mineral rights industry.
>
> ***
>
> 10. Further, Phoenix was able to outbid Incline directly on acquisitions and often came out on top when competing for the same investment opportunity.
>
> 11. Phoenix's success was met with hostility from Incline, specifically from Mr. Francis, Incline's Managing Partner.

---

[29] Certainly, Phoenix cannot challenge the Texas State Court's competence or jurisdiction.

[30] *See* Dkt. 1, ¶¶ 18; 20; 21; 22; 31-54.  Phoenix does not expressly plead that Incline's references to the felon controlling Phoenix are to Ferrari, but the emails Phoenix quotes demonstrates that Ferrari is the subject of these communications.  *See* Dkt. 1, ¶ 52.

APP208

\*\*\*

13. In response to Phoenix's success, Mr. Francis and Incline set out on an intentional, willful, and malicious campaign against Phoenix with the intention of damaging Phoenix's reputation and ability to compete in the marketplace.

\*\*\*

17. As a response to Mr. Ferrari's competition, Mr. Francis has always engaged in sharp business practices against Ferrari and his businesses, causing numerous lawsuits to be filed against Mr. Ferrari and those companies over the years.

18. Mr. Francis often tortiously interfered with Mr. Ferrari's business efforts — sending defamatory packets to Mr. Ferrari's business associates to try and derail Mr. Ferrari's transactions.

19. For example, on November 27, 2018, Bryan Hymer, an employee of Incline, sent to a landowner a link to an anonymous website disparaging Mr. Ferrari and his company, Ferrari Energy.

20. With respect to Phoenix, Mr. Francis latched onto the relationship between Phoenix's executives and Mr. Ferrari, an individual with whom Phoenix's executives had previously partnered.

21. Mr. Francis began emailing and sending anonymous packets to mineral rights sellers and industry executives, claiming that Mr. Ferrari was Phoenix's Chief Executive Officer and a convicted felon.

\*\*\*

23. As Phoenix became more successful in acquiring mineral rights and other investments, Mr. Francis became incensed and set out on a campaign to intentionally interfere with and damage Phoenix's business and reputation.

24. Upon information and belief, Mr. Francis set up a number of websites wherein he published information about various lawsuits filed against Mr. Ferrari and companies with which he was affiliated, including alleging that Mr. Ferrari was a convicted felon, which was and is false.

\*\*\*

26. Upon information and belief, Mr. Francis set up anonymous email accounts and sent, or had sent, packets of information to various industry players,  . . .  alleging, among other things, that Phoenix was violating SEC laws and was owned, financed, and managed by a convicted felon . . .

\*\*\*

12

31. Further, on June 17, 2021, Mr. Francis emailed Ms. Crystal Taylor, an individual with whom Phoenix was in the process of closing a real estate transaction. . . .

32. In the June 17, 2021, email, Mr. Francis stated: "I would love nothing more than to defend my company's track record versus the misdeeds that Phoenix/Ferrari has performed over the years. Namely, the fact that their CEO was arrested and convicted for forging a mineral owners signature in order to defraud her of hundreds of thousands of dollars." . . .

\*\*\*

36. In early May of 2022, Phoenix was moving to close on a $50,000,000 loan with its primary bank, First International Bank and Trust ("FIBT"), which closing was derailed, upon information and belief, by Francis's conduct.

\*\*\*

38. Phoenix later learned that someone had sent FIBT an anonymous packet regarding Mr. Ferrari, which caused FIBT to back out of the transaction.

39. Upon information and belief, Mr. Francis intentionally interfered with the transaction by defaming Phoenix."[31]

Phoenix has filed nearly identical claims here, premised on the same facts, while adding "local color" by substituting North Dakota mineral owners for Colorado mineral owners.  While the Texas State Case also includes other time-barred allegations of defamation premised on the same core facts, those additional allegations demonstrate that the Texas State Case is more comprehensive than this one, and thus presents an even stronger basis for res judicata.  A final judgment in the Texas State Case will preclude litigation of the claims asserted in this "whack-a-mole," third-bite at the apple, case.  The cases are parallel.

### 3.    Exceptional Circumstances Justify Abstention

In evaluating the existence of exceptional circumstances justifying abstention, courts generally examine six non-exclusive factors:  "(1) whether there is a res over which one court has

---

[31] Original Petition.

established jurisdiction, (2) the inconvenience of the federal forum, (3) whether maintaining separate actions may result in piecemeal litigation, unless the relevant law would require piecemeal litigation and the federal court issue is easily severed, (4) which case has priority—not necessarily which case was filed first but a greater emphasis on the relative progress made in the cases, (5) whether state or federal law controls, especially favoring the exercise of jurisdiction where federal law controls, and (6) the adequacy of the state forum to protect the federal plaintiff's rights." *Fru-Con Const. Corp.*, 574 F.3d at 534.  The factors are not applied as a "mechanical checklist," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), but instead are carefully balanced, with the importance afforded any one factor varying for each case. *Bank of Okla., N.A.*, 671 F. Supp. 2d at 1064.  This Court previously considered "forum shopping" as an additional factor. *Id.*

Here, only one factor weighs against abstention, with all others heavily supporting the doctrine.  There is no res involved and thus the first factor favors denying abstention. *But see Spectra Comm's Grp., LLC*, 806 F.3d at 1121 (treating first two issues as "irrelevant" where no res was in issue and the state and federal fora were "equally convenient"). However, as demonstrated above, North Dakota is a relatively inconvenient forum, particularly given that neither party resides or has an office in North Dakota and (1) Phoenix's prior selection of Texas as a convenient forum, and (2) Phoenix's recently opened Dallas office.  Further, given the identity between the claims and factual basis for them in the two lawsuits, maintaining separate actions will result in piecemeal litigation. *See id.* (risk of piecemeal litigation was "predominate factor" and of "significant concern" where "state and federal cases involve the same issues . . . [and thus] the federal and state courts could reach conflicting opinions on the same issues.").  The Texas State Case has "priority" since it has been pending for almost a year and a half, and an interlocutory appeal has already resolved 95% of the case, including the entirety of the FIBT claims.  As

discussed below, Texas law should govern both suits and no federal issues exist in either suit. Further, Phoenix has already conceded that Texas is an adequate forum, even for claims related to mineral owners who are not Texas residents by filing first in Texas. And Phoenix is blatantly forum shopping, seeking to avoid the Texas limitations period and the Defamation Mitigation Act, as well as the impending res judicata bar that will result from a final judgment in that case. Thus, only the absence of a *res*, a potentially irrelevant factor, cautions against abstention.

This Court should accordingly decline to afford Phoenix an additional forum in which to relitigate claims the Texas State Court has already dismissed. The cases are parallel and exceptional circumstances warrant abstention and dismissal.

**B.    In the Alternative, the Case Should be Transferred to the Northern District of Texas**

In the alternative, Inclines requests that the Court transfer this case to the Northern District of Texas where it can be consolidated with the Texas Federal Case.

**1.    Legal Standard for a Motion to Transfer Venue**

Motions to transfer venue are generally governed by (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice. 28 U.S.C. § 1404(a); *Terra Int'l, Inc. v. Mississippi Chem. Corp.,* 119 F.3d 688, 691 (8th Cir.1997). A district court's analysis, however, is not limited to these factors, but instead requires a "case-by-case evaluation of the particular circumstances in the case and a consideration of all relevant factors." *R.D. Offutt Co. v. Lexington Ins. Co.*, 342 F. Supp. 2d 838, 841 (D.N.D. 2004); *Terra Int'l, Inc.*, 119 F.3d at 691. The "interests of justice," without regard to the convenience of the parties and witnesses may control. *DataTreasury Corp. v. First Data Corp.*, 243 F. Supp. 2d 591, 595 (N.D. Tex. 2003). !

15

      i.        **Two Related Cases in Texas and Phoenix's Improper Effort to Circumvent Its Loss in Texas Mandate Transfer**

"Transfer is particularly appropriate where there is a prior pending lawsuit in the transferee district involving the same facts, transactions, or occurrences." *Levitt v. Maryland Deposit Insurance Fund Corp.,* 643 F.Supp. 1485, 1493 (E.D.N.Y.1986); *see also* 17 Moore's Federal Practice § 111.13[1][o]) ("Judicial economy is served by allowing related actions to proceed in the same district."); *see also Continental Grain Co. v. The FBL—585,* 364 U.S. 19, 26, 80 S.Ct. 1470, 1474, 4 L.Ed.2d 1540 (1960) (Section 1404 was designed to avoid the waste of time and resources resulting from two cases involving same issues pending in different forums); *Black & Decker Corp. v. Amirra, Inc.*, 909 F. Supp. 633, 641 (W.D. Ark. 1995) ("the pendency of the related action in the Central District of California when considered in conjunction with the location of the defendants and the absence of the presence of **any party** in Arkansas tips the scales in favor of a transfer.") (emphasis original)); *see also Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 55 (D.D.C. 2000) (transfer strongly favored because "the interest-of-justice factor encompasses the desire to avoid multiple litigation from a single transaction and *to try related litigation together*") (internal quote and alterations omitted) (emphasis original)).  Notably, the "related" case need not be identical, nor even involve identical parties. *See Steward v. Up N. Plastics, Inc.*, 177 F. Supp. 2d 953, 959 (D. Minn. 2001) (considering related case involving "same operative facts, the same antitrust claims and the same defendants"); *Kelly v. Lexxus Intern., Inc.*, No. 4:05CV3201, 2006 WL 436047, at *4 (D. Neb. Feb. 21, 2006) (considering transfer where related case pending in Texas involved "nearly identical" "facts, claims, and defendants"); *see also Hardwick v. Factor*, 2011 WL 1831706, at *3 (S.D. Tex. May 9, 2011) (transferring case when both cases "ar[ose] out of the same event," when both cases contained similar defendants, and when the case in the prospective transferee court "was filed first"); *The Whistler Grp., Inc. v. PNI Corp.*, 2003 WL

16

22939214, at *5 n.3 (N.D. Tex. Dec. 5, 2003) ("that actions be identical or duplicative is not a prerequisite to transfer. On the contrary, the court need only determine that 'the two actions involve closely related questions or common subject matter, or that the core issues substantially overlap.'") (quotation omitted)); *see also Sundance Leasing Co. v. Bingham*, 503 F. Supp. 139, 141 (N.D. Tex. 1980) (transferring case when both actions "appear[ed] to rest on [a] common foundation [of facts]," even though "the claims for relief [in both actions were] not identical").

Similarly, although a plaintiff's choice of forum generally receives significant deference, such deference disappears when a risk exists that the plaintiff chose the forum to "take advantage of favorable law or to harass the defendant. . ." *In re Apple, Inc.*, 602 F.3d 909, 913 (8th Cir. 2010). Accordingly, a foreign plaintiff's forum choice receives "'substantially less deference'" than a forum resident. *Id.* (quoting *De Melo v. Lederle Labs.,* 801 F.2d 1058, 1062 n. 4 (8th Cir.1986)). Here, neither party resides in North Dakota.

In filing the same claims in Texas, premised on the same and additional facts, Phoenix admitted Texas is a convenient and appropriate forum.  Specifically, Phoenix filed the Texas State Case almost a year and a half ago, premised on the same allegations: that Incline and Francis defamed it and tortiously interfered with its existing and prospective contracts with FIBT and Colorado mineral owners by stating that Ferrari is a felon and controls Phoenix.[32]  The same legal questions are—or were—in dispute, based on essentially the same facts.  If Texas was a convenient forum for resolution of alleged interference with Phoenix's prospective contracts with FIBT and Colorado mineral owners, it is no less convenient for resolution of the same claims based on North Dakota mineral owners.  Moreover, based on the Texas appellate court's recent opinion and judgment in which it dismissed virtually all of Incline's claims and remanded the only remaining

---

[32] Original Petition.

claim for further consideration under the TCPA, res judicata's preclusive effect is on the horizon. Res judicata will bar Phoenix's entitlement to assert all claims it brought to this Court, as well as the claims asserted by Ferrari in the Texas Federal Case.[33] *See EEOC v. Jefferson Dental Clinics, PA*, 478 F.3d 690, 694 (5th Cir. 2007) (recognizing that res judicata bars claims that were or could have been litigated by persons in privity with a party, which includes persons whose interests could have been represented by the party); *Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1175 (5th Cir. 1992) (privity for res judicata purposes exists if employer-employee or principal-agent relationship exists). Judicial economy supports transferring the case to Texas for consolidation with the Texas Federal Case, for eventual dismissal there.

Likewise, on the same day Phoenix filed its underwhelming appellee's brief in the Texas State Case, Ferrari individually sued Francis.[34] Ferrari, like Phoenix here, asserted he was injured through communications Francis allegedly made to FIBT[35] and many of the same communications also pleaded in Phoenix's Texas State Case.[36] The judge in the Texas Federal Case recognized the relatedness between the Texas Federal Case and the Texas State Case, and stayed discovery while waiting on a ruling from the Texas appellate court and while considering Francis's motion to dismiss Ferrari's Amended Complaint.[37]

---

[33] When the mandate issues from the Texas appellate court, the Texas trial court will consider one remaining issue regarding one remaining claim; application of the defense of privilege regarding defamation per se premised solely on the Taylor Email, which addressed a sale that Incline had already closed when it sent the email. *See Appellant Opinion* at pp. 20-21.

[34] A true and correct copy of the docket from the appellate case is attached to the Koonce Dec. as Exhibit A-2.

[35] Amended Complaint, ¶ 25.

[36] For instance, both Ferrari and Phoenix allege they were respectively injured by news reports about Ferrari's arrest, felony charges filed against him, and his plea deal, emails sent by Incline employees regarding which the applicable statutes of limitations has long since run, and many other statements about Ferrari's fraudulent conduct. Amended Complaint, ¶¶ 10-23; 25-27; 28-29. Ferrari also alleges he has been injured by statements made in the context of an ongoing FINRA investigation about him. A chart comparing the allegations in the two Texas cases and this one is attached to the Koonce Dec. as Exhibit A-8.

[37] Koonce Dec. ¶ 14.

APP215

Without regard to any other consideration, Phoenix and Ferrari's forum shopping and deliberate effort to obtain relief on the same claims the Texas state courts have already dismissed warrant transferring this case to the Northern District of Texas for assignment to the judge who is presiding over the related Texas Federal Case.

> **ii.** **Additional "Interests of Justice" Factors Weigh in Favor of Transfer**

Although the Court may rely solely on the existence of related litigation pending in two courts in Texas, other relevant considerations also support transfer. In addition to the pendency of related litigation, a court can consider "(1) judicial economy; (2) the plaintiff's choice of forum; (3) the comparative costs to the parties of litigating in each forum; (4) each party's ability to enforce a judgment; (5) obstacles to a fair trial; (6) conflict of law issues; and (7) the advantage of having a local court determine questions of local law." *R.D. Offutt Co.,* 342 F. Supp. 2d at 843.

> **a.** **Judicial Economy, Phoenix's Choice Of Forum, Comparative Costs, Enforcement And Obstacles To Fairness Weigh In Favor Of Transfer**

As discussed above, given the pendency of the Texas Federal Case, judicial economy supports transfer. *See Cosmetic Warriors Ltd. v. Abrahamson*, 723 F. Supp. 2d 1102, 1109–10 (D. Minn. 2010) ("It is in each party's interest, and it would conserve judicial resources, to have all of these related claims resolved in one forum."); *May Dept. Stores Co. v. Wilansky,* 900 F.Supp. 1154, 1166 (E.D.Mo.1995) ("Litigation of related claims in the same tribunal is strongly favored because it facilitates efficient, economical and expeditious pre-trial proceedings and discovery and avoids duplic[ative] litigation and inconsistent results.") (citation omitted)); *see also Kelly*, 2006 WL 436047, at *4 (judicial economy favored transfer where "[a]llowing both of these cases to proceed in separate jurisdictions would create a realistic possibility of inconsistent rulings, double recovery, judicial inefficiency, and wastefulness of time, energy and money that § 1404(a) was designed to prevent.") (internal quotation omitted)).

Further, the Texas Federal Case was first-filed, and the Texas Judge has already conducted a case management conference, set the case for trial, and denied (1) Ferrari's motion to seal his criminal record; and (2) Incline's motion to dismiss.[38]   The Texas State Case also sits on the res judicata goal-line.  Once judgment in the Texas State Case is final, it will bar Incline's claims here, as well as the claims in the Texas Federal Case.  *See Jefferson Dental Clinics, PA*, 478 F.3d at 694; *Russell*, 962 F.2d at 1175.  Judicial economy supports transferring the case to Texas for consolidation with the Texas Federal Case.

Likewise, Phoenix's choice of North Dakota for this lawsuit merits no weight, given Phoenix's Delaware origin and Colorado home, and Phoenix's prior choice of Texas for a nearly identical lawsuit in which its rights have already been adjudicated.  The comparative costs of litigating in Texas rather than North Dakota also support transfer, given both parties' presence in Texas and Phoenix's prior commitment to litigating in Texas. Admittedly no obstacles to a fair trial in North Dakota seem likely, but a Texas court will have more familiarity with Texas rules of res judicata that govern a final judgment in the Texas State Case.  *See Follette v. Wal-Mart Stores, Inc.*, 41 F.3d 1234, 1237 (8th Cir. 1994) ("When a federal court is sitting in diversity, the preclusive effect of a prior judgment is determined by the preclusion rules of the forum which provided the substantive law underlying that prior judgment.").  Ease of enforcement is likely a neutral factor given both parties' presumptive ownership of minerals in North Dakota.

   **b.** **Conflicts of Law Issues and Having a Texas Court Determine Issues Controlled by Texas Law Also Weigh in Favor of Transfer.**

The final two factors, conflict of law issues and the advantage of having a local court determine questions of local law, also weigh heavily in favor of transfer.  First, but notably, under

---

[38] Texas Federal Case, Dkts. 31; 32.

Texas law Phoenix's clams are barred by the statute of limitations.  *See Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 370 (Tex. 2014) ("We now similarly conclude that if a tortious interference claim is based solely on defamatory statements, the one-year limitations period for defamation claims applies."); *Martinez v. Hardy*, 864 S.W.2d 767, 776 (Tex. App.—Houston [14th Dist.] 1993, no writ) ("[S]ince Martinez' claim for tortious interference with contract is inextricably intertwined with and dependent upon her claim for slander the one-year limitation period for slander applies."). Equally important, Phoenix's claim for punitive damages is also barred by Texas' Defamation Mitigation Act, a statute for which North Dakota appears to have no parallel.  *See* TEX. CIV. PRAC. & REM. CODE § 73.055(c) ("If not later than the 90th day after receiving knowledge of the publication, the person does not request a correction, clarification, or retraction, the person may not recover exemplary damages.").  Elements of Phoenix's tortious interference claims also differ significantly under Texas law.  For instance, under Texas law, Phoenix's tortious interference with existing contract claim, Count I, also requires independently tortious conduct.  *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001) ("Independently tortious" as needed to support a tortious interference claim means conduct that violates some recognized tort duty).

These conflicts between Texas and North Dakota law are not academic because utilizing the "most significant relationship" test applied by North Dakota, Texas law will govern the torts asserted by Phoenix.  *See Daley v. Am. States Preferred Ins. Co.*, 1998 ND 225, ¶ 14, 587 N.W.2d 159, 162 (choice of law requires analysis of which state has the "most significant relationship" to the parties and issues involved). The approach turns on evaluation of "specific contacts with the jurisdictions," followed by policy considerations outlined in section 6 of the Restatement. *Id.*  All of the specific contacts relevant to tort cases favor Texas law: "the place where the injury

21

occurred,[39] the place where the conduct causing the injury occurred;[40] the domicile, nationality, residence, place of business, or place of incorporation of the parties;[41] and the place where the relationship, if any, between the parties is centered."[42]  *Id.* at n. 3 (citing Restatement (Second) of Conflict of Laws, § 145(2)(a)-(d) (1971)).  Similarly, the balance of policy considerations enumerated in section 6 also favor Texas,[43] particularly, Texas's relative interest in res judicata for judgments rendered by its courts, "certainty, predictability and uniformity of result" and "ease in the determination and application of the law to be applied."  *Id.* at n.4.  Certainly "protecting justifiable expectations" also favors Texas law, given Phoenix's "expectation" that Texas governed the dispute when it filed its Texas State Case.  Further, although Phoenix attempts to anchor its claims as important to North Dakota residents and thus this court, no North Dakota residents are or have sued Incline for *any* misrepresentations or inappropriate conduct, including the conduct underlying Phoenix's claims.  Texas law should govern this dispute and thus this Court should transfer the case to Texas for adjudication by a Texas judge.

Phoenix's choice to file a case based on the same facts and issues in Texas almost a year before it filed this lawsuit, followed by the closely related lawsuit filed by Phoenix's agent Ferrari

---

[39] Phoenix, a Delaware entity with Colorado and Texas offices, was "injured" in one of those states.  *See Birnstill v. Home Sav. of Am.*, 907 F.2d 795, 798 (8th Cir. 1990) (applying Missouri law to conclude injury occurred where injured plaintiff resides).

[40] Incline's "conduct" relative to Phoenix's claims occurred in Texas, where Francis resides and the location from which any of Incline's communications occurred.  *See* Francis Dec; *see also* Amended Complaint, ¶ 5, "a substantial part of the events or omissions giving rise to the action occurred within this judicial district [the Northern District of Texas]."

[41] Incline is a Texas entity, residing in Texas. Dkt. 1, ¶ 2; Francis Dec.; Phoenix is neither incorporated, domiciled, nor operating a principal place of business in North Dakota.

[42] The parties do not have a relationship and thus the final factor has no relevance.

[43] The policy considerations are: "the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue; the protection of the justified expectations; the basic policies underlying the particular field of law; certainty, predictability and uniformity of result; and ease in the determination and application of the law to be applied."  *Daley*, 1998 ND 225, 587 N.W.2d 159, 162, n. 4, citing Restatement (Second) of Conflict of Laws, § 6(2)(a)-(g) (1971)).

in a Texas federal court, without consideration of any other factor warrants transferring this case to Texas for consolidation with the Texas Federal Case.  Nonetheless, the additional factors that inform the "interests of justice," including a choice of law analysis that requires application of Texas law, weigh *heavily* in favor of transfer.

> ### iii.  The Interests of the Parties and the Witnesses Also Support Transfer
>
> #### a.  The Interests of the Parties Point to Texas

In addition to the interests of justice, courts also consider the interests of the parties and the witnesses in evaluating a motion to transfer venue.  With respect to the parties, courts generally consider "the "accessibility to records and documents, location where conduct occurred, [and] applicability of [a] state's substantive law." *Bhd. of Maint. of Way Employes Div./IBT v. Union Pac. R.R. Co.*, 485 F. Supp. 3d 1048, 1061 (D. Neb. 2020) (quoting *Melichar v. Blue Cross and Blue Shield of Kansas, Inc.*, 309 F. Supp. 3d 719, 726 (D. Neb. 2018)).  Courts also consider the parties' "ease of travel." *In re Apple, Inc.*, 602 F.3d at 913.

Here, Incline's records and relevant documents are located in Texas.[44]  Phoenix's records are presumably located in Colorado or its new Dallas office, and in this case and the Texas Federal Case, its counsel is located in Chicago.  While FIBT and some relevant mineral owners are located in North Dakota, all relevant documents should be as easily accessed from Texas as from North Dakota.  Similarly, any of Incline's conduct underlying Phoenix's claims occurred in Texas,[45] and as discussed above, Texas law should govern this dispute.  The "ease of travel" also suggests Texas is a more convenient forum with more than 50 flights per day available for travel to and from

---

[44] Francis Dec. ¶ 6.

[45] *Id.*

Denver to Dallas, but only six from Denver to Bismark, with the flights to Dallas also at a far lower cost. [46] The convenience of the parties heavily favors Texas.

### b.    Phoenix Already Conceded Texas Is Convenient for Witnesses

Generally, in evaluating the convenience of the witnesses, the Court examines each witnesses' materiality and the importance of his or her anticipated testimony, and then examines the accessibility and convenience to the forum. *Reid–Walen v. Hansen,* 933 F.2d 1390, 1396 (8th Cir.1991). Although this factor generally receives the most weight, it is not dispositive "and must still be weighed against the other relevant factors." *Dakota W. Bank of N. Dakota v. N. Am. Nutrition Companies, Inc.*, 284 F. Supp. 2d 1232, 1235 (D.N.D. 2003). In filing a very similar lawsuit in Texas, which notably includes the same alleged interference with Phoenix's FIBT transaction, Phoenix waived any potential inconvenience related to FIBT employees' North Dakota location. Similarly, in the Texas State Case, Phoenix was undeterred by the Colorado location of other mineral owners.

In the event this case survives the res judicata bar, the most critical witnesses will be (1) Phoenix's corporate representative, located in Denver; (2) Incline's corporate representative, located in Dallas, (3) a representative of the "Bakke Family," whose location is not specified; (4) a FIBT representative, presumably located in Waterford City, North Dakota; and potentially, (5) unspecified North Dakota mineral owners. Phoenix's disclosure of Incline's email to FIBT, Phoenix's email to FIBT, and FIBT's discretion to terminate the transaction, suggests live testimony from FIBT may have far less importance than the documents evidencing the communications and the contract, if any, between FIBT and Phoenix. And given Phoenix's failure to identify any mineral owners with whom it had a reasonable business expectancy at the time

---

[46] Denver to Dallas – Approximately 52 flights per day - $53 to $395: <u>Google - Denver to Dallas</u>
Denver to Bismarck – Approximately 6 flights per day - $413 to $1,071: <u>Google - Denver to Bismarck</u>

Incline allegedly communicated with those owners, as well as Incline's general practice of communicating with such mineral owners by email,[47] live testimony from the mineral owners may also have far less importance that Phoenix's and Incline's live testimony.  Thus, even the interests of the witnesses do not support retaining the case in North Dakota. *See R.D. Offutt Co.*, 342 F. Supp. 2d at 842 (determining that testimony of fact witnesses would not be critical to the court's determination of the issues in dispute and thus did not warrant transfer).

Neither the convenience of the parties nor the witnesses support retaining the case in North Dakota.  For all the reasons discussed above, if the Court does not dismiss the case based on abstention, the Court should transfer the case to the Northern District of Texas.

## IV.   CONCLUSION

This Court should not reward Phoenix's efforts to relitigate claims the Texas State Court has already dismissed.  Retaining the case promises a waste of judicial resources, sought by a plaintiff that does not reside in North Dakota, for claims that the same plaintiff already litigated in Texas against the same defendant, and lost.  Not one single fact weighs in favor of retaining this case in North Dakota, and this Court should not hesitate to dismiss, or alternatively, to transfer it.

WHEREFORE, PREMISES CONSIDERED, Incline respectfully requests that the Court abstain from exercising jurisdiction and dismiss or stay the case, or alternatively, transfer this case to the District of Northern Texas.  Incline requests such other and further relief to which it may show itself entitled.

---

[47] *See* Francis Dec. ¶ 4.

APP222

Respectfully submitted,

By: _/s/ Charlene C. Koonce_____
Charlene C. Koonce
  Texas Bar No. 11672850
  charlene@brownfoxlaw.com

BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, TX  75225
Tel. 214.327.5000
Fax. 214.327.5001

Joshua A. Swanson
North Dakota Bar No. 06788

VOGEL LAW FIRM
218 NP Avenue
PO Box 1389
Fargo, ND 58107-1389
701.237.6983
jswanson@vogellaw.com

*Attorneys for Defendant Incline Energy Partners, L.P.*

APP223

## CERTIFICATE OF CONFERENCE

The undersigned certifies that counsel for Incline conferred with counsel for Plaintiff and this Motion is opposed.

*/s/ Charlene C. Koonce*
Charlene C. Koonce

## CERTIFICATE OF SERVICE

Pursuant to Rule 5(d)(1)(B) of the Federal Rules of Civil Procedure, as amended, no certificate of service is necessary because this document is being filed with the Court's electronic-filing system.

APP224

# EXHIBIT F

| DC-22-06350<br>116th District Court, Dallas County | 3:23-cv-00455<br>Northern District of Texas | 1:23-cv-00209<br>District of North Dakota |
|---|---|---|
| 7.  Phoenix brought together industry experts with decades of experience in their fields to build an industry leady in mineral rights. | | 11.  Phoenix brought together industry experts with decades of experience in their fields to build an industry leading in mineral rights. |
| 8.  At the time Phoenix was founded, the industry was dominated by Incline and very few firms were able to compete. | | 12.  At the time Phoenix was founded, the industry was dominated by Incline and very few firms were able to compete. |
| 9.  By deploying its proprietary technology and decades of industry experience, Phoenix was able to successfully compete with Incline. | | 14.  Phoenix competes with Incline by deploying its proprietary technology and decades of industry experience. |
| 10.  Further, Phoenix was able to outbid Incline directly on acquisitions and often came out on top when competing for the same investment opportunity. | | 16.  Phoenix is successful because it offers the best price to mineral rights owners. |
| 11.  Phoenix's success was met with hostility from Incline, specifically from Mr. Francis, Incline's Managing Partner.<br><br>13.  In response to Phoenix's success, Mr. Francis and Incline set out on an intentional, willful, and malicious campaign against Phoenix with the intention of damaging Phoenix's reputation and ability to compete in the marketplace.<br><br>25.  As Phoenix became more successful in acquiring mineral rights and other investments, Mr. Francis became incensed and set out on a campaign to intentionally interfere with and damage Phoenix's business and reputation. | 8.  Soon after Mr. Ferrari founded Ferrari Energy, Ferrari Energy began to out-compete Mr. Francis and Incline, finding opportunities faster, valuing interests more quickly, and ultimately offering more money to prospective sellers.  Mr. Francis was furious. He quickly grew discontent with Mr. Ferrari's competition and began a highly targeted, vicious campaign of harassing and defaming Mr. Ferrari with the intention of damaging his personal and professional reputation. | 18.  Incline's principal, William Francis ("Francis") has lashed out at Phoenix in every way possible hoping to corner the mineral rights marked in North Dakota, including making defamatory statements to customers, lenders, investors, regulators both directly and via pseudonyms online. |
| 19.  For example, on November 27, 2018, Bryan Hymer an employee of Incline, send to a landowner a link to an anonymous website | 13.  On November 27, 2018, upon information and belief, Mr. Francis further caused Bryan Hymer, an employee of Mr. Francis, to send a mineral rights owner an | |

| DC-22-06350<br>116th District Court, Dallas County | 3:23-cv-00455<br>Northern District of Texas | 1:23-cv-00209<br>District of North Dakota |
|---|---|---|
| disparaging Mr. Ferrari and his company, Ferrari Energy. | email with a link to lawsuitsoilandgas.com and stated that Mr. Ferrari was involved in over six lawsuits to dissuade the mineral owner from doing business with Mr. Ferrari. | |
| 21.  Mr. Francis began emailing and sending anonymous packets to mineral rights sellers and industry executives, claiming that Mr. Ferrari was Phoenix's Chief Executive Officer and a convicted felon. | 10.  On information and belief, Mr. Francis has also anonymously transmitted packets of false and defamatory information to Mr. Ferrari's business associates and investment companies through the mail. | 22.  As part of its campaign to take advantage of North Dakota mineral rights holders, Incline's agents told potential lessors, including but not limited to the Bakke Family, that Phoenix was operated by criminals, among other false statements, in order to scare North Dakota mineral owners into paying more to Incline rather than selling or leasing to Phoenix.<br><br>49.  The attachments to the 10:17 p.m. email made numerous false accusations about Phoenix's current Vice President of Engineering, Adam Ferrari, accused him of committing various crimes while omitting the fact that the charges were dropped and the matter vacated, and lying to investors about his role in the business. |
| 27.  Further, and upon information and belief, Mr. Francis conspired with others, including at least one reporter at a Colorado newspaper, specifically Joe Moylan of the Greely Tribune, to publish false statements to third parties and to damage Phoenix's business. | 14.  Additionally, upon information and belief, Mr. Francis contributed false or misleading information throughout 2019 to the Greely Tribune, a Colorado-based newspaper, that it then ultimately relied on to publish various articles smearing Mr. Ferrari and his company.   Upon information and belief, Mr. Francis used the Greely Tribune as yet another vessel to spread false or misleading information regarding Mr. Ferrari in an effort to harm Mr. Ferrari and to compete against Mr. Ferrari's company. | |

| DC-22-06350<br>116th District Court, Dallas County | 3:23-cv-00455<br>Northern District of Texas | 1:23-cv-00209<br>District of North Dakota |
|---|---|---|
| 28. Upon information and belief, Mr. Francis set up anonymous email accounts and sent, or had sent, packets of information to various industry players, including one email on January 7, 2021 to executives from Hess, ExxonMobil, and other leading oil and gas operators, alleging among other things, that Phoenix was violating SEC laws and was owned, financed, and managed by a convicted felon. | 19. For example, upon information and belief, Mr. Francis, using one of his anonymous email accounts, sent an email on January 7, 2021 to executives of Hess, ExxonMobil, and other industry-leading oil and gas operators, alleging, among other things, that Mr. Ferrari was a "convicted criminal" in bold typeface. The email also contained false claims that Mr. Ferrari was the CEO of Phoenix, which is untrue, and that Phoenix was violating SEC laws. | |
| 31. Further on June 17, 2021, Mr. Francis emailed Ms. Crystal Taylor, an individual whom Phoenix was in the process of closing a real estate transaction.<br><br>32. In the June 17, 2021 email, Mr. Francis stated: "I would love nothing more than to defend my company's track record versus the misdeeds that Phoenix/Ferrari has performed over the years. Namely, the fact that their CEO was arrested and convicted for forging a mineral owners signature in order to defraud her of hundreds of thousands of dollars." | 22. Continuing his malicious campaign, and on June 17, 2021, Mr. Francis also emailed Crystal Taylor, an individual who was in the process of closing a real estate transaction with Phoenix. Despite the fact that Mr. Ferrari has never acted as CEO of Phoenix, Mr. Francis continued his pattern of disparagement against Mr. Ferrari, stating "I would love nothing more than to defend my company's track record versus the misdeeds that Phoenix/Ferrari has performed over the years. Namely, the fact that their CEO was arrested and convicted for forging a mineral owner's signature in order to defraud her of hundreds of thousands of dollars. | 20. Incline disparaged Phoenix to multiple lessors in North Dakota between 2021 and 2023 who Incline knew were considering offers from both Incline and Phoenix to obtain the leases. |
| 35. In February and March of 2022, Mr. Francis contacted Dalmore Capital, Phoenix's broker-dealer, to disparage Phoenix, to disparage Mr. Ferrari, and try to derail Phoenix's latest capital raise. | 26. Mr. Francis' harmful acts continued further into 2022. On February 28, 2022, upon information and belief and based on Mr. Francis' prior pattern of activity, Mr. Francis published false and disparaging statements about Mr. Ferrari to Dalmore Capital ("Dalmore"), an investment group that Phoenix had engaged with and hired. | |

| DC-22-06350<br>116th District Court, Dallas County | 3:23-cv-00455<br>Northern District of Texas | 1:23-cv-00209<br>District of North Dakota |
| --- | --- | --- |
| 36.  In early May of 2022, Phoenix was moving to close on a $50,000,000 loan with its primary bank, First International Bank and Trust ("FIBT"), which closing was derailed, upon information and belief, by Francis's conduct.<br><br>37.  On May 11, 2022, Phoenix received a call from FIBT, informing Phoenix that FIBT was backing out of the transaction.<br><br>38.  Phoenix later learned that someone had sent FIBT an anonymous packet regarding Mr. Ferrari, which caused FIBT to back out of the transaction. | 25.  In approximately 2021 or 2022, upon information and belief, Mr. Francis sent one of his slanderous packets to First International Bank and Trust ("FIBT") in order to further disparage Mr. Ferrari and damage relations between Mr. Ferrari and potential investors. | 42.  In the spring of 2022 FIBT offered the solution for Phoenix to surpass Incline's closing speed with a $50,000,000 credit facility.<br><br>44.  On May 5, 2022, Francis email Joel Brown ("Brown") "I was wondering if you're free later today or tomorrow to hop on a call to discuss a potential loan with my group, as well as another issue that I'd like to pick your brain about."<br><br>45.  The other issue Francis wanted to discuss with Brown was FIBT's agreement with Phoenix to provide a $50,000,000 credit facility.<br><br>54.  FIBT terminated the agreement to provide $50,000,000 in financing to Phoenix in bad faith based on the statements made by Francis on behalf of Incline. |
| 44.  Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights. Defendants defamed Plaintiff by intentionally and knowingly publishing falsehoods to third parties.  Defendants knew at the time of the publications that the statements were false and damaging to Plaintiff's business and reputation. | 35.  Mr. Ferrari is an individual that is professionally engaged in the oil and gas industry, including acting as a philanthropist, entrepreneur, business owner, and independent contractor.  Mr. Francis repeatedly defamed Mr. Ferrari by intentionally and knowingly publishing falsehoods to third parties… | |
| 47.  Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights. Defendants published disparaging words | 42.  Mr. Ferrari has suffered actual damages as a result of Mr. Francis' ruthless business practices, including the defamatory statements published about Mr. Ferrari.  Mr. Ferrari's | 75.  Incline's communication of false statements of fact, publishing other facts in a false light, unfairly competing to consumers and businesses in North Dakota for the |

| DC-22-06350<br>116th District Court, Dallas County | 3:23-cv-00455<br>Northern District of Texas | 1:23-cv-00209<br>District of North Dakota |
|---|---|---|
| about Plaintiff's economic interests, specifically including but not necessarily limited to, the character of Plaintiff's business.  The words were false, and Defendants published the words with malice, and without privilege,  and the publication caused Plaintiff to suffer damages, specifically including special damages. | personal and business reputation has been harmed by Mr. Francis' defamatory statements.  Furthermore, Mr. Ferrari has suffered mental anguish damages as a result of Mr. Francis' tortious conduct. | purpose of harming Phoenix was otherwise tortious. |
| 50.  Defendants willfully and intentionally interfered with Plaintiff's contracts and business relations when they published defamatory statements with the intent to harm Plaintiff's business.  Defendants' interference proximately caused injury to Plaintiff, and Plaintiff has incurred actual damage or loss.<br><br>52.  Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights.  There was a reasonable profitability that Plaintiff would have entered into one or more business relationships and/or contracts with one or more third persons, but Defendants intentionally interfered with the relationships by engaging in conduct that was independently tortious or unlawful. Defendants' interference proximately caused injury to Plaintiff, and Plaintiff suffered actual damage or loss. | | 65.  Defendant Incline knew of the contracts between Phoenix and FIBT, and communicated information or otherwise instigated FIBT to breach its contract with Phoenix.<br>66.  In their actions, Defendant Incline acted intentionally to instigate the breach by FIBT or acted with knowledge that the breach would result.<br>67.  As a result, FIBT terminated ongoing business it had with Phoenix upon information and belief in favor of entering business with Incline.<br>68.  By their conduct, the Defendants intentionally interfered with contracts Phoenix retained, and there was no justification for Incline's actions.<br>69.  The interference was done with the direct purpose of injuring Phoenix and benefiting Incline at Phoenix's expense.<br>70. Phoenix suffered damages including but not limited to lost profits, lost future profits, and lost goodwill, as a result of the Defendants' actions in an amount to be determined at trial. |

| DC-22-06350<br>116th District Court, Dallas County | 3:23-cv-00455<br>Northern District of Texas | 1:23-cv-00209<br>District of North Dakota |
|---|---|---|
| 54. The foregoing conduct of Defendants constitutes an unfair method of competition. As a consequence of the foregoing, Plaintiff has suffered injury and damages. | | 82. Phoenix is entitled to relief for Defendants' unfair competition, including an accounting for and a constructive trust over, followed by the return of all property and profits wrongfully obtained by defendants from said unfair competition, damages, and interest and costs as allowed by law. |
| 60. Defendants' conduct complained of herein was intentional, with malice, with conscious indifference to Plaintiff's rights, and with a specific intent to cause serious harm and substantial injury to Plaintiff, and Defendants were consciously indifferent to the harm. Based on the foregoing, Plaintiff is entitled to and seeks to recover exemplary damages against Defendants in an amount to be determined by the trier of fact. | 44. Mr. Francis' conduct complained of herein was intentional, with malice, with conscious indifference to Mr. Ferrari's rights, and with a specific intent to cause serious harm and substantial injury to Mr. Ferrari. Mr. Francis was consciously indifferent to the harm he caused Mr. Ferrari. Based on the foregoing, Plaintiff is entitled to and seeks to recover exemplary damages against Defendant in an amount to be determined by the trier of fact. | 80. The foregoing actions of defendants were committed willfully, knowingly, maliciously and in conscious disregard of Phoenix's rights. |