# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| Plaintiff, | § § § | |
| v. | § § § | Case No. 3:23-cv-00455-S |
| WILLIAM FRANCIS, | § § § | |
| Defendant. | § § § | |

### APPENDIX IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT WILLIAM FRANCIS' MOTION TO DISMISS OR ABSTAIN, ALTERNATIVE RENEWED MOTION TO STAY

Plaintiff Adam Ferrari ("Mr. Ferrari") hereby submits the following evidence in support of his Opposition to Defendant William Francis' Motion to Dismiss or Abstain, Alternative Renewed Motion to Stay:

| Tab | Description | Appendix Page(s) |
|---|---|---|
| **A** | **Declaration of John T. Ryan in Support of Plaintiff's Opposition to Defendant William Francis' Motion to Dismiss or Abstain, Alternative Renewed Motion to Stay** | APP0001-APP0005 |
| Exhibit 1 | Adam Ferrari's First Request for Production to William Francis, dated November 8, 2023. | APP0006-APP0025 |
| Exhibit 2 | William Francis's First Set of Discovery Requests to Adam Ferrari, dated December 22, 2023. | APP0026-APP0040 |
| Exhibit 3 | Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, issued by William Francis to Phoenix Capital Group Holdings LLC on December 28, 2023. | APP0041-APP0051 |

| Tab | Description | Appendix Page(s) |
|---|---|---|
| Exhibit 4 | William Francis's Third Set of Discovery Requests to Adam Ferrari, dated April 29, 2024. | APP0052-APP0061 |
| Exhibit 5 | Letter dated July 22 from counsel for Plaintiff to Counsel for Defendant. | APP0062-APP0069 |
| Exhibit 6 | Email exchange dated July 12 – July 15, 2023 between counsel for Plaintiff and counsel for Defendant. | APP0070-APP0072 |
| Exhibit 7 | A true and correct copy of a document produced in response to a subpoena served on FindIt, Inc. ("FindIt") in the Action, identified by Bates numbers FINDIT_00000007 - FINDIT_00000009. | APP0073-APP0076 |
| Exhibit 8 | A true and correct copy of a document produced in response to a subpoena served on FindIt in the Action, identified by Bates numbers FINDIT_00000029 - FINDIT_00000035. | APP0077-APP0084 |
| Exhibit 9 | A true and correct copy of a document produced in response to a subpoena served on FindIt in the Action, identified by Bates numbers FINDIT_00000001 - FINDIT_00000006.  Plaintiff has applied redactions to FindIt's financial transactions with third-parties that are not relevant to this litigation. | APP0085-APP0091 |
| Exhibit 10 | A true and correct copy of a May 13, 2017 screenshot of the webpage located at https://www.wsj.com/articles/SB984686618458103287, which is an articled dated March 15, 2001, entitled "Two-Time Stock Manipulator Sentenced to 87 Months in Jail." | APP0092-APP0094 |
| Exhibit 11 | A true and correct copy of a document produced in response to a subpoena served on EnergyNet.com, Inc. in the Action, identified by Bates numbers ENERGYNET_00000023 – ENERGYNET_00000030. | APP0095-APP0103 |
| Exhibit 12 | Plaintiff's Original Petition filed June 15, 2022 in *Phoenix Capital Group Holdings, LLC v. William Francis and Incline Energy Partners, L.P.,* 116th District Court for Dallas County, Texas, Case No. DC-22-06350 (the "State Case"). | APP0104-APP0124 |

| Tab | Description | Appendix Page(s) |
|---|---|---|
| Exhibit 13 | Order Partially Granting and Partially Denying Defendants' TCPA Motion to Dismiss, filed November 29, 2022 in the State Case. | APP0125-APP0126 |
| Exhibit 14 | Memorandum Opinion issued August 29, 2023 in *William Francis and Incline Energy Partners, L.P. v. Phoenix Capital Group Holdings, LLC*, Court of the Appeals for the Fifth District of Texas Case No. 05-22-0260-CV. | APP0127-APP0148 |

Dated: July 24, 2024

Respectfully submitted,

*/s/ John T. Ryan*
John T.  Ryan *(pro hac vice)*
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
jake.ryan@lw.com

Andrew R.  Gray (*pro hac vice*)
LATHAM &WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
andrew.gray@lw.com

Garrett S.  Long (*pro hac vice*)
LATHAM &WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
garrett.long@lw.com

James O. Crewse
Texas Bar No. 24045722
CREWSE LAW FIRM PLLC
5919 Vanderbilt Ave
Dallas, TX 75206
Telephone: (214) 394-2856
jcrewse@crewselawfirm.com

*Attorneys for Plaintiff Adam Ferrari*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true copy of the foregoing has been served on counsel of record for

Defendant via the Court's electronic filing system, on this the 24th day of July 2024.

*/s/ John T. Ryan*
John T. Ryan

# TAB A

**APP0001**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| ADAM FERRARI,<br><br>    v.<br><br>WILLIAM FRANCIS, | Plaintiff,<br><br><br><br>Defendant. | Civil Action No.: 3:23-cv-455 |

**DECLARATION OF JOHN T. RYAN IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO DEFENDANT WILLIAM FRANCIS' MOTION TO DISMISS OR ABSTAIN,
<u>ALTERNATIVE RENEWED MOTION TO STAY</u>**

APP0002

I, John T. Ryan, declare as follows:

1.      I am an attorney with the law firm of Latham & Watkins LLP, counsel of record for Plaintiff Adam Ferrari in the above-captioned action (the "Action").  I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would testify competently thereto.

2.      This declaration is filed in support of Plaintiff's Opposition to Defendant William Francis' Motion to Dismiss or Abstain, Alternative Renewed Motion to Stay.

3.      On November 8, 2023, Mr. Ferrari served his first sets of written discovery on Defendant.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of Adam Ferrari's First Request for Production to William Francis, dated November 8, 2023.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of William Francis's First Set of Discovery Requests to Adam Ferrari, dated December 22, 2023.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of a Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, issued by William Francis to Phoenix Capital Group Holdings LLC on December 28, 2023.

7.      In this Action, Defendant has served document subpoenas on at least 13 third-parties, taken the deposition of a third-party individual in Chicago, Illinois, and propounded on Mr. Ferrari a total of 67 document requests, 48 requests for admission, and 8 interrogatories.

8.      Attached hereto as **Exhibit 4** is a true and correct copy of William Francis's Third Set of Discovery Requests to Adam Ferrari, dated April 29, 2024.

9.      To date, the only documents Defendant has produced consist of public filings and documents relating to his attempt to obtain insurance coverage related to the Action.

10.     Attached hereto as **Exhibit 5** is a true and correct copy of a letter from counsel for Plaintiff to Counsel for Defendant, dated July 22, 2024.

11.     Attached hereto as **Exhibit 6** is a true and correct copy of an email exchange between counsel for Plaintiff and counsel for Defendant, dated July 12 – July 15, 2023.

12.     Attached hereto as **Exhibit 7** is a true and correct copy of a document produced in response to a subpoena served on FindIt, Inc. ("FindIt") in the Action, identified by Bates numbers FINDIT_00000007 - FINDIT_00000009.

13.     Attached hereto as **Exhibit 8** is a true and correct copy of a document produced in response to a subpoena served on FindIt in the Action, identified by Bates numbers FINDIT_00000029 - FINDIT_00000035.

14.     Attached hereto as **Exhibit 9** is a true and correct copy of a document produced in response to a subpoena served on FindIt in the Action, identified by Bates numbers FINDIT_00000001 - FINDIT_00000006.  Plaintiff has applied redactions to FindIt's financial transactions with third-parties that are not relevant to this litigation.

15.     Attached hereto as **Exhibit 10** is a true and correct copy of a May 13, 2017 screenshot of the webpage located at https://www.wsj.com/articles/SB984686618458103287, which is an articled dated March 15, 2001, entitled "Two-Time Stock Manipulator Sentenced to 87 Months in Jail."

16.     Attached hereto as **Exhibit 11** is a true and correct copy of a document produced in response to a subpoena served on EnergyNet.com, Inc. in the Action, identified by Bates numbers ENERGYNET_00000023 – ENERGYNET_00000030.

17.     Attached hereto as **Exhibit 12** is a true and correct copy of Plaintiff's Original Petition filed June 15, 2022 in *Phoenix Capital Group Holdings, LLC v. William Francis and*

*Incline Energy Partners, L.P.*, 116th District Court for Dallas County, Texas, Case No. DC-22-06350 (the "State Case").

18.     Attached hereto as **<u>Exhibit 13</u>** is a true and correct copy of an Order Partially Granting and Partially Denying Defendants' TCPA Motion to Dismiss, filed November 9, 2022 in the State Case.

19.     Attached hereto as **<u>Exhibit 14</u>** is a true and correct copy of a Memorandum Opinion issued August 29, 2023 in *William Francis and Incline Energy Partners, L.P. v. Phoenix Capital Group Holdings, LLC*, Court of the Appeals for the Fifth District of Texas Case No. 05-22-0260-CV.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 24, 2024.

_____
John T. Ryan

4

**APP0005**

# EXHIBIT 1

APP0006

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-CV-455 |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

## ADAM FERRARI'S FIRST REQUESTS FOR PRODUCTION TO WILLIAM FRANCIS

Plaintiff Adam Ferrari. ("Ferrari") hereby serves the following Requests for Production to Defendant William Francis ("Francis"). Ferrari requests Francis produce documents responsive to these Requests in accordance with the Federal Rules of Civil Procedure.

## INSTRUCTIONS

1.     The time frame covered by these discovery requests shall be January 1, 2016 to the present (the "Relevant Time Period"), unless otherwise indicated by a particular topic or request.

2.     All responses shall comply with the requirements of the Federal Rules of Civil Procedure and the Local Rules for this Court.

3.     The following Requests shall be deemed continuing in nature. In the event You become aware of or acquire additional information relating or referring to any of the following Requests, such additional information is to be promptly produced.

4.     You are to produce all responsive Documents in Your possession, custody, or control, wherever located, including those in the possession, custody, or control of Your representatives and affiliates. Documents are deemed to be in Your possession, custody, or control if they are in Your physical custody, or if they are in the physical custody of any other person or entity and You: (i) own such Document in whole or in part; (ii) have a right, by contract, statute,

1

or otherwise, to use, inspect, examine, or copy such Document on any terms; (iii) have an understanding, express or implied, that You may use, inspect, examine, or copy such Document on any terms; or (iv) as a practical matter, You have been able to use, inspect, examine, or copy such Document when You sought to do so. Documents in Your control also includes those in the possession or custody of any of Your financial or other advisors or any of their respective affiliates. If any requested Document was, but no longer is, in Your control, state the disposition of each such Document.

5.      If any Document requested herein was formerly in Your possession, custody or control and has been lost or destroyed or otherwise disposed of, You are requested to submit in lieu of any such Document a written statement (a) describing in detail the nature of the Document and its contents, (b) identifying the person(s) who prepared or authored the Document and, if applicable, the person(s) to whom the Document was sent, (c) specifying the date on which the Document was prepared or transmitted, and (d) specifying the date on which the Document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the person(s) requesting and performing the destruction.

6.      If any part of the following Requests cannot be responded to in full, respond to the extent possible, specifying the reason(s) for Your inability to respond to the remainder and stating whatever information or knowledge You have concerning the portion to which You do not respond.

7.      If You object to any of these Requests, state in writing with specificity the grounds of Your objections. Any ground not stated shall be deemed waived. If You object to a particular portion of any Request, You shall respond to the remaining portions of such Request as to which there is no objection and state with specificity the grounds of the objection.

APP0008

8.      Where any copy of any Document whose production is sought herein, whether a draft or final version, is not identical to any copy thereof, by reason of alterations, notes, comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto, all such non-identical copies are to be produced separately.

9.      Copies of all Documents available electronically should be delivered in uncompressed native format with all metadata intact, e.g., the "Last Modified Date" property of a Word document should not be altered during the production process such that the production date becomes the last modified date.

10.     In the Definitions, Instructions, and Requests:

      a.      The words "and" and "or" are to be construed both conjunctively and disjunctively;

      b.      The singular form of a noun or pronoun includes the plural form and vice versa;

      c.      The word "all" shall also include "each of," and vice versa; and

      d.      The word "any" shall be construed to mean "any and all" where the effect of such construction is to broaden the scope of the Request.

11.     If there are no Documents responsive to a Request, state so in writing.

12.     A Request for any Document shall be deemed to include any and all transmittal letters, exhibits, enclosures, or attachments to such Document, in addition to its full and unexpurgated form.

13.     Documents should be segregated according to the number of the Request to which You are responding or produced in the manner they are kept in the ordinary course of business. Documents attached to each other should not be separated, e.g., files attached to emails should remain linked to the email.

14.     If any privilege is claimed as to any Communication requested herein:

3

    a.      State the nature of the privilege claim (attorney/client communication, attorney work product, etc.);

    b.      State the name of the party claiming privilege and the name of the attorney, if any, with respect to whom the privilege is claimed;

    c.      State the basis for claiming the privilege as to the specific Communication;

    d.      Identify all persons present at any Communication to which privilege is claimed and all persons to whom the subject matter of the Communication was discussed or disclosed; and

    e.      State the date of each such Communication.

15.    If any privilege is claimed as to any Document requested herein:

    a.      State the nature of the privilege claimed (attorney/client communication, attorney work product, etc.);

    b.      State the basis for claiming the privilege as to the specific Documents; and

    c.      State the date of such Document; identify the type of document (i.e., letter, memo, email, email attachment, etc.); set forth the subject matter thereof; identify each person who prepared it; identify each person (if any) who signed it; identify each person to whom it was directed, circulated, or shown; and identify each person now in possession of the Document.

16.    If a Request concerns Communications with and/or actions by an entity, then the Request should be interpreted to include Communications with or actions by agents acting on an entity's behalf.

## DEFINITIONS

The following terms are defined and used in these Requests as follows:

17.    The term "**Communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise). By way of illustration only, communication includes, but is not limited to, telephone conversations, letters, e-mails, SMS texts, notes, telegrams, teletypes, telecopies, memoranda, face-to-face conversations, Facebook, Whatsapp, Signal, Instagram, or Twitter communications, and any other forms of textual or written communication, including any

APP0010

web-based, website-based, or other forms of electronic communication or record of a communication.

18.     The term "**Document**" includes each and every form of communication, including all written, printed, typed, recorded, or graphic matter of any kind, type, nature, or description, in whatever form (e.g., final and draft versions) that is or has been in Your actual or constructive possession, custody or control, including all printed and electronic copies of email, electronic text, chat, or direct messages sent on any platform (such as SMS, iMessage, WhatsApp, Signal, Confide, Telegram, Facebook, Instagram, Twitter, Slack, Microsoft Teams, Google Chat, Zoom, etc.), notes, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, teletypes, telexes, facsimiles, invoices, order forms, checks, drafts, statements, credit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, pamphlets or any written or recorded materials of any other kind, however stored (whether in tangible or electronic form), recorded, produced or reproduced, including backups.

1.     The term "**including**" means including without limitation.

2.     The terms "**You**" or "**Your**" refers to William Francis, Defendant in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf; including, but not limited to Incline Energy.

5

3.      The term "**Adam Ferrari**" means Adam Ferrari, Plaintiff in the above-captioned action, individually, and in all capacities, or any agent acting on his behalf, jointly or severally, individually or collectively, and any agent acting on his behalf.

4.      The term "**Daniel Ferrari**" means Daniel Ferrari, an individual and relative of Adam Ferrari.

5.      The term "**Charlene Ferrari**" means Charlene Ferrari, an individual and relative of Adam Ferrari.

6.      The term "**Phoenix Capital Group**" means Phoenix Capital Group Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

7.      The term "**Ferrari Energy**" means Ferrari Energy Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

8.      The term "**Wolfhawk Energy**" means Wolfhawk Energy Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

9.      The term "**Incline Energy**" means Incline Energy Partners, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

APP0012

19.     The term "**Greeley Tribune**" means Greeley Publishing Company, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to (1) **Joe Moylan,** (2) **Jerry Martin, and (3) Trevor Reid**.

20.     The term "**SEC**" means The U.S. Securities and Exchange Commission its subsidiaries, divisions, and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

21.     The term "**Jennifer Davis**" means Jennifer Davis, a resident of Oregon in 2016.

22.     The term "**Crystal Taylor**" means Crystal Taylor, whose email address is cat44771@yahoo.com.

23.     The term "**John Hodgin**" means John Hodgin, a petroleum engineer.

24.     The term "**Denver DA**" means District Attorney for Denver County Colorado District Attorney's Office including but not limited to Danielle Sexton.

25.     The term "**Denver Police Department**" means the Denver Police Department, its subsidiaries, divisions, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

26.     The term "**FINRA**" means Financial Industry Regulatory Authority, Inc., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and any  other person who ever served in any such capacity.

7

APP0013

27.     The term "**EnergyNet**" means EnergyNet.com, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and any person who ever served in any such capacity.

28.     The term "**Dalmore**" means Dalmore Group, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, and including any person who ever served in any such capacity.

29.     The term "**Long Reimer Winegar LLP**" means Long Reimer Winegar LLP, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including Kris Koski, and including any person who ever served in any such capacity.

30.     The term "**Barclay Leib**" means Barclay Leib, CFE, CAIA of Morristown NJ.

31.     The term "**FindIt**" means FINDIT, INC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Tom Powers, (2) Raymond Firth, (3) Dean Powers, and (4) Peter Tosto, and including any person who ever served in any such capacity.

32.     The term "**Lorene Butler Mineral Owners**" means owners of mineral rights in Williams County North Dakota.

33.     The term "**Smith Mineral Owners**" means Mark S Smith or Marilyn L Nardini-Smith, owners of mineral rights in Williams County North Dakota.

34.    The term "**Firenza Mineral Owners**" means Patricia Firenza, owner of mineral rights in Williams County North Dakota.

35.    The term "**Wilson Mineral Owners**" means Darrell Wilson, owner of mineral rights in Williams County, North Dakota.

36.    The term "**Thornton Colorado**" means the government for the city of Thronton Colorado, and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to Scott Twombly and Steven Louis-Prescott.

37.    The term "**Hansrude Sather Farms**" means Hansrude Sather Farms, LLLP. And Meagher Energy Advisors, their subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Bradley K. Sather and (2) Nick Asher, and including any person who ever served in any such capacity.

38.    The term "**Eagle River Energy Advisors**" means Eagle River Energy Advisors, LLC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including (1) Steve Florentine, (2) Blake Nance, (3) Austin McKee, and including any person who ever served in any such capacity.

39.    The term "**Rudman Family Trust**" means Rudman Family Trust, owners of mineral rights in North Dakota, including Hiram Luicius.

40.    The term "**The Petram Group**" means The Petram Group, LLC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and

attorneys, including (1) Scott Fey, (2) Larry Fey, (3) Dan Rose, (4) Kent Tedford, and (5) Mark Anderson, and including any person who ever served in any such capacity.

41.     The term "**Dines Family**" means Dines Family Trust, owners of mineral rights in Weld County Colorado, including Winston Dines and Holliday Dines.

42.     The term "**Arthur Bishop**" means Arthur Bishop of Cape Town South Africa.

43.     The term "**Ryan Werking**" means Ryan Werking of Denver, Colorado.

44.     The term "**Duchossois Group**" means THE DUCHOSSOIS GROUP, INC. and THE DUCHOSSOIS FAMILY FOUNDATION., their subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

45.     The term "**ANB Bank**" means ANB Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

46.     The term "**JPMorgan Chase Bank**" means JPMorgan Chase & Co (NYESE:JPM), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

47.     The term "**TPG Specialty Lending**" means TPG Specialty Lending, Inc., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

APP0016

48.      The term "**Texas Capital Bank**" means Texas Capital Bank, N.A.., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

49.      The term "**Prosperity Bank**" means Prosperity Bank, f/k/a LegacyTexas Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

50.      The term "**CrossFirst Bank**" means CrossFirst Bank, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

51.      The term "**MUFG Union Bank**" means MUFG Union Bank, N.A., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

52.      The term "**Capital One Financial**" means Capital One Financial Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

53.      The term "**G. Warren Smith II**" means G. Warren Smith II of Colorado.

54.      The term "**4 GRLZ Investments**" means 4 GRLZ Investments, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and

**APP0017**

each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

55.    The term "**Hess Corporation**" means Hess Corporation (NYSE:HESS), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

56.    The term "**Continental Resources**" means Continental Resources, Inc. (https://www.clr.com/), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

57.    The term "**GTCR**" means GTCR, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

58.    The term "**ExxonMobil**" means ExxonMobil Corporation (ExxonMobil (NYSE:XOM), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

59.    The term "**Royalty Asset Holdings**" means Royalty Asset Holdings, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and

APP0018

each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

60.     The term "**Chevron**" means Chevron Corporation (NYSE:CVX), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to (1) PDC Energy (NASDAQ:PDCE), (2) Great Western Petroleum, LLC, and (3) Noble Energy, Inc.

61.     The term "**Bayswater**" means Bayswater Exploration & Production, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

62.     The term "**Raisa II Holdings**" means Raisa II Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

63.     The term "**Rearden Minerals**" means Rearden Minerals, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

64.     The term "**Sitio Royalties**" means Sitio Royalties Corp (NYSE:STR), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and

APP0019

each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

65.     The term "**Whiting Oil and Gas Corporation**" means Whiting Oil and Gas Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

66.     The term "**Chord Energy**" means Chord Energy Corporation (NASDAQ:CHRD), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity including but not limited to Oasis Petroleum North America LLC.

67.     The term "**Kraken Oil & Gas**" means Kraken Oil & Gas, LLC, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

68.     The term "**ConocoPhillips**" means ConocoPhillips Company (NYSE:COP), its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

69.     The term "**Devon Energy Production**" means Devon Energy Production Company, L.P., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives,

consultants, accountants, and attorneys, including any person who ever served in any such capacity.

70.     The term "**Enerplus**" means Enerplus Resources (USA) Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

71.     The term "**EOG RESOURCES**" means EOG RESOURCES, INC., its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

72.     The term "**SOGC**" means SOGC, Inc., f/k/a Sinclair Oil Corporation, its subsidiaries, divisions, predecessor and successor companies affiliates, parents, member(s) and each of its employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who ever served in any such capacity.

73.     The term "**relating to**" means in whole or in part constituting, containing, concerning, embodying, reflecting, describing, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to.

74.     The term "**Complaint**" refers to Plaintiffs' First Amended Complaint including Exhibits A-H, and Jury Demand, filed April 13, 2023. (Doc. 7).

75.     Any undefined terms are to be defined in the manner in which they are used in the Complaint.

APP0021

## REQUESTS

1.      Any and all communications between You on the one hand, and any individual or

entity, including but not limited to

|     |     |
|-----|-----|
| a.  | Greeley Tribune, |
| b.  | SEC, |
| c.  | Jennifer Davis, |
| d.  | Crystal Taylor, |
| e.  | John Hodgin, |
| f.  | Denver DA, |
| g.  | Denver Police Department, |
| h.  | FINRA, |
| i.  | EnergyNet, |
| j.  | Dalmore, |
| k.  | Long Reimer Winegar LLP, |
| l.  | Barclay Leib, |
| m.  | FindIt, |
| n.  | Lorene Butler Mineral Owners, |
| o.  | Smith Mineral Owners, |
| p.  | Firenza Mineral Owners, |
| q.  | Wilson Mineral Owners, |
| r.  | Thornton Colorado, |
| s.  | Hansrude Sather Farms, |
| t.  | Eagle River Energy Advisors, |
| u.  | Rudman Family Trust, |
| v.  | The Petram Group, |
| w.  | Dines Family, |
| x.  | Arthur Bishop, |
| y.  | Ryan Werking, |
| z.  | Duchossois Group, |
| aa. | ANB Bank, |
| bb. | JPMorgan Chase Bank, |
| cc. | TPG Specialty Lending, |
| dd. | Texas Capital Bank, |
| ee. | Prosperity Bank, |
| ff. | CrossFirst Bank, |
| gg. | MUFG Union Bank, |
| hh. | Capital One Financial, |
| ii. | G. Warren Smith II, |
| jj. | 4 GRLZ Investments, |
| kk. | Hess Corporation, |
| ll. | Continental Resources, |
| mm. | GTCR, |
| nn. | ExxonMobil, |

16

**APP0022**

oo.     Royalty Asset Holdings,
pp.     Chevron,
qq.     Bayswater,
rr.      Raisa II Holdings,
ss.     Rearden Minerals,
tt.      Sitio Royalties,
uu.     Whiting Oil and Gas Corporation,
vv.     Chord Energy,
ww.    Kraken Oil & Gas,
xx.     ConocoPhillips,
yy.     Devon Energy Production,
zz.     Enerplus,
aaa.    EOG RESOURCES, and
bbb.    SOGC,

during the Relevant Time Period, discussing, disparaging, defaming, opining as to the character, reputation, or conduct of, or in any other form regarding or relating to (1) Adam Ferrari, (2) Phoenix Capital Group, (3) Ferrari Energy, (4) Wolfhawk Energy, (5) Daniel Ferrari, and/or (6) Charlene Ferrari.

2.      Any and all communications related to lawsuitsoilandgas.com, including but not limited to the registration, ownership, and contents thereof during the Relevant Time Period.

3.      Any and all documents related to lawsuitsoilandgas.com, including but not limited to the registration, ownership, and contents thereof during the Relevant Time Period.

4.      Any and all communications related to adamferrarioilandgaslawsuits.com, including but not limited to the registration, ownership, and contents thereof during the Relevant Time Period.

5.      Any and all documents related to adamferrarioilandgaslawsuits.com, including but not limited to the registration, ownership, and contents thereof during the Relevant Time Period.

6.      Any and all communications sent to and/or received by the email address "criminal@gmail.com" during the Relevant Time Period.

17

APP0023

7.      Any and all communications sent to and/or received by the email address "concernedbakkenmineralowner@gmail.com" during the Relevant Time Period.

8.      Any and all communications related to out-bidding Adam Ferrari in any mineral acquisition deal during the Relevant Time Period.

9.      Any and all documents evidencing that Adam Ferrari was the CEO of Phoenix Capital Group and/or directly organized Phoenix Capital Group during the Relevant Time Period.

10.     Any and all documents evidencing Your opinion of Adam Ferrari during the Relevant Time Period.

11.     Any and all drafts of documents made by You which were subsequently sent to those identified in Request 1.

12.     Any and all communications evidencing Your opinion of Adam Ferrari during the Relevant Time Period.

13.     Any and all documents evidencing Adam Ferrari has been convicted of a felony.


Dated:  November 8, 2023                    Respectfully submitted,

                                            _/s/Ross M. Good_____
                                            One of Plaintiff's Attorneys

Ross Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark Suite 1600
Chicago, Illinois 60601
p: (786) 539-3952
ross@loftusandesienberg.com

APP0024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record via electronic mail and pursuant to the Federal Rules of Civil Procedure on November 8, 2023.

*/s/ Ross M. Good*
Ross M. Good

19

# EXHIBIT 2

**APP0026**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 3:23-cv-455-S |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

## WILLIAM FRANCIS'S FIRST SET OF DISCOVERY REQUESTS TO ADAM FERRARI

To:   Plaintiff Adam Ferrari, by and through his counsel of record, Ross M. Good, Loftus & Eisenberg, Ltd., 161 N. Clark, Suite 100, Chicago, Illinois 60601.

Defendant William Francis ("Defendant") hereby serves his First Set of Discovery Requests on Plaintiff Adam Ferrari ("Plaintiff"), the responses to which shall be served not later than the 30th day after the date of service of these Requests.  **Responsive documents should be produced electronically concurrently with written Responses.**

1                                                          **APP0027**

Respectfully submitted,

By:  */s/ Charlene C. Koonce*
    Cortney C. Thomas
     Texas Bar No. 24075153
     cort@brownfoxlaw.com
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Andrew C. Debter
     Texas Bar No. 24133954
     andrew@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Defendant William Francis*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served electronically, on counsel for Adam Ferrari, on the 22nd of December, 2023.

*/s/ Charlene C. Koonce*
Charlene C. Koonce

## DEFINITIONS

1.      "Defendant" or "Francis" means William Francis.

2.      "Incline" means Incline Energy Partners, L.P.

3.      "You" or "Ferrari" means Plaintiff Adam D. Ferrari

4.      "Asset" has the broadest possible meaning and encompasses any legal or equitable interest in, right to, or claim to, any real or personal property, whether individually or jointly, directly or indirectly controlled, and wherever located, including but not limited to: chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds mail or other deliveries, inventory, checks, notes, accounts (including, but not limited to, bank accounts and accounts at other financial institutions), credits, receivables, lines of credit, contracts (including spot, futures, options, or swaps contracts), insurance policies, and all funds, wherever located, whether in the United States or outside the United States.

5.      "Complaint" means your live pleading in this Lawsuit.

6.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise), including, without limitation, written, oral, or electronic transmissions (including, but not limited to, electronic mail, texts, social media messaging, WhatsApp messaging, Signal Messaging, etc.).

7.      "Document(s)" or "Information" means all materials within the scope of the Texas Rules of Civil Procedure, including, without limitation, all writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations, including electronically-stored information ("ESI"), that are stored in any medium whatsoever from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, as well as any tangible things. A draft or non-identical copy of a document is a separate document within the meaning of this term. A document includes all appendices, schedules, exhibits, and other attachments. The term "Document(s)" or "Information" includes but is not limited to emails and other types of messages (including but not limited to text, instant, and direct messages), social media or other online content, data generated and stored by devices connected to the Internet of Things ("IoT"), communications generated and stored in workplace collaboration tools or ephemeral messaging applications, and all associated data and metadata.

8.      The terms "identify" and to give the "identity of," when used in connection with a natural person, shall mean to state:

      a.      his or her full name;

      b.      present or last known residence address;

      c.      present or last known business address;

      d.      present or last known residence phone number;

APP0029

   e.  present or last known business phone number; and

   f.  his or her occupation, including his or her title or position held, if any.

  9.  The terms "identify" and to give the "identity of" shall mean, in connection with an organization or corporation, to state:

   a.  its name;

   b.  its place of incorporation (if a corporation);

   c.  its principal place of business;

   d.  its phone number; and

   e.  any names by which it was formerly known.

  10.  The "Lawsuit" means *Adam Ferrari v. William Francis*, No. 3:23-CV-455 in the United States District Court for the Northern District of Texas.

  11.  "Person" means any natural person, corporation, firm, association, partnership, joint venture, proprietorship, governmental body, or any other organization, business, or legal entity, and all predecessors or successors in interest.

  12.  "Phoenix" means Phoenix Capital Group Holdings, LLC.

  13.  "Relate," "related," or "relating" means, in addition to their usual and customary meanings, concerning, referring to, reflecting, regarding, pertaining to, addressing, discussing, alluding to, describing, evidencing, constituting, or otherwise having any logical or factual connection with, directly or indirectly, expressly or implicitly, the subject matter of the specific request.

  14.  The words "and" and "or" shall be construed disjunctively or conjunctively to bring within the scope of each interrogatory all responses which otherwise might be construed to be outside the scope of an interrogatory.

  15.  The word "any" shall be construed to include "all" and vice versa.

  16.  The word "each" shall be construed to include "every" and vice versa.

  17.  "You" or "Your" means the person or entity to whom these Requests are directed **and includes any entity in which he/she/it holds any ownership interest directly or indirectly, as well as its agents, representatives, or anyone authorized or purportedly authorized to act on their behalf**.  This definition DOES NOT INCLUDE ATTORNEYS.

  18.  Any word in the singular form shall also be construed as plural and vice versa.

  19.  The masculine form shall also be construed to include the feminine and vice versa.

                   APP0030

20.     If You do not have documents that are responsive to a certain Request, indicate this in Your response.

21.     Any capitalized term not specifically defined above shall have the same meaning as in the parties' pleadings and motions.

22.     These definitions and instructions do not limit Your obligations under the Federal Rules of Civil Procedure.

## **INSTRUCTIONS**

1.     If any document which otherwise falls within the scope of this Request is not produced by you, list the document(s) not produced and, for each such document, state:

- the reasons for withholding each such document;
- the identity of the author(s) or preparer(s) of each such document;
- the identity of the sender(s) of each such document;
- the identity(ies) of the person(s) to whom the original and any copies of each such document were sent;
- a brief description of the nature and subject matter of each such document;
- the date of each such document; and
- the present location of each such document and the name, telephone number, and address of the current custodian.

2.     Produce the documents described below as they are kept in the usual course of business or organized and labeled to correspond with the categories of this Request.

3.     To the extent that any or all computer programs or other documents are available only on disks, drums, central computer memory, or other storage means which can be physically attached to a computer, such computer programs and other documents are required to be produced either in printed or machine-readable form.

4.     Whenever a requested document or group of documents is kept or found in a file, produce the document or documents along with the file in which they are contained.  Whenever a requested document or file or group of documents or files are kept or are found in a file drawer, file box or other place, before the same is produced, attach thereto a copy of the label, number or title of the file drawer, file box or other place from which the document or file was found or removed.

5.     No communication, document or file requested should be altered, changed or modified in any respect.  No communication, document or file requested should be disposed of or destroyed.  You should take appropriate steps to protect all communications, documents and files from being misplaced or destroyed pursuant to any record retention or destruction policy or otherwise.

6.     These Requests seek answers current to the date of response, and further shall be deemed to be continuing under the Texas Rules of Civil Procedure so that any additional

information relating in any way to these Requests which you acquire or which becomes known to you up to and including the time of trial shall be furnished promptly after such information is acquired or becomes known.

      7.     Unless stated otherwise or indicated by the subject matter of any Request, the relevant time frame for all Requests is February 1, 2020 to February 1, 2023 (the "Relevant Time Period").

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.     All documents evidencing, relating, or referring to the formation and governing documents for Lion of Judah, LLC, Lion of Judah Capital, LLC, and Phoenix. This request includes, but is not limited to, Certificate of Formation, Limited Liability Agreements and all amendments thereto, Articles of Organization, Shareholder Agreements, Bylaws, Operating Agreements, and any documents provided to or received from the Secretary of State for each state where the entity is registered to do business.

**RESPONSE:**

2.     All documents evidencing, relating, or referring to the formation and governing documents for any entity other than Lion of Judah, LLC, Lion of Judah Capital, LLC, or Phoenix, which is also a signatory to any of the formation documents for Lion of Judah, LLC, Lion of Judah Capital, LLC or Phoenix.

**RESPONSE:**

3.     All communications between You and Lion of Judah, LLC or Lion of Judah Capital, LLC, including any of its owners or managers regarding (a) any management, control, or authority either entity has over Phoenix; (b) the formation of Phoenix; (c) the formation of Lion of Judah, LLC or Lion of Judah Capital, LLC; (d) the capitalization of Lion of Judah, LLC, Lion of Judah Capital, LLC, or Phoenix (e) any management, control, or authority you have over Lion of Judah, LLC or Lion of Judah Capital, LLC; (f) Your title, job duties, authority, or responsibilities with Lion of Judah, LLC, Lion of Judah Capital, LLC or Phoenix  (g) all compensation, in any form, You have received from Judah, LLC, Lion of Judah Capital, LLC or Phoenix.

**RESPONSE:**

4.     All documents that evidence, refer, or relate to any "economic interest" You hold or have ever held in Lion of Judah, LLC or Lion of Judah Capital, LLC including, but not limited to (a) documents that evidence the assets or value you contributed to Lion of Judah, LLC or Lion of Judah Capital, LLC (b) communications regarding such assets or economic interest; (c) documents that refer, relate, or evidence the reason or justification for capitalizing Phoenix through Lion of Judah, LLC or Lion of Judah Capital, LLC.

**RESPONSE:**

5.     All contracts or written agreements between You and Phoenix.

          APP0032

**RESPONSE:**

6.      All communications between You and Phoenix regarding (a) your role, job, contracted position, authority, or control; (b) the decision to name you as Chief Executive Officer; (c) disclosures, announcements, reports, or communications, including publicly filed documents, that describe, discuss, identify, or otherwise reference your ownership, direct or indirect, control, or role with (i) Lion of Judah, LLC, (ii) Lion of Judah Capital, LLC, or (iii) Phoenix Capital; (d) any response to an inquiry or subpoena from FINRA or the SEC.  The relevant time period for this Request is March 1, 2019 through February 1, 2023.

**RESPONSE:**

7.      Any document provided by You or on Your behalf to FINRA or the SEC in response to any request or subpoena from either entity.  This Request is limited in time to February 1, 2020 through the present.

**RESPONSE:**

8.      All communications between You and any person or entity that evidence, refer, or relate to any inquiry by the SEC or FINRA regarding Your role, service, title, or control with or over Phoenix, including but not limited to communications by You or on Your behalf with FINRA or the SEC.  This Request is limited in time to February 1, 2020 through the present.

**RESPONSE:**

9.      All documents signed or otherwise executed by You on behalf of Phoenix, Lion of Judah, LLC or Lion of Judah Capital, LLC, including any such documents signed by permission for another person or entity, or through DocuSign.  The relevant time period for this Request is March 1, 2019 through the present.

**RESPONSE:**

10.     All documents evidencing, referring, or relating to any loan, loan application, or guarantee in which You and Phoenix Capital are both included in the transaction, in any capacity.  The relevant time period for this Request is March 1, 2019 through the present.

**RESPONSE:**

11.     All documents evidencing, relating, or referring to Your title or position with Phoenix Capital, Lion of Judah, LLC, or Lion of Judah Capital, LLC.  The relevant time period for this Request is March 1, 2019 through the present.

**RESPONSE:**

12.     All documents evidencing, relating, or referring to any authority, control, ownership, title, or capacity in which You are affiliated with Phoenix, Lion of Judah, LLC or Lion of Judah

Capital, LLC.  The relevant time period for this Request is March 1, 2019 through the present.

**RESPONSE:**

13.     All documents evidencing Your exercise of control over Lion of Judah, LLC, Lion of Judah Capital, LLC, or Phoenix, including but not limited to bank account signature cards, applications for credit or guarantees provided by You, licenses, permits, or any form of registration, contracts, agreements, leases, rental agreements, voting trusts, proxies, etc. The relevant time period for this Request is March 1, 2019 through the present.

**RESPONSE:**

14.     Any financial statement prepared by You, on Your behalf, or which includes any reference to any ownership interest You hold, directly or indirectly, in Phoenix, Lion of Judah, LLC or Lion of Judah Capital, LLC or any other entity that holds any interest, managerial authority, or rights in Phoenix, Lion of Judah, LLC or Lion of Judah Capital, LLC.  The relevant time period for this Request is March 1, 2019 through the present.

**RESPONSE:**

15.     Any document that grants You Power of Attorney for Daniel or Charlene Ferrari. This request includes all types of Power of Attorney, including General, Durable, Financial, and/or Springing.  It does not include Medical Powers of Attorney. The relevant time period for this Request is March 1, 2019 through the present.

**RESPONSE:**

16.     All documents evidencing, referring or relating to the formation and governing documents for Alpha and Omega Capital, LLC. This request includes, but is not limited to, any Certificate of Formation, Limited Liability Agreements and all amendments thereto, Articles of Organization, Shareholder Agreements, Bylaws, Operating Agreements, and any documents provided to or received from the Secretary of State for each state where the entity is registered to do business.

**RESPONSE:**

17.     All documents evidencing, relating, or referring to the relationship between Alpha and Omega Capital, LLC and Lion of Judah, LLC, Lion of Judah Capital, LLC, and Phoenix, including but not limited to any agreement or transaction between or among any of the entities.

**RESPONSE:**

APP0034

**RESPONSE:**

18.     Documents evidencing communications between You and any member, manager, or officer of Alpha & Omega Capital LLC regarding any transaction between that entity and Phoenix.

**RESPONSE:**

19.     All documents that evidence any damages You contend You sustained as a result of the claims asserted in Your Complaint.

**RESPONSE:**

20.     Any document that evidences Your compliance with the Defamation Mitigation Act, TEX. CIV. PRAC. & REM. CODE § 73.055.

**RESPONSE:**

21.     All documents that evidence, refer or relate to any investor who sought to invest with You personally, and whom you contend received any communication from Francis or Incline about You, that You contend was false, defamatory, derogatory, or injurious.  The relevant time period for this Request is February 1, 2020 through February 1, 2023.

**RESPONSE:**

22.     All documents evidencing the (a) existence of, (b) claims asserted in, (c) current status or disposition, of any lawsuit in which You were or are named as a Party and in which the opposing party made any allegation of dishonesty, a lack of candor, failure to comply with any duty, conversion, theft, misappropriation, or interference with another Persons's contractual rights.

**RESPONSE**:

23.     All communications between You and Lindsey Wilson relating to (a) Your or her compensation in connection with Phoenix; (b) Your or her title, job description, authority, or responsibilities regarding Phoenix; (c) any offer of employment made to her in connection with work at Phoenix.  This Relevant time period for this Request is March 25, 2019 through February 1, 2023.

**RESPONSE:**

24.     All documents evidencing, referring or relating to the owners, publishers, or contents of any website that describes or identifies lawsuits filed against You, Your criminal history, or Your response to statements made on such websites.

**RESPONSE:**

25.     All documents evidencing, referring, or relating to the office lease or post office box rental for 855 North Douglas Street, 2nd Floor Box #4, El Segundo, CA 90245.

**RESPONSE:**

26.     All documents evidencing, referring, or relating to the office lease or post office box rental related to 2601 Pacific Coast Highway, Floor 2, Hermosa Beach, CA 90254.

**RESPONSE:**

27.     All documents evidencing, referring, or relating to any Drilling Title Opinions, Division Order Title Opinions, Indexes and Mineral Ownership Spreadsheet / Reports, covering the states of North Dakota, Montana, Wyoming and Colorado, which were included in or constituted Lion of Judah Capital, LLC's Intangible Capital Contribution to Phoenix.

**RESPONSE:**

All communication between You and Anthony Will or Natalie Arch, regarding public comments, articles, posts, or statements about You, including suppressing, countering, or responding to such comments or statements. The relevant time period for this Request is February 14, 2019 and May 20, 2022.

**RESPONSE:**

28.     Any agreement between You and Reputation Resolutions.

**RESPONSE:**

29.     All communication between you and prospective employee for Phoenix evidencing, referring, or relating to Your efforts to recruit such person to join Phoenix as an employee, consultant or officer.

**RESPONSE:**

30.     All communication between you and Ken Willey evidencing, referring, or relating to any sales, purchases, negotiations, or transactions involving mineral rights in which Phoenix was a party to such transaction or negotiation.  The relevant time period for this Request is September 1, 2019 through November 1, 2020,

**RESPONSE:**

31.     All communication between You and any mineral owner You communicated with who subsequently sold, conveyed or contributed their oil and gas interests to Phoenix. The relevant time period for this Request is March 1, 2019 through November 1, 2021.

**RESPONSE:**

**APP0036**

32.      Documents evidencing, referring, or relating to software accounts or licenses to which You had access, were the registered owner or licensee, but which were used by, assigned to, purchased by, transferred to or otherwise acquired Phoenix. This request includes but is not limited to accounts or agreements DocuSign, Salesforce, Microsoft Outlook, GoogleMail, DrillingInfo dba Enverus, skip trace software services, county clerk websites etc.

**RESPONSE:**

## INTERROGATORIES

**INTERROGATORY NO. 1:**    For **each statement** identified in Your Complaint as the basis for Your claim, describe the manner in which You contend You have sustained (a) actual damages; or (b) consequential damages, and provide the amount of such damages sustained for each statement.

**ANSWER:**

**INTERROGATORY NO. 2:**    Describe the manner in which You contend any statement identified in Your Complaint as the basis for Your claim was (1) false; and (2) disparaging or otherwise injurious to You.

**ANSWER:**

**INTERROGATORY NO. 3:**    Explain the factual basis for Your contention that a statement to the effect that You served as Phoenix's CEO exposed you to liability, harmed your reputation, or otherwise injured You.

**ANSWER:**

**INTERROGATORY NO. 4:**    Identify all persons or entities You contend have defamed, disparaged or slandered You by referring to You as a criminal, felon, or dishonest person.

**ANSWER:**

**INTERROGATORY NO. 5:**    Identify the family member of an officer of Phoenix who has contributed minerals and royalty interests to Phoenix as well as provide all communication related to any related party transactions.

**ANSWER:**

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**    Admit that you are Phoenix's Chief Executive Officer.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:**      Admit that Phoenix was capitalized, directly or indirectly, through funds or assets provided byYou.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:**      Admit that prior to Feb 1, 2023, Phoenix has not paid any employee total compensation during any fiscal one-year period of its existence, that exceeded the total amount of compensation You received from or as a result of Your affiliation with Phoenix (ie. through consultancy, Your "beneficial ownership in Lion of Judah Capital, LLC, or otherwise) during the same one-year period.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 4:**      Admit that You were the officer referenced in Phoenix's December 23, 2021 Offering Circular whose family member controlled Lion of Judah Capital, LLC.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 5:**      Admit that Phoenix has not paid any officer total compensation during any fiscal one-year period of its existence, that exceeds the total amount of compensation You received from or as a result of Your affiliation with Phoenix (ie. through consultancy, Your "beneficial ownership in Lion of Judah, LLC or otherwise) during the same one-year period prior to February 1, 2023.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 6:**      Admit that for each Year of Phoenix's existence, total compensation received by You as a result of Your affiliation with Phoenix (ie. through consultancy, Your "beneficial ownership in Lion of Judah, LLC or otherwise) was the highest amount of compensation received from Phoenix by any person or entity.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 7:**      Admit that You contacted Lindsey Wilson to seek her employment or retention with or by Phoenix.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 8:**      Admit that You actively recruited Lindsey Wilson to seek her employment or retention with or by Phoenix.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 9:**      Admit that You contacted Justin Arn to seek his employment or retention with or by Phoenix.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 10:**   Admit that You actively recruited Justin Arn to seek his employment or retention with or by Phoenix.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 11:**   Admit that You contacted Sean Goodnight to seek his employment or retention with or by Phoenix.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 12:**   Admit that You actively recruited Sean Goodnight to seek his employment or retention with or by Phoenix.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 13:**   Admit that You purchased or obtained PO Box 363, El Segundo, California, 90245, for use by Phoenix.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 14:**   Admit that You are the Founder of Phoenix.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 15:**   Admit that You are the family member who controlled Lion of Judah Capital, LLC as disclosed in Phoenix's December 23, 2021 Offering Circular.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 16:**   Admit You, directly or indirectly, paid legal fees incurred in connection with the creation of Lion of Judah Capital, LLC.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 17:**   Admit You, directly or indirectly, paid legal fees incurred in connection with the creation of Lion of Judah LLC.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 18:**   Admit You, directly or indirectly, paid legal fees incurred in connection with the creation of Phoenix.

**RESPONSE:**

APP0039

**REQUEST FOR ADMISSION NO. 19:**   Admit that You, directly or indirectly, provided capitalization for Lion of Judah, LLC.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 20:**   Admit that You, directly or indirectly, provided capitalization for Lion of Judah Capital, LLC.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 21:**   Admit that prior to March 1, 2019 Daniel and Charlene Ferrari had no direct experience in the oil and gas business.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 22:**   Admit that since Phoenix's creation, you have always maintained an electronic mail address within Phoenix's domain.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 23:**   Admit that prior to your designation as an officer for Phoenix, your account within Phoenix Salesforce software system provided administrator/manager or corresponding access superior to the access provided to any employee who was not also an officer.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 24:**    Admit that prior to your designation as an officer for Phoenix, your account within Phoenix Salesforce software system provided access superior to any other contractor affiliated with Phoenix.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 25:**   Admit that prior to your designation as an officer for Phoenix, your account within Phoenix Salesforce software system provided administrator/manager access superior to access for any other Phoenix employee who was not also an officer of Phoenix.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 26:**   Admit that prior to your designation as an officer for Phoenix, your account within Phoenix's electronic mail master account provided administrator/manager or corresponding access superior to the access provided to any employee who was not also an officer.

**RESPONSE:**

**APP0040**

# EXHIBIT 3

**APP0041**

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | |
|---|---|
| Adam Ferrari | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   3:23-cv-00455-S |
| William Francis | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Phoenix Capital Group Holdings, LLC, by agreement, by and through counsel of record, Ross M. Good, Loftus & Eisenberg, Ltd., 161 N. Clark Suite, 1600, Chicago, IL 60601, ross@loftusandeisenberg.com

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: in Exhibit "A" attached.

| Place: 8111 Preston Road, Suite 300<br>Dallas, TX 75225 | Date and Time:<br>01/19/2024 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

      The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    12/28/2023

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Charlene C. Koonce |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
William Francis _____ , who issues or requests this subpoena, are:
Charlene C. Koonce, Brown Fox PLLC, 8111 Preston Road, Suite 300, Dallas, TX 75225; 214-327-5000; charlene@brownfoxlaw.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**APP0042**

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   3:23-cv-00455-S

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**APP0043**

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) For Other Discovery.** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) Command to Produce Materials or Permit Inspection.**
   **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) Quashing or Modifying a Subpoena.**
   **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
   **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
   **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) Claiming Privilege or Protection.**
   **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 3:23-cv-455-S |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

**EXHIBIT A**

**DEFINITIONS**

1.      "Defendant" or "Francis" means William Francis.

2.      "Incline" means Incline Energy Partners, L.P.

3.       "Ferrari" means Plaintiff Adam D. Ferrari

4.      "Asset" has the broadest possible meaning and encompasses any legal or equitable interest in, right to, or claim to, any real or personal property, whether individually or jointly, directly or indirectly controlled, and wherever located, including but not limited to: chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds mail or other deliveries, inventory, checks, notes, accounts (including, but not limited to, bank accounts and accounts at other financial institutions), credits, receivables, lines of credit, contracts (including spot, futures, options, or swaps contracts), insurance policies, and all funds, wherever located, whether in the United States or outside the United States.

5.      "Complaint" or "Amended Complaint" means your live pleading in this Lawsuit.

6.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise), including, without limitation, written, oral, or electronic transmissions (including, but not limited to, electronic mail, texts, social media messaging, WhatsApp messaging, Signal Messaging, etc.).

7.      "Document(s)" or "Information" means all materials within the scope of the Texas Rules of Civil Procedure, including, without limitation, all writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations, including electronically-stored information ("ESI"), that are stored in any medium whatsoever from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, as well as any tangible things. A draft or non-identical copy of a document is a separate document within the meaning of this term. A document includes all appendices, schedules, exhibits, and other attachments. The term "Document(s)" or "Information"

APP0045

includes but is not limited to emails and other types of messages (including but not limited to text, instant, and direct messages), social media or other online content, data generated and stored by devices connected to the Internet of Things ("IoT"), communications generated and stored in workplace collaboration tools or ephemeral messaging applications, and all associated data and metadata.

8.     The terms "identify" and to give the "identity of," when used in connection with a natural person, shall mean to state:

   a.     his or her full name;

   b.     present or last known residence address;

   c.     present or last known business address;

   d.     present or last known residence phone number;

   e.     present or last known business phone number; and

   f.     his or her occupation, including his or her title or position held, if any.

9.     The terms "identify" and to give the "identity of" shall mean, in connection with an organization or corporation, to state:

   a.     its name;

   b.     its place of incorporation (if a corporation);

   c.     its principal place of business;

   d.     its phone number; and

   e.     any names by which it was formerly known.

10.     The "Lawsuit" means *Adam Ferrari v. William Francis*, No. 3:23-CV-455 in the United States District Court for the Northern District of Texas.

11.     "Person" means any natural person, corporation, firm, association, partnership, joint venture, proprietorship, governmental body, or any other organization, business, or legal entity, and all predecessors or successors in interest.

12.     "Phoenix" means Phoenix Capital Group Holdings, LLC.

13.     "Relate," "related," or "relating" means, in addition to their usual and customary meanings, concerning, referring to, reflecting, regarding, pertaining to, addressing, discussing, alluding to, describing, evidencing, constituting, or otherwise having any logical or factual connection with, directly or indirectly, expressly or implicitly, the subject matter of the specific request.

APP0046

14. The words "and" and "or" shall be construed disjunctively or conjunctively to bring within the scope of each interrogatory all responses which otherwise might be construed to be outside the scope of an interrogatory.

15. The word "any" shall be construed to include "all" and vice versa.

16. The word "each" shall be construed to include "every" and vice versa.

17. "You" or "Your" means the person or entity to whom these Requests are directed **and includes any entity in which he/she/it holds any ownership interest directly or indirectly, as well as its agents, representatives, or anyone authorized or purportedly authorized to act on their behalf**. This definition DOES NOT INCLUDE ATTORNEYS.

18. Any word in the singular form shall also be construed as plural and vice versa.

19. The masculine form shall also be construed to include the feminine and vice versa.

20. If You do not have documents that are responsive to a certain Request, indicate this in Your response.

21. Any capitalized term not specifically defined above shall have the same meaning as in the parties' pleadings and motions.

22. These definitions and instructions do not limit Your obligations under the Federal Rules of Civil Procedure.

**INSTRUCTIONS**

1. If any document which otherwise falls within the scope of this Request is not produced by you, list the document(s) not produced and, for each such document, state:

- the reasons for withholding each such document;
- the identity of the author(s) or preparer(s) of each such document;
- the identity of the sender(s) of each such document;
- the identity(ies) of the person(s) to whom the original and any copies of each such document were sent;
- a brief description of the nature and subject matter of each such document;
- the date of each such document; and
- the present location of each such document and the name, telephone number, and address of the current custodian.

2. Produce the documents described below as they are kept in the usual course of business or organized and labeled to correspond with the categories of this Request.

3. To the extent that any or all computer programs or other documents are available only on disks, drums, central computer memory, or other storage means which can be physically attached to a computer, such computer programs and other documents are required to be produced either in printed or machine-readable form.

APP0047

4.      Whenever a requested document or group of documents is kept or found in a file, produce the document or documents along with the file in which they are contained.  Whenever a requested document or file or group of documents or files are kept or are found in a file drawer, file box or other place, before the same is produced, attach thereto a copy of the label, number or title of the file drawer, file box or other place from which the document or file was found or removed.

5.      No communication, document or file requested should be altered, changed, or modified in any respect.  No communication, document or file requested should be disposed of or destroyed.  You should take appropriate steps to protect all communications, documents, and files from being misplaced or destroyed pursuant to any record retention or destruction policy or otherwise.

6.      These Requests seek answers current to the date of response, and further shall be deemed to be continuing under the Texas Rules of Civil Procedure so that any additional information relating in any way to these Requests which you acquire or which becomes known to you up to and including the time of trial shall be furnished promptly after such information is acquired or becomes known.

7.      Unless otherwise stated, the time frame for all Requests is two months before the date of your incorporation through the present.

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.      Unredacted and fully executed copies of the Limited Liability Company Agreement of Phoenix Capital Group Holdings, LLC, and all amendments thereto.

2.      All documents evidencing, relating, or referring to the formation and governing documents for (a) Lion of Judah, LLC, (b) Lion of Judah Capital, LLC, and (c) Phoenix. This request includes, but is not limited to, Certificate of Formation, (fully executed copies as well as all amendments) Limited Liability Agreements ((fully executed copies and all amendments thereto), Articles of Organization, Shareholder Agreements, Bylaws, Operating Agreements, and any documents provided to or received from the Secretary of State for each state where the entity is registered to do business. Should there be other entities that are listed or are signatories to those instruments requested above but which are not already listed herein, then all of the same formation and governing documents as it relates to those unnamed entities as well.

3.      All documents evidencing, relating, or referring to the formation and governing documents for any entity other than Lion of Judah, LLC, Lion of Judah Capital, LLC, or Phoenix, which is also a signatory to any of the formation documents for Lion of Judah, LLC, Lion of Judah Capital, LLC or Phoenix.

4.      All organizational meeting minutes, resolutions, minutes of meetings, and written consents for You, in which Adam Ferrari, Lion of Judah Capital, LLC, Lion of Judah, LLC, or any fact made the basis of any lawsuit against Francis or Incline was discussed.

5.      All communications and documents provided to any bank in which You hold or have ever held any account, to open such account.  The relevant date range for this Request is March 1, 2019 to December 31, 2019.

6.      All member, manager, shareholder, profit sharing, or voting agreements, proxies, voting trusts, or other similar agreement which govern or apply to You, Lion of Judah Capital, LLC, and Lion of Judah, LLC including all amendments thereto.

7.      All communications with First International Bank and Trust regarding the Transaction described in ¶ 25 of the Amended Complaint.

8.      All documents that evidence any contractual relationship between You and First International Bank and Trust.

9.      Documents that evidence the identity of any person or entity who paid legal fees related to the creation of your formative and operational documents, including but not limited to your Limited Liability Company Agreement.

10.      Documents that evidence the identity of any person or entity who engaged any lawyer or law firm retained to draft or file your formative or operational documents, including but not limited to your Limited Liability Company Agreement.

11.      All documents, including communications, between You and any other person or entity, that refer or relate to authority (actual, implied, legal, beneficial or contractual) or control exercised by Adam Ferrari with regard to your operation, management, or governance.

12.      All documents, including communications, between You and any person or entity regarding Your compliance with SEC or FINRA regulations in relation to Mr. Ferrari's role, control, ownership, governance, or work with You.

13.      All communications between You and Dalmore Capital regarding the allegations in the Amended Complaint that refer or relate to Dalmore Capital.

14.      All communications between You and 4 GRLZ Investments regarding the allegations in the Amended Complaint that refer or relate to 4 GRLZ Investments.

15.      All documents or information You have provided to FINRA or the SEC in connection with any request, inquiry, or subpoena from either agency, which relates, refers, or discusses Adam Ferrari, his role, title, authority, governance, ownership. or control over You, or Your compliance with SEC regulations in relation to Mr. Ferrari's role, control, authority, governance, ownership, or work with You.

16.      All communications between You and the SEC that relate to Adam Ferrari, his role, title, authority or control over You, or Your compliance with SEC regulations in relation to Mr. Ferrari's role, control, ownership, or work with You.

17.      Documents that identify the **family member** of Your officer who controlled Lion of Judah Capital, LLC as disclosed in Your December 23, 2021 Offering Circular.

18.     Documents that identify **Your officer** whose family member controlled Lion of Judah Capital, LLC as disclosed in Your December 23, 2021 Offering Circular.

19.     All contracts, agreements, or documents signed or approved, directly or indirectly, by Adam Ferrari which were made or created in connection with any employee, contractor, or agent that You hired or contracted.

20.     Any document signed by Adam Ferrari in connection with Your operation, which evidences his control or authority, including but not limited to applications for insurance, applications for credit, letters of engagement for attorneys, etc.

21.     Applications for insurance coverage submitted by You to any insurer that includes any reference to or coverage for Adam Ferrari, as an insured, an employee, an officer, or otherwise.

22.     A copy of all signature cards for any financial account for which You are or were an owner or on which You have signatory authority.  The relevant time period for this Request is March 1, 2019 through the present.

23.     A copy of any documents evidencing, referring or relating to Your offer of employment made to Lindsey Brianne Wilson or Sean Goodnight.

24.     A copy of all documents evidencing, referring, or relating to any application for credit or lending You submitted to any financial institution.

25.     All emails sent to or from af@phxcapitalgroup.com, which relate to the facts made the basis of this lawsuit.

26.     All emails sent from af@phxcapitalgroup.com, which direct, instruct, approve, disapprove, or otherwise provide control or authority over any of Your employees, officers, or agents.

27.     All emails sent to or from any other email address owned, controlled, or maintained by You which Adam Ferrari used, controlled, or had access credentials for.

28.     All documents evidencing, referring, or relating to Your purchase of the URL for any website you own or control.

29.     Documents identifying any employee You have terminated or whose employment with You has ended.

30.     Copies of any common interest, privilege preservation, joint defense or similar agreement between You and Adam Ferrari.

31.     Documents evidencing, referring, or relating to all capital contributions You have received.

32.     Documents identifying each of Your current or past officers.

33.     Documents identifying each current or past member of Your Board of Directors, if any.

34.     Documents evidencing, referring, or relating to the manner in which and authority by which Your officers, directors, or managers or managing members were or are selected.

35.     Documents that evidence, refer, or relate to any payment made by You to, or for the benefit of Adam Ferrari.

36.     All documents evidencing, referring, or relating to the office lease or post office box rental related to 855 North Douglas Street, 2ⁿᵈ Floor Box #4, El Segundo, CA 90245.

37.     All documents evidencing, referring, or relating to the office lease or post office box rental related to 2601 Pacific Coast Highway, Floor 2, Hermosa Beach, CA 90254.

38.     All documents evidencing, referring, or relating to the office lease or post office box rental related to P. O. Box 363 El Segundo, California 90245.

39.     Documents that identify the family member of an officer of Phoenix who contributed minerals and royalty interests to Phoenix.

40.     All documents that evidence any relationship, contract, sale, deed, or transaction between You and (a) 4 GRLZ Investments LLC, (b) 4 GRLZ Investment's manager, Kelsey E. Fox, or (c) 4 GRLZ Investments LLC's land brokerage company FX Resources, LLC.

41.     Communications between You and (a) 4 GRLZ Investments, LLC, (b) GRLZ Investment's manager, Kelsey E. Fox, or (c) 4 GRLZ Investments LLC's land brokerage company FX Resources, LLC related to the "packet" of information described in Your Complaint.

42.     Documents that evidence, refer, or relate to any payment made by You to, or for the benefit of Ferrari Energy LLC.

43.     All documents evidencing, referring, or relating to any Drilling Title Opinions, Division Order Title Opinions, Indexes and Mineral Ownership Spreadsheet / Reports, covering the states of North Dakota, Montana, Wyoming and Colorado, which were included in or constituted Lion of Judah Capital, LLC's Intangible Capital Contribution to You.

44.     All communication between You and Anthony Will or Natalie Arch, regarding public comments, articles, posts, or statements about Ferrari, including suppressing, countering, or responding to such comments or statements. The relevant time period for this Request is February 14, 2019 to May 20, 2022.

45.     Any agreement between You and Reputation Resolutions.

46.     All documents evidencing, relating, or referring to the formation and governing documents for any entity other than Lion of Judah, LLC, Lion of Judah Capital, LLC, or Phoenix, which is also a signatory to any of the formation documents for Lion of Judah, LLC, Lion of Judah Capital, LLC or Phoenix.

APP0051

# EXHIBIT 4

APP0052

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM FERRARI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 3:23-cv-455-S |
| | § | |
| WILLIAM FRANCIS, | § | |
| | § | |
| Defendant. | § | |

**WILLIAM FRANCIS'S THIRD SET OF**
**DISCOVERY REQUESTS TO ADAM FERRARI**

To:    Plaintiff Adam Ferrari, by and through his counsel of record, Jake Ryan and Andrew Gray, Latham & Watkins LLP, 12670 High Bluff Drive, San Diego, California 92130

Pursuant to FED. R. CIV. P. 33, 34, and 36 Defendant William Francis ("Defendant") hereby serves his Second Set of Discovery Requests on Plaintiff Adam Ferrari ("Plaintiff"), the responses to which shall be served not later than the 30th day after the date of service of these Requests. **Responsive documents should be produced electronically and concurrently with written Responses.**

1

APP0053

Respectfully submitted,

By: _/s/ Charlene C. Koonce_____
    Cortney C. Thomas
     Texas Bar No. 24075153
     cort@brownfoxlaw.com
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Andrew C. Debter
     Texas Bar No. 24133954
     andrew@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Defendant William Francis*

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 29, 2024 the foregoing document was served electronically on counsel of record for Plaintiff.

*/s/ Charlene C. Koonce*_____
Charlene C. Koonce

APP0054

## DEFINITIONS

1.     "Defendant" or "Francis" means William Francis.

2.     "Incline" means Incline Energy Partners, L.P.

3.     "You" or "Ferrari" means Plaintiff Adam D. Ferrari

4.     "Asset" has the broadest possible meaning and encompasses any legal or equitable interest in, right to, or claim to, any real or personal property, whether individually or jointly, directly or indirectly controlled, and wherever located, including but not limited to: chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds mail or other deliveries, inventory, checks, notes, accounts (including, but not limited to, bank accounts and accounts at other financial institutions), credits, receivables, lines of credit, contracts (including spot, futures, options, or swaps contracts), insurance policies, and all funds, wherever located, whether in the United States or outside the United States.

5.     "Affiliate" means any person or entity (a) in which you hold or have held any ownership interest, directly or indirectly; (b) was created to provide support or assistance to you in your operations or fundraising; (c) is operated or controlled by you, Lion of Judah Capital, LLC, Lion of Judah, LLC, or Phoenix Capital Holdings Group, LLC.

6.     "Complaint" means your operative pleading in this Lawsuit.

7.     "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise), including, without limitation, written, oral, or electronic transmissions (including, but not limited to, electronic mail, texts, social media messaging, WhatsApp messaging, Signal Messaging, etc.).

8.     "Cortland" means Cortland Credit Corporation or any related or affiliated entity that provided a loan to Phoenix on or about October 28, 2021.

9.     "Document(s)" or "Information" means all materials within the scope of the Texas Rules of Civil Procedure, including, without limitation, all writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations, including electronically-stored information ("ESI"), that are stored in any medium whatsoever from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, as well as any tangible things. A draft or non-identical copy of a document is a separate document within the meaning of this term. A document includes all appendices, schedules, exhibits, and other attachments. The term "Document(s)" or "Information" includes but is not limited to emails and other types of messages (including but not limited to text, instant, and direct messages), social media or other online content, data generated and stored by devices connected to the Internet of Things ("IoT"), communications generated and stored in workplace collaboration tools or ephemeral messaging applications, and all associated data and metadata.

10.     "FIBT" means First International Bank & Trust.

11.     The terms "identify" and to give the "identity of," when used in connection with a natural person, shall mean to state:

    a.     his or her full name;

    b.     present or last known residence address;

    c.     present or last known business address;

    d.     present or last known residence phone number;

    e.     present or last known business phone number; and

    f.     his or her occupation, including his or her title or position held, if any.

12.    The terms "identify" and to give the "identity of" shall mean, in connection with an organization or corporation, to state:

    a.     its name;

    b.     its place of incorporation (if a corporation);

    c.     its principal place of business;

    d.     its phone number; and

    e.     any names by which it was formerly known.

13.    The "Lawsuit" means *Adam Ferrari v. William Francis*, No. 3:23-CV-455 in the United States District Court for the Northern District of Texas.

14.    "Person" means any natural person, corporation, firm, association, partnership, joint venture, proprietorship, governmental body, or any other organization, business, or legal entity, and all predecessors or successors in interest.

15.    "Phoenix" means Phoenix Capital Group Holdings, LLC, its subsidiaries, divisions, predecessor and successor companies, affiliates, parents, and member(s), and each of its or their past and present employees, managers, agents, officers, directors, representatives, consultants, accountants, and attorneys.

16.    "Relate," "related," or "relating" means, in addition to their usual and customary meanings, concerning, referring to, reflecting, regarding, pertaining to, addressing, discussing, alluding to, describing, evidencing, constituting, or otherwise having any logical or factual connection with, directly or indirectly, expressly or implicitly, the subject matter of the specific request.

17.    The words "and" and "or" shall be construed disjunctively or conjunctively to bring within the scope of each interrogatory all responses which otherwise might be construed to be outside the scope of an interrogatory.

18.    The word "any" shall be construed to include "all" and vice versa.

19.    The word "each" shall be construed to include "every" and vice versa.

APP0056

20.     "You" or "Your" means the person or entity to whom these Requests are directed **and includes any entity in which he/she/it holds any ownership interest directly or indirectly, as well as its agents, representatives, or anyone authorized or purportedly authorized to act on their behalf**.  This definition DOES NOT INCLUDE ATTORNEYS.

21.     Any word in the singular form shall also be construed as plural and vice versa.

22.     The masculine form shall also be construed to include the feminine and vice versa.

23.     If You do not have documents that are responsive to a certain Request, indicate this in Your response.

24.     Any capitalized term not specifically defined above shall have the same meaning as in the parties' pleadings and motions.

25.     Any undefined term that you contend is ambiguous or of uncertain meaning shall have the ordinary and customary meaning as provided by dictionaries, including Merriam-Webster or Black's Law Dictionary.

26.     These definitions and instructions do not limit Your obligations under the Federal Rules of Civil Procedure.

## <u>INSTRUCTIONS</u>

1.     If any document which otherwise falls within the scope of this Request is not produced by you, list the document(s) not produced and, for each such document, state:

- the reasons for withholding each such document;
- the identity of the author(s) or preparer(s) of each such document;
- the identity of the sender(s) of each such document;
- the identity(ies) of the person(s) to whom the original and any copies of each such document were sent;
- a brief description of the nature and subject matter of each such document;
- the date of each such document; and
- the present location of each such document and the name, telephone number, and address of the current custodian.

2.     Produce the documents described below as they are kept in the usual course of business or organized and labeled to correspond with the categories of this Request.

3.     To the extent that any or all computer programs or other documents are available only on disks, drums, central computer memory, or other storage means which can be physically attached to a computer, such computer programs and other documents are required to be produced either in printed or machine-readable form.

4.     Whenever a requested document or group of documents is kept or found in a file, produce the document or documents along with the file in which they are contained.  Whenever a requested document or file or group of documents or files are kept or are found in a file drawer, file

box or other place, before the same is produced, attach thereto a copy of the label, number or title of the file drawer, file box or other place from which the document or file was found or removed.

5.      No communication, document or file requested should be altered, changed or modified in any respect.  No communication, document or file requested should be disposed of or destroyed. You should take appropriate steps to protect all communications, documents and files from being misplaced or destroyed pursuant to any record retention or destruction policy or otherwise.

6.      These Requests seek answers current to the date of response, and further shall be deemed to be continuing under the Federal Rules of Civil Procedure so that any additional information relating in any way to these Requests which you acquire or which becomes known to you up to and including the time of trial shall be furnished promptly after such information is acquired or becomes known.

7.      If documents or information are withheld under a claim of privilege, identify the document or information, its date, author(s), immediate recipient(s), the general subject matter of the document, and the basis upon which the asserted privilege is claimed.

8.      Documents produced pursuant to these requests should be tendered in the manner that they are kept in the usual course of business or should be organized and labeled to correspond with the categories that follow in these requests.

9.      If you do not have documents that are responsive to a certain Request, you are instructed to indicate this is the case in your response.

10.     Unless stated otherwise, the time frame for all Requests is April 19, 2019 through the present.

## <u>REQUEST FOR PRODUCTION OF DOCUMENTS</u>

57.     All documents received in response to any subpoena served in connection with this Lawsuit.

**RESPONSE**:

58.     All documents received in response to any subpoena served in connection with Civil Action No. 2023CH000113, in the 12th Judicial Circuit Court, Illinois (the "Illinois Discovery Proceeding").

**RESPONSE:**

59.     All communications with any person or entity, including their counsel, regarding any subpoena you have served in this Lawsuit or any subpoena served in the Illinois Discovery Proceeding.

**RESPONSE**:

60.     All documents evidencing any membership interest you now hold or have ever held in Alpha and Omega Capital, LLC.

**APP0058**

**RESPONSE**:

61.     All documents evidencing, referring or relating to any ownership interest, beneficial, equitable or otherwise, that you now hold or have ever held in Alpha and Omega Capital, LLC.

62.     All communications that evidence, refer, or relate to your receipt and discovery of the letter attached to Ferrari's Complaint as Exhibit H (the "4 GRLZ Statement"), a copy of which is also attached to these requests as **Exh. 1**.

**RESPONSE**:

63.     Any document that was attached to the 4 GRLZ Statement, including but not limited to the Affidavit of Non-Payment from a Colorado mineral owner recorded in Weld County, as referenced in the Statement.

**RESPONSE**:

64.     All communications regarding any statement allegedly made to FINRA by Francis, as described in Ferrari's Amended Complaint at ¶ 32.

**RESPONSE**:

65.     PDF    screenshots    of    all    pages    of    the    website    located    at https://www.ferrarienergythetruth.com/.

**RESPONSE**:

66.     All documents and communications relied upon to create the content on the website located at https://www.ferrarienergythetruth.com/.

**RESPONSE**:

67.     All documents and communications related to the creation, management, editing, or promotion or search optimization for the website located at https://www.ferrarienergythetruth.com/, including but not limited to emails, memos, notes, contracts, and any other forms of communication.

**RESPONSE**:


## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 35:**     Admit you hold a membership interest in Alpha and Omega Capital, LLC.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 36:**     Admit that on September 15, 2021 you held a membership interest in Alpha and Omega Capital, LLC.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 37:**   Admit that you communicated with the drafters of Phoenix's Operating Agreement about its contents before it was created.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 38:**   Admit that you communicated with the drafters of Lion of Judah Capital, LLC's Operating Agreement about its contents before it was created.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 39:**   Admit that you communicated with the drafters of Lion of Judah, LLC's Operating Agreement about its contents before it was created.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 40:**   Admit that you communicated with the drafters of Alpha and Omega Capital, LLC's Operating Agreement about its contents before it was created.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 41:**   Admit that you communicated with the drafters of Phoenix's Operating Agreement about its contents during the drafting process.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 42:**   Admit that you communicated with the drafters of Lion of Judah Capital, LLC's Operating Agreement about its contents during the drafting process.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 43:**   Admit that you communicated with the drafters of Lion of Judah, LLC's Operating Agreement about its contents during the drafting process.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 44:**   Admit that you communicated with the drafters of Alpha and Omega Capital, LLC's Operating Agreement about its contents during the drafting process.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 45:**   Admit that you control the website located at **https://www.ferrarienergythetruth.com/.**

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 46:**   Admit that you commissioned the creation of the website located at **https://www.ferrarienergythetruth.com/.**

**RESPONSE:**

**APP0060**

**REQUEST FOR ADMISSION NO. 47:**     Admit that prior to prior to April 1, 2023, you sent emails offering employment with Phoenix to one or more persons.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 48:**     Admit that prior to April 1, 2023 you interviewed with one or more candidates seeking employment with Phoenix.

**RESPONSE:**

## INTERROGATORIES

**INTERROGATORY NO. 7:** State the earliest date on which you acquired knowledge of the alleged statement made to FINRA as described in your Amended Complaint at ¶ 32 (the "FINRA Statement").  Include the identity each person or entity from whom you learned about the FINRA Statement; whether the communication you received about the FINRA Statement was in writing or oral; and all persons who participated in such communication.

**ANSWER:**

**INTERROGATORY NO. 8:** State the earliest date that you sent an email from AF@phxcapitalgroup.com.

**ANSWER:**

9                                                                                    **APP0061**

# EXHIBIT 5

APP0062

Andrew R. Gray
Direct Dial: 714.755.8017
andrew.gray@lw.com

650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Tel: +1.714.540.1235  Fax: +1.714.755.8190
www.lw.com

## LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

July 22, 2024

**VIA EMAIL**

Charlene Koonce
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225

Re:     _Adam Ferrari v. William Francis_, No. 3:23-cv-0045 5-S, In the United States
        District Court for the Northern District of Texas, Dallas Division

Dear Ms. Koonce:

        We write to address the numerous deficiencies in the responses and objections served by
Defendant William Francis January 22, 2024, April 8, 2024, and June 10, 2024 in the above-
referenced matter (the "Litigation").[1]  As discussed below, Plaintiff is concerned by Defendant's
violation of the Federal Rules, which appears to be negligent at best—and at worst, intentional.

## I.     FALSE / MISLEADING DISCOVERY RESPONSES

        We notified you on June 7, 2024 of certain of Defendant's written discovery responses
that have been revealed by third-party discovery to be false and/or misleading.  Specifically, we
alerted you to the fact that the documents produced by FindIt, Inc. show that (a) Defendant
corresponded by email with Mr. Tosto in at least April 2018 and June 2021; (b) Defendant knew
Mr. Tosto was associated with FindIt since his receipt of those communications; and
(c) Defendant personally directed the payment of $7,500 to FindIt in June 2021 to pay for an
"Online AF Campaign," comprised of, at least, FindIt's creation of two websites dedicated to
disparaging and defaming Mr. Ferrari (including the adamferrarioilandgaslawsuits.com website)
and SEO efforts related to Mr. Ferrari, his businesses, and those sites.  _See_ J. Ji June 6, 2024
Email.  While Defendant served amended responses on June 10, 2024 after we notified you of
these defects, we were surprised to see that even these amended responses are demonstrably

---

[1] This correspondence addresses Defendant's responses and objections to: (i) Plaintiff's First
Requests for Admission ("RFAs"); (ii) Second RFAs; (iii) Third RFAs; (iv) First Interrogatories;
(v) Second Interrogatories; (vi) First Requests for Production ("RFPs" or "Requests");
(vii) Second Requests; (viii) Third Requests; and (viiii) Fourth Requests (collectively, the
"Responses").

**APP0063**

LATHAM&WATKINS LLP

false, which suggests that Defendant may be failing to meet his discovery obligations in serving false and/or misleading discovery responses.

For example, Interrogatory No. 2 asked Defendant to identify *all persons* with roles in creating the lawsuitoilandgas.com and adamferrarioilandgaslawsuits.com websites, and to specify what role each person had. The FindIt documents we shared with you plainly show that Defendant worked directly with—and directed Incline to pay—Mr. Tosto to create and maintain those websites. Yet Defendant's amended response asserts relevance and burden objections, and still attempts to disclaim his own involvement in the creation of those websites. Indeed, in response to this interrogatory, Defendant refers to Interrogatory Nos. 10 and 11, and FINDIT_0000029-34 and 00000441 as part of this amended Response, to which he states that "***Tosto solicited assistance*** [from Defendant] … in providing content for a new website ***Tosto wanted to publish***, 'adamferrarioilandgaslawsuits.com.'" Defendant further claims he provided only "publicly available" content—to Mr. Tosto "[o]n behalf of Incline," and that "***Incline issued the 'donation' requested by Tosto***.'" *Id.*

The idea that Mr. Tosto—who is unaffiliated with Plaintiff or Phoenix—was driving the train and asking for the very same information that Defendant has been peddling about Plaintiff for years defies belief. Also, Defendant's claim that the $7,500 payment was merely a "donation" is similarly incredible. The evidence produced by FindIt (and shared with Defendant) shows that none of this is true. One document shows Mr. Tosto writing: "Hello William, Wire Instructions for Online Campaign […] 2 Sites built out Featuring Content regarding Subject [including] Lists of possible violations. Using the word possible on purpose. We can proceed today. Let me know." FINDIT_00000019. At the very least, this (1) shows that this "Campaign" was conditioned on payment from Defendant, and (2) suggests that these two conspired to use the word "***possible on purpose***" because their conduct was unlawful.

Additionally, on July 2, 2021, Defendant eagerly follows up with Tosto, regarding the "Online AF Campaign. *See* FINDIT_00000028 (Defendant asking Tosto, "Any update here?"). In response, Mr. Tosto reports that he has uploaded most of the content "to the 2 sites" and that they "are SEOing the pages so things are getting indexed." FINDIT_00000029. After reviewing Tosto's work, Defendant writes: "Peter, In hind sight [*sic*], I should have sent 1/2 of the ***payment*** up front and the other 1/2 upon completion. ***Pretty disappointed*** in what's been put here, regardless of the indexing and I don't believe there was ever ***the blog post that was promised***. The websites are basically the same exact sites that don't have ***any coherent narrative or purpose other than data dumps***." *Id.* This correspondence further confirms that (1) Defendant paid, not donated, $7,500 for the "Online AF Campaign"; and (2) Defendant tasked Mr. Tosto with creating blogs and other content ***beyond*** the content that was publicly available—*i.e.*, a "narrative" against Plaintiff that goes beyond the "data" that was publicly available.

Evidence from FindIt and Duchossois also contradicts Defendant's response to Interrogatory No. 11, which states that "the purpose, target, and goal of these instructions was to provide ***true and correct*** information about Ferrari and the companies he founded and/or controlled, to persons and entities engaged in the oil and gas market who interact with Ferrari, directly or indirectly." As noted above, Defendant asked for a "blog post" and a "narrative" beyond just the "data." And when Mr. Francis was made aware that Mr. Ferrari had agreed to a

APP0064

LATHAM&WATKINSLLP

deferred judgment that would not result in a conviction, Mr. Francis exhibited a complete disregard for the truth, stating "his guilty plea and mugshot being splashed across the internet is enough for me." D0000166.

Similarly, in his amended Response to Request for Admission ("RFA") No. 15, Defendant states that he did not recall Mr. Tosto's "affiliation with Findit" until he received discovery from Mr. Ferrari in the "Illinois Action." The documents again show this qualification likely is false, as Defendant directed payment to FindIt in June 2021, and corresponded with Mr. Tosto at his "peter@findit.com" email address (with a large FindIt color logo in his signature block) in at least April 2018 and June 2021. Although June 2021 was three years ago, it would be difficult to forget someone you corresponded with for three years (between 2018 and 2021)—particularly when that person (Mr. Tosto) is a notorious convicted fraudster. *See* Dkt. 83 at 4.

Defendant's amended Response to RFA No. 76 is also false, as he continues to deny that he "contracted for the creation of adamferrarioilandgaslawsuits.com," citing instead his response to Interrogatory No. 10. As noted above, the documents show that Defendant made a payment of $7,500 in part for the creation of this website (and later regretted not paying half up front and half later because he was unsatisfied with the work product he commissioned), so Defendant's response should be further amended to Admit, rather than Deny, RFA No. 76. Defendant should similarly amend his responses to RFA No. 71 (which asks Defendant to admit that he "contracted for the creation of lawsuitsoilandgas.com") and RFA No. 72 (which similarly asks the same for "adamferrarioilandgaslawsuits.com"), both of which are also demonstrably false.

While all of these responses are troubling, the fact that Defendant's amended responses continue to contradict the evidence we have shared and flagged is bordering on sanctionable conduct. *See Bldg. Four Shady Oaks Mgmt. LP v. Fed. Deposit Ins. Co.*, 2011 WL 13229001, at *2 (N.D. Tex. June 10, 2011) (imposing discovery violations for abuse of discovery). We demand that Defendant amend all of his discovery responses relating to FindIt to be truthful; if any falsehoods remain by August 5, 2024, we will initiate the Joint Report process for a motion to compel and also seek sanctions.

## II.   IMPROPER OBJECTIONS / INCOMPLETE PRODUCTIONS

### A.   Requests for Production

Defendant's Responses to the RFPs are facially improper, incomplete, and deficient—particularly in light of what has been revealed through other third-party discovery. As noted above, FindIt's document productions have uncovered the false and misleading discovery responses that Defendant served in this action. We also learned from EnergyNet's and Duchossois' productions that the scope of Defendant's defamatory statements extends broadly—including to premier investors, like Perot and Duchossois. *See* Dkt. 105, at APP0012–0013 (email from the Head of Private Investing at Perot telling EnergyNet that Defendant says Plaintiff is a "bad actor," a "bad guy," and "a crook"). Given the damning evidence we have already uncovered from third parties dating back to as early as 2017, *see infra* at 6 (noting Defendant's plan to "Fuck Ferrari"), there is presumably a trove of similar documents that are responsive to Plaintiff's RFPs within Defendant's

APP0065

LATHAM&WATKINS LLP

possession, custody, or control.  While Defendant's discovery defects are numerous, we address certain egregious violations below.

*First*, Defendant improperly objects to the production of plainly relevant documents.

For example, Defendant provides a wholly deficient response to RFP No. 13, which requests "[a]ny and all documents evidencing Adam Ferrari has been convicted of a felony."  Such documents are central to Plaintiff's claims, *see* Complaint ¶¶ 18, 25–26, 32—yet, in response, Defendant merely cites to this case docket and "briefing in the State Case."  If Defendant is taking the position that the "documents filed at Dkt. 9, 10, 14, and the Memorandum Order at Dkt. 31" and "arguments raised in Dkt. 6, 9 and in briefing in the State Case" comprise the full universe of documents that Defendant is aware of "evidencing Adam Ferrari has been convicted of a felony," please confirm that position.  Otherwise, Defendant's response is incomplete, deficient, and must be amended to include all other responsive documents in his possession, custody, or control.

Defendant's objections to RFP No. 19, which seeks documents and communications related to "Hess's division order department," are also improper.   To start, Defendant objects to this Request as "Not Relevant," but third-party discovery produced by FindIt has revealed correspondences in which Defendant states that he wrote "anonymously" to Hess Corporation, leveling false claims against Plaintiff.  *See* APP0023–26.  Defendant has thus confirmed that documents responsive to this Request exist, so please withdraw the relevance objection.  Further, while Defendant also objects to this Request as "Not Proportional," this Request is narrowly limited to documents and communications "that EVIDENCE, REFER, REFLECT, or RELATE to YOUR COMMUNICATION to "Hess' division order department" as described in FINDIT_00000029 at -0031-34, including the COMMUNICATION itself and any exhibits attached thereto."  Presumably, Defendant can readily identify responsive documents that are tethered or related to that particular communication **he had** with **one division at Hess**.  If Defendant will stand on these objections, he must state whether any responsive materials are being withheld on the basis of that objection, *see* Fed. R. Civ. P. 34(b)(2)(C), and must also articulate the undue burden that would be imposed in searching for this limited set of documents—*e.g.*, the hit counts yielded for the searches Defendant ran for this RFP.  *Murray v. LeBlanc*, No. CV 21-592-JWD-RLB, 2023 WL 2028927, at *4 (M.D. La. Feb. 15, 2023) ("A producing party generally has an obligation to … **to provide the requesting party with the names of custodians whose ESI was searched, date ranges for the searches, and any search terms applied**.") (emphasis added).

Defendant also improperly refuses to produce any documents responsive to RFP No. 22, which seeks "All DOCUMENTS regarding any payments or wire transfers to FINDIT."  As explained in Plaintiff's Memorandum in Response to Notice of Deficiency on Subject Matter Jurisdiction filed on May 17, 2024 (Dkt. 83) (the "SMJ Memorandum"), documents relating to Defendant's "affiliation with FindIt" has taken center stage in this action.  *See* SMJ Memorandum at 6.  While Plaintiff was able to obtain key evidence from his subpoena to FindIt—*e.g.*, evidence of Defendant's payments to Mr. Tosto for his part in the "Online [Adam Ferrari] campaign," *see, e.g.,* Dkt. 84, at APP0020-27, APP0031—Mr. Tosto (who was in charge of FindIt's relationship with Defendant) is now deceased, so Defendant's emails are now the best source for the complete set of such communications. *See* FINDIT_00000031.

APP0066

LATHAM&WATKINS<sup>LLP</sup>

If Defendant does not withdraw his relevance objections to RFP Nos. 13, 19, and 22, we will move to compel. Please provide amended responses—or your availability to meet and confer.

*Second*, regarding RFP Nos. 1 and 8–11, it is unclear as to whether Defendant is standing on his objections—or if he has agreed to produce certain documents responsive to those Requests since no responsive documents have been produced to date. These responses are also ambiguous as to what Defendant agrees to produce. RFP No. 1 seeks "[a]ny and all communications" between Defendant and a list of relevant individuals and entities, while RFP No. 8 seeks "[a]ny and all communications related to out-bidding Adam Ferrari in any mineral acquisition deal." Similarly, RFP Nos. 10 and 11 seek "[a]ny and all documents evidencing Your opinion of Adam Ferrari," and drafts of the same. For all four Requests, Defendant only agrees to search for documents for the four email accounts he claims to have "access to," with no assurance that he did not have access to additional accounts during the Relevant Time Period such as, for example, accounts used for text messaging or direct messaging on any other platform. If there are other potential sources of responsive information that have not been included in Defendant's searches (either based on any objections or because Defendant no longer has access), we request to meet and confer to discuss Defendant's reasoning for omitting them. As the managing partner of Incline, we presume that Defendant is not taking the untenable position that he does not have custody, possession, or control for his @inclinelp.com address or text messages, but let us know if we will need to move to compel on that ground.

Similarly, RFP No. 9 seeks "[a]ny and all documents evidencing that Adam Ferrari was the CEO of Phoenix Capital Group and/or directly organized Phoenix Capital Group." In response, Defendant states that he is "unable to fully comply while Ferrari and Phoenix continue to withhold documents requested by Francis in discovery, or preclude discovery sought from third-parties." This answer violates the Federal Rules, which require Defendant to "state whether any responsive materials are being withheld" and explain "the basis of that objection." Fed. R. Civ. P. 34(b)(2)(C). Moreover, this response violates this Court's Order Regarding Non-Dispositive Motions that a "party cannot refuse to comply with another party's discovery requests because the responding party believes that another party has not complied with discovery requests that have been served on them." Dkt. 75 at 11. And again, Defendant only agrees to search for documents for the four email accounts he claims to have "access to." Defendant must promptly confirm he: (i) did not use any other email accounts; and (ii) will produce all documents responsive to these Requests or provide a procedurally proper objection.

*Third*, in response to RFP Nos. 6 and 17–18, Defendant claims that "no responsive documents" exist, but has not confirmed that he took reasonable efforts to identify and collect documents response to these Requests. These Requests are seek only communications with criminal@gmail.com, Deanpowers123@gmail.com, Khanawais5424@gmail.com, among others, which are ***known or suspected aliases*** of Defendant and/or his cohorts. These Requests therefore go to the heart of the Litigation because they implicate Defendant's concerted efforts with others to defame Plaintiff. *See* Complaint ¶¶ 32-33. Again, Defendant must state whether any responsive materials are being withheld on the basis of any objection, *see* Fed. R. Civ. P. 34(b)(2)(C), and must also articulate the undue burden that would be imposed in searching for this limited set of documents—*e.g.*, the hit counts yielded for the searches Defendant ran for this RFP. *Murray*, 2023

LATHAM&WATKINSLLP

WL 2028927, at *4 (explaining that a producing party generally has an obligation to provide the requesting party with an explanation of the custodians, terms, and date ranges searched).

*Finally*, we note that certain of Defendant's Responses remain incomplete because he has not yet produced the documents he agreed to produce. *See* RFP Nos. 2–3 (lawsuitsoilandgas.com); No. 4 (adamferrarioilandgaslawsuits.com); No. 7 (concernedbakkenmineralowner@gmail.com); No. 14 (insurance policies); Nos. 20–21 (the Online AF Campaign). Defendant has produced only documents relating to Defendant's litigation insurance policies—which appear to be responsive only to RFP No. 14. Please confirm Defendant will produce documents responsive to <u>RFP Nos. 2–3, 4, 7, and 20–21</u>, and that he will supplement his production for <u>RFP No. 14</u> (if necessary).

### B.   <u>Interrogatory No. 9</u>

Defendant's Response to <u>Interrogatory No. 9</u> fails to provide a full and complete answer, as required under the Federal Rules. Interrogatory No. 9 asks Defendant to "IDENTIFY the date on which [he] COMMUNICATED to "Hess's division order department" . . . the person or entity to whom [he] directed such COMMUNICATION, the name or pseudonym under which [he] sent such COMMUNICATION, the manner of COMMUNICATION, and describe the contents of the COMMUNICATION." In other words, this interrogatory seeks a description of the surrounding circumstances for a single communication that Defendant confirmed that he had. *See supra* at 4.

In response, Defendant claims that his "communication to Hess has no connection to the four allegedly defamatory statements alleged in the Amended Complaint, and because the limitations has long since run on any claim related to or based on the statement." Subject to those objections, Plaintiff cites only Exhibit F to the Complaint pursuant to Federal Rule Civil Procedure 33(d). As explained above, however, Defendant's communications with Hess are relevant to Plaintiff's claims, so Defendant's relevance objection fails. *See also* Complaint ¶¶ 19–20. Plaintiff is entitled to discovery of this relevant information, as well as any documents and materials that may lead to other relevant information. Further, Defendant's objection regarding the statute of limitations contradicts the case law of this circuit, *see infra* Section III (Relevant Time Period), so that objection also fails. In light of the evidence that Plaintiff has already uncovered—which shows that Defendant had "written anonymously to Hess' division order department" regarding the defamatory statements and conduct at issue in this litigation, *see* FINDIT_00000029 at -0031-34—Defendant's reference to *one exhibit* of *Plaintiff's Complaint* pursuant to Rule 33(d) is not a proper use of that Rule. If Defendant does not agree to amend this response with a reasonable answer, we request to meet and confer so that we can file a motion to compel.

### III.   RELEVANT TIME PERIOD

Plaintiff's Requests define the Relevant Time Period as January 1, 2016 through the present, which is narrowly-tailored to the claims alleged in the Litigation. *See e.g.*, November 8, 2023 First Requests for Production, at 1. Defendant objects, however, arguing that "no basis exists to extend relevance," and responds using only a narrow "Relevant Time Period" limited to February 1, 2020 through February 1, 2023. *See, e.g.*, April 8, 2024 Responses to First Set of Requests at 2. On its face, Defendant's boilerplate objection is improper. *See Ferguson v. Sw. Reg'l PCR, LLC*, 2023 WL 4938091, at *3 (N.D. Tex. June 22, 2023) ("General or boilerplate

**APP0068**

June 23, 2024
Page 7

LATHAM & WATKINS LLP

objections are invalid, [] objections to discovery must be made with specificity, and the responding party has the obligation to explain and support its objections"); *Zenith Ins. Co. v. Tex. Inst. for Surgery, L.L.P.*, 328 F.R.D. 153, 161 (N.D. Tex. 2018) ("an objecting party must urge and argue in support of its objection to an interrogatory or request [for production], and, if it does not, it waives the objection.").

Further, even if Defendant had asserted this temporal objection with specificity, there is no basis for it.  Plaintiff's First Amended Complaint (the "Complaint") and subsequent filings include particularized allegations and evidence that date back to March 8, 2017, when Defendant's enlisted co-conspirator responded to Defendant saying "[t]hanks Will for the info (We love this shit)" and instructed another individual to "make the call and Fuck Ferrari."  *See* Complaint ¶¶ 9–10; Dkt. 83 at 4; Dkt. 84 at APP0013.  Plaintiff is entitled to seek discovery dating back approximately one year from this 2017 attempt by Defendant to "Fuck Ferrari"— particularly where, as here, other third-party discovery has revealed Defendant's efforts to cover his tracks.  Defendant's position that zero discovery is permitted outside of the statutory limitations period is untenable.  *See Doss v. City of Kerrville*, 2012 WL 13029588 (W.D. Tex. 2012) (noting that "limiting the discovery period to the limitations period is too restrictive"); *Alvarez v. Aldi (Texas) LLC*, 2014 WL 3624929, at *4 (N.D. Tex. July 22, 2014) (noting relevance of information outside the limitations period).

If Defendant withholds any responsive documents based on his unilateral interpretation of the Relevant Time Period, he must state whether any responsive materials are being withheld on that basis for any and all of Plaintiff's Requests.  *See* Fed. R. Civ. P. 34(b)(2)(C).

## IV.    REQUEST TO MEET AND CONFER

If Defendant refuses to comply with any of the requests above, please let us know by August 5, 2024 so that we can initiate the Joint Report process for our motion(s) to compel.

Plaintiff reserves all rights.

Very truly yours,

Andrew R. Gray
of LATHAM & WATKINS LLP

**APP0069**

# EXHIBIT 6

**APP0070**

| From: | Charlene Koonce |
|---|---|
| To: | Hamilton, Kevin (OC); Andrew Debter; Paulette Miniter; Shannon Latham; Cort Thomas; Ranae Ladieu |
| | Ryan, Jake (SD); Gray, Andrew (OC); Long, Garrett (CH); Troutman, David (OC); Ji, Josh (OC); Jai, Kehaulani |
| | (OC) |
| Subject: | RE: Adam Ferrari v. William Francis | 3:23-cv-455 |
| Date: | Monday, July 15, 2024 9:32:03 AM |
| Attachments: | image001.png |

All- following up on the request sent Friday (below).  Please let us know if you are available **for a call today**, to comply with the Court's Jt Report process regarding Defendant's motion for protective order with respect to the notice for Defendant's deposition. Again, we intend to file our motion no later than the close of business on Thursday to comply with ¶ 4 of the Amended Scheduling Order. If you are not available for a call today, please let me know that as well and we will proceed with our motion as Dkt. 75 permits, unless Plaintiff agrees to voluntarily withdraw the deposition notice.

In this regard, we are not unilaterally staying discovery.  We are asking the Court to stay this case based on Plaintiff and PHX's serial lawsuits and res judicata that will arise when a final judgment in the State Case is issued.  We are also objecting to presenting Mr. Francis for a deposition (1) while our motion to stay is pending; (2) while Plaintiff has improperly designated a very high percentage of third-party documents "AEO" and refuses to remove those designations; (3) while Plaintiff continues to withhold all responsive documents; and (4)while  the third-parties controlled by Mr. Ferrari (PHX, Lion of Judah, Alpha & Omega, and Gust) and represented by the same counsel as Plaintiff, withhold virtually all responsive documents.

Thanks,



---

**From:** Charlene Koonce
**Sent:** Friday, July 12, 2024 5:45 PM
**To:** Kevin.Hamilton@lw.com; Andrew Debter <andrew@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>; Shannon Latham <Shannon@brownfoxlaw.com>; Cort Thomas <cort@brownfoxlaw.com>
**Cc:** Jake.Ryan@lw.com; Andrew.Gray@lw.com; Garrett.Long@lw.com; David.Troutman@lw.com; Josh.Ji@lw.com; Kehaulani.Jai@lw.com
**Subject:** RE: Adam Ferrari v. William Francis | 3:23-cv-455

All – please let us know your availability for a Jt Conference on Defendant's motion for protective order regarding this notice.  Please be advised that we intend to file within 5 business days so as to comply with ¶ 4 of the Amended Scheduling Order.



**APP0071**

**From:** Kevin.Hamilton@lw.com <Kevin.Hamilton@lw.com>
**Sent:** Friday, July 12, 2024 5:36 PM
**To:** Charlene Koonce <charlene@brownfoxlaw.com>; Andrew Debter <andrew@brownfoxlaw.com>;
Paulette Miniter <paulette@brownfoxlaw.com>; Shannon Latham <shannon@brownfoxlaw.com>;
Cort Thomas <cort@brownfoxlaw.com>
**Cc:** Jake.Ryan@lw.com; Andrew.Gray@lw.com; Garrett.Long@lw.com; David.Troutman@lw.com;
Josh.Ji@lw.com; Kehaulani.Jai@lw.com
**Subject:** Adam Ferrari v. William Francis | 3:23-cv-455

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

Counsel,

Attached please find a service copy of the following document:

- Plaintiff's Amended Notice of Deposition of Defendant William Francis

**Kevin Hamilton**

**LATHAM & WATKINS LLP**
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626-1925
Direct Dial: +1.714.755.8086
Email: kevin.hamilton@lw.com
https://www.lw.com

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

**APP0072**

# EXHIBIT 7

APP0073

## Fwd: Online AF Campaign

Clark St Amant <clark@findit.com>
Wed 3/23/2022 2:38 PM
To:Ray Firth <rwf@findit.com>

Sent from my iPhone

Begin forwarded message:

> **From:** William Francis <william@inclinelp.com>
> **Date:** March 23, 2022 at 2:25:47 PM EDT
> **To:** Peter Tosto <peter@findit.com>
> **Subject: Fwd: Online AF Campaign**

We need an invoice for our auditors, if you could provide that at your earliest convenience.

**William Francis**
Managing Partner
Incline Energy Partners, LP
(214) 274-3800
https://inclinelp.com/

---------- Forwarded message ---------
From: **Matt Cashion** <matt@inclinelp.com>
Date: Wed, Mar 23, 2022 at 1:16 PM
Subject: Re: Online AF Campaign
To: William Francis <william@inclinelp.com>

Need a copy of the invoice.  Auditors have inquired.

Matt Cashion

Vice President - Controller

Incline Energy Partners LP
817-984-3545

**APP0074**

Case 3:23-cv-00455-S-BN   Document 112   Filed 07/24/24   Page 79 of 152   PageID 2602

On Fri, Jun 18, 2021 at 2:51 PM William Francis <william@inclinelp.com> wrote:
Can we set up this wire for web services related to Incline Bakken Minerals, LLC?

Matt, I believe you're out, so I can confirm if Andy sets up.

**William Francis**
Managing Partner
Incline Energy Partners, LP
(214) 274-3800
https://inclinelp.com/

---------- Forwarded message ---------
From: **Peter Tosto** <peter@findit.com>
Date: Fri, Jun 18, 2021 at 11:11 AM
Subject: Online AF Campaign
To: william@inclinelp.com <william@inclinelp.com>

Hello William,

Wire Instructions for Online Campaign

Wells Fargo
Findit Inc.
ABA 061 000 227
Account 166 99 26154
$7,500.00

2 Sites built out Featuring Content regarding Subject
Blogs posted highlighting background and current names of entities
Lists of possible violations. Using the word possible on purpose.

We can proceed today.

Let me know.

Peter

**APP0075**

Firefox

https://outlook.office.com/mail/



**Peter Tosto**
peter@findit.com
**Office: 404-443-3224**
http://www.findit.com/petertosto

**APP0076**

# EXHIBIT 8

**APP0077**

## Re: Online AF Campaign

**William Francis** <william@inclinelp.com>
Fri 9/10/2021 8:04 AM
To:Peter Tosto <peter@findit.com>

📎 1 attachments (14 KB)
Outlook-1503524414.jpg;

Peter,

In hind sight, I should have sent 1/2 of the payment up front and the other 1/2 upon completion. Pretty disappointed in what's been put up here, regardless of the indexing and I don't believe there was ever the blog post that was promised.

The websites are basically the same exact sites that don't have any coherent narrative or purpose other than data dumps.

Can you please give me a call at some point to discuss.

Regards,

**William Francis**
Managing Partner
Incline Energy Partners, LP
(214) 274-3800
https://inclinelp.com/


On Fri, Jul 2, 2021 at 2:39 PM Peter Tosto <peter@findit.com> wrote:

Hi William,

We have been uploading content most of this week to the 2 sites. We are SEOing the pages so things are getting indexed.

Next week we will be looking to see anything else that may be out there and get some back links coming to both sites.

The sites are indexing in Bing pretty well. Bing tends to actually index faster than Google. The fact that it is indexing high is a good sign that it will do the same in Google.

Regards,

Peter

**APP0078**

FINDIT_00000029

1503524414746_finditnewlogo.jpg
**Peter Tosto**
**peter@findit.com**
**Office: 404-443-3224**
**http://www.findit.com/petertosto**

---

**From:** William Francis <william@inclinelp.com>
**Sent:** Friday, July 2, 2021 3:17 PM
**To:** Peter Tosto <peter@findit.com>
**Subject:** Re: Online AF Campaign

Any update here?

**William Francis**
Managing Partner
Incline Energy Partners, LP
(214) 274-3800
https://inclinelp.com/


On Mon, Jun 21, 2021 at 2:29 PM Peter Tosto <peter@findit.com> wrote:

Making progress. Have the 2 sites up. Going to be working on getting the
content posted, SEOd and indexing in search over the next 2 weeks.

We ought to have most of the content itself up by Thursday, after that we do
submissions to speed up the indexing.

Thanks,
Peter


1503524414746_finditnewlogo.jpg
**Peter Tosto**
**peter@findit.com**
**Office: 404-443-3224**
**http://www.findit.com/petertosto**

---

**From:** William Francis <william@inclinelp.com>
**Sent:** Friday, June 18, 2021 2:25 PM
**To:** Peter Tosto <peter@findit.com>
**Subject:** Re: Online AF Campaign

Here's what I got. Might have one or two more, but this should be most of it.


**William Francis**
Managing Partner
Incline Energy Partners, LP

**APP0079**

FINDIT_00000030

Case 3:23-cv-00455-S-BN    Document 112    Filed 07/24/24    Page 84 of 152    PageID 2607
(214) 274-3800

https://inclinelp.com/

On Fri, Jun 18, 2021 at 12:49 PM Peter Tosto <peter@findit.com> wrote:

## We are getting started. Thanks

🖼️1503524414746_finditnewlogo.jpg
**Peter Tosto**
**peter@findit.com**
**Office: 404-443-3224**
**http://www.findit.com/petertosto**

**From:** Peter Tosto <peter@findit.com>
**Sent:** Friday, June 18, 2021 1:30 PM
**To:** William Francis <william@inclinelp.com>
**Subject:** Re: Online AF Campaign

## Looking for old files. If you have them, please send. If not, I can grab everything that is out there on him and repurpose it.

🖼️1503524414746_finditnewlogo.jpg
**Peter Tosto**
**peter@findit.com**
**Office: 404-443-3224**
**http://www.findit.com/petertosto**

**From:** Peter Tosto <peter@findit.com>
**Sent:** Friday, June 18, 2021 12:56 PM
**To:** William Francis <william@inclinelp.com>
**Subject:** Re: Online AF Campaign

Will do.

Sent from Samsung Galaxy smartphone.
Get Outlook for Android

**From:** William Francis <william@inclinelp.com>
**Sent:** Friday, June 18, 2021 12:42:39 PM
**To:** Peter Tosto <peter@findit.com>
**Subject:** Re: Online AF Campaign

Should be able to get the wire out later today or Monday at the latest.

Below is what I'd written anonymously to Hess' division order department in which I feel like I explained the ghost company situation the best. I'd ask that you DO NOT include

**APP0080**

FINDIT_00000031

anything related to Hess or any specific mineral owner anywhere on what is published online.

*"To Whom It May Concern:*

*I was extremely disappointed to see, via backup (Ex1) that Phoenix Capital Group Holdings, LLC ("Phoenix") provided <u>through an auction at EnergyNet</u>, that Hess Corporation was essentially conducting pro bono due diligence for a mineral acquisition Phoenix was pursuing but had not closed on yet. It appears that Phoenix was utilizing Hess' labor and internal proprietary title databases to check ownership on a mineral owner on or before December 2, 2020, and would hold off on closing their acquisition until Hess blessed and signed off on title via an email on Friday December 4, 2020 at 7:05 AM. After obtaining Hess' due diligence on their mineral acquisition, Phoenix would then electronically file their Mineral and Royalty Deed shortly thereafter the same day at 2:56 PM (Ex2). Within 3 business days, on December 9, 2020 this interest would be setup to be auctioned on EnergyNet platform, with final bids due at 2:55 today.*

*Phoenix did this in a manner in which it appears to exploit the spread of prices that they knew existed between the price they got Ms. Western under agreement for and what buyers on EnergyNet would pay, while seemingly not taking on any pricing or title risk and certainly not informing Ms. Western of their intentions to start the process of having this interest put up for auction prior to even closing on her transaction. One could speculate with the facts at hand, and reviewing their PSA templates, that Phoenix went through this timeline in a manner in which the auction would close and they would have funds from that sales prior to even having tendered Ms. Western the closing price promised in their PSA. I've provided a copy of one of their proposed agreements (Ex3) which provides that Phoenix must take ownership of the asset prior to closing and that they don't have to close until 45 business days after they receive the executed PSA & Mineral Deed. As the mineral deed between Ms. Western and Phoenix was executed and notarized on December 1, 2020, if they negotiated their typical PSA, that would mean that Phoenix wouldn't need to even pay Ms. Western until January 31, 2021.*

*Hess providing ownership confirmation to its mineral owners in this type of transparent fashion should be applauded within our industry. However, that doesn't appear to be what happened and I think anyone reviewing this email would agree that providing this kind of proprietary data should not extend to mineral brokers who are trying to profit off risk free flipping of mineral owners property. **Further more and most disturbing, is the mineral broker being granted preferential treatment is owned, financed and managed by a convicted criminal named Adam Ferrari (Ex4 & Ex5)**. Mr. Ferrari was arrested in 2019 after he had cut off the signature and notary block of a mineral deed and cut and pasted it onto a backdated mineral deed into his company in order to defraud said mineral owner out of >$250k.*

*Phoenix obviously doesn't promote the fact that their CEO is Mr. Ferrari for obvious reasons, most importantly likely being that they're violating SEC laws which disallows any company to utilize EnergyNet's online marketplace if their owners or management have been convicted of crimes that "(ii) are based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct, issued within ten years;". As such, I'll address several points I feel prove beyond a reasonable doubt that Mr. Ferrari is behind Phoenix:*

*-Mr. Ferrari has a Phoenix email (Ex6) and is actively being listed in association with the company alongside the rest of their employees' contact information on 3rd party websites not associated with Phoenix.*

**APP0081**

Case 3:23-cv-00455-S-BN   Document 112   Filed 07/24/24   Page 86 of 152   PageID 2609

-I've never heard of a company that lists and actively promotes who their COO, CTO & CFO are, but omits who the CEO of the company is.

-First hand accounts from several of Phoenix's counterparties have specifically stated that their point of contact in working with Phoenix was Mr. Ferrari.

-Phoenix was incorporated in Delaware on 4/16/2019 (Ex7) two months after Ferrari was arrested and almost immediately after he was kicked out of his company by his board of directors shortly thereafter.

-Mr. Ferrari lists his address with the Colorado Secretary of State (Ex8) as being in Playa Vista, CA, which is adjacent to Phoenix offices in a city in which I don't think anyone can name another active mineral and royalty acquisition company.

-Phoenix's "founding member" (Ex9) alongside Mr. Ferrari, as well as Tom Kruk (Ex10), Sean Goodnight (Ex11) and Adam Josephson (Ex12) all worked for Mr. Ferrari prior to being let go alongside Mr. Ferrari in the purge that occurred after his arrest, and are all now gainfully employed at Phoenix under Mr. Ferrari's direction.

I mention all of this, as I don't believe it's widely known in the Bakken/Williston Basin community as to Mr. Ferrari's association with Phoenix or their wider employee base's lack luster track record in conducting themselves in an ethical manner. Also, I feel compelled to bring this particular incident to light so that Phoenix is not being assisted in promulgating the same business tactics that Mr. Ferrari utilized in order to exploit the mineral ownership community in Weld County Colorado starting in 2017 up until his arrest in 2019 while running Ferrari Energy/Wolfhawk Energy Holdings LLC.

In particular, Phoenix's predecessor entity's standard business practice in Weld County was to get someone under agreement in a manner in which the owner signed a PSA & Mineral Deed at the same time prior to closing. They would then file the mineral deed but hold off on paying or closing on that mineral owner until they had been able to sell the interest or the mineral owner started to complain. This ultimately led to Phoenix's predecessor entity getting sued 9 times within the span of just 9 months to a point that someone would set up a <u>website to document all of these misdeeds</u>. Phoenix's predecessor would ultimately not win a single one of these lawsuits, and be included in several more. In fact, over the span of just two years between September 2017 and 2019, Phoenix's predecessor would have to file 59 reconveyances (Ex13) to the counterparties they never paid, but had already filed a mineral deed of record in Weld County, with their misconduct and behavior being well documented in the local press (Ex14).

<u>Clearly I don't believe anyone at Hess or the organization in general has done anything wrong here, but were merely attempting to expedite your operations.</u> So, at the very least, I would encourage you and the rest of the operator community in the Bakken to stop providing Phoenix/Ferrari with proprietary information without having first obtained a filed copy of a mineral deed. Further, and I believe more importantly, I would also highly recommend that additional oversight be placed into whether or not Phoenix has actually tendered full payment to their mineral owners they're transacting with prior to formalizing any transfers they might be requesting and certainly before releasing any funds."

In regards to the EnergyNet process, Phoenix/Ferrari is currently in violation of the Seller's agreement & SEC rules/regulations by the following paragraphs:

pg 7 paragraph 24 Disqualification Event

**APP0082**

*SELLER represents that neither the SELLER nor its predecessors, affiliated entities, directors, executives or other officers of the SELLER, any beneficial owner of 20% or more of the SELLER's outstanding voting equity securities, calculated on the basis of voting power at the time of sale (each, a "Seller Covered Person" and together "Seller Covered Persons"), is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i)-(viii) under the Securities Act of 1933 (a "Disqualification Event"), except for a Disqualification Event covered by Rule 506 (d)(2) or (d) (3). The Disqualification Events are summarized on Exhibit "D". SELLER has exercised reasonable care to determine whether any Seller Covered Person is subject to a Disqualification Event. SELLER has complied, to the extent applicable, with its disclosure obligations under Rule 506(e) and has furnished to EnergyNet.com, LLC a copy of any disclosure provided thereunder."*

pg 12 Disqualification Events under Rule 506(d)(1)

  *Criminal convictions within ten years in connection with the purchase or sale of any security, making of a false filing with SEC, or arising out of the conduct of business as an underwriter, broker-dealer, investment adviser, or paid solicitor;"*

Let me know if you still have those old files that were on the old website, or if I need to compile those again for you.

On Fri, Jun 18, 2021 at 11:11 AM Peter Tosto <peter@findit.com> wrote:

## Hello William,

## Wire Instructions for Online Campaign

Wells Fargo
Findit Inc.
ABA 061 000 227
Account 166 99 26154
$7,500.00

2 Sites built out Featuring Content regarding Subject
Blogs posted highlighting background and current names of entities
Lists of possible violations. Using the word possible on purpose.

We can proceed today.

Let me know.

Peter

**APP0083**

FINDIT_00000034



**Peter Tosto**
**peter@findit.com**
**Office: 404-443-3224**
**http://www.findit.com/petertosto**

FINDIT_00000035

# EXHIBIT 9

**APP0085**

# Wells Fargo Business Choice Checking

June 30, 2021 ■ Page 1 of 6



FINDIT, INC
OPERATING
1375 CHARTER CLUB DR
LAWRENCEVILLE GA 30043-7516

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
We accept all relay calls, including 711

**1-800-CALL-WELLS**  (1-800-225-5935)

*En español:* 1-877-337-7454

*Online:*  wellsfargo.com/biz

*Write:*  Wells Fargo Bank, N.A. (297)
P.O. Box 6995
Portland, OR  97228-6995

## Your Business and Wells Fargo

Visit wellsfargoworks.com to explore videos, articles, infographics, interactive
tools, and other resources on the topics of business growth, credit, cash flow
management, business planning, technology, marketing, and more.



 IMPORTANT ACCOUNT INFORMATION

The following dedicated text telephone/telecommunication device for the deaf (TTY/TDD) lines are being retired on March 5, 2021:
800-877-4833, 800-419-2265 and 800-600-4833. We accept relay-assisted calls, including calls from the 711 service, when customers call
any Wells Fargo customer service toll-free phone number. Wells Fargo will continue to provide excellent service to our deaf or hard of
hearing customers and customers with speech disorders.





FINDIT, INC
OPERATING

**APP0086**



**Transaction history**



---

*Transaction history (continued)*

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------|-------------|---------|------------|---------|
| 6/18 | | WT Fed#01343 Prosperity Bank /Org=Incline Energy Partners Lp Srf# 20210618002328 Trn#210618201143 Rfb# | 7,500.00 | | |



**APP0088**



*Transaction history  (continued)*

APP0089

FINDIT_00000004

WELLS
FARGO



**Other Wells Fargo Benefits**

Our National Business Banking Center customer service number 1-800-CALL-WELLS (1-800-225-5935) hours of operation have temporarily changed to 7:00 a.m. to 11:00 p.m. Eastern Time, Monday through Saturday and Sunday 9:00 a.m. to 10:00 p.m. Eastern Time. Access to our automated banking system, the ability to report a fraud claim on your business credit or debit card, and access to report a lost or stolen business card will continue to be available 24 hours a day, 7 days per week. Thank you for banking with Wells Fargo. We appreciate your business.

# ✓ IMPORTANT ACCOUNT INFORMATION



Effective September 1, 2021, the non-Wells Fargo ATM balance inquiry fee will increase from $2.00 to $2.50, and the non-Wells Fargo ATM transfer fee will increase from $2.00 to $2.50. To avoid these fees, monitor your balances and transfer money by accessing Wells Fargo ATMs, calling the number on the back of your card, and using Wells Fargo Online® or the Wells Fargo Mobile® app. Availability may be affected by your mobile carrier's coverage area. Your mobile carrier's message and data rates may apply. These fees may not be applicable to all customers and may vary depending on the type of Account you have. For more details, refer to the applicable Wells Fargo Fee and Information Schedule for your Account.

Effective May 28, 2021, the following fees were eliminated and there is no longer a charge for these services: audit confirmation, credit inquiry, coin deposited per bag, and document copy. Thank you for banking with Wells Fargo. We appreciate your business.

**APP0090**

WELLS
FARGO

---

**General statement policies for Wells Fargo Bank**

■ **Notice:** Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies.  If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at:  Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation.  In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

---

**Account Balance Calculation Worksheet**

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**

**B.** Any deposits listed in your                            $ _____
register or transfers into                                      $ _____
your account which are not                                   $ _____
shown on your statement.                                  + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**SUBTRACT**

**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . . $ . _____

| Number | Items Outstanding | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | Total amount  $ | |

---

©2010 Wells Fargo Bank, N.A. All rights reserved.  Member FDIC.  NMLSR ID 399801

**APP0091**

# EXHIBIT 10

**APP0092**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/SB984686618458103287

# Two-Time Stock Manipulator Sentenced to 87 Months in Jail

*By Colleen Debaise* *Dow Jones Newswires*

*March 15, 2001 4:48 pm ET*

NEW YORK -- A former broker was sentenced to seven years and three months in prison after admitting to leading a $12 million stock fraud scheme when he was already convicted of securities fraud in another case.

Peter Lybrand, also known as Peter Tosto, has been described by the Securities and Exchange Commission as a "securities-fraud addict."

Mr. Lybrand, of Madison, Ga., pleaded guilty in 1998 to taking part in a broker-kickback scheme involving San Diego Bancorp securities. As the government's star witness, his testimony helped lead to the convictions of two other defendants in the case, Thomas Browne and Gerald McNeil.

But while he testified in court that he had abandoned a life of crime, prosecutors say Mr. Lybrand was secretly inflating the stock prices of three companies using so-called "wash" trades and "matched" buy and sell orders. Mr. Lybrand was subsequently charged with securities fraud, perjury and obstruction of justice, and pleaded guilty last fall.

"I was simply greedy and thought I could get away with the lies I told," an emotional Mr. Lybrand said during his sentencing in Manhattan federal court on all the counts.

U.S. District Judge Denny Chin handed down the highest sentence possible under federal sentencing guidelines. The minimum Mr. Lybrand could have received was five years and 10 months in jail.

WE HAVE UPDATED OUR TERMS OF USE    We updated our **TERMS OF USE**. By continuing, you are agreeing to be bound by these updated terms.

APP0093

as perjury and obstruction of justice. Last month, another judge overturned Mr. Browne's and Mr. McNeil's convictions as a result of Mr. Lybrand's actions. The two men are scheduled to be retried this spring.

Mr. Lybrand has been held without bail since the second case was brought in February 2000. He was charged with inflating the share prices of Polus Inc., Citron Inc. and Electronic Transfer Associates Inc.

All three stocks soared in early 1999 until the SEC halted trading, citing concerns about the adequacy and accuracy of reports about the companies. In addition to manipulating trades, Mr. Lybrand also was charged with issuing misleading press releases in order to boost market demand for the stock.

Mr. Lybrand still faces pending civil charges filed by the SEC in the case.

**Write to** Colleen DeBaise at colleen.debaise@dowjones.com

WE HAVE UPDATED OUR TERMS OF USE     We updated our **TERMS OF USE**. By continuing, you are agreeing to be bound by these updated terms.

**APP0094**

# EXHIBIT 11

APP0095

From: Patrick K. McGee <patrick@mpkequitypartners.com>
To: Chris Atherton <Chris.Atherton@energynet.com>
Date: 7/12/2020 12:45:39 PM
Subject: Re: Phoenix Capital Group Holdings, LLC has retained EnergyNet to divest 16 Well Package in Mountrail County, North Dakota

---

Hi Chris

Really good update - did not mean for you to have to do this on a Sunday.

I think I am good on this so no need for a call.
I think we move forward as you have directed.

Also interesting that Incline would try and go around ENET on assets being sold by the MDA no less!!!!

All the best

Patrick.

Sent via I Phone.


On Jul 12, 2020, at 11:37 AM, Chris Atherton <Chris.Atherton@energynet.com> wrote:


Hi Patrick:

Thank you for the email. I am available to visit when it is convenient for you. I can talk today, late afternoon on Monday, or Tuesday.

I am up to speed on the situation. I have talked to our VP of Business Development Ryan Dobbs and I have also spoken with Will Francis at Incline Energy Partners. EnergyNet is familiar with Adam Ferrari and the companies he formerly managed. Prior to 2019, EnergyNet successfully sold assets for three of his companies, Ferrari Energy, Wolf Resources and Wolfhawk Energy, all Denver Colorado based. If I recall correctly, Ferrari was convicted of felonies sometime in 2019, he's been fired from the previously named companies and we have not heard from him or done business with him since.

So far in 2020, we've sold two assets for Phoenix Capital Group; the first deal sold in March for $125K and another in May for $30K. There is a third Phoenix asset currently on the market at approximately $1MM. Phoenix Capital Group is based in California and there was nothing in the signed EN Seller Agreement, outgoing conveyance

Ferrari V Francis000057

APP0096
ENERGYNET_00000023

instruments, due diligence materials, company website tying Phoenix Capital Group to Adam Ferrari. EnergyNet was not looking for any connection prior to the email from Will Francis at Incline Energy from June 25th.

I personally spoke to Will Francis at Incline on Tuesday July 7th to hear him out and better understand the situation. I told Will that we did not know Ferrari  was involved with Phoenix, we have had no communication with him, he did not sign the EN seller agreement, he did not sign the outgoing conveyance instrument, Phoenix has listed 3 assets to sell with EN in the past few months without issue; they've complied with our agreement, etc. I thanked Will for bringing the issue to our attention and that we are monitoring it closely and working to find documentation explicitly connecting Ferrari to Phoenix.

A recent report showed Incline and Phoenix both in the top 5 royalty/mineral buyers in the Bakken; so I sensed there may be some competitive grudge working as well. Additionally, I had a poor experience dealing with Incline in March of 2020 when they tried to circumvent EnergyNet to buy a deal we had under contract where our seller, the Muscular Dystrophy Association (MDA), had already accepted an offer from the EN process.

I am available to visit at your convenience.

Chris Atherton
832-654-6612
chris.atherton@energynet.com

**From:** Patrick K. McGee <patrick@mpkequitypartners.com>
**Sent:** Sunday, July 12, 2020 5:26 AM
**To:** Chris Atherton <Chris.Atherton@energynet.com>; Patrick P. McGee Jr. <ppm@mpkequitypartners.com>
**Subject:** FW: Phoenix Capital Group Holdings, LLC has retained EnergyNet to divest 16 Well Package in Mountrail County, North Dakota

Chris,

When you have a second, take a look at the email chain below.

Hays Lindsley – works for the Perot family.   Perot has an investment in Incline and the head of Incline (Will Francis) reached out to Hays given that Phoenix Capital (Adam Ferrari) is selling properties on EnergyNet.

Happy to speak live when you have a second sometime early this week.   I have decent availability just let me know when convenient for you.

Patrick

**From:** Lindsley, Hays <Hays.Lindsley@perot.com>
**Sent:** Friday, July 10, 2020 4:01 PM
**To:** Patrick P. McGee Jr. <ppm@mpkequitypartners.com>

4/22/2024

Ferrari v Francis 000058

**APP0097**
ENERGYNET_00000024

Cc: Patrick K. McGee <patrick@mpkequitypartners.com>
Subject: RE: Phoenix Capital Group Holdings, LLC has retained EnergyNet to divest 16 Well Package in Mountrail County, North Dakota

No problem.  I thought I was sending in to Partrick, Sr.  My mistake.

Hays

**From:** Patrick P. McGee Jr. <ppm@mpkequitypartners.com>
**Sent:** Friday, July 10, 2020 1:59 PM
**To:** Lindsley, Hays <Hays.Lindsley@perot.com>
**Cc:** McGee, Patrick K. <patrick@mpkequitypartners.com>
**Subject:** Re: Phoenix Capital Group Holdings, LLC has retained EnergyNet to divest 16 Well Package in Mountrail County, North Dakota

CAUTION: External Sender


Hays-

Sorry I missed this email earlier.

I've looped in PKM and would be happy to chat next week.

Thanks,
Patrick


Get Outlook for iOS

**From:** Lindsley, Hays <Hays.Lindsley@perot.com>
**Sent:** Thursday, July 2, 2020 6:03:41 PM
**To:** Patrick P. McGee Jr. <ppm@mpkequitypartners.com>
**Subject:** FW: Phoenix Capital Group Holdings, LLC has retained EnergyNet to divest 16 Well Package in Mountrail County, North Dakota

Patrick:

Hays here.

I am forwarding an email from Will Francis.  He says there is a "bad actor" using EnergyNet to buy and sell properties.  After hearing some of Will's stories, it does sound

**APP0098**
ENERGYNET_00000025

like Adam Ferrari is a bad guy, but that is all based on hearsay. I don't know the guy.

We have money with Will. Will has litigated (and won) with Adam. He was hoping to share his story with you. I'm not sure what his end-goal is, but I know he thinks Ferrari is a crook and that he is now doing business on EnergyNet. My guess is he wants to make it difficult for Ferrari to continue doing business.

Will you listen to his story? I'm not sure what, if anything, you can do … but he would like to talk with you.

Hays

**From:** William Francis <william@inclinelp.com>
**Sent:** Thursday, July 2, 2020 1:34 PM
**To:** Lindsley, Hays <Hays.Lindsley@perot.com>
**Subject:** Fwd: Phoenix Capital Group Holdings, LLC has retained EnergyNet to divest 16 Well Package in Mountrail County, North Dakota

CAUTION: External Sender

Hays,

Thanks for the time the other day to catch up. Let me know if you survive the road trip back so we can grab lunch or HH and keep you apprised on the latest over at Incline.

As to the reason for my call yesterday, I've detailed out my concerns in my initial email to EnergyNet below. After speaking with an EnergyNet representative, I followed up with what I consider to be a fairly irrefutable case that EnergyNet is currently listing properties of an organization run by not only a convicted criminal, but by someone who's conviction was related to his implementation of predatory and illegal business practices upon unsophisticated mineral and property owners. Every person who's familiar with Adam Ferrari in our industry knows he's running this entity.

If you wouldn't mind sending over a brief introduction to MPK so that I could fill them in on the current situation it would be greatly appreciated. Again, Incline is not competing with the group at issue here, but are more wanting to limit giving our industry a further black eye by granting a platform to a convicted criminal to prey on the mineral ownership community in the same manner and scale that he'd done prior to being arrested in Colorado.

Regards,

**William Francis**
Managing Partner
Incline Energy Partners, LP
(214) 274-3800
https://inclinelp.com/

Ferrari v Francis000060

**APP0099**
ENERGYNET_00000026

---------- Forwarded message ---------
From: **William Francis** <william@inclinelp.com>
Date: Mon, Jun 29, 2020 at 11:49 AM
Subject: Re: Phoenix Capital Group Holdings, LLC has retained EnergyNet to divest 16 Well Package in Mountrail County, North Dakota
To: Ryan Dobbs <Ryan.Dobbs@energynet.com>

Ryan,

Very much appreciate the call on Friday. I had reached out to Phoenix for clarification but the CFO hadn't given me a call back yet. After having the weekend to think it over though, their CFO telling you over the phone Ferrari isn't involved in the day to day isn't going to be anywhere near sufficient for me to drop this issue when you consider the following facts I've put forth above below:

**1)** We've had several mineral owners tell us point blank that Adam Ferrari was the point of contact for Phoenix.
**2)** GRP has told me that their point of contact for buying acreage from Phoenix is Adam Ferrari.
**3)** The name of the company signals he's behind it (just like naming his last company Wolfhawk to signify he's stealing all of his former company Wolf Resources' deals).
**4)** Phoenix COO was Ferrari's assistant at Ferrari Energy and was fired alongside him.
**5)** Phoenix Capital Group Holdings, LLC was incorporated in Delaware on 4/16/2019 two months after Ferrari was arrested and one month after he was kicked out of his company by his board of directors.
**6)** Adam Ferrari now lists his address with the California probation office as well as the Colorado Secretary of State as being in Playa Vista, CA, which is just a 20 minute drive to Phoenix's office. One doesn't see too many mineral aggregators starting up in the beach towns just south of LA, so one starting up immediately after and within a 20 minute drive of Adam getting fired and moving out there is beyond coincidence.
**7)** Most curious of all is that this guy's ego won't let him not be the CEO of the company, so they just go ahead and give everyone else Chief titles on their website but leave the CEO off??? Have you ever heard of anyone putting up a COO, CTO & CFO bios on their website but not the CEO?

https://www.phxcapitalgroup.com/team

If their CFO was willing to put in writing that **1)** Adam Ferrari isn't the mysterious unnamed CEO **2)** that he isn't affiliated with Phoenix in any way **3)** he doesn't own 20% or more of the company either directly or indirectly as the rules of your seller's agreement state, I would consider dropping this issue.

Regards,

**William Francis**
Managing Partner
Incline Energy Partners, LP
(214) 274-3800
https://inclinelp.com/

4/22/2024

Ferrari v Francis000061

**APP0100**
ENERGYNET_00000027

On Thu, Jun 25, 2020 at 3:01 PM William Francis <william@inclinelp.com> wrote:

Ryan,

Little disappointed to see EnergyNet listing the assets of Adam Ferrari's new company, who if you'll remember, was arrested for cutting off the signature block of a signed instrument he had obtained and then taping the signature block onto another mineral deed into his company and filing the scanned copy of the fraudulent deed of record without having tendered payment. He would plead guilty to a felony count of theft for these actions.

I've attached some of the documentation in the press of his misdeeds which have been a black eye upon the mineral aggregation community in the Rockies over the past few years, and would urge EnergyNet reconsider granting a convicted criminal a platform without first notifying your clients of who you're promoting them to transact with.

Of note, it appears from reading EnergyNet Seller's Agreement that management of Phoenix Capital Group Holdings LLC has disqualified itself from being able to utilize EnergyNet through Exhibit D.(3)(ii.), which specifically states:

*(ii) are based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct, issued within ten years;*

If you've got some time, please give me a call to discuss.

Regards,

**William Francis**
Managing Partner
Incline Energy Partners, LP
(214) 274-3800
https://inclinelp.com/


--------- Forwarded message ---------
From: **EnergyNet.com** <energy@energynet.com>
Date: Thu, Jun 25, 2020 at 2:30 PM
Subject: Phoenix Capital Group Holdings, LLC has retained EnergyNet to divest 16 Well Package in Mountrail County, North Dakota
To: William Francis <williamefrancis@gmail.com>

4/22/2024

Ferrari v Francis000062

**APP0101**
ENERGYNET_00000028

Click here to view this message in a browser window.

Dear William,

Forward To a Friend

EnergyNet has been retained as the exclusive representative to market and sell the following package of properties.  Full due diligence data is available by clicking on the respective offering below or by accessing the EnergyNet website using the following link: energynet.com.

4/22/2024

Ferrari v Francis000063

**APP0102**
ENERGYNET_00000029

For Additional Information, Please Contact:

**Ryan P. Dobbs**
Vice President
Business Development
Western U.S.
**Direct: (720) 459-2072**
**Ryan.Dobbs@energynet.com**

EnergyNet.com | (877) 351-4488
**HOUSTON | DALLAS | AMARILLO | OKLAHOMA CITY | DENVER | MIDLAND**

Copyright (c) 2020 EnergyNet.com, Inc.

View our policy on the Privacy of Consumer Financial Information.

Unsubscribe From All EnergyNet Email

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. In addition, this message may contain information and data regarding the prior sales of properties sold by the EnergyNet auction marketplace. Any such information and data reflect EnergyNet's experience on the sale of properties in the past and do not establish a value for specific properties that may be sold in the future. You are advised that investments in oil and gas properties involve substantial risk, including the possible loss of principal. These risks include commodity price fluctuations and unforeseen events that may affect oil and gas property values.

<Top 20 Bakken Mineral Buyers.png>

4/22/2024

Ferrari v Francis000064

**APP0103**
ENERGYNET_00000030

# EXHIBIT 12

APP0104

FILED
6/15/2022 12:35 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Connie Jones DEPUTY

ESERVE 2

DC-22-06350

CAUSE NO. _____

| | | |
|---|---|---|
| **PHOENIX CAPITAL GROUP HOLDINGS, LLC,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | 116th |
| | § | |
| v. | § | _____ **JUDICIAL DISTRICT** |
| | § | |
| **WILLIAM FRANCIS and INCLINE** | § | |
| **ENERGY PARTNERS, L.P.,** | § | |
| | § | |
| **Defendants.** | § | **DALLAS COUNTY, TEXAS** |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff, Phoenix Capital Group Holdings, LLC ("**Plaintiff**" or "**Phoenix**"), by counsel, submits the following Original Petition against Defendants, William Francis ("**Mr. Francis**") and Incline Energy Partners, L.P. ("**Incline**") (collectively, "**Defendants**").

### I.
### NATURE OF ACTION

1.     Before this Court comes Phoenix Capital Group Holdings, LLC, a Colorado-based company specializing in the mineral rights industry. For years, Phoenix has suffered a persistent campaign of defamation and tortious interference at the hands of William Francis, the managing partner of Incline, a competitor to Phoenix in the mineral rights industry. Mr. Francis, upset at the direct competition presented by Phoenix's business, set out to harm Phoenix at all costs and with no regard for the truth. Mr. Francis has published false and defamatory statements to land owners, oil companies, and financial institutions, posing significant damage to Phoenix's business and operations. Phoenix cannot let Mr. Francis and Incline's actions continue without redress and, accordingly, must seek this Court's intervention to bring a stop to Defendants' tortious conduct and to penalize them to the fullest extent permissible under law.

**APP0105**

## II.
## RULE 47(c) STATEMENT & DISCOVERY LEVEL

2.      Plaintiff seeks monetary relief over $1,000,000.

3.      Plaintiff requests this case be conducted under a <u>Level 2</u> Discovery Control Plan in accordance with Texas Rules of Civil Procedure 190.3.

## III.
## PARTIES

2.      Plaintiff is a Delaware limited liability company with its headquarters located in Littleton, Colorado.

3.      Defendant William Francis is an individual who resides in Dallas County and may be served with process at his residence located at 15800 Spectrum Drive, Apt 1432, Addison, Texas.

4.      Defendant Incline Energy Partners, L.P. is a Texas limited partnership with its principal place of business in Dallas County, and may be served through its registered agent, Andrew K. Louis, at such agent's designated address on record with the Texas Secretary of State, 5019 N. Central Expwy, Dallas, Texas 75205, or wherever he may be found.

## IV.
## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action because damages sought are within the jurisdictional limits of this Court.  Venue is proper in this Court pursuant to Texas Civil Practice and Remedies Code § 15.022(1)-(3) as both Defendants reside in and have their principal place of business in Dallas County, and all or a substantial part of the events or omissions giving rise to the claims occurred in Dallas County.

## V.
## BACKGROUND

**Phoenix's Growth**

6.     Phoenix was founded in 2019 and is currently led by Lindsey Wilson, Phoenix's Manager and Chief Operating Officer.

7.     Phoenix brought together industry experts with decades of experience in their fields to build an industry leader in mineral rights.  One of those experts with whom Phoenix consulted regularly was Adam Ferrari ("**Mr. Ferrari**"), an individual with years of experience and expertise in the mineral rights industry.

8.     At the time Phoenix was founded, the industry was dominated by Incline and very few firms were able to compete.

9.     By deploying its proprietary technology and decades of industry experience, Phoenix was able to successfully compete with Incline.

10.     Further, Phoenix was able to outbid Incline directly on acquisitions and often came out on top when competing for the same investment opportunity.

11.     Phoenix's success was met with hostility from Incline, specifically from Mr. Francis, Incline's Managing Partner.

**Francis's Campaign Against Phoenix**

12.     Incline operates in the oil and gas industry, where it operates and acquires mineral rights, and is a direct competitor to Plaintiff in the mineral rights space.  Mr. Francis is currently a managing partner of Incline.

13.     In response to Phoenix's success, Mr. Francis and Incline set out on an intentional, willful, and malicious campaign against Phoenix with the intention of damaging Phoenix's reputation and ability to compete in the marketplace.

**PLAINTIFF'S ORIGINAL PETITION**                                        **Page 3**

**APP0107**

14.     Incline is liable to Phoenix through the theory of respondeat superior and/or ratification of Mr. Francis's tortious conduct.

15.     Mr. Francis focused on Phoenix's work with Mr. Ferrari, an individual with whom Mr. Francis had a long and contentious history.

16.     Mr. Francis and Mr. Ferrari are no strangers to each other, having competed in the mineral rights industry for years.

17.     As a response to Mr. Ferrari's competition, Mr. Francis has always engaged in sharp business practices against Ferrari and his businesses, causing numerous lawsuits to be filed against Mr. Ferrari and those companies over the years.

18.     Mr. Francis often tortiously interfered with Mr. Ferrari's business efforts – sending defamatory packets to Mr. Ferrari's business associates to try and derail Mr. Ferrari's transactions.

19.     For example, on November 27, 2018, Bryan Hymer, an employee of Incline, sent to a landowner a link to an anonymous website disparaging Mr. Ferrari and his company, Ferrari Energy.

20.     With respect to Phoenix, Mr. Francis latched onto the relationship between Phoenix's executives and Mr. Ferrari, an individual with whom Phoenix's executives had previously partnered.

21.     Mr. Francis began emailing and sending anonymous packets to mineral rights sellers and industry executives, claiming that Mr. Ferrari was Phoenix's Chief Executive Officer and a convicted felon.

22.     Importantly, however, Mr. Ferrari is not an owner of Phoenix and has never been an owner of Phoenix.

23.     Further, Mr. Ferrari has never held any management position with Phoenix and has never had authority to bind Phoenix.

24.     Instead, Mr. Ferrari provided consulting services to Phoenix, providing his decades of experience in the industry.

25.     As Phoenix became more successful in acquiring mineral rights and other investments, Mr. Francis became incensed and set out on a campaign to intentionally interfere with and damage Phoenix's business and reputation.

26.     Upon information and belief, Mr. Francis set up a number of websites wherein he published information about various lawsuits filed against Mr. Ferrari and companies with which he was affiliated, including alleging that Mr. Ferrari was a convicted felon, which was and is false.

27.     Further, and upon information and belief, Mr. Francis conspired with others, including at least one reporter at a Colorado newspaper, specifically Joe Moylan of the Greeley Tribune, to publish false statements to third parties and to damage Phoenix's business.

28.     Upon information and belief, Mr. Francis set up anonymous email accounts and sent, or had sent, packets of information to various industry players, including one email on January 7, 2021 to executives from Hess, ExxonMobil, and other leading oil and gas operators, alleging, among other things, that Phoenix was violating SEC laws and was owned, financed, and managed by a convicted felon.  A true and correct copy of the January 7, 2021 e-mail is attached as **Exhibit A**.

29.     Hess and ExxonMobil, of course, are large multinational energy corporations.  As a result of its work in the mineral rights industry, Phoenix regularly conducts business with Hess, ExxonMobil, and others copied on the email.  In fact, Phoenix became aware of the anonymous

email to ExxonMobil when it was forwarded to one of Phoenix's employees by an ExxonMobil employee with whom Phoenix regularly interfaces.

30.     Importantly, the anonymous January 7, 2021 e-mail forwarded the same link, "lawsuitsoilandgas.com" as the November 27, 2018 e-mail from Bryan Hymer, an Incline employee.

31.     Further, on June 17, 2021, Mr. Francis emailed Ms. Crystal Taylor, an individual with whom Phoenix was in the process of closing a real estate transaction.  A true and correct copy of the e-mail thread is attached as **Exhibit B**.

32.     In the June 17, 2021, email, Mr. Francis stated: "I would love nothing more than to defend my company's track record versus the misdeeds that Phoenix/Ferrari has performed over the years.  Namely, the fact that their CEO was arrested and convicted for forging a mineral owners signature in order to defraud her of hundreds of thousands of dollars."  (Ex. B, at 1.)

33.     Mr. Ferrari is not and never was Phoenix's CEO, a fact of which Mr. Francis has always been aware.

34.     Further, at the time of Mr. Francis's statement, Mr. Ferrari had not been, and has never been, convicted of any crimes.  Mr. Francis was also aware that Mr. Ferrari had never been convicted of any crimes.

35.     In February and March of 2022, Mr. Francis contacted Dalmore Capital, Phoenix's broker-dealer, to disparage Phoenix, to disparage Mr. Ferrari, and try to derail Phoenix's latest capital raise.

36.     In early May of 2022, Phoenix was moving to close on a $50,000,000 loan with its primary bank, First International Bank and Trust ("**FIBT**"), which closing was derailed, upon information and belief, by Francis's conduct.

37.     On May 11, 2022, Phoenix received a call from FIBT, informing Phoenix that FIBT was backing out of the transaction.

38.     Phoenix later learned that someone had sent FIBT an anonymous packet regarding Mr. Ferrari, which caused FIBT to back out of the transaction.

39.     Upon information and belief, Mr. Francis intentionally interfered with the transaction by defaming Phoenix.

40.     Mr. Francis and Incline have acted with malicious intent and with the sole goal of damaging Phoenix in its reputation, trade, and business.

## VI.
## CONDITIONS PRECEDENT

41.     All paragraphs in this pleading are reasserted and incorporated by reference

42.     Any and all conditions precedent, including as it relates to Plaintiff's filing of this lawsuit, recovery against Defendant, and right to all relief requested herein have occurred, been fulfilled, fully performed, and/or been waived or excused.

## VII.
## CAUSES OF ACTION

**COUNT 1:     DEFAMATION, LIBEL, & SLANDER / DEFAMATION, LIBEL & SLANDER PER SE**

43.     Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

44.     Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights.  Defendants defamed Plaintiff by intentionally and knowingly publishing falsehoods to third parties.  Defendants knew at the time of the publications that the statements were false and damaging to Plaintiff's business and reputation.

45.     Indeed, Defendants published the defamatory statements with malice and with the intent to harm Plaintiff's business and reputation.  Plaintiff's business and reputation has been harmed by Defendants' defamatory statements.

**COUNT 2:** **BUSINESS DISPARAGEMENT**

46. Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

47. Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights. Defendants published disparaging words about Plaintiff's economic interests, specifically including but not necessarily limited to, the character of Plaintiff's business. The words were false, and Defendants published the words with malice, and without privilege, and the publication caused Plaintiff to suffer damages, specifically including special damages.

**COUNT 3:** **TORTIOUS INTERFERENCE WITH CONTRACT**

48. Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

49. Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights. Plaintiff engaged in business with a variety of other companies in the mineral rights industry, as well as with landowners and financial institutions, with whom Plaintiff had one or more valid contracts. Defendants had actual knowledge of the Plaintiff's contracts and Plaintiff's interests therein, or had knowledge of facts and circumstances that would lead a reasonable person to believe there was a contract in which Plaintiff had an interest.

50. Defendants willfully and intentionally interfered with Plaintiff's contracts and business relations when they published defamatory statements with the intent to harm Plaintiff's business. Defendants' interference proximately caused injury to Plaintiff, and Plaintiff has incurred actual damage or loss.

**COUNT 4:** **TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT/RELATIONS**

51. Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

52. Plaintiff is an entity engaged in, among other things, the business of purchasing, owning, and selling mineral rights. There was a reasonable probability that Plaintiff would have

entered into one or more business relationships and/or contracts with one or more third persons, but Defendants intentionally interfered with the relationships by engaging in conduct that was independently tortious or unlawful.  Defendants' interference proximately caused injury to Plaintiff, and Plaintiff suffered actual damage or loss.

**COUNT 5:**        **UNFAIR COMPETITION**

53.        Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

54.        The foregoing conduct of Defendants constitutes an unfair method of competition. As a consequence of the foregoing, Plaintiff has suffered injury and damages.

**COUNT 6:**        **CIVIL CONSPIRACY**

55.        Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

56.        Defendants conspired with others, including a reporter from a Colorado newspaper, to publish false statements regarding Plaintiff.

57.        Defendants conspired with others with the intent to damage Plaintiff's business.

58.        Plaintiff's business was damaged as a result of Defendants' conspiracy.

## VIII.
## EXEMPLARY DAMAGES

59.        Plaintiff re-pleads and incorporates the preceding paragraphs set forth above.

60.        Defendants' conduct complained of herein was intentional, with malice, with conscious indifference to Plaintiff's rights, and with a specific intent to cause serious harm and substantial injury to Plaintiff, and Defendants were consciously indifferent to the harm.  Based on the foregoing, Plaintiff is entitled to and seeks to recover exemplary damages against Defendants in an amount to be determined by the trier of fact.

## IX.
## PRAYER

WHEREFORE, Phoenix Capital Group Holdings, LLC, by counsel, respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants, jointly and severally, which awards Plaintiff the following:

      a.     actual, consequential, compensatory and/or special damages in the amount of $50,000,000.00;

      b.     exemplary damages in the amount of $50,000,000.00 and/or the maximum amount permitted by law;

      c.     all costs of court;

      d.     pre-judgment interest at the highest rate permitted by law;

      e.     post-judgment interest on all amounts awarded at the highest rate permitted by law; and

      f.     all other and further relief, general and special, and legal and equitable, that Plaintiff may be entitled to receive, at law or in equity.

DATED:  June 15, 2022          Respectfully submitted,

                           /s/ James Crewse
                        JAMES CREWSE
                        State Bar No. 24045722
                        jcrewse@crewselawfirm.com
                        **CREWSE LAW FIRM, PLLC**
                        5546 Goodwin Ave.
                        Dallas, TX 75206
                        Phone: (214) 394-2856
                        Fax: (253) 252-8776

                        *- and -*

                        VERNON E. INGE, JR. (*pro hac vice application forthcoming*)
                        vinge@wtplaw.com
                        PATRICK D. HOUSTON (*pro hac vice application forthcoming*)
                        phouston@wtplaw.com
                        **WHITEFORD, TAYLOR & PRESTON LLP**
                        Two James Center
                        1021 East Cary Street, Suite 1700
                        Richmond, Virginia 23219

**APP0114**

Phone:  (804) 977-3301
Fax:  (804) 977-3291

**ATTORNEYS FOR PHOENIX CAPITAL
GROUP HOLDINGS, LLC**

# EXHIBIT A

**APP0116**

EXHIBIT A



**From:** Mchenry, Stacey Ohwen <stacey.mchenry@exxonmobil.com>
**Sent:** Thursday, January 7, 2021 11:50 AM
**To:** Curtis Allen <CA@phxcapitalgroup.com>
**Subject:** FW: Adam Ferrari - CEO of Phoenix Capital Group Holdings, LLC

I opened this thinking it was from you, and was wondering if you have any idea who is sending this out to oil companies?


Thank You,
**Stacey McHenry | Sr. Title Analyst- Central**
**EXXONMOBIL-**Land Administration UOG |HLW-03-S326
**Mail:**  22777 Springwoods Village Pkwy- **LOC 116** | Spring, TX 77389
Direct:  346.335.0400 | Personal Cell 713.498.2532 | **Oildex Log In** [secure.oildexdx.com]

---

**From:** Concerned Mineral Owner [mailto:concernedbakkenmineralowner@gmail.com]
**Sent:** Thursday, January 7, 2021 11:28 AM
**To:** ask@hess.com; integrity@hess.com
**Subject:** Adam Ferrari - CEO of Phoenix Capital Group Holdings, LLC

**External Email - Think Before You Click**


To Whom It May Concern:

I was extremely disappointed to see, via some backup (Ex1) that Phoenix Capital Group Holdings, LLC ("Phoenix") provided through an auction at EnergyNet [energynet.com], that Hess Corporation was essentially conducting pro bono due diligence for a mineral acquisition Phoenix was pursuing but had not closed on yet. It appears that Phoenix was utilizing Hess' labor and internal proprietary title databases to check ownership on a mineral owner on or before December 2, 2020, and would hold off on closing their acquisition until Hess blessed and signed off on title via an email on Friday December 4, 2020 at 7:05 AM. After obtaining Hess' due diligence on their mineral acquisition, Phoenix would then electronically file their Mineral and Royalty Deed

1

**APP0117**

EXHIBIT A

shortly thereafter the same day at 2:56 PM (Ex2). Within 3 business days, on December 9, 2020 this interest would be setup to be auctioned on EnergyNet platform, with final bids due at 2:55 today.

Phoenix did this in a manner in which it appears to exploit the spread of prices that they knew existed between the price they got Ms. Western under agreement for and what buyers on EnergyNet would pay, while seemingly not taking on any pricing or title risk and certainly not informing Ms. Western of their intentions to start the process of having this interest put up for auction prior to even closing on her transaction. One could speculate with the facts at hand, and reviewing their PSA templates, that Phoenix went through this timeline in a manner in which the auction would close and they would have funds from that sales prior to even having tendered Ms. Western the closing price promised in their PSA. I've provided a copy of one of their proposed agreements (Ex3) which provides that Phoenix must take ownership of the asset prior to closing and that they don't have to close until 45 business days after they receive the executed PSA & Mineral Deed. As the mineral deed between Ms. Western and Phoenix was executed and notarized on December 1, 2020, if they negotiated their typical PSA, that would mean that Phoenix wouldn't need to even pay Ms. Western until January 31, 2021.

Hess providing ownership confirmation to its mineral owners in this type of transparent fashion should be applauded within our industry. However, that doesn't appear to be what happened and I think anyone reviewing this email would agree that providing this kind of proprietary data should not extend to mineral brokers who are trying to profit off risk free flipping of mineral owners property. **Further more and most disturbing, is the mineral broker being granted preferential treatment is owned, financed and managed by a convicted criminal named Adam Ferrari (Ex4 & Ex5)**. Mr. Ferrari was arrested in 2019 after he had cut off the signature and notary block of a mineral deed and cut and pasted it onto a backdated mineral deed into his company in order to defraud said mineral owner out of >$250k.

Phoenix obviously doesn't promote the fact that their CEO is in fact Mr. Ferrari for obvious purposes, most importantly being the fact that they're clearly violating SEC laws, which disallows any company to utilize EnergyNet's online marketplace if their owners or management have been convicted of crimes that "*(ii) are based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct, issued within ten years;"*, thus assisting them in their scheme to profit off unsuspecting mineral owners. As such, I'll address several points I feel prove beyond a reasonable doubt that Mr. Ferrari is behind Phoenix:

-Mr. Ferrari has a Phoenix email (Ex6) and is actively being listed in association with the company alongside the rest of their employees contact information on 3rd party websites not associated with Phoenix.
-I've never heard of a company that lists and actively promotes who their COO, CTO & CFO are, but omits who the CEO of the company is.
-First hand accounts from Phoenix's counterparties have specifically stated that their point of contact in working with Phoenix was Mr. Ferrari.
-Phoenix was incorporated in Delaware on 4/16/2019 (Ex7) two months after Ferrari was arrested and almost immediately after he was kicked out of his company by his board of directors shortly thereafter.
-Mr. Ferrari lists his address with the Colorado Secretary of State (Ex8) as being in Playa Vista, CA, which is adjacent to Phoenix offices in a city in which I don't think anyone can name another active mineral and royalty acquisition company.
-Phoenix's "founding member" (Ex9) alongside Mr. Ferrari, as well as Tom Kruk (Ex10), Sean Goodnight (Ex11) and Adam Josephson (Ex12) all worked for Mr. Ferrari prior to being let go alongside Mr. Ferrari in the purge that occurred after his arrest, and are all now gainfully employed at Phoenix under Mr. Ferrari's direction.

I mention all of this, as I don't believe it's widely known in the Bakken/Williston Basin community as to Mr. Ferrari's association with Phoenix or their wider employee base's lack luster track record in conducting themselves in an ethical manner. Also, I feel compelled to bring this particular incident to light so that Phoenix is not being assisted in promulgating the same business tactics that Mr. Ferrari utilized in order to exploit the

APP0118

EXHIBIT A

mineral ownership community in Weld County Colorado starting in 2017 up until his arrest in 2019 while running Ferrari Energy/Wolfhawk Energy Holdings LLC.

In particular, Phoenix's predecessor entity's standard business practice in Weld County was to get someone under agreement in a manner in which the owner signed a PSA & Mineral Deed at the same time prior to closing. They would then file the mineral deed but hold off on paying or closing on that mineral owner until they had been able to sell the interest or the mineral owner started to complain. This ultimately led to Phoenix's predecessor entity getting sued 9 times within the span of just 9 months to a point that someone would set up a website to document all of these misdeeds [lawsuitsoilandgas.com]. Phoenix's predecessor would ultimately not win a single one of these lawsuits. In fact, over the span of just two years between September 2017 and 2019, Phoenix's predecessor would have to file 59 reconveyances (Ex13) to the counterparties they never paid, but had already filed a mineral deed of record in Weld County, with their misconduct and behavior being well documented in the local press (Ex14).

Clearly I don't believe anyone at Hess or the organization in general has done anything wrong here, but were merely attempting to expedite your operations. So, at the very least, I would encourage you and the rest of the operator community in the Bakken to stop providing Phoenix/Ferrari with proprietary information without having first obtained a filed copy of a mineral deed. Further, and I believe more importantly, I would also highly recommend that additional oversight be placed into whether or not Phoenix has actually tendered full payment to their mineral owners they're transacting with prior to formalizing any transfers they might be requesting and certainly before releasing any funds.

Thank you for your time,


Concerned Mineral Owner

APP0119

# EXHIBIT B

**APP0120**

EXHIBIT B



**From:** Adam Ferrari <AF@phxcapitalgroup.com>
**Date:** Thursday, June 24, 2021 at 9:18 AM
**To:** Curtis Allen <CA@phxcapitalgroup.com>, Lindsey Wilson <LW@phxcapitalgroup.com>
**Subject:** Fw: Krystal family oil holdings

**From:** William Francis <william@inclinelp.com>
**Sent:** Thursday, June 17, 2021 2:59 PM
**To:** Crystal Taylor <cat44771@yahoo.com>; Adam Ferrari <AF@phxcapitalgroup.com>
**Subject:** Re: Krystal family oil holdings

You citing Phoenix/Ferrari as the other offer/group that is telling you that we low balled you is all the information I need to know. We made your aunt aware of those permits when she had called us and not the other way around.

I would love nothing more than to defend my company's track record versus the misdeeds that Phoenix/Ferrari has peformed over the years. Namely, the fact that their CEO was arrested and convicted for forging a mineral owners signature in order to defraud her of hundreds of thousands of dollars.

https://www.denverpost.com/2019/02/19/denver-ceo-ferrari-oil-gas-weld-fraud-charges/ [denverpost.com]
https://www.greeleytribune.com/2019/08/08/adam-ferrari-pleads-guilty-to-felony-theft-in-denver-district-court-receives-deferred-sentence/ [greeleytribune.com]

Here's another link that details Sean Goodnight track record, who you're working with:
https://www.greeleytribune.com/2019/02/24/weld-district-court-records-provide-insights-into-adam-ferraris-business-practices/ [greeleytribune.com]

APP0121

EXHIBIT B

Regards,


**William Francis**
Managing Partner
Incline Energy Partners, LP
(214) 274-3800
https://inclinelp.com/ [inclinelp.com]


On Thu, Jun 17, 2021 at 3:59 PM Crystal Taylor <cat44771@yahoo.com> wrote:

Hi again William,

I have spent every spare minute these past days researching, calling, and investigating these mineral oil interests and the oil market in general.

Your claim that Incline has acquired 3 times more business in the Williston Basin area than any other company in the past 3 years doesn't automatically equate to your company never giving low ball offers as you proposed in this last email. That could mean any number of things....you could be marketing more aggressively than your competitors, you could be buying up undervalued mineral deeds from lots of owners who have no idea what they're doing in the selling marketplace like the case with my aunt, etc. That's great that your business is growing so rapidly but your argument here about never giving low ball offers doesn't hold weight. I don't think negatively of you as a person, I'm just doing what is fair and right in this case based on personal as well as professional opinions and appraisals.

In reference to the professional opinions we've received since my brother and I stepped in, they are all from reputable and highly experienced mineral oil brokers who know the market well. The first opinion/appraisal was from Brian Wolf Oil and Gas Properties, who has been in business since 1992 and has brokered over $1 billion in mineral oil transactions. The other professional opinions/appraisals have been from US Mineral Exchange, who have been in business for a decade, Vintage Oil and Gas, and Community Minerals, which has over 50 years in this business.

They have all agreed that this was a low ball offer and I'll explain why. As I'm sure you are aware, 10-12 new drilling permits have been issued on and around the land in this particular contract with Incline (4.8 net mineral acres in 147N-96W sections 23 & 26). That greatly increases the value of these oil interests and these permits were issued before May 19th.

We do very much appreciate your offer to make things right by honoring any other official offers during that time period. Sheila has been searching through her emails for other offers on this exact piece of land and she's getting confused again by all the numbers and details of dozens of mineral oil properties we own in several different states. She thinks she began putting our various properties up for sale in March or April of this year so there would be nothing before that time. But I do have an official offer in my inbox that she emailed to me back in May for the same exact property. They have the 4.8 net mineral acres divided up into sections 23 and 26, with an offer of $27,615.56 for 23 and $55,231.14 for 26. So the total offer for the same 4.8 net mineral acres was $82,846.70. They also wanted to buy other holdings we have in Dunn County, which is included in their offer but it's all separated out into distinct holdings and offers as you will see in the documents. She was in contact with them before May 19th but did not receive the official documentation until May 24th and then they sent finalized documents on May 31st and June 1st. My research and conversations with professionals in this field show that the price of oil fluctuated very little between May 19th and June 1st and absolutely does not account for the difference in offers....Incline at $45,000 and Phoenix at $82,846.70 for the same exact mineral oil holdings.

I will forward you Phoenix's official offer in a separate email.

Thank you for your consideration,
Crystal

APP0122

EXHIBIT B

APP0123

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

James Crewse on behalf of James Crewse
Bar No. 24045722
jcrewse@crewselawfirm.com
Envelope ID: 65465651
Status as of 6/17/2022 7:19 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| James Crewse | | jcrewse@crewselawfirm.com | 6/15/2022 12:35:44 PM | SENT |

Associated Case Party: Phoenix Capital Group Holdings, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| James Crewse | | jcrewse@crewselawfirm.com | 6/15/2022 12:35:44 PM | SENT |
| Vernon E.Inge | | vinge@wtplaw.com | 6/15/2022 12:35:44 PM | SENT |
| Patrick D.Houston | | phouston@wtplaw.com | 6/15/2022 12:35:44 PM | SENT |

**APP0124**

# EXHIBIT 13

APP0125

**CAUSE NO. DC-22-06350**

| | | |
|---|---|---|
| **PHOENIX CAPITAL GROUP HOLDINGS, LLC,** | § § § § § § § § § § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | | |
| **v.** | | **DALLAS COUNTY, TEXAS** |
| **WILLIAM FRANCIS and INCLINE ENERGY PARTNERS, L.P.,** | | |
| *Defendants.* | | **116TH JUDICIAL DISTRICT** |

Partially Granting and Partially
**ORDER DENYING DEFENDANTS' TCPA MOTION TO DISMISS**

On this day came on to be heard and considered Defendants' TCPA Motion to Dismiss

("**Motion**"). After considering the Motion, Plaintiff's Response, and any and all replies and
in part, and GRANTED in part
arguments of counsel, the court finds the Motion should be DENIED. It is, therefore,

**ORDERED, ADJUDGED and DECREED** that Defendants' TCPA Motion to Dismiss

is denied ~~in all respects.~~ except as to the tortious interference with a existing contract claim and, to the extent
that such claims rest upon statements other than the Taylor email, Plaintiff's defamation and business
disparagement claims are dismissed to that extent only.  IT IS FURTHER ORDERED that movant is awarded
Signed this ___9th___ day of ~~October,~~ 2022.   $10,000 for reasonable and necessary costs and fees in
                        November                   defending against the dismissed legal action.

_____
PRESIDING JUDGE

# EXHIBIT 14

**APP0127**

**Affirmed in part and Reversed in part and Opinion Filed August 29, 2023**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-22-01260-CV

**WILLIAM FRANCIS AND INCLINE ENERGY PARTNERS, L.P.,
Appellants**

**V.**

**PHOENIX CAPITAL GROUP HOLDINGS, LLC, Appellee**

**On Appeal from the 116th Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-22-06350**

## MEMORANDUM OPINION

Before Justices Nowell, Goldstein, and Breedlove
Opinion by Justice Breedlove

Appellants William Francis (Francis) and Incline Energy Partners, L.P.

(Incline) appeal the trial court's November 9, 2022 order partially granting and

partially denying their motion to dismiss appellee Phoenix Capital Group Holdings,

LLC (Phoenix)'s claims under the Texas Citizens Participation Act (TCPA). *See*

TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a). We reverse the portions of the trial

court's judgment denying dismissal of Phoenix's claims for: (1) disparagement;

(2) defamation; (3) tortious interference with prospective contract; (4) conspiracy;

**APP0128**

and (5) unfair competition.  We affirm the portion of the trial court's judgment denying dismissal of Phoenix's claim for defamation per se, and we remand the case for further proceedings on that cause of action, as well as on the issue of attorney's fees.

## I.    BACKGROUND[1]

Incline and Phoenix are direct competitors in the oil and gas industry.  Francis serves as Incline's managing partner.   Incline also competes with companies previously operated by Adam Ferrari with whom Incline had previously been involved in business disputes and litigation. In 2019, Ferrari pleaded guilty to a felony theft charge related to forgery of deeds in a mineral transaction, and Incline obtained information regarding Ferrari's criminal proceedings in litigation between one of Ferrari's businesses and an affiliate of Incline.  In exchange for his guilty plea Ferrari received a deferred sentence pursuant to which the felony charge would be dismissed following the expiration of three years upon compliance with the terms of his probation.  Ferrari's criminal records were then sealed, and the felony charge was dismissed in 2022.  Ferrari's arrest and plea deal became the subject of articles published in *The Greeley Tribune*, a local newspaper, as well as the *Denver Post*.

---

[1] Many of the facts of this case are disputed; therefore, we limit our discussion to those facts necessary to our analysis and, where specific facts necessary to our analysis are disputed, we identify both parties' assertions.

APP0129

At some point after receiving the documents related to Ferrari's criminal background, Incline began investigating Ferrari's possible involvement with Phoenix. While Incline asserts that Ferrari controls Phoenix as its CEO and that Phoenix has attempted to conceal Ferrari's role within the company, Phoenix contends that Ferrari is only one of many non-executive consultants it employs. Specifically, Phoenix asserts that Ferrari's role is limited to being a "Petroleum Engineering Consultant." Phoenix offered evidence that it has no CEO and instead is managed by Manager and COO Lindsey Wilson, along with CFO Curtis Roger Allen.

The present dispute centers primarily on an email sent by Francis to Crystal Taylor on June 17, 2021 (the "Taylor email").[2] Both Phoenix and Incline sought a potential transaction with the family of Sheila Krystal, a landowner with mineral interests in Colorado. Taylor is Krystal's niece. In April 2021, Incline contracted with the Krystal family to purchase certain oil and gas interests. The deed conveying those interests to Incline was recorded on June 2, 2021. At some point, Phoenix made a competing offer and characterized Incline's offer as a "low ball" offer, prompting some of Krystal's family members, led by Taylor, to seek to renegotiate the deal with Incline. In response, Francis sent the following to Taylor:

---

[2] Phoenix also alleged that Francis sent an anonymous package to First International Bank & Trust (FIBT) containing allegedly defamatory content. The trial court dismissed the portions of the lawsuit relying on the FIBT package, and Phoenix does not cross-appeal. Therefore, our discussion is limited only to the Taylor email.

**APP0130**

> You citing Phoenix/Ferrari as the other offer/group that is telling you that we low balled you is all the information I need to know. We made your aunt aware of those permits when she had called us and not the other way around.
>
> I would love nothing more than to defend my company's track record versus the misdeeds that Phoenix/Ferrari has performed over the years. Namely, the fact that their CEO was arrested and convicted for forging a mineral owners signature in order to defraud her of hundreds of thousands of dollars.

Francis also included the links to several articles regarding Ferrari's criminal history.

Phoenix filed suit on June 15, 2022, alleging: (1) defamation and defamation per se, libel and libel per se, slander and slander per se; (2) business disparagement; (3) tortious interference with contract; (4) tortious interference with prospective contract and relationship; (5) unfair competition; and (6) civil conspiracy. Francis and Incline filed a general denial and affirmative defenses on July 8, 2022. Francis and Incline filed a motion to dismiss under the TCPA on August 16, 2022. Phoenix filed objections to evidence submitted along with Francis's and Incline's motion to dismiss on September 29, 2022, along with their response to the motion to dismiss. Francis and Incline filed their own motion to strike evidence on October 3, 2022. The trial court held a hearing on the motions to strike as well as the motion to dismiss on October 6, 2022, and entered an order on November 8, 2022 partially granting and partially denying objections from both sides. On November 9, 2022, the trial court entered an order partially granting and partially denying appellants' TCPA

–4–

**APP0131**

motion to dismiss.  More specifically, the order reads that Francis's and Incline's motion to dismiss

> is denied except as to the tortious interference with a [sic] existing contract claim and, to the extent that such claims rest upon statements other than the Taylor email, Plaintiff's defamation and business disparagement claims are dismissed to that extent only.  It is further ordered that movant is awarded $10,000 for reasonable and necessary costs and fees in defending against the dismissed legal action.[3]

Francis and Incline appealed the trial court's ruling on November 23, 2022. In five issues, they complain that the trial court erred: (1) in denying the motion to dismiss regarding the disparagement and defamation claims relying on the Taylor email; (2) in denying the motion to dismiss regarding the tortious interference with prospective contract claim; (3) in denying the motion to dismiss regarding the conspiracy and unfair competition claims; (4) regarding evidentiary objections, which likely resulted in the improper denial of their motion; and (5) by abusing its discretion regarding the fee award.

## II.   APPLICABLE LAW

The TCPA is Texas's anti-SLAPP law, providing a means to dismiss so-called "Strategic Lawsuits Against Public Participation." *Krasnicki v. Tactical Entm't, LLC*, 583 S.W.3d 279, 282 (Tex. App.—Dallas 2019, pet. denied).  The TCPA "protects citizens who petition or speak on matters of public concern from retaliatory

---

[3] The order is unclear whether by "movant" the court means both Francis and Incline, and if so, whether the award is for $10,000 to each party or $10,000 split between the two moving parties.

APP0132

lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding). That protection comes in the form of a motion to dismiss suits, or claims within suits, that appear to stifle the defendant's exercise of those rights. *Barnes v. Kinser*, 600 S.W.3d 506, 509 (Tex. App.—Dallas 2020, pet. denied); *see White Nile Software, Inc. v. Carrington, Coleman, Sloman & Blumenthal, LLP*, No. 05-19-00780-CV, 2020 WL 5104966, at *4 (Tex. App.—Dallas Aug. 31, 2020, pet. denied) (mem. op.). We construe the TCPA liberally to fully effectuate its purpose and intent. TEX. CIV. PRAC. & REM. CODE ANN. § 27.011(b). We review a trial court's ruling on a TCPA motion to dismiss de novo. *Mireskandari v. Casey*, 636 S.W.3d 727, 734 (Tex. App.—Dallas 2021, pet. denied). In our review, we consider the pleadings, evidence a court could consider under civil procedure rule 166a, and any supporting and opposing affidavits stating the facts on which the liability or defense is based. *Id.* at 735.

Under the TCPA, a party may file a motion to dismiss a legal action based on or in response to a party's exercise of the right of free speech. TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a). "Exercise of the right of free speech" means a communication made in connection with a matter of public concern. *Id.* § 27.001(3). A "matter of public concern" is defined as a statement or activity regarding:

> (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity;
>
> (B) a matter of political, social, or other interest to the community; or

APP0133

(C) a subject of concern to the public.

*Id.* § 27.001(7).

The TCPA process generally involves three steps. *Mireskandari*, 636 S.W.3d at 734. First, the TCPA movant has the burden to demonstrate the nonmovant's legal action is based on or in response to the moving party's exercise of the right of association, right of free speech, or the right to petition. *Id.* Second, if the movant meets its step-one burden, the burden of proof shifts to the nonmovant to establish by clear and specific evidence a prima facie case for each essential element of the claim. *Id.* Third, if the nonmovant meets its step-two burden, the burden of proof shifts back to the movant to establish an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law. *Id.* at 735. If the nonmovant either cannot meet its step two burden or the movant establishes an affirmative defense, the motion to dismiss will be granted. *Id.*

## III.   DISCUSSION

### A.   TCPA Step One

Because we review the denial of a motion to dismiss under the TCPA de novo, we first consider whether the appellants have satisfied their step-one burden. *See Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019); *Thomas v. Wm. Charles Bundren & Assocs. Law Grp. PLLC*, No. 05-20-00632-CV, 2021 WL 3159795, at *3 (Tex. App.—Dallas July 26, 2021, no pet.) (mem. op.). In conducting

–7–

our review, we consider the pleadings, evidence a court could consider under Texas Rule of Civil Procedure 166a, and supporting and opposing affidavits stating the facts on which the liability or defense is based. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a). More specifically, we must determine whether the Taylor email, the communication upon which Phoenix's lawsuit rests, constitutes a matter of public concern. *Id.* § 27.001(7). For a movant to trigger the TCPA's dismissal framework, there must first be a "communication" as defined by section 27.001(1). *Id.* § 27.001(1).

The relevant portion of the Taylor email states:

> [T]he fact that their CEO was arrested and convicted for forging a mineral owners [sic] signature in order to defraud her of hundreds of thousands of dollars.

Neither party challenges whether the Taylor email is a "communication." Therefore, we must analyze whether the statement was made while exercising the right of free speech. *See Thomas*, 2021 WL 3159795, at \*5. The "exercise of the right of free speech" means "a communication made in connection with a matter of public concern." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3).

A "matter of public concern" means "a statement or activity regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter

of political, social, or other interest to the community; or (C) a subject of concern to the public." *See id.* § 27.001(7)(A)–(C).[4]

We are constrained by this court's interpretation of "matter of public concern," which includes within its ambit "criminal acts." *See Garcia v. Semler*, 663 S.W.3d 270, 281 (Tex. App.—Dallas 2022, no pet.) (communication alleging theft of estate sale signs is a matter of public concern because "[i]t is well-settled that even after the 2019 amendments, 'criminal acts are matters of public concern'"); *Austin v. Amundson*, No. 05-22-00066-CV, 2022 WL 16945911, at *3 (Tex. App.—Dallas Nov. 15, 2022, no pet.) (mem. op.) (allegation of road rage is a matter of public concern); *Page v. Bakewell*, No. 05-21-00905-CV, 2022 WL 4007879, at *4 (Tex. App.—Dallas Sept. 2, 2022, no pet.) (mem. op.) (communication alleging the hiring of a hit man to "take care" of ex-wife is a matter of public concern); *Beard v. McGregor Bancshares, Inc.*, No. 05-21-00478-CV, 2022 WL 1076176, at *6 (Tex. App.—Dallas Apr. 11, 2022, pet. denied) (mem. op.) (statements about the killing of Joanna Gaines' goats implicated a matter of public concern because they concerned criminal activity); *Miller v. Schupp*, No. 02-21-00107-CV, 2022 WL 60606, at *2 (Tex. App.—Fort Worth Jan. 6, 2022, no pet.) (mem. op.) (Instagram

---

[4] In 2019, the legislature amended the definition of "matter of public concern." The prior definition included: "(A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." Act of May 18, 2011, 82nd Leg., R.S., Ch. 341, 2011 Tex. Gen. Laws 961, 962 (current version at Tex. Civ. Prac. & Rem. Code Ann. § 27.001(7)).

APP0136

message alleging drug addition, sexual assault, and physical assault is a matter of public concern); *CBS Stations Grp. of Tex., LLC v. Burns*, No. 05-21-00042-CV, 2021 WL 4398031, at *3 (Tex. App.—Dallas Sept. 27, 2021, no pet.) (mem. op.) (news broadcast involving robbery, high-speed chase, and arrest of suspect is a matter of public concern).

Incline's accusation that Phoenix's CEO "was arrested and convicted for forging a mineral owners [sic] signature in order to defraud her of hundreds of thousands of dollars" is a communication regarding an allegation of criminal activity. *See* TEX. PENAL CODE ANN. § 32.21 (forgery). Phoenix argues, however, that this particular communication is not a subject of concern to the public because the allegation was made in a private communication, between private parties, regarding a private transaction, which affects only the fortunes of the parties to the communication.   Phoenix asks this court to reject a bright line rule that all communications regarding criminal activity are a matter of public concern, without regard to the content, form, and context of the speech.  *See Saks & Co., LLC v. Li*, 653 S.W.3d 306, 316 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (finding "dubious" the proposition that any statement about the commission of a crime is matter of public concern). Phoenix asserts that the content, form, and context of the speech removes it from the scope of a matter of public concern because the Taylor email was not addressed to the community and was not a news report, a statement made to law enforcement, or a public social media post.

−10−

We need not reach the broader question of whether every communication regarding criminal activity is a subject of concern to the public because the Taylor email fits squarely within the scope of "public concern" that has been adopted by this court. Phoenix's focus on the fact that the allegation was shared in a private email is misplaced because whether Incline had posted its allegations of criminal activity on a public social media post, rather than in a private email, does not change the subject matter of the allegation or the TCPA analysis. The TCPA does not require a communication to be public in order for it to constitute a matter of public concern. *See Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015) (per curiam) (holding that despite the private context of a private email regarding the employment of a nurse anesthetist, the communication nevertheless amounted to a matter of public concern because it regarded the provision of medical services by a health care professional).[5]

Because the Taylor email regards a matter of public concern, we conclude that Francis and Incline have satisfied their step-one burden. *See Page*, 2022 WL

---

[5] During oral argument and in subsequent briefing, the parties considered the applicability of *Morris v. Daniel*, 615 S.W.3d 571, 573, 578 (Tex. App.—Houston [1st Dist.] 2020, no pet.), to the present case. We find *Morris* distinguishable. In that case, the general subject of the communication, the health and safety of children, was a matter of public concern, but the specific issue identified in the communication, the health and safety of one child, was not because it affected only the concerns of that specific child. *Id.* By contrast, the criminal history and continued involvement of Ferrari with a large-scale oil and gas company is potentially relevant to anyone involved in the buying and selling of mineral rights in the areas the parties do business. The present case is therefore more analogous to *Lippincott*. *See Lippincott*, 462 S.W.3d at 508, discussed above.

4007879, at *4; *Beard*, 2022 WL 1076176, at *6. We now turn to consider whether Phoenix satisfied its burden under step two.

## B.    TCPA Step Two

Because Francis and Incline satisfied their initial burden, we now move to step two of the burden-shifting analysis: whether Phoenix established by clear and specific evidence a prima facie case for each essential element of its claims for defamation,[6] defamation per se, business disparagement,[7] tortious interference,[8] and civil conspiracy.[9] [10] TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).

---

[6] The elements of a defamation action include (1) publication of a false statement of fact to a third party; (2) that was defamatory concerning the plaintiff; (3) with the requisite degree of fault; and (4) caused damages. *In re Lipsky*, 460 S.W.3d at 594. The plaintiff must plead and prove damages, unless the defamatory statements are defamatory per se. *Id.* at 593. Defamation per se refers to statements that are so obviously harmful that general damages may be presumed. *See id.* at 592. The elements of a defamation per se claim are similar to that of a claim for defamation and differ only in that damages are presumed. *See Van Der Linden v. Khan*, 535 S.W.3d 179, 198 (Tex. App.—Fort Worth 2017, pet. denied).

[7] To prevail on a business disparagement claim, the plaintiff must establish that (1) the defendant published disparaging words about the plaintiff's economic interests; (2) with malice; (3) without privilege; (4) that resulted in special damages. *Marketshare Telecom, L.L.C. v. Ericsson*, 198 S.W.3d 908, 924–25 (Tex. App.—Dallas 2006, no pet.).

[8] The elements of a tortious interference with prospective business relations claim are: (1) there was a reasonable probability that plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). Phoenix plead tortious interference with existing contract but limits itself to tortious interference with prospective contract and business relations on appeal.

[9] The elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *RTLC AG Prod. Inc. v. Treatment Equip. Co.*, 195 S.W.3d 824, 833 (Tex. App.—Dallas 2006, no pet.).

[10] Phoenix also pleaded "unfair competition" but provided no elements or legal analysis to support its claim beyond the mere assertion that Francis's defamatory and tortious conduct constituted unfair competition. Accordingly, Phoenix has not presented anything for our review on this claim. TEX. R. APP. P. 38.1.

–12–

"[A prima facie case, in its traditional legal meaning] refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *In re Lipsky*, 460 S.W.3d at 590. A prima facie standard generally requires only the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding) (per curiam)). "Prima facie evidence is evidence that, until its effect is overcome by other evidence, will suffice as proof of a fact in issue. In other words, a prima facie case is one that will entitle a party to recover if no evidence to the contrary is offered by the opposite party." *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 726 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citation omitted), *disapproved on other grounds by In re Lipsky*, 460 S.W.3d at 587–88).

"[A] plaintiff must provide enough detail to show the factual basis for its claim." *In re Lipsky*, 460 S.W.3d at 591; *see D Magazine Partners, L.P. v. Rosenthal*, 475 S.W.3d 470, 480 (Tex. App.—Dallas 2015), *aff'd in part, rev'd in part on other grounds*, 529 S.W.3d 429 (Tex. 2017). "Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case." *Serafine v. Blunt*, 466 S.W.3d 352, 358 (Tex. App.—Austin 2015, no pet.) (op. on reh'g). In other words, "bare, baseless opinions" are not "a sufficient substitute for the clear and specific evidence required to establish a prima facie case" under the Act. *In re*

–13–

APP0140

*Lipsky*, 460 S.W.3d at 592. "Opinions must be based on demonstrable facts and a reasoned basis." *Id.* at 593.

### 1. Defamation, business disparagement, tortious interference with prospective contract, and civil conspiracy

With the sole exception of defamation per se, all of Phoenix's causes of action require a showing of damages; therefore, we turn first to evaluating whether Phoenix established a prima facie case of damages.

Phoenix alleges that the evidence shows that the Taylor email "(1) interfered with and disrupted Phoenix's business and economic interest with Taylor and her family; (2) harmed Phoenix's reputation; (3) caused Taylor not to do business with or sell mineral rights to Phoenix; and (4) caused Taylor to do business with and sell mineral rights to Incline despite Incline's substantially inferior 'low ball' offer." The evidence Phoenix relies on to support this assertion is the Taylor email itself as well as the fact that Krystal did not ultimately sell mineral rights to Phoenix. However, Phoenix fails to address the timeline of events showing that Incline and Krystal had already entered into a contract for the subject mineral rights prior to Phoenix's involvement.

According to the mineral and royalty deed offered by Phoenix as an exhibit to its response to the TCPA motion to dismiss, the deed transferring Krystal's mineral rights to Incline was effective as of April 1, 2021, was signed and notarized by Sheila Krystal on May 19, 2021, and was recorded in the Dunn County records on June 2,

2021. Phoenix's CFO, Curtis Allen, attests that the interests conveyed in that deed are the same interests that are the subject of Phoenix's offer referenced in Taylor's email. This evidence shows that, at the very latest, the transaction at issue between Krystal and Incline was completed by June 2, 2021. The Taylor email upon which Phoenix's claims are based was not sent until June 17, 2021. By the time Francis sent the Taylor email the mineral rights had already been transferred to Incline. Accordingly, the email came too late for any prospective interference with Phoenix's interests in the subject mineral rights.

Further, a close reading of the email from Taylor that prompted Francis's response does not support Phoenix's allegations that, if not for the Taylor email, the Krystal family would have sold its interests to Phoenix because its offer was twice that of Incline's. Instead, Taylor describes ongoing negotiations between Francis/Incline and Taylor regarding the price discrepancy in an attempt to seek a resolution. Taylor notes that "[w]e do very much appreciate your offer to make things right by honoring any other official offers during that time period" and provides Francis with the details of Phoenix's offer, ostensibly so that Incline could address the discrepancy as discussed. There is no suggestion in Taylor's email that she or the family were planning to breach their existing contract with Incline or to enter into a new agreement with Phoenix—every indication in the email instead suggests an ongoing attempt to resolve discrepancies with Incline despite Phoenix's higher offer.

–15–

**APP0142**

Phoenix's Manager and COO Lindsey Wilson alleges in her affidavit that "Phoenix was close to closing the transaction with Ms. Krystal and Ms. Taylor, but after the email from Francis, Ms. Taylor had doubts about Phoenix and Incline ultimately purchased the mineral rights." However, not only is this statement contradicted by the clear timeline of events, her allegation that Phoenix was "close to closing the transaction" is unsupported by any evidence in the record. Phoenix offers no other evidence to support its assertion that the Taylor email caused damages.

Phoenix failed to establish a prima facie case for the essential element of damages; therefore, we sustain Francis's and Incline's first, second, and third issues as they apply to the defamation, business disparagement, tortious interference with prospective contract, and civil conspiracy claims. *See In re Lipsky*, 460 S.W.3d at 592.

### 2. *Defamation per se*

In addition to its other causes of action, Phoenix pled defamation per se. Unlike Phoenix's other causes of action, defamation per se does not require a showing of damages. *See Van Der Linden*, 535 S.W.3d at 198. Therefore, Phoenix can still carry its step two burden by making a prima facie showing of the elements of a defamation per se claim. *See id.*

Defamation per se refers to statements that are so obviously harmful that general damages may be presumed. *See In re Lipsky*, 460 S.W.3d at 592. General

–16–

APP0143

damages include non-economic losses, such as loss of reputation and mental anguish. *Id.* Defamation per se is itself broken down into separate categories of falsehoods. *Id.* at 596. Accusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se. *Id.* Remarks that adversely reflect on a person's fitness to conduct his or her business or trade are also deemed defamatory per se. *Id.* And whether a statement qualifies as defamation per se is generally a question of law. *Id.* If false and disparaging statements injure a corporation's reputation, it can sue for defamation per se just like flesh-and-blood individuals. *Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 151 (Tex. 2014). Francis and Incline do not argue that defamation per se is inapplicable to the facts of this case; therefore, we turn to consider whether Phoenix satisfied its step two burden on each element of defamation per se.

The elements of a defamation per se claim are similar to that of a claim for defamation: (1) the publication of a false statement of fact to a third party; (2) that was defamatory concerning the plaintiff; (3) with the requisite degree of fault. *In re Lipsky*, 460 S.W.3d at 593. Defamation per se differs only in that damages are presumed. *Van Der Linden*, 535 S.W.3d at 198.

a. *Publication of a false statement*

Francis and Incline first contend that Phoenix cannot meet its burden on the first element of defamation per se because the allegedly defamatory statement in the

–17–

Taylor email was true "in its gist."   Truth in the "gist" exists where the actual statement is no more "damaging to the person affected by it than a literally true statement would have been." *River Oaks L-M. Inc. v. Vinton-Duarte*, 469 S.W.3d 213, 239–40 (Tex. App.—Houston [14th Dist.] 2015, no pet.).   To support this argument, they assert that the statement at issue is "Phoenix's CEO, Adam Ferrari, is a felon," and argue that because Ferrari pled guilty to a felony, the statement is true in its gist even though Ferrari ultimately completed probation and was cleared of the felony charges as a result.

However, Francis's and Incline's assertion ignores the plain text of the statement in an attempt to distinguish what Francis allegedly "meant" from what he actually said.   Unlike appellants' rewriting of the statement, the actual email said "the fact that their CEO was arrested and convicted for forging a mineral owners signature in order to defraud her of hundreds of thousands of dollars."   A factual restatement of the allegedly disparaging statement at issue, then, can be condensed to "Phoenix's CEO is a felon," and Phoenix has met its burden of providing competent evidence demonstrating that Phoenix does not have a CEO and that none of its executives have been convicted of a felony.

### b. *Defamatory concerning the plaintiff*

Francis and Incline argue that Phoenix cannot meet its burden on this element because Phoenix failed to address how or why the email's assertion of Ferrari's relationship with Phoenix was defamatory; however, this again requires us to read

–18–

**APP0145**

additional words into the Taylor email that are not there. Francis and Incline do not argue that the statement "Phoenix's CEO is a felon" is not defamatory; indeed, Texas law provides that this is exactly the type of statement that satisfies the showing required under a defamation per se standard. *See In re Lipsky*, 460 S.W.3d at 596 (holding remarks that adversely reflect on a person's fitness to conduct his or her business or trade are defamatory per se). Therefore, Phoenix has established a prima facie showing of the second element of defamation per se.

### c. *Requisite degree of fault*

A private individual need only prove negligence to prevail on a defamation per se claim. *Id.* at 593. To prove negligence, a private individual must show "that the publisher . . . knew or should have known that the defamatory statement was false." *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex. 1976). Although appellants allege that they believe that a felon (Ferrari) actually is acting as Phoenix's CEO despite their attempts to conceal the extent of his involvement, the court must review the evidence in the light most favorable to Phoenix, the claimant/nonmovant. *Dyer v. Medoc Health Servs., LLC*, 573 S.W.3d 418, 424 (Tex. App.—Dallas 2019, pet. denied). The evidence provided by Phoenix satisfies a prima facie showing that Incline and Francis, as regular business competitors experienced in dealing with Phoenix and its executives, should have known that the statement was false, despite its allegations of having conducted research that created the suspicion of Ferrari's deeper involvement with Phoenix. *See D Magazine*

–19–

APP0146

*Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 437–40 (Tex. 2017) (holding that a prima facie showing of negligence was made in spite of evidence that raised suspicion of the allegedly defamatory statement's truth).

Because Phoenix has satisfied its step two burden regarding its defamation per se claim, we turn to step three of the TCPA analysis. *See Mireskandari*, 636 S.W.3d at 735.

## C.   TCPA Step Three

If the nonmovant meets its step-two burden, the burden of proof shifts back to the movant to establish an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law. *Id.* One such affirmative defense to defamation per se is privilege, an affirmative defense which Francis and Incline pled. *See In re Lipsky*, 460 S.W.3d at 592; *Butler v. Cent. Bank & Tr. Co.*, 458 S.W.2d 510, 514 (Tex. App.—Dallas 1970, writ dism'd).

Qualified privilege in the context of defamation includes all communications made in good faith on any subject matter in which the author has an interest. *Id.* Circumstances that may give rise to the privilege include:

> (1) a belief that publication protects the publisher's interest; (2) a belief that publication protects the interest of certain recipients or third persons; (3) a belief that a person sharing a common interest in the published information is entitled to know that information…and (5) a belief that an important public interest requires publication.

*Steinhaus v. Beachside Envtl. LLC*, 590 S.W.3d 672, 677 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). As discussed in detail above, at the time of the Taylor

APP0147

email, Incline produced evidence demonstrating that it had an existing contract with the Krystal family as well as an ongoing business relationship which Phoenix was attempting to disrupt. Accordingly, we conclude that Francis and Incline have provided evidence raising the affirmative defense of privilege, and we remand the case to the trial court for further consideration of this issue. *See id.*

Because we sustain issues one through three, we need not address appellants' fourth issue. TEX. R. APP. P. 47.1. Further, our disposition of issues one through three require us to remand the case to the trial court for reconsideration of the award of attorney's fees challenged in issue five; therefore, we do not address it here. *Id.*

## IV.   CONCLUSION

We reverse the portions of the trial court's judgment denying dismissal of Phoenix's claims for: (1) disparagement; (2) defamation; (3) tortious interference with prospective contract; (4) conspiracy; and (5) unfair competition. We affirm the portion of the trial court's judgment denying dismissal of Phoenix's claim for defamation per se, and we remand the case for further proceedings on that cause of action as well as on the issue of attorney's fees.

221260f.p05

/Maricela Breedlove/
_____
MARICELA BREEDLOVE
JUSTICE

–21–

APP0148